# Exhibit 40

12.6.2014    EN    Official Journal of the European Union    L 173/349

### DIRECTIVE 2014/65/EU OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL

#### of 15 May 2014

#### on markets in financial instruments and amending Directive 2002/92/EC and Directive 2011/61/EU

#### (recast)

#### (Text with EEA relevance)

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 53(1) thereof,

Having regard to the proposal from the European Commission,

After transmission of the draft legislative act to the national parliaments,

Having regard to the opinion of the European Central Bank (¹),

Having regard to the opinion of the European Economic and Social Committee (²),

Acting in accordance with the ordinary legislative procedure (³),

Whereas:

(1) Directive 2004/39/EC of the European Parliament and of the Council (⁴) has been substantially amended several times (⁵). Since further amendments are to be made, it should be recast in the interests of clarity.

(2) Council Directive 93/22/EEC (⁶) sought to establish the conditions under which authorised investment firms and banks could provide specified services or establish branches in other Member States on the basis of home country authorisation and supervision. To that end, that Directive aimed to harmonise the initial authorisation and operating requirements for investment firms including conduct of business rules. It also provided for the harmonisation of some conditions governing the operation of regulated markets.

(3) In recent years more investors have become active in the financial markets and are offered an even more complex wide-ranging set of services and instruments. In view of those developments the legal framework of the Union should encompass the full range of investor-oriented activities. To that end, it is necessary to provide for the degree of harmonisation needed to offer investors a high level of protection and to allow investment firms to provide services throughout the Union, being an internal market, on the basis of home country supervision. Directive 93/22/EEC was therefore replaced by Directive 2004/39/EC.

(4) The financial crisis has exposed weaknesses in the functioning and in the transparency of financial markets. The evolution of financial markets has exposed the need to strengthen the framework for the regulation of markets in financial instruments, including where trading in such markets takes place over-the-counter (OTC), in order to increase transparency, better protect investors, reinforce confidence, address unregulated areas, and ensure that supervisors are granted adequate powers to fulfil their tasks.

---

(¹) OJ C 161, 7.6.2012, p. 3.
(²) OJ C 191, 29.6.2012, p. 80.
(³) Position of the European Parliament of 15 April 2014 (not yet published in the Official Journal) and decision of the Council of 13 May 2014.
(⁴) Directive 2004/39/EC of the European Parliament and of the Council of 21 April 2004 on markets in financial instruments amending Council Directives 85/611/EEC and 93/6/EEC and Directive 2000/12/EC of the European Parliament and of the Council and repealing Council Directive 93/22/EEC (OJ L 145, 30.4.2004, p. 1).
(⁵) See Annex III, Part A.
(⁶) Council Directive 93/22/EEC of 10 May 1993 on investment services in the securities field (OJ L 141, 11.6.1993, p. 27).

(5)  There is agreement among regulatory bodies at international level that weaknesses in corporate governance in a number of financial institutions, including the absence of effective checks and balances within them, have been a contributory factor to the financial crisis. Excessive and imprudent risk taking may lead to the failure of individual financial institutions and systemic problems in Member States and globally. Incorrect conduct of firms providing services to clients may lead to investor detriment and loss of investor confidence. In order to address the potentially detrimental effect of those weaknesses in corporate governance arrangements, Directive 2004/39/EC should be supplemented by more detailed principles and minimum standards. Those principles and standards should apply taking into account the nature, scale and complexity of investment firms.

(6)  The High-Level Group on Financial Supervision in the EU invited the Union to develop a more harmonised set of financial regulation. In the context of the future European supervision architecture, the European Council of 18 and 19 June 2009 also stressed the need to establish a European single rulebook applicable to all financial institutions in the internal market.

(7)  Directive 2004/39/EC should therefore now partly be recast as this Directive and partly replaced by Regulation (EU) No 600/2014 of the European Parliament and the Council (¹). Together, both legal instruments should form the legal framework governing the requirements applicable to investment firms, regulated markets, data reporting services providers and third country firms providing investment services or activities in the Union. This Directive should therefore be read together with that Regulation. This Directive should contain the provisions governing the authorisation of the business, the acquisition of qualifying holding, the exercise of the freedom of establishment and of the freedom to provide services, the operating conditions for investment firms to ensure investor protection, the powers of supervisory authorities of home and host Member States and the regime for imposing sanctions. Since the main objective and subject-matter of this Directive is to harmonise national provisions concerning the areas referred to, it should be based on Article 53(1) of the Treaty on the Functioning of the European Union (TFEU). The form of a Directive is appropriate in order to enable the implementing provisions in the areas covered by this Directive, when necessary, to be adjusted to any existing specificities of the particular market and legal system in each Member State.

(8)  It is appropriate to include in the list of financial instruments commodity derivatives and others which are constituted and traded in such a manner as to give rise to regulatory issues comparable to traditional financial instruments.

(9)  The scope of financial instruments will include physically settled energy contracts traded on an organised trading facility (OTF), except for those already regulated under Regulation (EU) No 1227/2011 of the European Parliament and the Council (²). Several measures have been taken to mitigate the impact of such an inclusion on firms trading those products. Those firms are today exempt from own funds requirements under Regulation (EU) No 575/2013 of the European Parliament and of the Council (³) and that exemption will be the subject of a review under Article 493(1) of that Regulation before it expires at the latest at the end of 2017. Those contracts being financial instruments, financial markets law requirements would apply from the onset, thus position limits, transaction reporting and market abuse requirements would apply as from the date of entry into application of this Directive and of Regulation (EU) No 600/2014. However a phasing-in period of 42 months is provided for the application of the clearing obligation and the margining requirements set out in Regulation (EU) No 648/2012 of the European Parliament and of the Council (⁴).

(10)  The limitation of the scope concerning commodity derivatives traded on an OTF and physically settled should be limited to avoid a loophole that may lead to regulatory arbitrage. It is therefore necessary to provide for a delegated act to further specify the meaning of the expression 'must be physically settled' taking into account at least the creation of an enforceable and binding obligation to physically deliver, which cannot be unwound and with no right to cash settle or offset transactions except in the case of force majeure, default or other bona fide inability to perform.

---

(¹)  Regulation (EU) No 600/2014 of the European Parliament and the Council of 15 May 2014 on markets in financial instruments and amending Regulation (EU) No 648/2012 (see page 84 of this Official Journal).
(²)  Regulation (EU) No 1227/2011 of the European Parliament and of the Council of 25 October 2011 on wholesale energy market integrity and transparency (OJ L 326, 8.12.2011, p. 1).
(³)  Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No 648/2012 (OJ L 176, 27.6.2013, p. 1).
(⁴)  Regulation (EU) No 648/2012 of the European Parliament and of the Council of 4 July 2012 on OTC derivatives, central counter-parties and trade repositories (OJ L 201, 27.7.2012, p. 1).

(11) A range of fraudulent practices have occurred in spot secondary markets in emission allowances (EUA) which could undermine trust in the emissions trading scheme, set up by Directive 2003/87/EC of the European Parliament and of the Council (¹), and measures are being taken to strengthen the system of EUA registries and conditions for opening an account to trade EUAs. In order to reinforce the integrity and safeguard the efficient functioning of those markets, including comprehensive supervision of trading activity, it is appropriate to complement measures taken under Directive 2003/87/EC by bringing emission allowances fully into the scope of this Directive and of Regulation (EU) No 600/2014 of the European Parliament and of the Council (²), by classifying them as financial instruments.

(12) The purpose of this Directive is to cover undertakings the regular occupation or business of which is to provide investment services and/or perform investment activities on a professional basis. Its scope should therefore not cover any person with a different professional activity.

(13) It is necessary to establish a comprehensive regulatory regime governing the execution of transactions in financial instruments irrespective of the trading methods used to conclude those transactions so as to ensure a high quality of execution of investor transactions and to uphold the integrity and overall efficiency of the financial system. A coherent and risk-sensitive framework for regulating the main types of order-execution arrangement currently active in the European financial marketplace should be provided for. It is necessary to recognise the emergence of a new generation of organised trading systems alongside regulated markets which should be subjected to obligations designed to preserve the efficient and orderly functioning of financial markets and to ensure that such organised trading systems do not benefit from regulatory loopholes.

(14) All trading venues, namely regulated markets, multilateral trading facilities (MTFs), and OTFs, should lay down transparent and non-discriminatory rules governing access to the facility. However, while regulated markets and MTFs should continue to be subject to similar requirements regarding whom they may admit as members or participants, OTFs should be able to determine and restrict access based, inter alia, on the role and obligations which they have in relation to their clients. In that regard, trading venues should be able to specify parameters governing the system such as minimum latency provided that that is done in an open and transparent manner and does not involve discrimination by the platform operator.

(15) A central counterparty (CCP) is defined in Regulation (EU) No 648/2012 as a legal person that interposes itself between the parties to the contracts traded on one or more financial markets, becoming the buyer to every seller and the seller to every buyer. CCPs are not covered by the term OTF as defined in this Directive.

(16) Persons having access to regulated markets or MTFs are referred to as members or participants. Both terms may be used interchangeably. Those terms do not include users who only access the trading venues via direct electronic access.

(17) Systematic internalisers should be defined as investment firms which, on an organised, frequent, systematic and substantial basis, deal on own account when executing client orders outside a regulated market, an MTF or an OTF. In order to ensure the objective and effective application of that definition to investment firms, any bilateral trading carried out with clients should be relevant and criteria should be developed for the identification of investment firms required to register as systematic internalisers. While trading venues are facilities in which multiple third party buying and selling interests interact in the system, a systematic internaliser should not be allowed to bring together third party buying and selling interests in functionally the same way as a trading venue.

(18) Persons administering their own assets and undertakings, who do not provide investment services or perform investment activities other than dealing on own account in financial instruments which are not commodity derivatives, emission allowances or derivatives thereof, should not be covered by the scope of this Directive unless they are market makers, members or participants of a regulated market or an MTF or have direct electronic access to a trading venue, apply a high-frequency algorithmic trading technique, or deal on own account when executing client orders.

---

(¹) Directive 2003/87/EC of the European Parliament and of the Council of 13 October 2003 establishing a scheme for greenhouse gas emission allowance trading within the Community and amending Council Directive 96/61/EC (OJ L 275, 25.10.2003, p. 32).
(²) Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (market abuse Regulation) and repealing Directive 2003/6/EC of the European Parliament and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC (see page 1 of this Official Journal).

(19) The communiqué of the G20 finance ministers and central bank governors of 15 April 2011 states that participants on commodity derivatives markets should be subject to appropriate regulation and supervision and therefore certain exemptions from Directive 2004/39/EC are to be modified.

(20) Persons who deal on own account, including market makers, in commodity derivatives, emission allowances or derivatives thereof, excluding persons who deal on own account when executing client orders, or who provide investment services in commodity derivatives or emission allowances or derivatives thereof to the customers or suppliers of their main business should not be covered by the scope of this Directive, provided that that activity is an ancillary activity to their main business on a group basis, and that main business is neither the provision of investment services within the meaning of this Directive nor of banking activities within the meaning of Directive 2013/36/EU of the European Parliament and of the Council (¹), nor market making in commodity derivatives, and those persons do not apply a high-frequency algorithmic trading technique. Technical criteria for when an activity is ancillary to such a main business should be clarified in regulatory technical standards, taking into account the criteria specified in this Directive.

Those criteria should ensure that non-financial firms dealing in financial instruments in a disproportionate manner compared with the level of investment in the main business are covered by the scope of this Directive. In doing so, those criteria should take at least into consideration, the need for ancillary activities to constitute a minority of activities at group level and the size of their trading activity compared to the overall market trading activity in that asset class. It is appropriate that where the obligation to provide liquidity on a venue is required by regulatory authorities in accordance with Union or national laws, regulations and administrative provisions or by trading venues, the transactions entered into to meet such an obligation should be excluded in the assessment of whether the activity is ancillary.

(21) For the purposes of this Directive and of Regulation (EU) No 600/2014, which regulate both OTC and exchange-traded derivatives within the meaning of Regulation (EU) No 600/2014, activities that are deemed to be objectively measurable as reducing risks directly relating to the commercial activity or treasury financing activity and intragroup transactions should be considered in a consistent way with Regulation (EU) No 648/2012.

(22) Persons that deal in commodity derivatives, emission allowance and derivatives thereof may also deal in other financial instruments as part of their commercial treasury risk management activities to protect themselves against risks, such as exchange rate risks. Therefore, it is important to clarify that exemptions apply cumulatively. For example, the exemption in point (j) of Article 2(1) can be used in conjunction with the exemption in point (d) of Article 2(1).

(23) However, in order to avoid any potential misuse of exemptions, market makers in financial instruments, other than market makers in commodity derivatives, emission allowances or derivatives thereof provided that their market making activity is ancillary to their main business considered on a group basis and provided that they do not apply a high-frequency algorithmic trading technique, should be covered by the scope of this Directive and should not benefit from any exemption. Persons dealing on own account when executing client orders or applying a high-frequency algorithmic trading technique should also be covered by the scope of this Directive and should not benefit from any exemption.

(24) Dealing on own account when executing client orders should include firms executing orders from different clients by matching them on a matched principal basis (back-to-back trading), which should be regarded as acting as principal and should be subject to the provisions of this Directive covering both the execution of orders on behalf of clients and dealing on own account.

(25) The execution of orders in financial instruments as an ancillary activity between two persons whose main business, on a group basis, is neither the provision of investment services within the meaning of this Directive nor of banking activities within the meaning of Directive 2013/36/EU should not be considered to be dealing on own account when executing client orders.

---

(¹) Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC (OJ L 176, 27.6.2013, p. 338).

12.6.2014          EN          Official Journal of the European Union          L 173/353

(26)    References in the text to persons should be understood as including both natural and legal persons.

(27)    Insurance or assurance undertakings the activities of which are subject to appropriate monitoring by the competent prudential-supervision authorities and which are subject to Directive 2009/138/EC of the European Parliament and of the Council (¹) should be excluded from the scope of this Directive when carrying out the activities referred to in that Directive.

(28)    Persons who do not provide services for third parties but whose business consists in providing investment services solely for their parent undertakings, for their subsidiaries, or for other subsidiaries of their parent undertakings should not be covered by this Directive.

(29)    Some local energy utilities and some operators of industrial installations covered by the EU Emissions Trading Scheme bundle and out-source their trading activities for hedging commercial risks to non-consolidated subsidiaries. Those joint venture companies do not provide any other services and perform exactly the same function as the persons referred to in Recital 28. In order to ensure a level playing field, it should also be possible to exclude joint venture companies from the scope of this Directive if they are jointly held by local energy utilities or operators falling within point (f) of Article 3 of Directive 2003/87/EC who do not provide any services other than investment services for local energy utilities or operators falling within point (f) of Article 3 of Directive 2003/87/EC, and provided that those local energy utilities or those operators will be exempt under point (j) of Article 2(1) should they carry out those investment services themselves. However, in order to ensure that the appropriate safeguards are in place and that investors are adequately protected, Member States that choose to exempt such joint ventures should subject them to requirements at least analogous to the ones laid down in this Directive, in particular during the phase of authorisation, in the assessment of their reputation and experience and of the suitability of any shareholders, in the review of the conditions for initial authorisation and on-going supervision as well as on conduct of business obligations.

(30)    Persons who provide investment services only on an incidental basis in the course of professional activity should also be excluded from the scope of this Directive, provided that that activity is regulated and the relevant rules do not prohibit the provision, on an incidental basis, of investment services.

(31)    Persons who provide investment services consisting exclusively in the administration of employee-participation schemes and who therefore do not provide investment services for third parties should not be covered by this Directive.

(32)    It is necessary to exclude from the scope of this Directive central banks and other bodies performing similar functions as well as public bodies charged with or intervening in the management of public debt, which concept covers the investment thereof, with the exception of bodies that are partly or wholly state-owned the role of which is commercial or linked to the acquisition of holdings.

(33)    In order to clarify the regime of exemptions for the European System of Central Banks (ESCB), other national bodies performing similar functions and bodies intervening in the management of public debt, it is appropriate to limit such exemptions to the bodies and institutions performing their functions in accordance with the law of one Member State or in accordance with the Union law, as well as to international bodies of which two or more Member States are members and which have the purpose of mobilising funding and providing financial assistance to the benefit of their members that are experiencing or threatened by severe financing problems, such as the European Stability Mechanism.

(34)    It is necessary to exclude from the scope of this Directive collective investment undertakings and pension funds whether or not coordinated at Union level, and the depositaries or managers of such undertakings, since they are subject to specific rules directly adapted to their activities.

---

(¹) Directive 2009/138/EC of the European Parliament and of the Council of 25 November 2009 on the taking-up and pursuit of the business of Insurance and Reinsurance (Solvency II) (OJ L 335, 17.12.2009, p. 1).

(35) It is necessary to exclude from the scope of this Directive transmission system operators as defined in Article 2(4) of Directive 2009/72/EC of the European Parliament and of the Council ([1]) or Article 2(4) of Directive 2009/73/EC of the European Parliament and of the Council ([2]) when carrying out their tasks under those Directives, under Regulation (EC) No 714/2009 of the European Parliament and of the Council ([3]), under Regulation (EC) No 715/2009 of the European Parliament and of the Council ([4]) or under network codes or guidelines adopted pursuant to those legislative acts. In accordance with those legislative acts, transmission system operators have specific obligations and responsibilities, are subject to specific certification and are supervised by sector specific competent authorities. Transmission system operators should also benefit from such an exemption where they use other persons acting as service providers on their behalf to carry out their task under those legislative acts or under network codes or guidelines adopted pursuant to those Regulations. Transmission system operators should not be able to benefit from such an exemption when providing investment services or activities in financial instruments, including when operating a platform for secondary trading in financial transmission rights.

(36) In order to benefit from the exemptions from this Directive, the person concerned should comply on a continuous basis with the conditions laid down for such exemptions. In particular, if a person provides investment services or performs investment activities and is exempt from this Directive because such services or activities are ancillary to that person's main business, when considered on a group basis, that person should no longer be covered by the exemption relating to ancillary services where the provision of those services or activities ceases to be ancillary to that person's main business.

(37) Persons who provide the investment services and/or perform investment activities covered by this Directive should be subject to authorisation by their home Member States in order to protect investors and the stability of the financial system.

(38) Credit institutions that are authorised under Directive 2013/36/EU should not need another authorisation under this Directive in order to provide investment services or perform investment activities. When a credit institution decides to provide investment services or perform investment activities the competent authorities, before granting an authorisation under Directive 2013/36/EU, should verify that it complies with the relevant provisions of this Directive.

(39) Structured deposits have emerged as a form of investment product but are not covered under any legislative act for the protection of investors at Union level, while other structured investments are covered by such legislative acts. It is therefore appropriate to strengthen the confidence of investors and to make regulatory treatment concerning the distribution of different packaged retail investment products more uniform in order to ensure an adequate level of investor protection across the Union. For that reason, it is appropriate to include in the scope of this Directive structured deposits. In this regard, it is necessary to clarify that since structured deposits are a form of investment product, they do not include deposits linked solely to interest rates, such as Euribor or Libor, regardless of whether or not the interest rates are predetermined, or whether they are fixed or variable. Such deposits should therefore be excluded from the scope of this Directive.

(40) The application of this Directive to investment firms and credit institutions when selling or advising clients in relation to structured deposits, should be understood as when acting as intermediaries for those products issued by credit institutions that can take deposits in accordance with Directive 2013/36/EU.

(41) Central securities depositaries (CSDs) are systemically important institutions for financial markets that ensure the initial recording of securities, the maintenance of the accounts containing the securities issued and the settlement of virtually all trades of securities. CSDs are to be specifically regulated under Union law and subject, in particular, to authorisation and certain operating conditions. However, CSDs might, in addition to the core services referred to in other Union law, provide investment services and activities which are regulated under this Directive.

---

([1]) Directive 2009/72/EC of the European Parliament and of the Council of 13 July 2009 concerning common rules for the internal market in electricity and repealing Directive 2003/54/EC (OJ L 211, 14.8.2009, p. 55).
([2]) Directive 2009/73/EC of the European Parliament and of the Council of 13 July 2009 concerning common rules for the internal market in natural gas and repealing Directive 2003/55/EC (OJ L 211, 14.8.2009, p. 94).
([3]) Regulation (EC) No 714/2009 of the European Parliament and of the Council of 13 July 2009 on conditions for access to the network for cross-border exchanges in electricity and repealing Regulation (EC) No 1228/2003 (OJ L 211, 14.8.2009, p. 15).
([4]) Regulation (EC) No 715/2009 of the European Parliament and of the Council of 13 July 2009 on conditions for access to the natural gas transmission networks and repealing Regulation (EC) No 1775/2005 (OJ L 211, 14.8.2009, p. 36).

12.6.2014          EN          Official Journal of the European Union          L 173/355

In order to ensure that any entities providing investment services and activities are subject to the same regulatory framework, it is appropriate to ensure that such CSDs are not subject to the requirements of this Directive relating to authorisation and certain operating conditions but that Union law regulating CSDs as such should ensure that they are subject to the provisions of this Directive when they provide investment services or perform investment activities in addition to the services specified in that Union law.

(42) In order to strengthen the protection of investors in the Union, it is appropriate to limit the conditions under which Member States may exclude the application of this Directive to persons providing investment services to clients who, as a result, are not protected under this Directive. In particular, it is appropriate to require Member States to apply requirements at least analogous to the ones laid down in this Directive to those persons, in particular during the phase of authorisation, in the assessment of their reputation and experience and of the suitability of any shareholders, in the review of the conditions for initial authorisation and on-going supervision as well as on conduct of business obligations.

In addition, persons excluded from the application of this Directive should be covered under an investor compensation scheme recognised in accordance with Directive 97/9/EC of the European Parliament and of the Council (¹) or professional indemnity insurance ensuring equivalent protection to their clients in the situations covered under that Directive.

(43) Where an investment firm provides one or more investment services not covered by its authorisation, or performs one or more investment activities not covered by its authorisation, on a non-regular basis it should not need an additional authorisation under this Directive.

(44) For the purposes of this Directive, the business of reception and transmission of orders should also include bringing together two or more investors, thereby bringing about a transaction between those investors.

(45) Investment firms and credit institutions distributing financial instruments they issue themselves should be subject to this Directive when they provide investment advice to their clients. In order to eliminate uncertainty and strengthen investor protection, it is appropriate to provide for the application of this Directive when, in the primary market, investment firms and credit institutions distribute financial instruments issued by them without providing any advice. To that end, the definition of the service of execution of orders on behalf of clients should be extended.

(46) The principles of mutual recognition and of home Member State supervision require that the Member States' competent authorities should not grant or should withdraw authorisation where factors such as the content of programmes of operations, the geographical distribution or the activities actually carried on indicate clearly that an investment firm has opted for the legal system of one Member State for the purpose of evading the stricter standards in force in another Member State within the territory of which it intends to carry out or does carry out the greater part of its activities. An investment firm which is a legal person should be authorised in the Member State in which it has its registered office. An investment firm which is not a legal person should be authorised in the Member State in which it has its head office. In addition, Member States should require that an investment firm's head office is always situated in its home Member State and that it actually operates there.

(47) Directive 2007/44/EC of the European Parliament and of the Council (²) has provided for detailed criteria for the prudential assessment of proposed acquisitions in an investment firm and for a procedure for their application. In order to provide legal certainty, clarity and predictability with regard to the assessment process, as well as to the result thereof, it is appropriate to confirm the criteria and the process of prudential assessment laid down in that Directive.

(¹) Directive 97/9/EC of the European Parliament and of the Council of 3 March 1997 on investor-compensation schemes (OJ L 84, 26.3.1997, p. 22).
(²) Directive 2007/44/EC of the European Parliament and of the Council of 5 September 2007 amending Council Directive 92/49/EEC and Directives 2002/83/EC, 2004/39/EC, 2005/68/EC and 2006/48/EC as regards procedural rules and evaluation criteria for the prudential assessment of acquisitions and increase of holdings in the financial sector (OJ L 247, 21.9.2007, p. 1).

L 173/356          EN          Official Journal of the European Union          12.6.2014

In particular, competent authorities should appraise the suitability of the proposed acquirer and the financial soundness of the proposed acquisition against all of the following criteria: the reputation of the proposed acquirer; the reputation and experience of any person who will direct the business of the investment firm as a result of the proposed acquisition; the financial soundness of the proposed acquirer; whether the investment firm will be able to comply with the prudential requirements based on this Directive and on other Directives, in particular, on Directives 2002/87/EC of the European Parliament and of the Council (¹) and 2013/36/EU; whether there are reasonable grounds to suspect that money laundering or terrorist financing within the meaning of Article 1 of Directive 2005/60/EC of the European Parliament and of the Council (²) is being or has been committed or attempted, or that the proposed acquisition could increase the risk thereof.

(48) An investment firm authorised in its home Member State should be entitled to provide investment services or perform investment activities throughout the Union without the need to seek a separate authorisation from the competent authority in the Member State in which it wishes to provide such services or perform such activities.

(49) Since certain investment firms are exempt from certain obligations imposed by Directive 2013/36/EU, they should be obliged to hold either a minimum amount of capital or professional indemnity insurance or a combination of both. The adjustments of the amounts of that insurance should take into account adjustments made in the framework of Directive 2002/92/EC of the European Parliament and of the Council (³). That particular treatment for the purposes of capital adequacy should be without prejudice to any decisions regarding the appropriate treatment of those firms under future changes to Union law on capital adequacy.

(50) Since the scope of prudential regulation should be limited to those entities which, by virtue of running a trading book on a professional basis, represent a source of a counterparty risk to other market participants, entities which deal on own account in financial instruments other than commodity derivatives, emission allowances or derivatives thereof, should be excluded from the scope of this Directive provided that they are not market makers, do not deal on own account when executing client orders, are not members or participants of a regulated market or MTF, do not have direct electronic access to a trading venue and do not apply a high-frequency algorithmic trading technique.

(51) In order to protect an investor's ownership and other similar rights in respect of securities and the investor's rights in respect of funds entrusted to a firm, those rights should in particular be kept distinct from those of the firm. This principle should not, however, prevent a firm from doing business in its name but on behalf of the investor, where that is required by the very nature of the transaction and the investor is in agreement, for example stock lending.

(52) The requirements concerning the protection of client assets are a crucial tool for the protection of clients in the provision of services and activities. Those requirements can be excluded when full ownership of funds and financial instrument is transferred to an investment firm to cover any present or future, actual or contingent or prospective obligations. That broad possibility may create uncertainty and jeopardise the effectiveness of the requirements concerning the safeguard of client assets. Thus, at least when retail client assets are involved, it is appropriate to limit the possibility of investment firms to conclude title transfer financial collateral arrangements as defined under Directive 2002/47/EC of the European Parliament and of the Council (⁴), for the purpose of securing or otherwise covering their obligations.

(53) It is necessary to strengthen the role of management bodies of investment firms, regulated markets and data reporting services providers in ensuring sound and prudent management of the firms, the promotion of the integrity of the market and the interest of investors. The management body of an investment firm, regulated markets and data reporting services providers should at all times commit sufficient time and possess adequate

(¹) Directive 2002/87/EC of the European Parliament and of the Council of 16 December 2002 on the supplementary supervision of credit institutions, insurance undertakings and investment firms in a financial conglomerate and amending Council Directives 73/239/EEC, 79/267/EEC, 92/49/EEC, 92/96/EEC, 93/6/EEC and 93/22/EEC, and Directives 98/78/EC and 2000/12/EC of the European Parliament and of the Council (OJ L 35, 11.2.2003, p. 1).
(²) Directive 2005/60/EC of the European Parliament and of the Council of 26 October 2005 on the prevention of the use of financial system for the purpose of money laundering and terrorist financing (OJ L 309, 25.11.2005, p. 15).
(³) Directive 2002/92/EC of the European Parliament and of the Council of 9 December 2002 on insurance mediation (OJ L 9, 15.1.2003, p. 3).
(⁴) Directive 2002/47/EC of the European Parliament and of the Council of 6 June 2002 on financial collateral arrangements (OJ L 168, 27.6.2002, p. 43).

12.6.2014    EN    Official Journal of the European Union    L 173/357

collective knowledge, skills and experience to be able to understand the firm's activities including the main risks. To avoid group thinking and facilitate independent opinions and critical challenge, management bodies should therefore be sufficiently diverse as regards age, gender, geographic provenance and educational and professional background to present a variety of views and experiences. Employee representation in management bodies could also, by adding a key perspective and genuine knowledge of the internal workings of firms, be seen as a positive way of enhancing diversity. Therefore, diversity should be one of the criteria for the composition of management bodies. Diversity should also be addressed in firms' recruitment policy more generally. That policy should, for instance, encourage firms to select candidates from shortlists including both genders. In the interests of a coherent approach to corporate governance it is desirable to align the requirements for investment firms as far as possible to those included in Directive 2013/36/EU.

(54)   In order to have an effective oversight and control over the activities of investment firms, regulated markets and data reporting services providers, the management body should be responsible and accountable for the overall strategy of the firm, taking into account the firm's business and risk profile. The management body should assume clear responsibilities across the business cycle of the firm, in the areas of the identification and definition of the strategic objectives, risk strategy and internal governance of the firm, of the approval of its internal organisation, including criteria for selection and training of personnel, of effective oversight of senior management, of the definition of the overall policies governing the provision of services and activities, including the remuneration of sales staff and the approval of new products for distribution to clients. Periodic monitoring and assessment of the strategic objectives of firms, their internal organisation and their policies for the provision of services and activities should ensure their continuous ability to deliver sound and prudent management, in the interest of the integrity of the markets and the protection of investors. Combining too high a number of directorships would preclude a member of the management body from spending adequate time on the performance of that oversight role.

       Therefore, it is necessary to limit the number of directorships a member of the management body of an institution may hold at the same time in different entities. However, directorships in organisations which do not pursue predominantly commercial objectives, such as not-for-profit or charitable organisations, should not be taken into account for the purposes of applying such a limit.

(55)   Different governance structures are used across Member States. In most cases a unitary or a dual board structure is used. The definitions used in this Directive are intended to embrace all existing structures without advocating any particular structure. They are purely functional for the purpose of setting out rules aiming to achieve a particular outcome irrespective of the national company law applicable to an institution in each Member State. The definitions should therefore not interfere with the general allocation of competences in accordance with national company law.

(56)   The expanding range of activities that many investment firms undertake simultaneously has increased potential for conflicts of interest between those different activities and the interests of their clients. It is therefore necessary to provide for rules to ensure that such conflicts do not adversely affect the interests of their clients. Firms have a duty to take effective steps to identify and prevent or manage conflicts of interest and mitigate the potential impact of those risks as far as possible. Where some residual risk of detriment to the client's interests nonetheless remains, clear disclosure to the client of the general nature and/or sources of conflicts of interest to the client and the steps taken to mitigate those risks should be made before undertaking business on its behalf.

(57)   Commission Directive 2006/73/EC (¹) allows Member States to require, in the context of organisational requirements for investment firms, the recording of telephone conversations or electronic communications involving client orders. Recording of telephone conversations or electronic communications involving client orders is compatible with the Charter of Fundamental Rights of the European Union (the Charter) and is justified in order to strengthen investor protection, to improve market surveillance and increase legal certainty in the interest of investment firms and their clients. The importance of such records is also referred to in the technical advice to the Commission, released by the Committee of European Securities Regulators on 29 July 2010. Such records should ensure that there is evidence to prove the terms of any orders given by clients and its correspondence with transactions executed by the investment firms, as well as to detect any behaviour that may have relevance in terms of market abuse, including when firms deal on own account.

---

(¹)   Commission Directive 2006/73/EC of 10 August 2006 implementing Directive 2004/39/EC of the European Parliament and of the Council as regards organisational requirements and operating conditions for investment firms and defined terms for the purposes of that Directive (OJ L 241, 2.9.2006, p. 26).

To that end records are needed for all conversations involving a firm's representatives when dealing, or intending to deal, on own account. Where orders are communicated by clients through other channels than by telephone, such communications should be made in a durable medium such as mails, faxes, emails, documentation of client orders made at meetings. For example, the content of relevant face-to-face conversations with a client could be recorded by using written minutes or notes. Such orders should be considered to be equivalent to orders received by telephone. Where minutes are taken of face-to-face conversations with clients, Member States should ensure that appropriate safeguards are in place to ensure that the client does not lose out as a result of the minutes inaccurately recording the communication between the parties. Such safeguards should not imply any assumption of liability by the client.

In order to provide legal certainty regarding the scope of the obligation, it is appropriate to apply it to all equipment provided by the firm or permitted to be used by the investment firm and to require the investment firms to take reasonable steps to ensure that no privately owned equipment is used in relation to transactions. Those records should be available to competent authorities in the fulfilment of their supervisory tasks and in the performance of enforcement actions under this Directive and under Regulation (EU) No 600/2014, Regulation (EU) No 596/2014 and Directive 2014/57/EU of the European Parliament and of the Council (¹) in order to help competent authorities identify behaviours which are not compliant with the legal framework regulating the activity of investment firms. Those records should also be available to investment firms and to clients to demonstrate the development of their relationship with regard to orders transmitted by clients and transaction carried out by firms. For those reasons, it is appropriate to provide in this Directive for the principles of a general regime concerning the recording of telephone conversations or electronic communications involving client orders.

(58) In line with Council conclusions on strengthening European financial supervision of June 2009, and in order to contribute to the establishment of a single rulebook for Union financial markets, to help further develop a level playing field for Member States and market participants, to enhance investor protection and to improve supervision and enforcement, the Union is committed to minimising, where appropriate, discretions available to Member States across Union financial services law. In addition to the introduction in this Directive of a common regime for the recording of telephone conversations or electronic communications involving client orders, it is appropriate to reduce the possibility of competent authorities to delegate supervisory tasks in certain cases, to limit discretions in the requirements applicable to tied agents and to the reporting from branches.

(59) The use of trading technology has evolved significantly in the past decade and is now extensively used by market participants. Many market participants now make use of algorithmic trading where a computer algorithm automatically determines aspects of an order with minimal or no human intervention. Risks arising from algorithmic trading should be regulated. However, the use of algorithms in post-trade processing of executed transactions does not constitute algorithmic trading. An investment firm that engages in algorithmic trading pursuing a market making strategy should carry out that market making continuously during a specified proportion of the trading venue's trading hours. Regulatory technical standards should clarify what constitutes specified proportion of the trading venue's trading hours by ensuring that such specified proportion is significant in comparison to the total trading hours, taking into account the liquidity, scale and nature of the specific market and the characteristics of the financial instrument traded.

(60) Investment firms that engage in algorithmic trading pursuing a market making strategy should have in place appropriate systems and controls for that activity. Such an activity should be understood in a way specific to its context and purpose. The definition of such an activity is therefore independent from definitions such as that of 'market making activities' in Regulation (EU) No 236/2012 of the European Parliament and of the Council (²).

(61) A specific subset of algorithmic trading is high-frequency algorithmic trading where a trading system analyses data or signals from the market at high speed and then sends or updates large numbers of orders within a very short time period in response to that analysis. In particular, high-frequency algorithmic trading may contain elements such as order initiation, generating, routing and execution which are determined by the system without human intervention for each individual trade or order, short time-frame for establishing and liquidating positions, high daily portfolio turnover, high order-to-trade ratio intraday and ending the trading day at or close to a flat position. High-frequency algorithmic trading is characterised, among others, by high message intra-day rates which

---

(¹) Directive 2014/57/EU of the European Parliament and of the Council of 16 April 2014 on criminal sanctions for market abuse (market abuse Directive) (see page 179 of this Official Journal).
(²) Regulation (EU) No 236/2012 of the European Parliament and of the Council of 14 March 2012 on short selling and certain aspects of credit default swaps (OJ L 86, 24.3.2012, p. 1).

constitute orders, quotes or cancellations. In determining what constitutes high message intra-day rates, the identity of the client ultimately behind the activity, the length of the observation period, the comparison with the overall market activity during that period and the relative concentration or fragmentation of activity should be taken into account. High-frequency algorithmic trading is typically done by the traders using their own capital to trade and rather than being a strategy in itself is usually the use of sophisticated technology to implement more traditional trading strategies such as market making or arbitrage.

(62) Technical advances have enabled high-frequency trading and an evolution of business models. High-frequency trading is facilitated by the co-location of market participants' facilities in close physical proximity to a trading venue's matching engine. In order to ensure orderly and fair trading conditions, it is essential to require trading venues to provide such co-location services on a non-discriminatory, fair and transparent basis. The use of trading technology has increased the speed, capacity and complexity of how investors trade. It has also enabled market participants to facilitate direct electronic access by their clients to markets through the use of their trading facilities, through direct market access or sponsored access. Trading technology has provided benefits to the market and market participants generally such as wider participation in markets, increased liquidity, narrower spreads, reduced short term volatility and the means to obtain better execution of orders for clients. Yet that trading technology also gives rise to a number of potential risks such as an increased risk of the overloading of the systems of trading venues due to large volumes of orders, risks of algorithmic trading generating duplicative or erroneous orders or otherwise malfunctioning in a way that may create a disorderly market.

In addition, there is the risk of algorithmic trading systems overreacting to other market events which can exacerbate volatility if there is a pre-existing market problem. Finally, algorithmic trading or high-frequency algorithmic trading techniques can, like any other form of trading, lend themselves to certain forms of behaviour which is prohibited under Regulation (EU) No 596/2014. High-frequency trading may also, because of the information advantage provided to high-frequency traders, prompt investors to choose to execute trades in venues where they can avoid interaction with high-frequency traders. It is appropriate to subject high-frequency algorithmic trading techniques which rely on certain specified characteristics to particular regulatory scrutiny. While those are predominantly techniques which rely on trading on own account such scrutiny should also apply where the execution of the technique is structured in such a way as to avoid the execution taking place on own account.

(63) Those potential risks from increased use of technology are best mitigated by a combination of measures and specific risk controls directed at firms that engage in algorithmic trading or high-frequency algorithmic trading techniques, those that provide direct electronic access, and other measures directed at operators of trading venues that are accessed by such firms. In order to strengthen the resilience of markets in the light of technological developments, those measures should reflect and build on the technical guidelines issued by the European Supervisory Authority (European Securities and Markets Authority) ('ESMA'), established by Regulation (EU) No 1095/2010 of the European Parliament and of the Council ([1]) in February 2012 on systems and controls in an automated trading environment for trading platforms, investment firms and competent authorities (ESMA/2012/122). It is desirable to ensure that all high-frequency algorithmic trading firms be authorised. Such authorisation should ensure those firms are subject to organisational requirements under this Directive and that they are properly supervised. However, entities which are authorised and supervised under Union law regulating the financial sector and are exempt from this Directive, but which engage in algorithmic trading or high-frequency algorithmic trading techniques, should not be required to obtain an authorisation under this Directive and should only be subject to the measures and controls aiming to tackle the specific risk arising from those types of trading. In that respect, ESMA should play an important coordinating role by defining appropriate tick sizes in order to ensure orderly markets at Union level.

(64) Both investment firms and trading venues should ensure robust measures are in place to ensure that algorithmic trading or high-frequency algorithmic trading techniques do not create a disorderly market and cannot be used for abusive purposes. Trading venues should also ensure their trading systems are resilient and properly tested to deal with increased order flows or market stresses and that circuit breakers are in place on trading venues to temporarily halt trading or constrain it if there are sudden unexpected price movements.

(65) It is also necessary to ensure that the fee structures of trading venues are transparent, non-discriminatory and fair and that they are not structured in such a way as to promote disorderly market conditions. It is therefore

---

([1]) Regulation (EU) No 1095/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Securities and Markets Authority), amending Decision No 716/2009/EC and repealing Commission Decision 2009/77/EC (OJ L 331, 15.12.2010, p. 84).

L 173/360     EN     Official Journal of the European Union     12.6.2014

appropriate to allow for trading venues to adjust their fees for cancelled orders according to the length of time for which the order was maintained and to calibrate the fees to each financial instrument to which they apply. Member States should also be able to allow trading venues to impose higher fees for placing orders that are subsequently cancelled or on participants placing a high ratio of cancelled orders and on those operating a high-frequency algorithmic trading technique in order to reflect the additional burden on system capacity without necessarily benefitting other market participants.

(66)   In addition to measures relating to algorithmic and high-frequency algorithmic trading techniques it is appropriate to ban the provision of direct electronic access to markets by investment firms for their clients where such access is not subject to proper systems and controls. Irrespective of the form of the direct electronic access provided, firms providing such access should assess and review the suitability of clients using that service and ensure that risk controls are imposed on the use of the service and that those firms retain responsibility for trading submitted by their clients through the use of their systems or using their trading codes. It is appropriate that detailed organisational requirements regarding those new forms of trading should be prescribed in more detail in regulatory technical standards. This should ensure that requirements can be amended where necessary to deal with further innovation and developments in that area.

(67)   In order to ensure effective supervision and in order to enable the competent authorities to take appropriate measures against defective or rogue algorithmic strategies in due time it is necessary to flag all orders generated by algorithmic trading. By means of flagging, competent authorities should be enabled to identify and distinguish orders originating from different algorithms and to reconstruct efficiently and evaluate the strategies that algorithmic traders employ. This should mitigate the risk that orders are not unambiguously attributed to an algorithmic strategy and a trader. The flagging permits the competent authorities to react efficiently and effectively against algorithmic trading strategies that behave in an abusive manner or pose risks to the orderly functioning of the market.

(68)   In order to ensure that market integrity is maintained in the light of technological developments in financial markets, ESMA should regularly seek input from national experts on developments relating to trading technology including high-frequency trading and new practices which could constitute market abuse, so as to identify and promote effective strategies for preventing and addressing such abuse.

(69)   There is a multitude of trading venues currently operating in the Union, among which a number are trading identical financial instruments. In order to address potential risks to the interests of investors it is necessary to formalise and further coordinate the processes on the consequences for trading on other trading venues if an investment firm or a market operator operating a trading venue decides to suspend or remove a financial instrument from trading. In the interest of legal certainty and to adequately address conflicts of interests when deciding to suspend or to remove financial instruments from trading, it should be ensured that if an investment firm or a market operator operating a trading venue stops trading due to non-compliance with their rules, the others follow that decision if it is decided so by their competent authorities unless continuing trading may be justified due to exceptional circumstances. In addition, it is necessary to formalise and improve the exchange of information and the cooperation between the competent authorities in relation to suspension and removal of financial instruments from trading on a trading venue. Those arrangements should be applied in such a way as to prevent trading venues using information transmitted in the context of a suspension or removal of a financial instrument from trading for commercial purposes.

(70)   More investors have become active in the financial markets and are offered a more complex wide-ranging set of services and instruments and, in view of those developments, it is necessary to provide for a degree of harmonisation to offer investors a high level of protection across the Union. When Directive 2004/39/EC was adopted, the increasing dependence of investors on personal recommendations required to include the provision of investment advice as an investment service subject to authorisation and to specific conduct of business obligations. The continuous relevance of personal recommendations for clients and the increasing complexity of services and instruments require enhancing the conduct of business obligations in order to strengthen the protection of investors.

(71)   Member States should ensure that investment firms act in accordance with the best interests of their clients and are able to comply with their obligations under this Directive. Investment firms should accordingly understand the features of the financial instruments offered or recommended and establish and review effective policies and

arrangements to identify the category of clients to whom products and services are to be provided. Member States should ensure that the investment firms which manufacture financial instruments ensure that those products are manufactured to meet the needs of an identified target market of end clients within the relevant category of clients, take reasonable steps to ensure that the financial instruments are distributed to the identified target market and periodically review the identification of the target market of and the performance of the products they offer. Investment firms that offer or recommend to clients financial instruments not manufactured by them should also have appropriate arrangements in place to obtain and understand the relevant information concerning the product approval process, including the identified target market and the characteristics of the product they offer or recommend. That obligation should apply without prejudice to any assessment of appropriateness or suitability to be subsequently carried out by the investment firm in the provision of investment services to each client, on the basis of their personal needs, characteristics and objectives.

In order to ensure that financial instruments will be offered or recommended only when in the interest of the client, investment firms offering or recommending the product manufactured by firms which are not subject to the product governance requirements set out in this Directive or manufactured by third-country firms should also have appropriate arrangements to obtain sufficient information about the financial instruments.

(72) In order to give all relevant information to investors, it is appropriate to require investment firms providing investment advice to disclose the cost of the advice, to clarify the basis of the advice they provide, in particular the range of products they consider in providing personal recommendations to clients, whether they provide investment advice on an independent basis and whether they provide the clients with the periodic assessment of the suitability of the financial instruments recommended to them. It is also appropriate to require investment firms to explain to their clients the reasons for the advice provided to them.

(73) In order to further establish the regulatory framework for the provision of investment advice, while at the same time leaving choice to investment firms and clients, it is appropriate to establish the conditions for the provisions of that service when firms inform clients that the service is provided on an independent basis. When advice is provided on an independent basis a sufficient range of different product providers' products should be assessed prior to making a personal recommendation. It is not necessary for the advisor to assess investment products available on the market by all product providers or issuers, but the range of financial instruments should not be limited to financial instruments issued or provided by entities with close links with the investment firm or with other legal or economic relationships, such as a contractual relationship, that are so close as to put at risk the independent basis of the advice provided.

(74) In order to strengthen the protection of investors and increase clarity to clients as to the service they receive, it is also appropriate to further restrict the possibility for firms providing the service of investment advice on an independent basis and the service of portfolio management to accept and retain fees, commissions or any monetary and non-monetary benefits from third parties, and particularly from issuers or product providers. This implies that all fees, commissions and any monetary benefits paid or provided by a third party must be returned in full to the client as soon as possible after receipt of those payments by the firm and the firm should not be allowed to offset any third-party payments from the fees due by the client to the firm. The client should be accurately and, where relevant, periodically, informed about all fees, commissions and benefits the firm has received in connection with the investment service provided to the client and transferred to him. Firms providing independent advice or portfolio management should also set up a policy, as part of their organisational requirements, to ensure that third party payments received are allocated and transferred to the clients. Only minor non-monetary benefits should be allowed, provided that they are clearly disclosed to the client, that they are capable of enhancing the quality of the service provided and that they could not be judged to impair the ability of investment firms to act in the best interest of their clients.

(75) When providing the service of investment advice on an independent basis and the service of portfolio management, fees, commissions or non-monetary benefits paid or provided by a person on behalf of the client should be allowed only as far as the person is aware that such payments have been made on that person's behalf and that the amount and frequency of any payment is agreed between the client and the investment firm and not determined by a third party. Cases which would satisfy that requirement include where a client pays a firm's invoice directly or it is paid by an independent third party who has no connection with the investment firm regarding the investment service provided to the client and is acting only on the instructions of the client and cases where the client negotiates a fee for a service provided by an investment firm and pays that fee. This would generally be the case for accountants or lawyers acting under a clear payment instruction from the client or where a person is acting as a mere conduit for the payment.

(76)    This Directive provides for conditions and procedures for Member States to comply with when planning to impose additional requirements. Such requirements may include prohibiting or further restricting the offer or acceptance of fees, commissions or any monetary or non-monetary benefits paid or provided by any third party or a person acting on behalf of a third party in relation to the provision of service to clients.

(77)    To further protect consumers, it is also appropriate to ensure that investment firms do not remunerate or assess the performance of their own staff in a way that conflicts with the firm's duty to act in the best interests of their clients, for example through remuneration, sales targets or otherwise which provide an incentive for recommending or selling a particular financial instrument when another product may better meet the client's needs.

(78)    Where sufficient information in relation to the costs and associated charges or to the risks in respect of the financial instrument is provided in accordance with other Union law that information should be regarded as appropriate for the purposes of providing information to clients under this Directive. However, investment firms or credit institutions distributing that financial instrument should additionally inform their clients about all the other costs and associated charges relating to their provision of investment services in relation to that financial instrument.

(79)    Given the complexity of investment products and the continuous innovation in their design, it is also important to ensure that staff who advise on or sell investment products to retail clients possess an appropriate level of knowledge and competence in relation to the products offered. Investment firms should allow their staff sufficient time and resources to achieve that knowledge and competence and to apply it in providing services to clients.

(80)    Investment firms are allowed to provide investment services that consist only of execution and/or of the reception and transmission of client orders, without the need to obtain information regarding the knowledge and experience of the client in order to assess the appropriateness of the service or the financial instrument for the client. Since those services entail a relevant reduction of client protection, it is appropriate to improve the conditions for their provision. In particular, it is appropriate to exclude the possibility to provide those services in conjunction with the ancillary service consisting of granting credits or loans to investors to allow them to carry out a transaction in which the investment firm is involved, since this increases the complexity of the transaction and makes more difficult the understanding of the risk involved. It is also appropriate to better define the criteria for the selection of the financial instruments to which those services should relate in order to exclude certain financial instruments, including those which embed a derivative or incorporate a structure which makes it difficult for the client to understand the risk involved, shares in undertakings that are not undertakings for collective investment in transferable securities (non-UCITS collective investment undertakings) and structured UCITS as referred to in the second subparagraph of Article 36(1) of Commission Regulation (EU) No 583/2010 ([1]). The treatment of certain UCITS as complex products should be without prejudice to future Union law defining the scope of and the rules applicable to such products.

(81)    Cross-selling practices are a common strategy for retail financial service providers throughout the Union. They can provide benefits to retail clients but can also represent practices where the interest of the client is not adequately considered. For instance, certain forms of cross-selling practices, namely tying practices where two or more financial services are sold together in a package and at least one of those services is not available separately, can distort competition and negatively affect client mobility and their ability to make informed choices. An example of tying practices can be the necessary opening of current accounts when an investment service is provided to a retail client. While practices of bundling, where two or more financial services are sold together in a package, but each of the services can also be purchased separately, may also distort competition and negatively affect customer mobility and the ability of clients to make informed choices, they at least leave choice to the client and may therefore pose less risk to the compliance of investment firms with their obligations under this Directive. The use of such practices should be carefully assessed in order to promote competition and consumer choice.

(82)    When providing investment advice, the investment firm should specify in a written statement on suitability how the advice given meets the preferences, needs and other characteristics of the retail client. The statement should be provided in a durable medium including in an electronic form. The responsibility to undertake the suitability

---

([1])    Commission Regulation (EU) No 583/2010 of 1 July 2010 implementing Directive 2009/65/EC of the European Parliament and of the Council as regards key investor information and conditions to be met when providing key investor information or the prospectus in a durable medium other than paper or by means of a website (OJ L 176, 10.7.2010, p. 1).

assessment and to provide an accurate suitability report to the client lies with the investment firm and appropriate safeguards should be in place to ensure that the client does not incur a loss out as a result of the report presenting in an inaccurate or unfair manner the personal recommendation, including how the recommendation provided is suitable for the client and the disadvantages of the recommended course of action.

(83) In determining what constitutes the provision of information in good time before a time specified in this Directive, an investment firm should take into account, having regard to the urgency of the situation, the client's need for sufficient time to read and understand it before taking an investment decision. A client is likely to require more time to review information given on a complex or unfamiliar product or service, or a product or service a client has no experience with than a client considering a simpler or more familiar product or service, or where the client has relevant prior experience.

(84) Nothing in this Directive should oblige investment firms to provide all required information about the investment firm, financial instruments, costs and associated charges, or concerning the safeguarding of client financial instruments or client funds immediately and at the same time, provided that they comply with the general obligation to provide the relevant information in good time before the time specified in this Directive. Provided that the information is communicated to the client in good time before the provision of the service, nothing in this Directive obliges firms to provide it either separately or by incorporating the information in a client agreement.

(85) A service should be considered to be provided at the initiative of a client unless the client demands it in response to a personalised communication from or on behalf of the firm to that particular client, which contains an invitation or is intended to influence the client in respect of a specific financial instrument or specific transaction. A service can be considered to be provided at the initiative of the client notwithstanding that the client demands it on the basis of any communication containing a promotion or offer of financial instruments made by any means that by its very nature is general and addressed to the public or a larger group or category of clients or potential clients.

(86) One of the objectives of this Directive is to protect investors. Measures to protect investors should be adapted to the particularities of each category of investors (retail, professional and counterparties). However, in order to enhance the regulatory framework applicable to the provision of services irrespective of the categories of clients concerned, it is appropriate to make it clear that principles to act honestly, fairly and professionally and the obligation to be fair, clear and not misleading apply to the relationship with any clients.

(87) Investments that involve contracts of insurance are often made available to customers as potential alternatives or substitutes to financial instruments subject to this Directive. To deliver consistent protection for retail clients and ensure a level playing field between similar products, it is important that insurance-based investment products are subject to appropriate requirements. Whereas the investor protection requirements in this Directive should therefore be applied equally to those investments packaged under insurance contracts, their different market structures and product characteristics make it more appropriate that detailed requirements are set out in the ongoing review of Directive 2002/92/EC rather than setting them in this Directive. Future Union law regulating the activities of insurance intermediaries and insurance undertakings should thus appropriately ensure a consistent regulatory approach concerning the distribution of different financial products which satisfy similar investor needs and therefore raise comparable investor protection challenges. The European Supervisory Authority (European Investment and Occupational Pensions Authority) ('EIOPA'), established by Regulation (EU) No 1094/2010 of the European Parliament and of the Council (¹) and ESMA should work together to achieve as much consistency as possible in the conduct of business standards for those investment products. Those new requirements for insurance-based investment products should be laid down in Directive 2002/92/EC.

(88) In order to align the rules pertaining to conflicts of interests, general principles and information to customers and to allow Member States to place restrictions on the remuneration of insurance intermediaries, Directive 2002/92/EC should be amended accordingly.

(¹) Regulation (EU) No 1094/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Investment and Occupational Pensions Authority), amending Decision No 716/2009/EC and repealing Commission Decision 2009/79/EC (OJ L 331, 15.12.2010, p. 48).

(89) Insurance-based investment products that do not offer investment opportunities and deposits solely exposed to interest rates should be excluded from the scope of this Directive. Individual and occupational pension products, having the primary purpose of providing the investor an income in retirement, should be excluded from the scope of this Directive, in consideration of their particularities and objectives.

(90) By way of derogation from the principle of home Member State authorisation, supervision and enforcement of obligations in respect of the operation of branches, it is appropriate for the competent authority of the host Member State to assume responsibility for enforcing certain obligations specified in this Directive in relation to business conducted through a branch within the territory where the branch is located, since that authority is closest to the branch, and is better placed to detect and intervene in respect of infringements of rules governing the operations of the branch.

(91) It is necessary to impose an effective 'best execution' obligation to ensure that investment firms execute client orders on terms that are most favourable to the client. That obligation should apply where a firm owes contractual or agency obligations to the client.

(92) Given that a wider range of execution venues are now available in the Union, it is appropriate to enhance the best execution framework for retail investors. Advances in technology for monitoring best execution should be considered when applying the best execution framework in accordance with the second and third subparagraph of Article 27(1).

(93) For the purposes of determining best execution when executing retail client orders, the costs relating to execution should include an investment firm's own commissions or fees charged to the client for limited purposes, where more than one venue listed in the firm's execution policy is capable of executing a particular order. In such cases, the firm's own commissions and costs for executing the order on each of the eligible execution venues should be taken into account in order to assess and compare the results for the client that would be achieved by executing the order on each such venue. However, it is not intended to require a firm to compare the results that would be achieved for its client on the basis of its own execution policy and its own commissions and fees, with results that might be achieved for the same client by any other investment firm on the basis of a different execution policy or a different structure of commissions or fees. Nor is it intended to require a firm to compare the differences in its own commissions which are attributable to differences in the nature of the services that the firm provides to clients.

(94) The provisions of this Directive that provide that costs of execution should include an investment firm's own commissions or fees charged to the client for the provision of an investment service should not apply for the purpose of determining what execution venues should be included in the firm's execution policy for the purposes of Article 27(5) of this Directive.

(95) An investment firm should be considered to be structuring or charging its commissions in a way which discriminates unfairly between execution venues if it charges a different commission or spread to clients for execution on different execution venues and that difference does not reflect actual differences in the cost to the firm of executing on those venues.

(96) In order to enhance the conditions under which investment firms comply with their obligation to execute orders on terms most favourable to their clients in accordance with this Directive, it is appropriate to require that for financial instruments subject to the trading obligation in Articles 23 and 28 of Regulation (EU) No 600/2014 that each trading venue and systematic internaliser and for other financial instruments that each execution venue to make available to the public data relating to the quality of execution of transactions on each venue.

(97) Information provided by investment firms to clients in relation to their execution policy often are generic and standard and do not allow clients to understand how an order will be executed and to verify firms' compliance with their obligation to execute orders on term most favourable to their clients. In order to enhance investor protection it is appropriate to specify the principles concerning the information given by investment firms to their clients on the execution policy and to require firms to make public, on an annual basis, for each class of financial instruments, the top five execution venues where they executed client orders in the preceding year and to take account of that information and information published by execution venues on execution quality in their policies on best execution.

(98) When establishing the business relationship with the client the investment firm might ask the client or potential client to consent at the same time to the execution policy as well as to the possibility that that person's orders may be executed outside a trading venue.

(99) Persons who provide investment services on behalf of more than one investment firm should not be considered to be tied agents but as investment firms when they fall under the definition provided in this Directive, with the exception of certain persons who may be exempt.

(100) This Directive should be without prejudice to the right of tied agents to undertake activities covered by other Directives and related activities in respect of financial services or products not covered by this Directive, including on behalf of parts of the same financial group.

(101) The conditions for conducting activities outside the premises of the investment firm (door-to-door selling) should not be covered by this Directive.

(102) Member States' competent authorities should not register or should withdraw the registration where the activities actually carried on indicate clearly that a tied agent has opted for the legal system of one Member State for the purpose of evading the stricter standards in force in another Member State within the territory of which it intends to carry out or does carry out the greater part of its activities.

(103) For the purposes of this Directive eligible counterparties should be considered to be acting as clients.

(104) The financial crisis has shown limits in the ability of non-retail clients to appreciate the risk of their investments. While it should be confirmed that conduct of business rules should be enforced in respect of those investors most in need of protection, it is appropriate to better calibrate the requirements applicable to different categories of clients. To that extent, it is appropriate to extend some information and reporting requirements to the relationship with eligible counterparties. In particular, the relevant requirements should relate to the safeguarding of client financial instruments and funds as well as information and reporting requirements concerning more complex financial instruments and transactions. In order to better define the classification of municipalities and local public authorities, it is appropriate to clearly exclude them from the list of eligible counterparties and of clients who are considered to be professionals while still allowing those clients to ask for treatment as professional clients on request.

(105) In respect of transactions executed between eligible counterparties, the obligation to disclose client limit orders should only apply where the counterparty is explicitly sending a limit order to an investment firm for its execution.

(106) Member States should ensure the respect of the right to the protection of personal data in accordance with Directive 95/46/EC of the European Parliament and of the Council (¹) and Directive 2002/58/EC of the European Parliament and of the Council (²) which govern the processing of personal data carried out in application of this Directive. Processing of personal data by ESMA in the application of this Directive is subject to Regulation (EU) No 45/2001 of the European Parliament and of the Council (³).

(107) Investment firms should all have the same opportunities of joining or having access to regulated markets throughout the Union. Regardless of the manner in which transactions are at present organised in the Member States, it is important to abolish the technical and legal restrictions on access to regulated markets.

---

(¹) Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (OJ L 281, 23.11.1995, p. 31).

(²) Directive 2002/58/EC of the European Parliament and of the Council of 12 July 2002 concerning the processing of personal data and the protection of privacy in the electronic communications sector (Directive on privacy and electronic communications) (OJ L 201, 31.7.2002, p. 37).

(³) Regulation (EC) No 45/2001 of the European Parliament and of the Council of 18 December 2000 on the protection of individuals with regard to the processing of personal data by the Community institutions and bodies and on the free movement of such data (OJ L 8, 12.1.2001, p. 1).

(108) In order to facilitate the finalisation of cross-border transactions, it is appropriate to provide for access to clearing and settlement systems throughout the Union by investment firms, irrespective of whether transactions have been concluded through regulated markets in the Member State concerned. Investment firms which wish to participate directly in other Member States' settlement systems should comply with the relevant operational and commercial requirements for membership and the prudential measures to uphold the smooth and orderly functioning of the financial markets.

(109) The provision of services by third country firms in the Union is subject to national regimes and requirements. Firms authorised in accordance with them do not enjoy the freedom to provide services and the right of establishment in Member States other than the one where they are established. Where a Member State considers that the appropriate level of protection for its retail clients or retail clients who have requested to be treated as professional clients can be achieved by the establishment of a branch by the third-country firm it is appropriate to introduce a minimum common regulatory framework at Union level with respect to the requirements applicable to those branches and in light of the principle that third-country firms should not be treated in a more favourable way than Union firms.

(110) When implementing the provisions of this Directive, Member States should take due account of the recommendations by the Financial Action Task Force (FATF) on jurisdictions that have strategic anti-money laundering and countering the financing of terrorism deficiencies and to which counter-measures apply or jurisdictions with strategic anti-money laundering and countering the financing of terrorism deficiencies that have not made sufficient progress in addressing the deficiencies or have not committed to an action plan developed with the FATF to address the deficiencies.

(111) The provision of this Directive regulating the provision of investment services or activities by third-country firms in the Union should not affect the possibility for persons established in the Union to receive investment services by a third country firm at their own exclusive initiative. Where a third-country firm provides services at the own exclusive initiative of a person established in the Union, the services should not be deemed as provided in the territory of the Union. Where a third-country firm solicits clients or potential clients in the Union or promotes or advertises investment services or activities together with ancillary services in the Union, it should not be deemed as a service provided at the own exclusive initiative of the client.

(112) The authorisation to operate a regulated market should extend to all activities which are directly relating to the display, processing, execution, confirmation and reporting of orders from the point at which such orders are received by the regulated market to the point at which they are transmitted for subsequent finalisation, and to activities relating to the admission of financial instruments to trading. This should also include transactions concluded through the medium of designated market makers appointed by the regulated market which are undertaken under its systems and in accordance with the rules that govern those systems. Not all transactions concluded by members or participants of the regulated market, MTF or OTF are to be considered to be concluded within the systems of a regulated market, MTF or OTF. Transactions which members or participants conclude on a bilateral basis and which do not comply with all the obligations established for a regulated market, an MTF or an OTF under this Directive should be considered to be transactions concluded outside a regulated market, an MTF or an OTF for the purposes of the definition of systematic internaliser. In such a case the obligation for investment firms to make public firm quotes should apply if the conditions established by this Directive and by Regulation (EU) No 600/2014 are met.

(113) Given the importance of liquidity provision to the orderly and efficient functioning of markets, investment firms that engage in algorithmic trading to pursue a market making strategy should have written agreements in place with trading venues clarifying their obligations to provide liquidity to the market.

(114) Nothing in this Directive should require competent authorities to approve or examine the content of the written agreement between the regulated market and the investment firm that is required from the participation in a market making scheme. However, neither does it prevent them from doing so, insofar as any such approval or examination is based only on the regulated markets' compliance with their obligations under Article 48.

(115) The provision of core market data services which are pivotal for users to be able to obtain a desired overview of trading activity across Union financial markets and for competent authorities to receive accurate and comprehensive information on relevant transactions should be subject to authorisation and regulation to ensure the necessary level of quality.

(116) The introduction of approved publication arrangements (APAs) should improve the quality of trade transparency information published in the OTC space and contribute significantly to ensuring that such data is published in a way facilitating its consolidation with data published by trading venues.

(117) Now that a market structure is in place which allows for competition between multiple trading venues it is essential that an effective and comprehensive consolidated tape is in operation as soon as possible. The introduction of a commercial solution for a consolidated tape for equities and equity-like financial instruments should contribute to creating a more integrated European market and make it easier for market participants to gain access to a consolidated view of trade transparency information that is available. The envisaged solution is based on an authorisation of providers working along pre-defined and supervised parameters which are in competition with each other in order to achieve technically highly sophisticated and innovative solutions, serving the market to the greatest extent possible and ensuring that consistent and accurate market data is made available. By requiring all consolidated tape providers (CTPs) to consolidate data from all APAs and trading venues it will be assured that competition will take place on the basis of quality of service to clients rather than breadth of data covered. Nevertheless it is appropriate to make provision now for a consolidated tape to be put in place through a public procurement process if the mechanism envisaged does not lead to the timely delivery of an effective and comprehensive consolidated tape for equities and equity-like financial instruments.

(118) The establishment of a consolidated tape for non-equity financial instruments is deemed to be more difficult to implement than the consolidated tape for equity financial instruments and potential providers should be able to gain experience with the latter before constructing it. In order to facilitate the proper establishment of the consolidated tape for non-equity financial instruments, it is therefore appropriate to provide for an extended date of application of the national measures transposing the relevant provision. Nevertheless it is appropriate to make provision now for a consolidated tape to be put in place through a public procurement process if the mechanism envisaged does not lead to the timely delivery of an effective and comprehensive consolidated tape for non-equity financial instruments.

(119) When determining, as regards non-equity financial instruments, the trading venues and APAs which need to be included in the post-trade information to be disseminated by CTPs, ESMA should ensure that the objective of the establishment of an integrated Union market for those financial instruments will be achieved and should ensure non-discriminatory treatment of APAs and trading venues.

(120) Union law on own funds requirements should fix the minimum capital requirements with which regulated markets should comply in order to be authorised, and in so doing should take into account the specific nature of the risks associated with such markets.

(121) Operators of a regulated market should also be able to operate an MTF or an OTF in accordance with the relevant provisions of this Directive.

(122) The provisions of this Directive concerning the admission of financial instruments to trading under the rules enforced by the regulated market should be without prejudice to the application of Directive 2001/34/EC of the European Parliament and of the Council (¹) and of Directive 2003/71/EC of the European Parliament and of the Council (²). A regulated market should not be prevented from applying more stringent requirements in respect of the issuers of financial instruments which it is considering for admission to trading than are imposed pursuant to this Directive.

---

(¹) Directive 2001/34/EC of the European Parliament and of the Council of 28 May 2001 on the admission of securities to official stock exchange listing and on information to be published on those securities (OJ L 184, 6.7.2001, p. 1).
(²) Directive 2003/71/EC of the European Parliament and of the Council of 4 November 2003 on the prospectus to be published when securities are offered to the public or admitted to trading (OJ L 345, 31.12.2003, p. 64).

(123) Member States should be able to designate different competent authorities to enforce the wide-ranging obligations laid down in this Directive. Such authorities should be of a public nature guaranteeing their independence from economic actors and avoiding conflicts of interest. In accordance with national law, Member States should ensure appropriate financing of the competent authority. The designation of public authorities should not exclude delegation under the responsibility of the competent authority.

(124) In order to ensure that the communication between competent authorities of suspensions, removals, disruptions, disorderly trading conditions and circumstances that may indicate market abuse is achieved in an efficient and timely way, an effective communication and coordination process between national competent authorities is necessary, which will be achieved via arrangements developed by ESMA.

(125) The G20 summit in Pittsburgh on 25 September 2009 agreed to improve the regulation, functioning and transparency of financial and commodity markets to address excessive commodity price volatility. The Commission Communications of 28 October 2009 on 'A Better Functioning Food Supply Chain in Europe', and of 2 February 2011 on 'Tackling the Challenges in Commodity Markets and Raw Materials' outlined measures that fall to be taken in the context of the review of Directive 2004/39/EC. In September 2011, the International Organization of Securities Commissions published Principles for the Regulation and Supervision of Commodity Derivatives Markets. Those principles were endorsed by the G20 summit in Cannes on 4 November 2011 which called for market regulators to have formal position management powers, including the power to set *ex ante* position limits as appropriate.

(126) The powers made available to competent authorities should be complemented with explicit powers to obtain information from any person regarding the size and purpose of a position in derivative contracts relating to commodities and to request the person to take steps to reduce the size of the position in the derivative contracts.

(127) A harmonised position limits regime is needed to ensure greater coordination and consistency in the application of the G20 agreement, especially for contracts that are traded across the Union. Therefore, explicit powers should be granted to competent authorities to establish limits, on the basis of a methodology determined by ESMA, on the positions any person can hold, at an aggregate group level, in a derivative contract in relation to a commodity at all times in order to prevent market abuse, including cornering the market, and to support orderly pricing and settlement conditions including the prevention of market distorting positions. Such limits should promote integrity of the market for the derivative and the underlying commodity without prejudice to price discovery on the market for the underlying commodity and should not apply to positions which objectively reduce risks directly relating to commercial activities in relation to the commodity. The distinction between spot contracts for commodities and commodity derivative contracts should also be clarified. In order to achieve the harmonised regime, it is also appropriate for ESMA to monitor the implementation of the position limits and for competent authorities to put in place cooperation arrangements, including exchange of relevant data with each other and to enable the monitoring and enforcement of the limits.

(128) All venues which offer trading in commodity derivatives should have in place appropriate position management controls, providing the necessary powers at least to monitor and access information about commodity derivative positions, to require the reduction or termination of such positions and to require that liquidity is provided back on the market to mitigate the effects of a large or dominant position. ESMA should maintain and publish a list containing summaries of all position limits and position management controls in force. Those limits and arrangements should be applied in a consistent manner and take account of the specific characteristics of the market in question. They should be clearly spelled out as regards to how they apply and to the relevant quantitative thresholds which constitute the limits or which may trigger other obligations.

(129) Trading venues should publish an aggregated weekly breakdown of the positions held by different categories of persons for the different commodity derivative contracts, emission allowances and derivatives thereof traded on their platforms. A comprehensive and detailed breakdown of the positions held by all persons should be made available to the competent authority at least daily. Arrangement for reporting under this Directive should take into account, where applicable, reporting requirements already imposed under Article 8 of Regulation (EU) No 1227/2011.

(130) While the methodology used for calculation of position limits should not create barriers to the development of new commodity derivatives, ESMA should ensure when determining the methodology for calculation that the development of new commodity derivatives cannot be used to circumvent the position limits regime.

(131) Position limits should be set for each individual commodity derivative contract. In order to avoid circumvention of the position limits regime through the ongoing development of new commodity derivative contracts, ESMA should ensure that the methodology for calculation prevents any circumvention by taking into account the overall open interest in other commodity derivatives with the same underlying commodity.

(132) It is desirable to facilitate access to capital for smaller and medium-sized enterprises (SMEs) and to facilitate the further development of specialist markets that aim to cater for the needs of smaller and medium-sized issuers. Those markets which are usually operated under this Directive as MTFs are commonly known as SME growth markets, growth markets or junior markets. The creation within the MTF category of a new sub category of SME growth market and the registration of those markets should raise their visibility and profile and aid the development of common regulatory standards in the Union for those markets. Attention should be focused on how future regulation should further foster and promote the use of that market so as to make it attractive for investors, and provide a lessening of administrative burdens and further incentives for SMEs to access capital markets through SME growth markets.

(133) The requirements applying to that new category of markets need to provide sufficient flexibility to be able to take into account the current range of successful market models that exist across Europe. They also need to strike the correct balance between maintaining high levels of investor protection, which are essential to fostering investor confidence in issuers on those markets, while reducing unnecessary administrative burdens for issuers on those markets. It is proposed that more details about SME growth market requirements such as those relating to criteria for admission to trading on such a market would be further prescribed in delegated acts or technical standards.

(134) Given the importance of not adversely affecting existing successful markets the option should remain for operators of markets aimed at smaller and medium-sized issuers to choose to continue to operate such a market in accordance with the requirements under this Directive without seeking registration as an SME growth market. An issuer that is an SME should not be obliged to apply to have its financial instruments admitted to trading on an SME growth market.

(135) In order for that new category of markets to benefit SMEs, at least 50 % of the issuers whose financial instruments are traded on a SME growth market should be SMEs. That assessment should be made on an annual basis. That 50 % criterion should be implemented in a flexible way. A temporary failure to meet that criterion should not mean that the trading venue will have to be immediately deregistered or refused to be registered as an SME growth market if it has a reasonable prospect of meeting the 50 % criterion from the subsequent year. With respect to the assessment to determine whether an issuer is an SME enterprise, it should be made based on the market capitalisation of the previous three calendar years. This should ensure a smoother transition for those issuers from those specialist markets to the main markets.

(136) Any confidential information received by the contact point of one Member State through the contact point of another Member State should not be regarded as purely domestic.

(137) It is necessary to enhance convergence of powers at the disposal of competent authorities so as to pave the way towards an equivalent intensity of enforcement across the integrated financial market. A common minimum set of powers coupled with adequate resources should guarantee supervisory effectiveness. This Directive should therefore provide for a minimum set of supervisory and investigative powers competent authorities of Member States should be entrusted with in accordance with national law. Those powers should be exercised, where the national law so requires, by application to the competent judicial authorities. When exercising their powers under this Directive, competent authorities should act objectively and impartially and remain autonomous in their decision making.

(138) While this Directive specifies a minimum set of powers competent authorities should have, those powers are to be exercised within a complete system of national law which guarantees the respect for fundamental rights, including the right to privacy. For the exercise of those powers, which may amount to serious interferences with the right to

respect private and family life, home and communications, Member States should have in place adequate and effective safeguards against any abuse, for instance, where appropriate prior authorisation from the judicial authorities of a Member State concerned. Member States should allow the possibility for competent authorities to exercise such intrusive powers to the extent necessary for the proper investigation of serious cases where there are no equivalent means for effectively achieving the same result.

(139) No action taken by any competent authority or ESMA in the performance of their duties should directly or indirectly discriminate against any Member State or group of Member States as a venue for the provision of investment services and activities in any currency.

(140) In view of the significant impact and market share acquired by various MTFs, it is appropriate to ensure that adequate cooperation arrangements are established between the competent authority of the MTF and that of the jurisdiction in which the MTF is providing services. In order to anticipate any similar developments, this should be extended to OTFs.

(141) In order to ensure compliance by investment firms, market operators authorised to operate an MTF or OTF, regulated markets, APAs, CTPs or approved reporting mechanisms (ARMs), those who effectively control their business and the members of the investment firms and regulated markets' management body with the obligations deriving from this Directive and from Regulation (EU) No 600/2014 and to ensure that they are subject to similar treatment across the Union, Member States should be required to provide for sanctions and measures which are effective, proportionate and dissuasive. Administrative sanctions and measures set out by Member States should satisfy certain essential requirements in relation to addressees, criteria to be taken into account when applying a sanction or measure, publication, key powers to impose sanctions and levels of administrative fines.

(142) In particular, competent authorities should be empowered to impose fines which are sufficiently high to offset the benefits that can be expected and to be dissuasive even for larger institutions and their managers.

(143) It is also necessary for competent authorities to have, in accordance with national law and with the Charter, the ability to access the premises of natural and legal persons. Access to such premises is necessary when there is reasonable suspicion that documents and other data relating to the subject matter of an investigation exist and may be relevant to prove an infringement of this Directive or of Regulation (EU) No 600/2014. Additionally, access to such premises is necessary where the person to whom a demand for information has already been made, fails to comply with such demand wholly or in part; or where there are reasonable grounds for believing that if a demand were to be made, it would not be complied with, or that the documents or information to which the information requirement relates, would be removed, tampered with or destroyed. If prior authorisation is needed from the judicial authority of the Member State concerned, in accordance with national law, such power for access into premises should be used after having obtained that prior judicial authorisation.

(144) Existing recordings of telephone conversations and data traffic records from investment firms executing and documenting the executions of transactions, as well as existing telephone and data traffic records from tele-communications operators constitute crucial, and sometimes the only, evidence to detect and prove the existence of market abuse as well as verify compliance by firms with investor protection and other requirements set out in this Directive or in Regulation (EU) No 600/2014. Therefore, competent authorities should be able to require existing recordings of telephone conversations, electronic communications and data traffic records held by an investment firm or credit. Access to data and telephone records is necessary for the detection and penalising of market abuse or of infringements of requirements set out in this Directive or in Regulation (EU) No 600/2014.

In order to introduce a level playing field in the Union in relation to the access to telephone and existing data traffic records held by a telecommunication operator or the existing recordings of telephone conversations and data traffic held by an investment firm, competent authorities should, in accordance with national law, be able to require existing telephone and existing data traffic records held by a telecommunication operator insofar as permitted under national law and existing recordings of telephone conversations as well as data traffic held by an investment firm, in those cases where a reasonable suspicion exists that such records relating to the subject-matter of the inspection or investigation may be relevant to prove behaviour that is prohibited under Regulation (EU) No 596/2014 or infringements of the requirements of this Directive or of Regulation (EU) No 600/2014. Access to telephone and data traffic records held by a telecommunications operator should not encompass the content of voice communications by telephone.

12.6.2014    EN    Official Journal of the European Union    L 173/371

(145)  In order to ensure a consistent application of sanctions across the Union, Member States should be required to ensure that when determining the type of administrative sanctions or measures and the level of administrative fines, the competent authorities take into account all relevant circumstances.

(146)  In order to ensure that decisions made by competent authorities have a dissuasive effect on the public at large, they should normally be published. The publication of decisions is also an important tool for competent authorities to inform market participants of what behaviour is considered to infringe this Directive and to promote wider good behaviour amongst market participants. If such publication causes disproportionate damage to the persons involved, jeopardises the stability of financial markets or an ongoing investigation the competent authority should publish the sanctions and measures on an anonymous basis in a manner which complies with national law or delay the publication.

Competent authorities should have the option not to publish sanctions where anonymous or delayed publication is considered to be insufficient to ensure that the stability of financial markets will not be jeopardised. Competent authorities should not be required to publish measures which are deemed to be of a minor nature where publication would be disproportionate. It is appropriate to provide a mechanism for reporting unpublished sanctions to ESMA so that competent authorities can take them into account in their ongoing supervision. This Directive does not require but should not prevent the publication of criminal sanctions imposed for infringements of this Directive or of Regulation (EU) No 600/2014.

(147)  In order to detect potential infringements, competent authorities should have the necessary investigatory powers, and should establish effective and reliable mechanisms to encourage reporting of potential or actual infringements, including protection of employees reporting infringements within their own institution. Those mechanisms should be without prejudice to adequate safeguards for accused persons. Appropriate procedures should be established to ensure appropriate protection of an accused person, particularly with regard to the right to the protection of personal data of that person and procedures to ensure the right of the accused person of defence and to be heard before the adoption of a decision concerning him as well as the right to seek effective remedy before a court against a decision concerning him.

(148)  This Directive should refer to sanctions and measures in order to cover all actions applied after an infringement, and which are intended to prevent further infringements, irrespective of their qualification as a sanction or a measure under national law.

(149)  This Directive should be without prejudice to any provisions in the law of Member States relating to criminal sanctions.

(150)  Even though nothing prevents Member States from laying down rules for administrative and criminal sanctions for the same infringements, Member States should not be required to lay down rules for administrative sanctions for the infringements of this Directive or of Regulation (EU) No 600/2014 which are subject to national criminal law. In accordance with national law, Member States are not obliged to impose both administrative and criminal sanctions for the same offence, but they should be able to do so if their national law so permits. However, the maintenance of criminal sanctions instead of administrative sanctions for infringements of this Directive or of Regulation (EU) No 600/2014 should not reduce or otherwise affect the ability of competent authorities to cooperate, access and exchange information in a timely way with competent authorities in other Member States for the purposes of this Directive and of Regulation (EU) No 600/2014, including after any referral of the relevant infringements to the competent judicial authorities for criminal prosecution.

(151)  With a view to protecting clients and without prejudice to the right of customers to bring their action before the courts, it is appropriate that Member States ensure that public or private bodies are established with a view to settling disputes out-of-court, to cooperate in resolving cross-border disputes, taking into account Commission Recommendation 98/257/EC (¹) and Commission Recommendation 2001/310/EC (²). When implementing provisions on complaints and redress procedures for out-of-court settlements, Member States should be encouraged to use existing cross-border cooperation mechanisms, in particular the Financial Services Complaints Network (FIN-Net).

---

(¹) Commission Recommendation 98/257/EC of 30 March 1998 on the principles applicable to the bodies responsible for out-of-court settlement of consumer disputes (OJ L 115, 17.4.1998, p. 31).
(²) Commission Recommendation 2001/310/EC of 4 April 2001 on the principles for out-of-court bodies involved in the consensual resolution of consumer disputes (OJ L 109, 19.4.2001, p 56).

(152) Any exchange or transmission of information between competent authorities, other authorities, bodies or persons should be in accordance with the rules on transfer of personal data to third countries as laid down in Directive 95/46/EC. Any exchange or transmission of personal data by ESMA with third countries should be in accordance with the rules on the transfer of personal data as laid down in Regulation (EC) No 45/2001.

(153) It is necessary to reinforce provisions on exchange of information between national competent authorities and to strengthen the duties of assistance and cooperation which they owe to each other. Due to increasing cross-border activity, competent authorities should provide each other with the relevant information for the exercise of their functions, so as to ensure the effective enforcement of this Directive, including in situations where infringements or suspected infringements may be of concern to authorities in two or more Member States. In the exchange of information, strict professional secrecy is needed to ensure the smooth transmission of that information and the protection of particular rights.

(154) Where the operation of a trading venue that has established arrangements in a host Member State has become of substantial importance for the functioning of the securities markets and the protection of the investors in that host Member State, the proportionate cooperation arrangements to be put in place should take the appropriate form amongst possible cooperation modalities between the competent authorities of the home and host Member States, proportionate to the needs for cross-border supervisory cooperation in particular resulting from the nature and scale of the impact on the securities markets and the investor protection in the host Member State, such as ad hoc or periodic information sharing, consultation and assistance.

(155) In order to attain the objectives set out in this Directive, the power to adopt acts in accordance with Article 290 TFEU should be delegated to the Commission in respect of details concerning exemptions, the clarification of definitions, the criteria for the assessment of proposed acquisitions of an investment firm, the organisational requirements for investment firms, APAs and CTPs, the management of conflicts of interest, conduct of business obligations in the provision of investment services, the execution of orders on terms most favourable to the client, the handling of client orders, the transactions with eligible counterparties, the circumstances that trigger an information requirement for investment firms or market operators operating an MTF or an OTF and operators of a regulated market, the circumstances constituting significant damage to the investors' interests and the orderly functioning of the market for the purposes of the suspension and removal of financial instruments from trading on an MTF, an OTF or a regulated market, the SME growth markets, the thresholds above which the position reporting obligations apply and the criteria under which the operations of a trading venue in a host Member State could be considered as of substantial importance for the functioning of the securities markets and the protection of the investors. It is of particular importance that the Commission carry out appropriate consultations during its preparatory work, including at expert level. The Commission, when preparing and drawing up delegated acts, should ensure a simultaneous, timely and appropriate transmission of relevant documents to the European Parliament and to the Council.

(156) Technical standards in financial services should ensure consistent harmonisation and adequate protection of investors, including those investing in structured deposits, and consumers across the Union. As a body with highly specialised expertise, it would be efficient and appropriate to entrust ESMA, with the elaboration of draft regulatory and implementing technical standards which do not involve policy choices, for submission to the Commission. To ensure consistent investor and consumer protection across financial services sectors, ESMA should carry out its tasks, to the extent possible, in close cooperation with the European Supervisory Authority (European Banking Authority) ('EBA'), established by Regulation (EC) No 1093/2010 of the European Parliament and of the Council (¹) and with EIOPA.

(157) The Commission should adopt the draft regulatory technical standards developed by ESMA regarding exemptions that relate to activities considered to be ancillary to the main business, regarding the information to be provided and certain requirements in the context of procedures for granting and refusing requests for authorisation of investment firms, regarding acquisition of the qualifying holding, regarding algorithmic trading, regarding obligation to execute orders on terms most favourable to clients, regarding the suspension and removal of financial instruments from trading on a regulated market, on an MTF or an OTF, regarding freedom to provide investment services and activities, regarding establishment of a branch, regarding systems resilience, circuit breakers and electronic trading, regarding tick sizes, regarding synchronisation of business clocks, regarding admission of

(¹) Regulation (EU) No 1093/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Banking Authority), amending Decision No 716/2009/EC and repealing Commission Decision 2009/78/EC (OJ L 331, 15.12.2010, p. 12).

12.6.2014          EN          Official Journal of the European Union          L 173/373

financial instruments to trading, regarding the position limits and position management controls in commodity derivatives, regarding procedures for granting and refusing requests for authorisation of data reporting services providers, regarding organisational requirements for APAs, CTPs and ARMs and regarding cooperation among competent authorities. The Commission should adopt those draft regulatory technical standards by means of delegated acts pursuant to Article 290 TFEU and in accordance with Articles 10 to 14 of Regulation (EU) No 1093/2010.

(158) The Commission should also be empowered to adopt implementing technical standards by means of implementing acts pursuant to Article 291 TFEU and in accordance with Article 15 of Regulation (EU) No 1095/2010. ESMA should be entrusted with drafting implementing technical standards for submission to the Commission regarding procedures for granting and refusing requests for authorisation of investment firms, regarding the acquisition of a qualifying holding, regarding trading process on finalisation of transactions in MTFs and OTFs, regarding suspension and removal of financial instruments from trading, regarding freedom to provide investment services and activities, regarding establishment of a branch, regarding position reporting by categories of position holders, regarding procedures for granting and refusing requests for authorisation, regarding the procedures and forms for submitting information in relation to the publication of decisions, regarding obligation to cooperate, regarding cooperation among competent authorities, regarding exchange of information and regarding consultation prior to authorisation of an investment firm.

(159) The Commission should submit a report to the European Parliament and the Council assessing the functioning of OTFs, the functioning of the regime for SME growth markets, the impact of requirements regarding automated and high-frequency trading, the experience with the mechanism for banning certain products or practices and the impact of the measures regarding commodity derivatives markets.

(160) By 1 January 2018, the Commission should prepare a report assessing the potential impact on energy prices and the functioning of the energy market of the expiry of the transitional period provided for the application of the clearing obligation and the margining requirements set out in Regulation (EU) No 648/2012. If appropriate, the Commission should submit a legislative proposal to establish or amend the relevant law, including specific sectoral legislation such as Regulation (EU) No 1227/2011.

(161) Directive 2011/61/EU of the European Parliament and of the Council ([1]) allows Member States to authorise alternative investment fund managers (AIFMs) to provide certain investment services in addition to the collective management of alternative investment funds (AIFs), including services of management of portfolios of investments, investment advice, safe-keeping and administration in relation to shares or units of collective investment undertakings, as well as reception and transmission of orders in relation to financial instruments. Since the requirements governing the provision of those services are harmonised within the Union, AIFMs authorised by their home competent authorities to provide those services should not be subject to any additional authorisation in host Member States nor to any other measure having the same effect.

(162) Under the current legal framework, AIFMs authorised to provide those investment services and intending to provide them in Member States other than their home Member State are to comply with additional national requirements, including the establishment of a separate legal entity. In order to eliminate obstacles in the cross-border provision of harmonised investment services and to ensure a level playing field between entities providing the same investment services under the same legal requirements, an AIFM authorised to provide those services should be able to provide them on a cross-border basis, subject to appropriate notification requirements, under the authorisation granted by the competent authorities of their home Member State.

(163) Directive 2011/61/EU should therefore be amended accordingly.

(164) Since the objective of this Directive, namely creating an integrated financial market in which investors are effectively protected and the efficiency and integrity of the overall market are safeguarded, requires the establishment of common regulatory requirements relating to investment firms wherever they are authorised in the Union and

---

([1]) Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directives 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010 (OJ L 174, 1.7.2011, p. 1).

L 173/374          EN          Official Journal of the European Union          12.6.2014

governing the functioning of regulated markets and other trading systems so as to prevent opacity or disruption on one market from undermining the efficient operation of the Union financial system as a whole which cannot be sufficiently achieved by the Member States but can rather, by reason of the scale and effects of this Directive, be better achieved at Union level, the Union may adopt measures in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty on European Union. In accordance with the principle of proportionality, as set out in that Article, this Directive does not go beyond what is necessary in order to achieve that objective.

(165) Given the increase of tasks conferred on ESMA by this Directive and by Regulation (EU) No 600/2014, the European Parliament, the Council and the Commission should ensure that adequate human and financial resources are made available.

(166) This Directive respects the fundamental rights and observes the principles recognised in the Charter, in particular the right to the protection of personal data, the freedom to conduct a business, the right to consumer protection, the right to an effective remedy and to a fair trial, the right not to be tried or punished twice for the same offence and has to be implemented in accordance with those rights and principles.

(167) The European Data Protection Supervisor has been consulted in accordance with Article 28(2) of Regulation (EC) No 45/2001 and delivered an opinion on 10 February 2012 ([1]).

(168) In accordance with the Joint Political Declaration of Member States and the Commission on explanatory documents of 28 September 2011 ([2]), Member States have undertaken to accompany, in justified cases, the notification of their transposition measures with one or more documents explaining the relationship between the components of a directive and the corresponding parts of national transposition instruments. With regard to this Directive, the legislator considers the transmission of such documents to be justified.

(169) The obligation to transpose this Directive into national law should be confined to those provisions which represent a substantive amendment as compared to the earlier Directives. The obligation to transpose the provisions which are unchanged arises under the earlier Directives.

(170) This Directive should be without prejudice to the obligations of the Member States relating to the time-limits for the transposition into national law and the dates of application of the Directives set out in Annex III, Part B,

HAVE ADOPTED THIS DIRECTIVE:

TITLE I

**SCOPE AND DEFINITIONS**

*Article 1*

**Scope**

1.    This Directive shall apply to investment firms, market operators, data reporting services providers, and third-country firms providing investment services or performing investment activities through the establishment of a branch in the Union.

2.    This Directive establishes requirements in relation to the following:

(a) authorisation and operating conditions for investment firms;

(b) provision of investment services or activities by third-country firms through the establishment of a branch;

---

([1]) OJ C 147, 25.5.2012, p. 1.
([2]) OJ C 369, 17.12.2011, p. 14.

(c) authorisation and operation of regulated markets;

(d) authorisation and operation of data reporting services providers; and

(e) supervision, cooperation and enforcement by competent authorities.

3.    The following provisions shall also apply to credit institutions authorised under Directive 2013/36/EU, when providing one or more investment services and/or performing investment activities:

(a) Article 2(2), Article 9(3) and Articles 14 and 16 to 20,

(b) Chapter II of Title II excluding second subparagraph of Article 29(2),

(c) Chapter III of Title II excluding Article 34(2) and (3) and Article 35(2) to (6) and (9),

(d) Articles 67 to 75 and Articles 80, 85 and 86.

4.    The following provisions shall also apply to investment firms and to credit institutions authorised under Directive 2013/36/EU when selling or advising clients in relation to structured deposits:

(a) Article 9(3), Article 14, and Article 16(2), (3) and (6);

(b) Articles 23 to 26, Article 28 and Article 29, excluding the second subparagraph of paragraph 2 thereof, and Article 30; and

(c) Articles 67 to 75.

5.    Article 17(1) to (6) shall also apply to members or participants of regulated markets and MTFs who are not required to be authorised under this Directive pursuant to points (a), (e), (i) and (j) of Article 2(1).

6.    Articles 57 and 58 shall also apply to persons exempt under Article 2.

7.    All multilateral systems in financial instruments shall operate either in accordance with the provisions of Title II concerning MTFs or OTFs or the provisions of Title III concerning regulated markets.

Any investment firms which, on an organised, frequent, systematic and substantial basis, deal on own account when executing client orders outside a regulated market, an MTF or an OTF shall operate in accordance with Title III of Regulation (EU) No 600/2014.

Without prejudice to Articles 23 and 28 of Regulation (EU) No 600/2014, all transactions in financial instruments as referred to in the first and the second subparagraphs which are not concluded on multilateral systems or systematic internalisers shall comply with the relevant provisions of Title III of Regulation (EU) No 600/2014.

*Article 2*

**Exemptions**

1.    This Directive shall not apply to:

(a)  insurance undertakings or undertakings carrying out the reinsurance and retrocession activities referred to in Directive 2009/138/EC when carrying out the activities referred to in that Directive;

(b)  persons providing investment services exclusively for their parent undertakings, for their subsidiaries or for other subsidiaries of their parent undertakings;

(c)  persons providing an investment service where that service is provided in an incidental manner in the course of a professional activity and that activity is regulated by legal or regulatory provisions or a code of ethics governing the profession which do not exclude the provision of that service;

(d)  persons dealing on own account in financial instruments other than commodity derivatives or emission allowances or derivatives thereof and not providing any other investment services or performing any other investment activities in financial instruments other than commodity derivatives or emission allowances or derivatives thereof unless such persons:

   (i)  are market makers;

   (ii)  are members of or participants in a regulated market or an MTF or have direct electronic access to a trading venue;

   (iii)  apply a high-frequency algorithmic trading technique; or

   (iv)  deal on own account when executing client orders;

   Persons exempt under points (a), (i) or (j) are not required to meet the conditions laid down in this point in order to be exempt.

(e)  operators with compliance obligations under Directive 2003/87/EC who, when dealing in emission allowances, do not execute client orders and who do not provide any investment services or perform any investment activities other than dealing on own account, provided that those persons do not apply a high-frequency algorithmic trading technique;

(f)  persons providing investment services consisting exclusively in the administration of employee-participation schemes;

(g)  persons providing investment services which only involve both the administration of employee-participation schemes and the provision of investment services exclusively for their parent undertakings, for their subsidiaries or for other subsidiaries of their parent undertakings;

(h)  the members of the ESCB and other national bodies performing similar functions in the Union, other public bodies charged with or intervening in the management of the public debt in the Union and international financial institutions established by two or more Member States which have the purpose of mobilising funding and providing financial assistance to the benefit of their members that are experiencing or threatened by severe financing problems;

(i)    collective investment undertakings and pension funds whether coordinated at Union level or not and the depositaries and managers of such undertakings;

(j)    persons:

(i) dealing on own account, including market makers, in commodity derivatives or emission allowances or derivatives thereof, excluding persons who deal on own account when executing client orders; or

(ii) providing investment services, other than dealing on own account, in commodity derivatives or emission allowances or derivatives thereof to the customers or suppliers of their main business;

provided that:

— for each of those cases individually and on an aggregate basis this is an ancillary activity to their main business, when considered on a group basis, and that main business is not the provision of investment services within the meaning of this Directive or banking activities under Directive 2013/36/EU, or acting as a market-maker in relation to commodity derivatives,

— those persons do not apply a high-frequency algorithmic trading technique; and

— those persons notify annually the relevant competent authority that they make use of this exemption and upon request report to the competent authority the basis on which they consider that their activity under points (i) and (ii) is ancillary to their main business;

(k)    persons providing investment advice in the course of providing another professional activity not covered by this Directive provided that the provision of such advice is not specifically remunerated;

(l)    associations set up by Danish and Finnish pension funds with the sole aim of managing the assets of pension funds that are members of those associations;

(m)    'agenti di cambio' whose activities and functions are governed by Article 201 of Italian Legislative Decree No 58 of 24 February 1998;

(n)    transmission system operators as defined in Article 2(4) of Directive 2009/72/EC or Article 2(4) of Directive 2009/73/EC when carrying out their tasks under those Directives, under Regulation (EC) No 714/2009, under Regulation (EC) No 715/2009 or under network codes or guidelines adopted pursuant to those Regulations, any persons acting as service providers on their behalf to carry out their task under those legislative acts or under network codes or guidelines adopted pursuant to those Regulations, and any operator or administrator of an energy balancing mechanism, pipeline network or system to keep in balance the supplies and uses of energy when carrying out such tasks.

That exemption shall apply to persons engaged in the activities set out in this point only where they perform investment activities or provide investment services relating to commodity derivatives in order to carry out those activities. That exemption shall not apply with regard to the operation of a secondary market, including a platform for secondary trading in financial transmission rights;

(o)    CSDs that are regulated as such under Union law, to the extent that they are regulated under that Union law.

2.    The rights conferred by this Directive shall not extend to the provision of services as counterparty in transactions carried out by public bodies dealing with public debt or by members of the ESCB performing their tasks as provided for by the TFEU and by Protocol No 4 on the Statute of the European System of Central Banks and of the European Central Bank or performing equivalent functions under national provisions.

3.    The Commission shall adopt delegated acts in accordance with Article 89 to clarify for the purposes of point (c) of paragraph 1 when an activity is provided in an incidental manner.

4.    ESMA shall develop draft regulatory technical standards to specify, for the purposes of point (j) of paragraph 1, the criteria for establishing when an activity is to be considered to be ancillary to the main business at a group level.

Those criteria shall take into account at least the following elements:

(a)  the need for ancillary activities to constitute a minority of activities at a group level;

(b)  the size of their trading activity compared to the overall market trading activity in that asset class.

In determining the extent to which ancillary activities constitute a minority of activities at a group level ESMA may determine that the capital employed for carrying out the ancillary activity relative to the capital employed for carrying out the main business is to be considered. However, that factor shall in no case be sufficient to demonstrate that the activity is ancillary to the main business of the group.

The activities referred to in this paragraph shall be considered at a group level.

The elements referred to in the second and third subparagraphs shall exclude:

(a)  intra-group transactions as referred to in Article 3 of Regulation (EU) No 648/2012 that serve group-wide liquidity or risk management purposes;

(b)  transactions in derivatives which are objectively measurable as reducing risks directly relating to the commercial activity or treasury financing activity;

(c)  transactions in commodity derivatives and emission allowances entered into to fulfil obligations to provide liquidity on a trading venue, where such obligations are required by regulatory authorities in accordance with Union law or with national laws, regulations and administrative provisions, or by trading venues.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

*Article 3*

**Optional exemptions**

1.    Member States may choose not to apply this Directive to any persons for which they are the home Member State, provided that the activities of those persons are authorised and regulated at national level and those persons:

(a)  are not allowed to hold client funds or client securities and which for that reason are not allowed at any time to place themselves in debit with their clients;

(b) are not allowed to provide any investment service except the reception and transmission of orders in transferable securities and units in collective investment undertakings and/or the provision of investment advice in relation to such financial instruments; and

(c) in the course of providing that service, are allowed to transmit orders only to:

(i) investment firms authorised in accordance with this Directive;

(ii) credit institutions authorised in accordance with Directive 2013/36/EU;

(iii) branches of investment firms or of credit institutions authorised in a third country and which are subject to and comply with prudential rules considered by the competent authorities to be at least as stringent as those laid down in this Directive, in Regulation (EU) No 575/2013 or in Directive 2013/36/EU;

(iv) collective investment undertakings authorised under the law of a Member State to market units to the public and to the managers of such undertakings; or

(v) investment companies with fixed capital, as defined in Article 17(7) of Directive 2012/30/EU of the European Parliament and of the Council (¹) the securities of which are listed or dealt in on a regulated market in a Member State; or

(d) provide investment services exclusively in commodities, emission allowances and/or derivatives thereof for the sole purpose of hedging the commercial risks of their clients, where those clients are exclusively local electricity undertakings as defined in Article 2(35) of Directive 2009/72/EC and/or natural gas undertakings as defined in Article 2(1) of Directive 2009/73/EC, and provided that those clients jointly hold 100 % of the capital or of the voting rights of those persons, exercise joint control and are exempt under point (j) of Article 2(1) of this Directive if they carry out those investment services themselves; or

(e) provide investment services exclusively in emission allowances and/or derivatives thereof for the sole purpose of hedging the commercial risks of their clients, where those clients are exclusively operators as defined in point (f) of Article 3 of Directive 2003/87/EC, and provided that those clients jointly hold 100 % of the capital or voting rights of those persons, exercise joint control and are exempt under point (j) of Article 2(1) of this Directive if they carry out those investment services themselves.

2.    Member States' regimes shall submit the persons referred to in paragraph 1 to requirements which are at least analogous to the following requirements under this Directive:

(a) conditions and procedures for authorisation and on-going supervision as established in Article 5(1) and (3), Articles 7 to 10, 21, 22 and 23 and the corresponding delegated acts adopted by the Commission in accordance with Article 89;

(b) conduct of business obligations as established in Article 24(1), (3), (4), (5), (7) and (10), Article 25(2), (5) and (6), and, where the national regime allows those persons to appoint tied agents, Article 29, and the respective implementing measures;

(¹) Directive 2012/30/EU of the European Parliament and of the Council of 25 October 2012 on coordination of safeguards which, for the protection of the interests of members and others, are required by Member States of companies within the meaning of the second paragraph of Article 54 of the Treaty on the Functioning of the European Union, in respect of the formation of public limited liability companies and the maintenance and alteration of their capital, with a view to making such safeguards equivalent (OJ L 315, 14.11.2012, p. 74).

(c) organisational requirements as laid down in the first, sixth and seventh subparagraph of Article 16(3) and in Article 16(6) and (7) and the corresponding delegated acts adopted by the Commission in accordance with Article 89.

Member States shall require persons exempt from this Directive pursuant to paragraph 1 of this Article to be covered by an investor-compensation scheme recognised in accordance with Directive 97/9/EC. Member States may allow investment firms not to be covered by such a scheme provided they hold professional indemnity insurance where, taking into account the size, risk profile and legal nature of the persons exempt in accordance with paragraph 1 of this Article, equivalent protection to their clients is ensured.

By way of derogation from the second subparagraph of this paragraph, Member States that already have in place such laws, regulations or administrative provisions before 2 July 2014 may until 3 July 2019 require that where the persons exempt from this Directive pursuant to paragraph 1 of this Article provide the investment services of the reception and transmission of orders and/or of the provision of investment advice in units in collective investment undertakings and act as an intermediary with a management company as defined in Directive 2009/65/EC, those persons are jointly and severally liable with the management company for any damages incurred by the client in relation to those services.

3.    Persons exempt from this Directive pursuant to paragraph 1 shall not benefit from the freedom to provide services or to perform activities or to establish branches as provided for in Articles 34 and 35 respectively.

4.    Member States shall notify the Commission and ESMA of the exercise of the option under this Article and shall ensure that each authorisation granted in accordance with paragraph 1 mentions that it is granted in accordance with this Article.

5.    Member States shall communicate to ESMA the provisions of national law analogous to the requirements of this Directive listed in paragraph 2.

*Article 4*

**Definitions**

1.    For the purposes of this Directive, the following definitions apply:

(1) 'investment firm' means any legal person whose regular occupation or business is the provision of one or more investment services to third parties and/or the performance of one or more investment activities on a professional basis.

Member States may include in the definition of investment firms undertakings which are not legal persons, provided that:

(a) their legal status ensures a level of protection for third parties' interests equivalent to that afforded by legal persons; and

(b) they are subject to equivalent prudential supervision appropriate to their legal form.

However, where a natural person provides services involving the holding of third party funds or transferable securities, that person may be considered to be an investment firm for the purposes of this Directive and of Regulation (EU) No 600/2014 only if, without prejudice to the other requirements imposed in this Directive, in Regulation (EU) No 600/2014, and in Directive 2013/36/EU, that person complies with the following conditions:

(a) the ownership rights of third parties in instruments and funds must be safeguarded, especially in the event of the insolvency of the firm or of its proprietors, seizure, set-off or any other action by creditors of the firm or of its proprietors;

(b) the firm must be subject to rules designed to monitor the firm's solvency and that of its proprietors;

(c) the firm's annual accounts must be audited by one or more persons empowered, under national law, to audit accounts;

(d) where the firm has only one proprietor, that person must make provision for the protection of investors in the event of the firm's cessation of business following the proprietor's death or incapacity or any other such event;

(2) 'investment services and activities' means any of the services and activities listed in Section A of Annex I relating to any of the instruments listed in Section C of Annex I.

The Commission shall adopt delegated acts in accordance with Article 89 measures specifying:

(a) the derivative contracts referred to in Section C.6 of Annex I that have the characteristics of wholesale energy products that must be physically settled and C.6 energy derivative contracts;

(b) the derivative contracts referred to in Section C.7 of Annex I that have the characteristics of other derivative financial instruments;

(c) the derivative contracts referred to in Section C.10 of Annex I that have the characteristics of other derivative financial instruments, having regard to whether, inter alia, they are traded on a regulated market, an MTF or an OTF;

(3) 'ancillary services' means any of the services listed in Section B of Annex I;

(4) 'investment advice' means the provision of personal recommendations to a client, either upon its request or at the initiative of the investment firm, in respect of one or more transactions relating to financial instruments;

(5) 'execution of orders on behalf of clients' means acting to conclude agreements to buy or sell one or more financial instruments on behalf of clients and includes the conclusion of agreements to sell financial instruments issued by an investment firm or a credit institution at the moment of their issuance;

(6) 'dealing on own account' means trading against proprietary capital resulting in the conclusion of transactions in one or more financial instruments;

(7) 'market maker' means a person who holds himself out on the financial markets on a continuous basis as being willing to deal on own account by buying and selling financial instruments against that person's proprietary capital at prices defined by that person;

(8) 'portfolio management' means managing portfolios in accordance with mandates given by clients on a discretionary client-by-client basis where such portfolios include one or more financial instruments;

(9) 'client' means any natural or legal person to whom an investment firm provides investment or ancillary services;

(10) 'professional client' means a client meeting the criteria laid down in Annex II;

(11) 'retail client' means a client who is not a professional client;

(12) 'SME growth market' means a MTF that is registered as an SME growth market in accordance with Article 33;

(13) 'small and medium-sized enterprises' for the purposes of this Directive, means companies that had an average market capitalisation of less than EUR 200 000 000 on the basis of end-year quotes for the previous three calendar years;

(14) 'limit order' means an order to buy or sell a financial instrument at its specified price limit or better and for a specified size;

(15) 'financial instrument' means those instruments specified in Section C of Annex I;

(16) 'C6 energy derivative contracts' means options, futures, swaps, and any other derivative contracts mentioned in Section C.6 of Annex I relating to coal or oil that are traded on an OTF and must be physically settled;

(17) 'money-market instruments' means those classes of instruments which are normally dealt in on the money market, such as treasury bills, certificates of deposit and commercial papers and excluding instruments of payment;

(18) 'market operator' means a person or persons who manages and/or operates the business of a regulated market and may be the regulated market itself;

(19) 'multilateral system' means any system or facility in which multiple third-party buying and selling trading interests in financial instruments are able to interact in the system;

(20) 'systematic internaliser' means an investment firm which, on an organised, frequent systematic and substantial basis, deals on own account when executing client orders outside a regulated market, an MTF or an OTF without operating a multilateral system;

The frequent and systematic basis shall be measured by the number of OTC trades in the financial instrument carried out by the investment firm on own account when executing client orders. The substantial basis shall be measured either by the size of the OTC trading carried out by the investment firm in relation to the total trading of the investment firm in a specific financial instrument or by the size of the OTC trading carried out by the investment firm in relation to the total trading in the Union in a specific financial instrument. The definition of a systematic internaliser shall apply only where the pre-set limits for a frequent and systematic basis and for a substantial basis are both crossed or where an investment firm chooses to opt-in under the systematic internaliser regime;

(21) 'regulated market' means a multilateral system operated and/or managed by a market operator, which brings together or facilitates the bringing together of multiple third-party buying and selling interests in financial instruments – in the system and in accordance with its non-discretionary rules – in a way that results in a contract, in respect of the financial instruments admitted to trading under its rules and/or systems, and which is authorised and functions regularly and in accordance with Title III of this Directive;

(22) 'multilateral trading facility' or 'MTF' means a multilateral system, operated by an investment firm or a market operator, which brings together multiple third-party buying and selling interests in financial instruments – in the system and in accordance with non-discretionary rules – in a way that results in a contract in accordance with Title II of this Directive;

(23) 'organised trading facility' or 'OTF' means a multilateral system which is not a regulated market or an MTF and in which multiple third-party buying and selling interests in bonds, structured finance products, emission allowances or derivatives are able to interact in the system in a way that results in a contract in accordance with Title II of this Directive;

(24) 'trading venue' means a regulated market, an MTF or an OTF;

(25) 'liquid market' means a market for a financial instrument or a class of financial instruments, where there are ready and willing buyers and sellers on a continuous basis, assessed in accordance with the following criteria, taking into consideration the specific market structures of the particular financial instrument or of the particular class of financial instruments:

  (a) the average frequency and size of transactions over a range of market conditions, having regard to the nature and life cycle of products within the class of financial instrument;

  (b) the number and type of market participants, including the ratio of market participants to traded instruments in a particular product;

  (c) the average size of spreads, where available;

(26) 'competent authority' means the authority, designated by each Member State in accordance with Article 67, unless otherwise specified in this Directive;

(27) 'credit institution' means a credit institution as defined in point (1) of Article 4(1) of Regulation (EU) No 575/2013;

(28) 'UCITS management company' means a management company as defined in point (b) of Article 2(1) of Directive 2009/65/EC of the European Parliament and of the Council ([1]);

(29) 'tied agent' means a natural or legal person who, under the full and unconditional responsibility of only one investment firm on whose behalf it acts, promotes investment and/or ancillary services to clients or prospective clients, receives and transmits instructions or orders from the client in respect of investment services or financial instruments, places financial instruments or provides advice to clients or prospective clients in respect of those financial instruments or services;

(30) 'branch' means a place of business other than the head office which is a part of an investment firm, which has no legal personality and which provides investment services and/or activities and which may also perform ancillary services for which the investment firm has been authorised; all the places of business set up in the same Member State by an investment firm with headquarters in another Member State shall be regarded as a single branch;

(31) 'qualifying holding' means a direct or indirect holding in an investment firm which represents 10 % or more of the capital or of the voting rights, as set out in Articles 9 and 10 of Directive 2004/109/EC of the European Parliament and of the Council ([2]), taking into account the conditions regarding aggregation thereof laid down in Article 12(4) and (5) of that Directive, or which makes it possible to exercise a significant influence over the management of the investment firm in which that holding subsists;

(32) 'parent undertaking' means a parent undertaking within the meaning of Article 2(9) and 22 of Directive 2013/34/EU of the European Parliament and of the Council ([3]);

---

([1]) Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) (OJ L 302, 17.11.2009, p. 32).

([2]) Directive 2004/109/EC of the European Parliament and of the Council of 15 December 2004 on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market and amending Directive 2001/34/EC (OJ L 390, 31.12.2004, p. 38).

([3]) Directive 2013/34/EU of the European Parliament and of the Council of 26 June 2013 on the annual financial statements, consolidated financial statements and related reports of certain types of undertakings, amending Directive 2006/43/EC of the European Parliament and of the Council and repealing Council Directives 78/660/EEC and 83/349/EEC (OJ L 182, 29.6.2013, p. 19).

(33) 'subsidiary' means a subsidiary undertaking within the meaning of Articles 2(10) and 22 of Directive 2013/34/EU, including any subsidiary of a subsidiary undertaking of an ultimate parent undertaking;

(34) 'group' means a group as defined in Article 2(11) of Directive 2013/34/EU;

(35) 'close links' means a situation in which two or more natural or legal persons are linked by:

(a) participation in the form of ownership, direct or by way of control, of 20 % or more of the voting rights or capital of an undertaking;

(b) 'control' which means the relationship between a parent undertaking and a subsidiary, in all the cases referred to in Article 22(1) and (2) of Directive 2013/34/EU, or a similar relationship between any natural or legal person and an undertaking, any subsidiary undertaking of a subsidiary undertaking also being considered to be a subsidiary of the parent undertaking which is at the head of those undertakings;

(c) a permanent link of both or all of them to the same person by a control relationship;

(36) 'management body' means the body or bodies of an investment firm, market operator or data reporting services provider, which are appointed in accordance with national law, which are empowered to set the entity's strategy, objectives and overall direction, and which oversee and monitor management decision-making and include persons who effectively direct the business of the entity.

Where this Directive refers to the management body and, pursuant to national law, the managerial and supervisory functions of the management body are assigned to different bodies or different members within one body, the Member State shall identify the bodies or members of the management body responsible in accordance with its national law, unless otherwise specified by this Directive;

(37) 'senior management' means natural persons who exercise executive functions within an investment firm, a market operator or a data reporting services provider and who are responsible, and accountable to the management body, for the day-to-day management of the entity, including for the implementation of the policies concerning the distribution of services and products to clients by the firm and its personnel;

(38) 'matched principal trading' means a transaction where the facilitator interposes itself between the buyer and the seller to the transaction in such a way that it is never exposed to market risk throughout the execution of the transaction, with both sides executed simultaneously, and where the transaction is concluded at a price where the facilitator makes no profit or loss, other than a previously disclosed commission, fee or charge for the transaction;

(39) 'algorithmic trading' means trading in financial instruments where a computer algorithm automatically determines individual parameters of orders such as whether to initiate the order, the timing, price or quantity of the order or how to manage the order after its submission, with limited or no human intervention, and does not include any system that is only used for the purpose of routing orders to one or more trading venues or for the processing of orders involving no determination of any trading parameters or for the confirmation of orders or the post-trade processing of executed transactions;

(40) 'high-frequency algorithmic trading technique' means an algorithmic trading technique characterised by:

(a) infrastructure intended to minimise network and other types of latencies, including at least one of the following facilities for algorithmic order entry: co-location, proximity hosting or high-speed direct electronic access;

(b) system-determination of order initiation, generation, routing or execution without human intervention for individual trades or orders; and

(c) high message intraday rates which constitute orders, quotes or cancellations;

(41) 'direct electronic access' means an arrangement where a member or participant or client of a trading venue permits a person to use its trading code so the person can electronically transmit orders relating to a financial instrument directly to the trading venue and includes arrangements which involve the use by a person of the infrastructure of the member or participant or client, or any connecting system provided by the member or participant or client, to transmit the orders (direct market access) and arrangements where such an infrastructure is not used by a person (sponsored access);

(42) 'cross-selling practice' means the offering of an investment service together with another service or product as part of a package or as a condition for the same agreement or package;

(43) 'structured deposit' means a deposit as defined in point (c) of Article 2(1) of Directive 2014/49/EU of the European Parliament and of the Council (¹), which is fully repayable at maturity on terms under which interest or a premium will be paid or is at risk, according to a formula involving factors such as:

(a) an index or combination of indices, excluding variable rate deposits whose return is directly linked to an interest rate index such as Euribor or Libor;

(b) a financial instrument or combination of financial instruments;

(c) a commodity or combination of commodities or other physical or non-physical non-fungible assets; or

(d) a foreign exchange rate or combination of foreign exchange rates;

(44) 'transferable securities' means those classes of securities which are negotiable on the capital market, with the exception of instruments of payment, such as:

(a) shares in companies and other securities equivalent to shares in companies, partnerships or other entities, and depositary receipts in respect of shares;

(b) bonds or other forms of securitised debt, including depositary receipts in respect of such securities;

(c) any other securities giving the right to acquire or sell any such transferable securities or giving rise to a cash settlement determined by reference to transferable securities, currencies, interest rates or yields, commodities or other indices or measures;

(45) 'depositary receipts' means those securities which are negotiable on the capital market and which represent ownership of the securities of a non-domiciled issuer while being able to be admitted to trading on a regulated market and traded independently of the securities of the non-domiciled issuer;

(¹) Directive 2014/49/EU of the European Parliament and of the Council of 16 April 2014 on deposit guarantee schemes (see page 149 of this Official Journal).

(46) 'exchange-traded fund' means a fund of which at least one unit or share class is traded throughout the day on at least one trading venue and with at least one market maker which takes action to ensure that the price of its units or shares on the trading venue does not vary significantly from its net asset value and, where applicable, from its indicative net asset value;

(47) 'certificates' means certificates as defined in Article 2(1)(27) of Regulation (EU) No 600/2014;

(48) 'structured finance products' means structured finance products as defined in Article 2(1)(28) of Regulation (EU) No 600/2014;

(49) 'derivatives' means derivatives as defined in Article 2(1)(29) of Regulation (EU) No 600/2014;

(50) 'commodity derivatives' means commodity derivatives as defined in Article 2(1)(30) of Regulation (EU) No 600/2014;

(51) 'CCP' means a CCP as defined in Article 2(1) of Regulation (EU) No 648/2012;

(52) 'approved publication arrangement' or 'APA' means a person authorised under this Directive to provide the service of publishing trade reports on behalf of investment firms pursuant to Articles 20 and 21 of Regulation (EU) No 600/2014;

(53) 'consolidated tape provider' or 'CTP' means a person authorised under this Directive to provide the service of collecting trade reports for financial instruments listed in Articles 6, 7, 10, 12 and 13, 20 and 21 of Regulation (EU) No 600/2014 from regulated markets, MTFs, OTFs and APAs and consolidating them into a continuous electronic live data stream providing price and volume data per financial instrument;

(54) 'approved reporting mechanism' or 'ARM' means a person authorised under this Directive to provide the service of reporting details of transactions to competent authorities or to ESMA on behalf of investment firms;

(55) 'home Member State' means:

(a) in the case of investment firms:

(i) if the investment firm is a natural person, the Member State in which its head office is situated;

(ii) if the investment firm is a legal person, the Member State in which its registered office is situated;

(iii) if the investment firm has, under its national law, no registered office, the Member State in which its head office is situated;

(b) in the case of a regulated market, the Member State in which the regulated market is registered or, if under the law of that Member State it has no registered office, the Member State in which the head office of the regulated market is situated;

(c) in the case of an APA, a CTP or an ARM:

(i) if the APA, CTP or ARM is a natural person, the Member State in which its head office is situated;

(ii) if the APA, CTP or ARM is a legal person, the Member State in which its registered office is situated;

(iii) if the APA, CTP or ARM has, under its national law, no registered office, the Member State in which its head office is situated;

(56) 'host Member State' means the Member State, other than the home Member State, in which an investment firm has a branch or provides investment services and/or activities, or the Member State in which a regulated market provides appropriate arrangements so as to facilitate access to trading on its system by remote members or participants established in that same Member State;

(57) 'third-country firm' means a firm that would be a credit institution providing investment services or performing investment activities or an investment firm if its head office or registered office were located within the Union;

(58) 'wholesale energy product' means wholesale energy products as defined in point (4) of Article 2 of Regulation (EU) No 1227/2011;

(59) 'agricultural commodity derivatives' means derivative contracts relating to products listed in Article 1 of, and Annex I, Parts I to XX and XXIV/1, to, Regulation (EU) No 1308/2013 of the European Parliament and of the Council (¹);

(60) 'sovereign issuer' means any of the following that issues debt instruments:

(i) the Union;

(ii) a Member State, including a government department, an agency, or a special purpose vehicle of the Member State;

(iii) in the case of a federal Member State, a member of the federation;

(iv) a special purpose vehicle for several Member States;

(v) an international financial institution established by two or more Member States which has the purpose of mobilising funding and provide financial assistance to the benefit of its members that are experiencing or threatened by severe financing problems; or

(vi) the European Investment Bank;

(61) 'sovereign debt' means a debt instrument issued by a sovereign issuer;

(62) 'durable medium' means any instrument which:

(a) enables a client to store information addressed personally to that client in a way accessible for future reference and for a period of time adequate for the purposes of the information; and

(b) allows the unchanged reproduction of the information stored;

(¹) Regulation (EU) No 1308/2013 of the European Parliament and of the Council of 17 December 2013 establishing a common organisation of the markets in agricultural products and repealing Council Regulations (EEC) No 922/72, (EEC) No 234/79, (EC) No 1037/2001 and (EC) No 1234/2007 (OJ L 347, 20.12.2013, p. 671).

L 173/388    EN    Official Journal of the European Union    12.6.2014

(63) 'data reporting services provider' means an APA, a CTP or an ARM.

2.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to specify some technical elements of the definitions laid down in paragraph 1, to adjust them to market developments, technological developments and experience of behaviour that is prohibited under Regulation (EU) No 596/2014 and to ensure the uniform application of this Directive.

TITLE II

**AUTHORISATION AND OPERATING CONDITIONS FOR INVESTMENT FIRMS**

CHAPTER I

**Conditions and procedures for authorisation**

Article 5

**Requirement for authorisation**

1.    Each Member State shall require that the provision of investment services and/or the performance of investment activities as a regular occupation or business on a professional basis be subject to prior authorisation in accordance with this Chapter. Such authorisation shall be granted by the home Member State competent authority designated in accordance with Article 67.

2.    By way of derogation from paragraph 1, Member States shall authorise any market operator to operate an MTF or an OTF, subject to the prior verification of their compliance with this Chapter.

3.    Member States shall register all investment firms. The register shall be publicly accessible and shall contain information on the services or activities for which the investment firm is authorised. It shall be updated on a regular basis. Every authorisation shall be notified to ESMA.

ESMA shall establish a list of all investment firms in the Union. That list shall contain information on the services or activities for which each investment firm is authorised and it shall be updated on a regular basis. ESMA shall publish and keep up-to-date that list on its website.

Where a competent authority has withdrawn an authorisation in accordance with points (b), (c) and (d) of Article 8, that withdrawal shall be published on the list for a period of five years.

4.    Each Member State shall require that:

(a) any investment firm which is a legal person have its head office in the same Member State as its registered office;

(b) any investment firm which is not a legal person or any investment firm which is a legal person but under its national law has no registered office, have its head office in the Member State in which it actually carries out its business.

Article 6

**Scope of authorisation**

1.    The home Member State shall ensure that the authorisation specifies the investment services or activities which the investment firm is authorised to provide. The authorisation may cover one or more of the ancillary services set out in Section B of Annex I. Authorisation shall in no case be granted solely for the provision of ancillary services.

2.    An investment firm seeking authorisation to extend its business to additional investment services or activities or ancillary services not foreseen at the time of initial authorisation shall submit a request for extension of its authorisation.

3.    The authorisation shall be valid for the entire Union and shall allow an investment firm to provide the services or perform the activities, for which it has been authorised, throughout the Union, either through the right of establishment, including through a branch, or through the freedom to provide services.

*Article 7*

**Procedures for granting and refusing requests for authorisation**

1.    The competent authority shall not grant authorisation unless and until such time as it is fully satisfied that the applicant complies with all requirements under the provisions adopted pursuant to this Directive.

2.    The investment firm shall provide all information, including a programme of operations setting out, inter alia, the types of business envisaged and the organisational structure, necessary to enable the competent authority to satisfy itself that the investment firm has established, at the time of initial authorisation, all the necessary arrangements to meet its obligations under this Chapter.

3.    An applicant shall be informed, within six months of the submission of a complete application, whether or not authorisation has been granted.

4.    ESMA shall develop draft regulatory technical standards to specify:

(a) the information to be provided to the competent authorities under paragraph 2 of this Article including the programme of operations;

(b) the requirements applicable to the management of investment firms under Article 9(6) and the information for the notifications under Article 9(5);

(c) the requirements applicable to shareholders and members with qualifying holdings, as well as obstacles which may prevent effective exercise of the supervisory functions of the competent authority, under Article 10(1) and (2).

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

5.    ESMA shall develop draft implementing technical standards to determine standard forms, templates and procedures for the notification or provision of information provided for in paragraph 2 of this Article and in Article 9(5).

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 8*

**Withdrawal of authorisations**

The competent authority may withdraw the authorisation issued to an investment firm where such an investment firm:

(a) does not make use of the authorisation within 12 months, expressly renounces the authorisation or has provided no investment services or performed no investment activity for the preceding six months, unless the Member State concerned has provided for authorisation to lapse in such cases;

L 173/390          EN          Official Journal of the European Union          12.6.2014

(b) has obtained the authorisation by making false statements or by any other irregular means;

(c) no longer meets the conditions under which authorisation was granted, such as compliance with the conditions set out in Regulation (EU) No 575/2013;

(d) has seriously and systematically infringed the provisions adopted pursuant to this Directive or Regulation (EU) No 600/2014 governing the operating conditions for investment firms;

(e) falls within any of the cases where national law, in respect of matters outside the scope of this Directive, provides for withdrawal.

Every withdrawal of authorisation shall be notified to ESMA.

*Article 9*

**Management body**

1.    Competent authorities granting the authorisation in accordance with Article 5 shall ensure that investment firms and their management bodies comply with Article 88 and Article 91 of Directive 2013/36/EU.

ESMA and EBA shall adopt, jointly, guidelines on the elements listed in Article 91(12) of Directive 2013/36/EU.

2.    When granting the authorisation in accordance with Article 5, competent authorities may authorise members of the management body to hold one additional non-executive directorship than allowed in accordance with Article 91(3) of Directive 2013/36/EU. Competent authorities shall regularly inform ESMA of such authorisations.

EBA and ESMA shall coordinate the collection of information provided for under the first subparagraph of this paragraph and under Article 91(6) of Directive 2013/36/EU in relation to investment firms.

3.    Member States shall ensure that the management body of an investment firm defines, oversees and is accountable for the implementation of the governance arrangements that ensure effective and prudent management of the investment firm including the segregation of duties in the investment firm and the prevention of conflicts of interest, and in a manner that promotes the integrity of the market and the interest of clients.

Without prejudice to the requirements established in Article 88(1) of Directive 2013/36/EU, those arrangements shall also ensure that the management body define, approve and oversee:

(a) the organisation of the firm for the provision of investment services and activities and ancillary services, including the skills, knowledge and expertise required by personnel, the resources, the procedures and the arrangements for the provision of services and activities, taking into account the nature, scale and complexity of its business and all the requirements the firm has to comply with;

(b) a policy as to services, activities, products and operations offered or provided, in accordance with the risk tolerance of the firm and the characteristics and needs of the clients of the firm to whom they will be offered or provided, including carrying out appropriate stress testing, where appropriate;

(c) a remuneration policy of persons involved in the provision of services to clients aiming to encourage responsible business conduct, fair treatment of clients as well as avoiding conflict of interest in the relationships with clients.

12.6.2014          EN          Official Journal of the European Union          L 173/391

The management body shall monitor and periodically assess the adequacy and the implementation of the firm's strategic objectives in the provision of investment services and activities and ancillary services, the effectiveness of the investment firm's governance arrangements and the adequacy of the policies relating to the provision of services to clients and take appropriate steps to address any deficiencies.

Members of the management body shall have adequate access to information and documents which are needed to oversee and monitor management decision-making.

4.    The competent authority shall refuse authorisation if it is not satisfied that the members of the management body of the investment firm are of sufficiently good repute, possess sufficient knowledge, skills and experience and commit sufficient time to perform their functions in the investment firm, or if there are objective and demonstrable grounds for believing that the management body of the firm may pose a threat to its effective, sound and prudent management and to the adequate consideration of the interest of its clients and the integrity of the market.

5.    Member States shall require the investment firm to notify the competent authority of all members of its management body and of any changes to its membership, along with all information needed to assess whether the firm complies with paragraphs 1, 2 and 3.

6.    Member States shall require that at least two persons meeting the requirements laid down in paragraph 1 effectively direct the business of the applicant investment firm.

By way of derogation from the first subparagraph, Member States may grant authorisation to investment firms that are natural persons or to investment firms that are legal persons managed by a single natural person in accordance with their constitutive rules and national laws. Member States shall nevertheless require that:

(a) alternative arrangements be in place which ensure the sound and prudent management of such investment firms and the adequate consideration of the interest of clients and the integrity of the market;

(b) the natural persons concerned are of sufficiently good repute, possess sufficient knowledge, skills and experience and commit sufficient time to perform their duties.

*Article 10*

**Shareholders and members with qualifying holdings**

1.    The competent authorities shall not authorise the provision of investment services or performance of investment activities by an investment firm until they have been informed of the identities of the shareholders or members, whether direct or indirect, natural or legal persons, that have qualifying holdings and the amounts of those holdings.

The competent authorities shall refuse authorisation if, taking into account the need to ensure the sound and prudent management of an investment firm, they are not satisfied as to the suitability of the shareholders or members that have qualifying holdings.

Where close links exist between the investment firm and other natural or legal persons, the competent authority shall grant authorisation only if those links do not prevent the effective exercise of the supervisory functions of the competent authority.

2.    The competent authority shall refuse authorisation if the laws, regulations or administrative provisions of a third country governing one or more natural or legal persons with which the undertaking has close links, or difficulties involved in their enforcement, prevent the effective exercise of its supervisory functions.

L 173/392    EN    Official Journal of the European Union    12.6.2014

3.    Member States shall require that, where the influence exercised by the persons referred to in the first subparagraph of paragraph 1 is likely to be prejudicial to the sound and prudent management of an investment firm, the competent authority take appropriate measures to put an end to that situation.

Such measures may include applications for judicial orders or the imposition of sanctions against directors and those responsible for management, or suspension of the exercise of the voting rights attaching to the shares held by the shareholders or members in question.

*Article 11*

**Notification of proposed acquisitions**

1.    Member States shall require any natural or legal person or such persons acting in concert (the 'proposed acquirer'), who have taken a decision either to acquire, directly or indirectly, a qualifying holding in an investment firm or to further increase, directly or indirectly, such a qualifying holding in an investment firm as a result of which the proportion of the voting rights or of the capital held would reach or exceed 20 %, 30 % or 50 % or so that the investment firm would become its subsidiary (the 'proposed acquisition'), first to notify in writing the competent authorities of the investment firm in which they are seeking to acquire or increase a qualifying holding, indicating the size of the intended holding and relevant information, as referred to in Article 13(4).

Member States shall require any natural or legal person who has taken a decision to dispose, directly or indirectly, of a qualifying holding in an investment firm first to notify in writing the competent authorities, indicating the size of the intended holding. Such a person shall likewise notify the competent authorities if he has taken a decision to reduce his qualifying holding so that the proportion of the voting rights or of the capital held would fall below 20 %, 30 % or 50 % or so that the investment firm would cease to be his subsidiary.

Member States need not apply the 30 % threshold where, in accordance with point (a) of Article 9(3) of Directive 2004/109/EC, they apply a threshold of one-third.

In determining whether the criteria for a qualifying holding referred to in Article 10 and in this Article are fulfilled, Member States shall not take into account voting rights or shares which investment firms or credit institutions may hold as a result of providing the underwriting of financial instruments and/or placing of financial instruments on a firm commitment basis included under point 6 of Section A of Annex I, provided that those rights are, on the one hand, not exercised or otherwise used to intervene in the management of the issuer and, on the other, disposed of within one year of acquisition.

2.    The relevant competent authorities shall work in full consultation with each other when carrying out the assessment provided for in Article 13(1) (the 'assessment') if the proposed acquirer is one of the following:

(a)  a credit institution, assurance undertaking, insurance undertaking, reinsurance undertaking, investment firm or UCITS management company authorised in another Member State or in a sector other than that in which the acquisition is proposed;

(b)  the parent undertaking of a credit institution, assurance undertaking, insurance undertaking, reinsurance undertaking, investment firm or UCITS management company authorised in another Member State or in a sector other than that in which the acquisition is proposed; or

(c)  a natural or legal person controlling a credit institution, assurance undertaking, insurance undertaking, reinsurance undertaking, investment firm or UCITS management company authorised in another Member State or in a sector other than that in which the acquisition is proposed.

The competent authorities shall, without undue delay, provide each other with any information which is essential or relevant for the assessment. In that regard, the competent authorities shall communicate to each other upon request all relevant information and shall communicate on their own initiative all essential information. A decision by the competent authority that has authorised the investment firm in which the acquisition is proposed shall indicate any views or reservations expressed by the competent authority responsible for the proposed acquirer.

3.    Member States shall require that, if an investment firm becomes aware of any acquisitions or disposals of holdings in its capital that cause holdings to exceed or fall below any of the thresholds referred to in the first subparagraph of paragraph 1, that investment firm is to inform the competent authority without delay.

At least once a year, investment firms shall also inform the competent authority of the names of shareholders and members possessing qualifying holdings and the sizes of such holdings as shown, for example, by the information received at annual general meetings of shareholders and members or as a result of compliance with the regulations applicable to companies whose transferable securities are admitted to trading on a regulated market.

4.    Member States shall require that competent authorities take measures similar to those referred to in Article 10(3) in respect of persons who fail to comply with the obligation to provide prior information in relation to the acquisition or increase of a qualifying holding. If a holding is acquired despite the opposition of the competent authorities, the Member States shall, regardless of any other sanctions to be adopted, provide either for exercise of the corresponding voting rights to be suspended, for the nullity of the votes cast or for the possibility of their annulment.

*Article 12*

**Assessment period**

1.    The competent authorities shall, promptly and in any event within two working days following receipt of the notification required under the first subparagraph of Article 11(1), as well as following the possible subsequent receipt of the information referred to in paragraph 2 of this Article, acknowledge receipt thereof in writing to the proposed acquirer.

The competent authorities shall have a maximum of sixty working days as from the date of the written acknowledgement of receipt of the notification and all documents required by the Member State to be attached to the notification on the basis of the list referred to in Article 13(4) (the 'assessment period'), to carry out the assessment.

The competent authorities shall inform the proposed acquirer of the date of the expiry of the assessment period at the time of acknowledging receipt.

2.    The competent authorities may, during the assessment period, if necessary, and no later than on the 50th working day of the assessment period, request any further information that is necessary to complete the assessment. Such request shall be made in writing and shall specify the additional information needed.

For the period between the date of request for information by the competent authorities and the receipt of a response thereto by the proposed acquirer, the assessment period shall be interrupted. The interruption shall not exceed 20 working days. Any further requests by the competent authorities for completion or clarification of the information shall be at their discretion but may not result in an interruption of the assessment period.

3.    The competent authorities may extend the interruption referred to in the second subparagraph of paragraph 2 up to 30 working days if the proposed acquirer is one of the following:

(a)  a natural or legal person situated or regulated outside the Union;

L 173/394     EN     Official Journal of the European Union     12.6.2014

(b) a natural or legal person not subject to supervision under this Directive or Directives 2009/65/EC, 2009/138/EC or 2013/36/EU.

4.     If the competent authorities, upon completion of the assessment, decide to oppose the proposed acquisition, they shall, within two working days, and not exceeding the assessment period, inform the proposed acquirer in writing and provide the reasons for that decision. Subject to national law, an appropriate statement of the reasons for the decision may be made accessible to the public at the request of the proposed acquirer. This shall not prevent a Member State from allowing the competent authority to make such disclosure in the absence of a request by the proposed acquirer.

5.     If the competent authorities do not oppose the proposed acquisition within the assessment period in writing, it shall be deemed to be approved.

6.     The competent authorities may fix a maximum period for concluding the proposed acquisition and extend it where appropriate.

7.     Member States may not impose requirements for the notification to and approval by the competent authorities of direct or indirect acquisitions of voting rights or capital that are more stringent than those set out in this Directive.

8.     ESMA shall develop draft regulatory technical standards to establish an exhaustive list of information, referred to in Article 13(4) to be included by proposed acquirers in their notification, without prejudice to paragraph 2 of this Article.

ESMA shall submit those draft regulatory technical standards to the Commission by 1 January 2014.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

9.     ESMA shall develop draft implementing technical standards to determine standard forms, templates and procedures for the modalities of the consultation process between the relevant competent authorities as referred to in Article 11(2).

ESMA shall submit those draft implementing technical standards to the Commission by 1 January 2014.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 13*

**Assessment**

1.     In assessing the notification provided for in Article 11(1) and the information referred to in Article 12(2), the competent authorities shall, in order to ensure the sound and prudent management of the investment firm in which an acquisition is proposed, and having regard to the likely influence of the proposed acquirer on the investment firm, appraise the suitability of the proposed acquirer and the financial soundness of the proposed acquisition against all of the following criteria:

(a) the reputation of the proposed acquirer;

(b) the reputation and experience of any person who will direct the business of the investment firm as a result of the proposed acquisition;

(c) the financial soundness of the proposed acquirer, in particular in relation to the type of business pursued and envisaged in the investment firm in which the acquisition is proposed;

(d) whether the investment firm will be able to comply and continue to comply with the prudential requirements based on this Directive and, where applicable, other Directives, in particular Directives 2002/87/EC and 2013/36/EU, in particular, whether the group of which it will become a part has a structure that makes it possible to exercise effective supervision, effectively exchange information among the competent authorities and determine the allocation of responsibilities among the competent authorities;

(e) whether there are reasonable grounds to suspect that, in connection with the proposed acquisition, money laundering or terrorist financing within the meaning of Article 1 of Directive 2005/60/EC is being or has been committed or attempted, or that the proposed acquisition could increase the risk thereof.

The Commission shall be empowered to adopt delegated acts in accordance with Article 89 which adjust the criteria set out in the first subparagraph of this paragraph.

2. The competent authorities may oppose the proposed acquisition only if there are reasonable grounds for doing so on the basis of the criteria set out in paragraph 1 or if the information provided by the proposed acquirer is incomplete.

3. Member States shall neither impose any prior conditions in respect of the level of holding that must be acquired nor allow their competent authorities to examine the proposed acquisition in terms of the economic needs of the market.

4. Member States shall make publicly available a list specifying the information that is necessary to carry out the assessment and that must be provided to the competent authorities at the time of notification referred to in Article 11(1). The information required shall be proportionate and adapted to the nature of the proposed acquirer and the proposed acquisition. Member States shall not require information that is not relevant for a prudential assessment.

5. Notwithstanding Article 12(1), (2) and (3), where two or more proposals to acquire or increase qualifying holdings in the same investment firm have been notified to the competent authority, the latter shall treat the proposed acquirers in a non-discriminatory manner.

*Article 14*

**Membership of an authorised investor compensation scheme**

The competent authority shall verify that any entity seeking authorisation as an investment firm meets its obligations under Directive 97/9/EC at the time of authorisation.

The obligation laid down in the first paragraph shall be met in relation to structured deposits where the structured deposit is issued by a credit institution which is a member of a deposit guarantee scheme recognised under Directive 2014/49/EU.

*Article 15*

**Initial capital endowment**

Member States shall ensure that the competent authorities do not grant authorisation unless the investment firm has sufficient initial capital in accordance with the requirements of Regulation (EU) No 575/2013 having regard to the nature of the investment service or activity in question.

*Article 16*

**Organisational requirements**

1. The home Member State shall require that investment firms comply with the organisational requirements laid down in paragraphs 2 to 10 of this Article and in Article 17.

2.    An investment firm shall establish adequate policies and procedures sufficient to ensure compliance of the firm including its managers, employees and tied agents with its obligations under this Directive as well as appropriate rules governing personal transactions by such persons.

3.    An investment firm shall maintain and operate effective organisational and administrative arrangements with a view to taking all reasonable steps designed to prevent conflicts of interest as defined in Article 23 from adversely affecting the interests of its clients.

An investment firm which manufactures financial instruments for sale to clients shall maintain, operate and review a process for the approval of each financial instrument and significant adaptations of existing financial instruments before it is marketed or distributed to clients.

The product approval process shall specify an identified target market of end clients within the relevant category of clients for each financial instrument and shall ensure that all relevant risks to such identified target market are assessed and that the intended distribution strategy is consistent with the identified target market.

An investment firm shall also regularly review financial instruments it offers or markets, taking into account any event that could materially affect the potential risk to the identified target market, to assess at least whether the financial instrument remains consistent with the needs of the identified target market and whether the intended distribution strategy remains appropriate.

An investment firm which manufactures financial instruments shall make available to any distributor all appropriate information on the financial instrument and the product approval process, including the identified target market of the financial instrument.

Where an investment firm offers or recommends financial instruments which it does not manufacture, it shall have in place adequate arrangements to obtain the information referred to in the fifth subparagraph and to understand the characteristics and identified target market of each financial instrument.

The policies, processes and arrangements referred to in this paragraph shall be without prejudice to all other requirements under this Directive and Regulation (EU) No 600/2014, including those relating to disclosure, suitability or appropriateness, identification and management of conflicts of interests, and inducements.

4.    An investment firm shall take reasonable steps to ensure continuity and regularity in the performance of investment services and activities. To that end the investment firm shall employ appropriate and proportionate systems, resources and procedures.

5.    An investment firm shall ensure, when relying on a third party for the performance of operational functions which are critical for the provision of continuous and satisfactory service to clients and the performance of investment activities on a continuous and satisfactory basis, that it takes reasonable steps to avoid undue additional operational risk. Outsourcing of important operational functions may not be undertaken in such a way as to impair materially the quality of its internal control and the ability of the supervisor to monitor the firm's compliance with all obligations.

An investment firm shall have sound administrative and accounting procedures, internal control mechanisms, effective procedures for risk assessment, and effective control and safeguard arrangements for information processing systems.

Without prejudice to the ability of competent authorities to require access to communications in accordance with this Directive and Regulation (EU) No 600/2014, an investment firm shall have sound security mechanisms in place to guarantee the security and authentication of the means of transfer of information, minimise the risk of data corruption and unauthorised access and to prevent information leakage maintaining the confidentiality of the data at all times.

6.    An investment firm shall arrange for records to be kept of all services, activities and transactions undertaken by it which shall be sufficient to enable the competent authority to fulfil its supervisory tasks and to perform the enforcement actions under this Directive, Regulation (EU) No 600/2014, Directive 2014/57/EU and Regulation (EU) No 596/2014, and in particular to ascertain that the investment firm has complied with all obligations including those with respect to clients or potential clients and to the integrity of the market.

7.    Records shall include the recording of telephone conversations or electronic communications relating to, at least, transactions concluded when dealing on own account and the provision of client order services that relate to the reception, transmission and execution of client orders.

Such telephone conversations and electronic communications shall also include those that are intended to result in transactions concluded when dealing on own account or in the provision of client order services that relate to the reception, transmission and execution of client orders, even if those conversations or communications do not result in the conclusion of such transactions or in the provision of client order services.

For those purposes, an investment firm shall take all reasonable steps to record relevant telephone conversations and electronic communications, made with, sent from or received by equipment provided by the investment firm to an employee or contractor or the use of which by an employee or contractor has been accepted or permitted by the investment firm.

An investment firm shall notify new and existing clients that telephone communications or conversations between the investment firm and its clients that result or may result in transactions will be recorded.

Such a notification may be made once, before the provision of investment services to new and existing clients.

An investment firm shall not provide, by telephone, investment services and activities to clients who have not been notified in advance about the recording of their telephone communications or conversations, where such investment services and activities relate to the reception, transmission and execution of client orders.

Orders may be placed by clients through other channels, however such communications must be made in a durable medium such as mails, faxes, emails or documentation of client orders made at meetings. In particular, the content of relevant face-to-face conversations with a client may be recorded by using written minutes or notes. Such orders shall be considered equivalent to orders received by telephone.

An investment firm shall take all reasonable steps to prevent an employee or contractor from making, sending or receiving relevant telephone conversations and electronic communications on privately-owned equipment which the investment firm is unable to record or copy.

The records kept in accordance with this paragraph shall be provided to the client involved upon request and shall be kept for a period of five years and, where requested by the competent authority, for a period of up to seven years.

8.    An investment firm shall, when holding financial instruments belonging to clients, make adequate arrangements so as to safeguard the ownership rights of clients, especially in the event of the investment firm's insolvency, and to prevent the use of a client's financial instruments on own account except with the client's express consent.

9.    An investment firm shall, when holding funds belonging to clients, make adequate arrangements to safeguard the rights of clients and, except in the case of credit institutions, prevent the use of client funds for its own account.

10.    An investment firm shall not conclude title transfer financial collateral arrangements with retail clients for the purpose of securing or covering present or future, actual or contingent or prospective obligations of clients.

11.    In the case of branches of investment firms, the competent authority of the Member State in which the branch is located shall, without prejudice to the possibility of the competent authority of the home Member State of the investment firm to have direct access to those records, enforce the obligation laid down in paragraphs 6 and 7 with regard to transactions undertaken by the branch.

Member States may, in exceptional circumstances, impose requirements on investment firms concerning the safeguarding of client assets additional to the provisions set out in paragraphs 8, 9 and 10 and the respective delegated acts as referred to in paragraph 12. Such requirements must be objectively justified and proportionate so as to address, where investment firms safeguard client assets and client funds, specific risks to investor protection or to market integrity which are of particular importance in the circumstances of the market structure of that Member State.

Member States shall notify, without undue delay, the Commission of any requirement which they intend to impose in accordance with this paragraph and at least two months before the date appointed for that requirement to come into force. The notification shall include a justification for that requirement. Any such additional requirements shall not restrict or otherwise affect the rights of investment firms under Articles 34 and 35.

The Commission shall within two months of the notification referred to in the third subparagraph provide its opinion on the proportionality of and justification for the additional requirements.

Member States may retain additional requirements provided that they were notified to the Commission in accordance with Article 4 of Directive 2006/73/EC before 2 July 2014 and that the conditions laid down in that Article are met.

The Commission shall communicate to Member States and make public on its website the additional requirements imposed in accordance with this paragraph.

12.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to specify the concrete organisational requirements laid down in paragraphs 2 to 10 of this Article to be imposed on investment firms and on branches of third-country firms authorised in accordance with Article 41 performing different investment services and/or activities and ancillary services or combinations thereof.

*Article 17*

**Algorithmic trading**

1.    An investment firm that engages in algorithmic trading shall have in place effective systems and risk controls suitable to the business it operates to ensure that its trading systems are resilient and have sufficient capacity, are subject to appropriate trading thresholds and limits and prevent the sending of erroneous orders or the systems otherwise functioning in a way that may create or contribute to a disorderly market. Such a firm shall also have in place effective systems and risk controls to ensure the trading systems cannot be used for any purpose that is contrary to Regulation (EU) No 596/2014 or to the rules of a trading venue to which it is connected. The investment firm shall have in place effective business continuity arrangements to deal with any failure of its trading systems and shall ensure its systems are fully tested and properly monitored to ensure that they meet the requirements laid down in this paragraph.

2.    An investment firm that engages in algorithmic trading in a Member State shall notify this to the competent authorities of its home Member State and of the trading venue at which the investment firm engages in algorithmic trading as a member or participant of the trading venue.

The competent authority of the home Member State of the investment firm may require the investment firm to provide, on a regular or ad-hoc basis, a description of the nature of its algorithmic trading strategies, details of the trading parameters or limits to which the system is subject, the key compliance and risk controls that it has in place to ensure the conditions laid down in paragraph 1 are satisfied and details of the testing of its systems. The competent authority of the home Member State of the investment firm may, at any time, request further information from an investment firm about its algorithmic trading and the systems used for that trading.

The competent authority of the home Member State of the investment firm shall, on the request of a competent authority of a trading venue at which the investment firm as a member or participant of the trading venue is engaged in algorithmic trading and without undue delay, communicate the information referred to in the second subparagraph that it receives from the investment firm that engages in algorithmic trading.

The investment firm shall arrange for records to be kept in relation to the matters referred to in this paragraph and shall ensure that those records be sufficient to enable its competent authority to monitor compliance with the requirements of this Directive.

An investment firm that engages in a high-frequency algorithmic trading technique shall store in an approved form accurate and time sequenced records of all its placed orders, including cancellations of orders, executed orders and quotations on trading venues and shall make them available to the competent authority upon request.

3.    An investment firm that engages in algorithmic trading to pursue a market making strategy shall, taking into account the liquidity, scale and nature of the specific market and the characteristics of the instrument traded:

(a) carry out this market making continuously during a specified proportion of the trading venue's trading hours, except under exceptional circumstances, with the result of providing liquidity on a regular and predictable basis to the trading venue;

(b) enter into a binding written agreement with the trading venue which shall at least specify the obligations of the investment firm in accordance with point (a); and

(c) have in place effective systems and controls to ensure that it fulfils its obligations under the agreement referred to in point (b) at all times.

4.    For the purposes of this Article and of Article 48 of this Directive, an investment firm that engages in algorithmic trading shall be considered to be pursuing a market making strategy when, as a member or participant of one or more trading venues, its strategy, when dealing on own account, involves posting firm, simultaneous two-way quotes of comparable size and at competitive prices relating to one or more financial instruments on a single trading venue or across different trading venues, with the result of providing liquidity on a regular and frequent basis to the overall market.

5.    An investment firm that provides direct electronic access to a trading venue shall have in place effective systems and controls which ensure a proper assessment and review of the suitability of clients using the service, that clients using the service are prevented from exceeding appropriate pre-set trading and credit thresholds, that trading by clients using the service is properly monitored and that appropriate risk controls prevent trading that may create risks to the investment firm itself or that could create or contribute to a disorderly market or could be contrary to Regulation (EU) No 596/2014 or the rules of the trading venue. Direct electronic access without such controls is prohibited.

An investment firm that provides direct electronic access shall be responsible for ensuring that clients using that service comply with the requirements of this Directive and the rules of the trading venue. The investment firm shall monitor the transactions in order to identify infringements of those rules, disorderly trading conditions or conduct that may involve market abuse and that is to be reported to the competent authority. The investment firm shall ensure that there is a binding written agreement between the investment firm and the client regarding the essential rights and obligations arising from the provision of the service and that under the agreement the investment firm retains responsibility under this Directive.

An investment firm that provides direct electronic access to a trading venue shall notify the competent authorities of its home Member State and of the trading venue at which the investment firm provides direct electronic access accordingly.

The competent authority of the home Member State of the investment firm may require the investment firm to provide, on a regular or ad-hoc basis, a description of the systems and controls referred to in first subparagraph and evidence that those have been applied.

The competent authority of the home Member State of the investment firm shall, on the request of a competent authority of a trading venue in relation to which the investment firm provides direct electronic access, communicate without undue delay the information referred to in the fourth subparagraph that it receives from the investment firm.

The investment firm shall arrange for records to be kept in relation to the matters referred to in this paragraph and shall ensure that those records be sufficient to enable its competent authority to monitor compliance with the requirements of this Directive.

6.    An investment firm that acts as a general clearing member for other persons shall have in place effective systems and controls to ensure clearing services are only applied to persons who are suitable and meet clear criteria and that appropriate requirements are imposed on those persons to reduce risks to the investment firm and to the market. The investment firm shall ensure that there is a binding written agreement between the investment firm and the person regarding the essential rights and obligations arising from the provision of that service.

7.    ESMA shall develop draft regulatory technical standards to specify the following:

(a) the details of organisational requirements laid down in paragraphs 1 to 6 to be imposed on investment firms providing different investment services and/or activities and ancillary services or combinations thereof, whereby the specifications in relation to the organisational requirements laid down in paragraph 5 shall set out specific requirements for direct market access and for sponsored access in such a way as to ensure that the controls applied to sponsored access are at least equivalent to those applied to direct market access;

(b) the circumstances in which an investment firm would be obliged to enter into the market making agreement referred to in point (b) of paragraph 3 and the content of such agreements, including the proportion of the trading venue's trading hours laid down in paragraph 3;

(c) the situations constituting exceptional circumstances referred to in paragraph 3, including circumstances of extreme volatility, political and macroeconomic issues, system and operational matters, and circumstances which contradict the investment firm's ability to maintain prudent risk management practices as laid down in paragraph 1;

(d) the content and format of the approved form referred to in the fifth subparagraph of paragraph 2 and the length of time for which such records must be kept by the investment firm.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

*Article 18*

**Trading process and finalisation of transactions in an MTF and an OTF**

1.    Member States shall require that investment firms and market operators operating an MTF or an OTF, in addition to meeting the organisational requirements laid down in Article 16, establish transparent rules and procedures for fair and orderly trading and establish objective criteria for the efficient execution of orders. They shall have arrangements for the sound management of the technical operations of the facility, including the establishment of effective contingency arrangements to cope with risks of systems disruption.

2.    Member States shall require that investment firms and market operators operating an MTF or an OTF establish transparent rules regarding the criteria for determining the financial instruments that can be traded under its systems.

Member States shall require that, where applicable, investment firms and market operators operating an MTF or an OTF provide, or are satisfied that there is access to, sufficient publicly available information to enable its users to form an investment judgement, taking into account both the nature of the users and the types of instruments traded.

3.    Member States shall require that investment firms and market operators operating an MTF or an OTF establish, publish and maintain and implement transparent and non-discriminatory rules, based on objective criteria, governing access to its facility.

4.    Member States shall require that investment firms and market operators operating an MTF or an OTF have arrangements to identify clearly and manage the potential adverse consequences for the operation of the MTF or OTF, or for the members or participants and users, of any conflict of interest between the interest of the MTF, the OTF, their owners or the investment firm or market operator operating the MTF or OTF and the sound functioning of the MTF or OTF.

5.    Member States shall require that investment firms and market operators operating an MTF or OTF comply with Articles 48 and 49 and have in place all the necessary effective systems, procedures and arrangements to do so.

6.    Member States shall require that investment firms and market operators operating an MTF or an OTF clearly inform its members or participants of their respective responsibilities for the settlement of the transactions executed in that facility. Member States shall require that investment firms and market operators operating an MTF or an OTF have put in place the necessary arrangements to facilitate the efficient settlement of the transactions concluded under the systems of that MTF or OTF.

7.    Member States shall require that MTFs and OTFs have at least three materially active members or users, each having the opportunity to interact with all the others in respect to price formation.

8.    Where a transferable security that has been admitted to trading on a regulated market is also traded on an MTF or an OTF without the consent of the issuer, the issuer shall not be subject to any obligation relating to initial, ongoing or ad hoc financial disclosure with regard to that MTF or an OTF.

9.    Member States shall require that any investment firm and market operator operating an MTF or an OTF comply immediately with any instruction from its competent authority pursuant to Article 69(2) to suspend or remove a financial instrument from trading.

10.    Member States shall require that investment firms and market operators operating an MTF or an OTF provide the competent authority with a detailed description of the functioning of the MTF or OTF, including, without prejudice to Article 20(1), (4) and (5), any links to or participation by a regulated market, an MTF, an OTF or a systematic internaliser owned by the same investment firm or market operator, and a list of their members, participants and/or users. Competent authorities shall make that information available to ESMA on request. Every authorisation to an investment firm or market operator as an MTF and an OTF shall be notified to ESMA. ESMA shall establish a list of all MTFs and OTFs in the Union. The list shall contain information on the services an MTF or an OTF provides and entail the unique code identifying the MTF and the OTF for use in reports in accordance with Articles 6, 10 and 26 of Regulation (EU) No 600/2014. It shall be updated on a regular basis. ESMA shall publish and keep up-to-date that list on its website.

11.    ESMA shall develop draft implementing technical standards to determine the content and format of the description and notification referred to in paragraph 10.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 19*

**Specific requirements for MTFs**

1.    Member States shall require that investment firms and market operators operating an MTF, in addition to meeting the requirements laid down in Articles 16 and 18, shall establish and implement non-discretionary rules for the execution of orders in the system.

2.    Member States shall require that the rules referred to in Article 18(3) governing access to an MTF comply with the conditions established in Article 53(3).

3.    Member States shall require that investment firms and market operators operating an MTF to have arrangements:

(a)  to be adequately equipped to manage the risks to which it is exposed, to implement appropriate arrangements and systems to identify all significant risks to its operation, and to put in place effective measures to mitigate those risks;

(b)  to have effective arrangements to facilitate the efficient and timely finalisation of the transactions executed under its systems; and

(c)  to have available, at the time of authorisation and on an ongoing basis, sufficient financial resources to facilitate its orderly functioning, having regard to the nature and extent of the transactions concluded on the market and the range and degree of the risks to which it is exposed.

4.    Member States shall ensure that Articles 24, 25, Article 27(1), (2) and (4) to (10) and Article 28 are not applicable to the transactions concluded under the rules governing an MTF between its members or participants or between the MTF and its members or participants in relation to the use of the MTF. However, the members of or participants in the MTF shall comply with the obligations provided for in Articles 24, 25, 27 and 28 with respect to their clients when, acting on behalf of their clients, they execute their orders through the systems of an MTF.

5.    Member States shall not allow investment firms or market operators operating an MTF to execute client orders against proprietary capital, or to engage in matched principal trading.

*Article 20*

**Specific requirements for OTFs**

1.    Member States shall require that an investment firm and a market operator operating an OTF establishes arrangements preventing the execution of client orders in an OTF against the proprietary capital of the investment firm or market operator operating the OTF or from any entity that is part of the same group or legal person as the investment firm or market operator.

2.    Member States shall permit an investment firm or market operator operating an OTF to engage in matched principal trading in bonds, structured finance products, emission allowances and certain derivatives only where the client has consented to the process.

An investment firm or market operator operating an OTF shall not use matched principal trading to execute client orders in an OTF in derivatives pertaining to a class of derivatives that has been declared subject to the clearing obligation in accordance with Article 5 of Regulation (EU) No 648/2012.

An investment firm or market operator operating an OTF shall establish arrangements ensuring compliance with the definition of matched principal trading in point (38) of Article 4(1).

3.    Member States shall permit an investment firm or market operator operating an OTF to engage in dealing on own account other than matched principal trading only with regard to sovereign debt instruments for which there is not a liquid market.

4.    Member States shall not allow the operation of an OTF and of a systematic internaliser to take place within the same legal entity. An OTF shall not connect with a systematic internaliser in a way which enables orders in an OTF and orders or quotes in a systematic internaliser to interact. An OTF shall not connect with another OTF in a way which enables orders in different OTFs to interact.

5.    Member States shall not prevent an investment firm or a market operator operating an OTF from engaging another investment firm to carry out market making on that OTF on an independent basis.

For the purposes of this Article, an investment firm shall not be deemed to be carrying out market making on an OTF on an independent basis if it has close links with the investment firm or market operator operating the OTF.

6.    Member States shall require that the execution of orders on an OTF is carried out on a discretionary basis.

An investment firm or market operator operating an OTF shall exercise discretion only in either or both of the following circumstances:

(a)  when deciding to place or retract an order on the OTF they operate;

(b)  when deciding not to match a specific client order with other orders available in the systems at a given time, provided it is in compliance with specific instructions received from a client and with its obligations in accordance with Article 27.

For the system that crosses client orders the investment firm or market operator operating the OTF may decide if, when and how much of two or more orders it wants to match within the system. In accordance with paragraphs 1, 2, 4 and 5 and without prejudice to paragraph 3, with regard to a system that arranges transactions in non-equities, the investment firm or market operator operating the OTF may facilitate negotiation between clients so as to bring together two or more potentially compatible trading interest in a transaction.

That obligation shall be without prejudice to Articles 18 and 27.

7.    The competent authority may require, either when an investment firm or market operator requests to be authorised for the operation of an OTF or on ad-hoc basis, a detailed explanation why the system does not correspond to and cannot operate as a regulated market, MTF, or systematic internaliser, a detailed description as to how discretion will be exercised, in particular when an order to the OTF may be retracted and when and how two or more client orders will be matched within the OTF. In addition, the investment firm or market operator of an OTF shall provide the competent authority with information explaining its use of matched principal trading. The competent authority shall monitor an investment firm's or market operator's engagement in matched principal trading to ensure that it continues to fall within the definition of such trading and that its engagement in matched principal trading does not give rise to conflicts of interest between the investment firm or market operator and its clients.

8.    Member States shall ensure that Articles 24, 25, 27 and 28 are applied to the transactions concluded on an OTF.

CHAPTER II

*Operating conditions for investment firms*

S e c t i o n  1

G e n e r a l   p r o v i s i o n s

*Article 21*

**Regular review of conditions for initial authorisation**

1.    Member States shall require that an investment firm authorised in their territory comply at all times with the conditions for initial authorisation established in Chapter I.

2.    Member States shall require competent authorities to establish the appropriate methods to monitor that investment firms comply with their obligation under paragraph 1. They shall require investment firms to notify the competent authorities of any material changes to the conditions for initial authorisation.

ESMA may develop guidelines regarding the monitoring methods referred to in this paragraph.

*Article 22*

**General obligation in respect of on-going supervision**

Member States shall ensure that the competent authorities monitor the activities of investment firms so as to assess compliance with the operating conditions provided for in this Directive. Member States shall ensure that the appropriate measures are in place to enable the competent authorities to obtain the information needed to assess the compliance of investment firms with those obligations.

*Article 23*

**Conflicts of interest**

1.    Member States shall require investment firms to take all appropriate steps to identify and to prevent or manage conflicts of interest between themselves, including their managers, employees and tied agents, or any person directly or indirectly linked to them by control and their clients or between one client and another that arise in the course of providing any investment and ancillary services, or combinations thereof, including those caused by the receipt of inducements from third parties or by the investment firm's own remuneration and other incentive structures.

2.    Where organisational or administrative arrangements made by the investment firm in accordance with Article 16(3) to prevent conflicts of interest from adversely affecting the interest of its client are not sufficient to ensure, with reasonable confidence, that risks of damage to client interests will be prevented, the investment firm shall clearly disclose to the client the general nature and/or sources of conflicts of interest and the steps taken to mitigate those risks before undertaking business on its behalf.

3.    The disclosure referred to in paragraph 2 shall:

(a)  be made in a durable medium; and

(b)  include sufficient detail, taking into account the nature of the client, to enable that client to take an informed decision with respect to the service in the context of which the conflict of interest arises.

4.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to:

(a) define the steps that investment firms might reasonably be expected to take to identify, prevent, manage and disclose conflicts of interest when providing various investment and ancillary services and combinations thereof;

(b) establish appropriate criteria for determining the types of conflict of interest whose existence may damage the interests of the clients or potential clients of the investment firm.

## Section 2

### Provisions to ensure investor protection

*Article 24*

### General principles and information to clients

1.    Member States shall require that, when providing investment services or, where appropriate, ancillary services to clients, an investment firm act honestly, fairly and professionally in accordance with the best interests of its clients and comply, in particular, with the principles set out in this Article and in Article 25.

2.    Investment firms which manufacture financial instruments for sale to clients shall ensure that those financial instruments are designed to meet the needs of an identified target market of end clients within the relevant category of clients, the strategy for distribution of the financial instruments is compatible with the identified target market, and the investment firm takes reasonable steps to ensure that the financial instrument is distributed to the identified target market.

An investment firm shall understand the financial instruments they offer or recommend, assess the compatibility of the financial instruments with the needs of the clients to whom it provides investment services, also taking account of the identified target market of end clients as referred to in Article 16(3), and ensure that financial instruments are offered or recommended only when this is in the interest of the client.

3.    All information, including marketing communications, addressed by the investment firm to clients or potential clients shall be fair, clear and not misleading. Marketing communications shall be clearly identifiable as such.

4.    Appropriate information shall be provided in good time to clients or potential clients with regard to the investment firm and its services, the financial instruments and proposed investment strategies, execution venues and all costs and related charges. That information shall include the following:

(a) when investment advice is provided, the investment firm must, in good time before it provides investment advice, inform the client:

   (i) whether or not the advice is provided on an independent basis;

   (ii) whether the advice is based on a broad or on a more restricted analysis of different types of financial instruments and, in particular, whether the range is limited to financial instruments issued or provided by entities having close links with the investment firm or any other legal or economic relationships, such as contractual relationships, so close as to pose a risk of impairing the independent basis of the advice provided;

   (iii) whether the investment firm will provide the client with a periodic assessment of the suitability of the financial instruments recommended to that client;

(b) the information on financial instruments and proposed investment strategies must include appropriate guidance on and warnings of the risks associated with investments in those instruments or in respect of particular investment strategies and whether the financial instrument is intended for retail or professional clients, taking account of the identified target market in accordance with paragraph 2;

(c) the information on all costs and associated charges must include information relating to both investment and ancillary services, including the cost of advice, where relevant, the cost of the financial instrument recommended or marketed to the client and how the client may pay for it, also encompassing any third-party payments.

The information about all costs and charges, including costs and charges in connection with the investment service and the financial instrument, which are not caused by the occurrence of underlying market risk, shall be aggregated to allow the client to understand the overall cost as well as the cumulative effect on return of the investment, and where the client so requests, an itemised breakdown shall be provided. Where applicable, such information shall be provided to the client on a regular basis, at least annually, during the life of the investment.

5. The information referred to in paragraphs 4 and 9 shall be provided in a comprehensible form in such a manner that clients or potential clients are reasonably able to understand the nature and risks of the investment service and of the specific type of financial instrument that is being offered and, consequently, to take investment decisions on an informed basis. Member States may allow that information to be provided in a standardised format.

6. Where an investment service is offered as part of a financial product which is already subject to other provisions of Union law relating to credit institutions and consumer credits with respect to information requirements, that service shall not be additionally subject to the obligations set out in paragraphs 3, 4 and 5.

7. Where an investment firm informs the client that investment advice is provided on an independent basis, that investment firm shall:

(a) assess a sufficient range of financial instruments available on the market which must be sufficiently diverse with regard to their type and issuers or product providers to ensure that the client's investment objectives can be suitably met and must not be limited to financial instruments issued or provided by:

 (i) the investment firm itself or by entities having close links with the investment firm; or

 (ii) other entities with which the investment firm has such close legal or economic relationships, such as contractual relationships, as to pose a risk of impairing the independent basis of the advice provided;

(b) not accept and retain fees, commissions or any monetary or non-monetary benefits paid or provided by any third party or a person acting on behalf of a third party in relation to the provision of the service to clients. Minor non-monetary benefits that are capable of enhancing the quality of service provided to a client and are of a scale and nature such that they could not be judged to impair compliance with the investment firm's duty to act in the best interest of the client must be clearly disclosed and are excluded from this point.

8. When providing portfolio management the investment firm shall not accept and retain fees, commissions or any monetary or non-monetary benefits paid or provided by any third party or a person acting on behalf of a third party in relation to the provision of the service to clients. Minor non-monetary benefits that are capable of enhancing the quality of service provided to a client and are of a scale and nature such that they could not be judged to impair compliance with the investment firm's duty to act in the best interest of the client shall be clearly disclosed and are excluded from this paragraph.

9.    Member States shall ensure that investment firms are regarded as not fulfilling their obligations under Article 23 or under paragraph 1 of this Article where they pay or are paid any fee or commission, or provide or are provided with any non-monetary benefit in connection with the provision of an investment service or an ancillary service, to or by any party except the client or a person on behalf of the client, other than where the payment or benefit:

(a)  is designed to enhance the quality of the relevant service to the client; and

(b)  does not impair compliance with the investment firm's duty to act honestly, fairly and professionally in accordance with the best interest of its clients.

The existence, nature and amount of the payment or benefit referred to in the first subparagraph, or, where the amount cannot be ascertained, the method of calculating that amount, must be clearly disclosed to the client, in a manner that is comprehensive, accurate and understandable, prior to the provision of the relevant investment or ancillary service. Where applicable, the investment firm shall also inform the client on mechanisms for transferring to the client the fee, commission, monetary or non-monetary benefit received in relation to the provision of the investment or ancillary service.

The payment or benefit which enables or is necessary for the provision of investment services, such as custody costs, settlement and exchange fees, regulatory levies or legal fees, and which by its nature cannot give rise to conflicts with the investment firm's duties to act honestly, fairly and professionally in accordance with the best interests of its clients, is not subject to the requirements set out in the first subparagraph.

10.    An investment firm which provides investment services to clients shall ensure that it does not remunerate or assess the performance of its staff in a way that conflicts with its duty to act in the best interests of its clients. In particular, it shall not make any arrangement by way of remuneration, sales targets or otherwise that could provide an incentive to its staff to recommend a particular financial instrument to a retail client when the investment firm could offer a different financial instrument which would better meet that client's needs.

11.    When an investment service is offered together with another service or product as part of a package or as a condition for the same agreement or package, the investment firm shall inform the client whether it is possible to buy the different components separately and shall provide for a separate evidence of the costs and charges of each component.

Where the risks resulting from such an agreement or package offered to a retail client are likely to be different from the risks associated with the components taken separately, the investment firm shall provide an adequate description of the different components of the agreement or package and the way in which its interaction modifies the risks.

ESMA, in cooperation with EBA and EIOPA, shall develop by 3 January 2016, and update periodically, guidelines for the assessment and the supervision of cross-selling practices indicating, in particular, situations in which cross-selling practices are not compliant with obligations laid down in paragraph 1.

12.    Member States may, in exceptional cases, impose additional requirements on investment firms in respect of the matters covered by this Article. Such requirements must be objectively justified and proportionate so as to address specific risks to investor protection or to market integrity which are of particular importance in the circumstances of the market structure of that Member State.

Member States shall notify the Commission of any requirement which they intend to impose in accordance with this paragraph without undue delay and at least two months before the date appointed for that requirement to come into force. The notification shall include a justification for that requirement. Any such additional requirements shall not restrict or otherwise affect the rights of investment firms under Articles 34 and 35 of this Directive.

The Commission shall within two months from the notification referred to in the second subparagraph provide its opinion on the proportionality of and justification for the additional requirements.

The Commission shall communicate to Member States and make public on its website the additional requirements imposed in accordance with this paragraph.

Member States may retain additional requirements that were notified to the Commission in accordance with Article 4 of Directive 2006/73/EC before 2 July 2014 provided that the conditions laid down in that Article are met.

13.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to ensure that investment firms comply with the principles set out in this Article when providing investment or ancillary services to their clients, including:

(a) the conditions with which the information must comply in order to be fair, clear and not misleading;

(b) the details about content and format of information to clients in relation to client categorisation, investment firms and their services, financial instruments, costs and charges;

(c) the criteria for the assessment of a range of financial instruments available on the market;

(d) the criteria to assess compliance of firms receiving inducements with the obligation to act honestly, fairly and professionally in accordance with the best interest of the client.

In formulating the requirements for information on financial instruments in relation to point b of paragraph 4 information on the structure of the product shall be included, where applicable, taking into account any relevant standardized information required under Union law.

14.    The delegated acts referred to in paragraph 13 shall take into account:

(a) the nature of the service(s) offered or provided to the client or potential client, taking into account the type, object, size and frequency of the transactions;

(b) the nature and range of products being offered or considered including different types of financial instruments;

(c) the retail or professional nature of the client or potential clients or, in the case of paragraphs 4 and 5, their classification as eligible counterparties.

*Article 25*

**Assessment of suitability and appropriateness and reporting to clients**

1.    Member States shall require investment firms to ensure and demonstrate to competent authorities on request that natural persons giving investment advice or information about financial instruments, investment services or ancillary services to clients on behalf of the investment firm possess the necessary knowledge and competence to fulfil their obligations under Article 24 and this Article. Member States shall publish the criteria to be used for assessing such knowledge and competence.

2.   When providing investment advice or portfolio management the investment firm shall obtain the necessary information regarding the client's or potential client's knowledge and experience in the investment field relevant to the specific type of product or service, that person's financial situation including his ability to bear losses, and his investment objectives including his risk tolerance so as to enable the investment firm to recommend to the client or potential client the investment services and financial instruments that are suitable for him and, in particular, are in accordance with his risk tolerance and ability to bear losses.

Member States shall ensure that where an investment firm provides investment advice recommending a package of services or products bundled pursuant to Article 24(11), the overall bundled package is suitable.

3.   Member States shall ensure that investment firms, when providing investment services other than those referred to in paragraph 2, ask the client or potential client to provide information regarding that person's knowledge and experience in the investment field relevant to the specific type of product or service offered or demanded so as to enable the investment firm to assess whether the investment service or product envisaged is appropriate for the client. Where a bundle of services or products is envisaged pursuant to Article 24(11), the assessment shall consider whether the overall bundled package is appropriate.

Where the investment firm considers, on the basis of the information received under the first subparagraph, that the product or service is not appropriate to the client or potential client, the investment firm shall warn the client or potential client. That warning may be provided in a standardised format.

Where clients or potential clients do not provide the information referred to under the first subparagraph, or where they provide insufficient information regarding their knowledge and experience, the investment firm shall warn them that the investment firm is not in a position to determine whether the service or product envisaged is appropriate for them. That warning may be provided in a standardised format.

4.   Member States shall allow investment firms when providing investment services that only consist of execution or reception and transmission of client orders with or without ancillary services, excluding the granting of credits or loans as specified in Section B.1 of Annex I that do not comprise of existing credit limits of loans, current accounts and overdraft facilities of clients, to provide those investment services to their clients without the need to obtain the information or make the determination provided for in paragraph 3 where all the following conditions are met:

(a)  the services relate to any of the following financial instruments:

   (i) shares admitted to trading on a regulated market or on an equivalent third-country market or on a MTF, where those are shares in companies, and excluding shares in non-UCITS collective investment undertakings and shares that embed a derivative;

   (ii) bonds or other forms of securitised debt admitted to trading on a regulated market or on an equivalent third country market or on a MTF, excluding those that embed a derivative or incorporate a structure which makes it difficult for the client to understand the risk involved;

   (iii) money-market instruments, excluding those that embed a derivative or incorporate a structure which makes it difficult for the client to understand the risk involved;

   (iv) shares or units in UCITS, excluding structured UCITS as referred to in the second subparagraph of Article 36(1) of Regulation (EU) No 583/2010;

L 173/410    EN    Official Journal of the European Union    12.6.2014

(v) structured deposits, excluding those that incorporate a structure which makes it difficult for the client to understand the risk of return or the cost of exiting the product before term;

(vi) other non-complex financial instruments for the purpose of this paragraph.

For the purpose of this point, if the requirements and the procedure laid down under the third and the fourth subparagraphs of Article 4(1) of Directive 2003/71/EC are fulfilled, a third-country market shall be considered to be equivalent to a regulated market.

(b) the service is provided at the initiative of the client or potential client;

(c) the client or potential client has been clearly informed that in the provision of that service the investment firm is not required to assess the appropriateness of the financial instrument or service provided or offered and that therefore he does not benefit from the corresponding protection of the relevant conduct of business rules. Such a warning may be provided in a standardised format;

(d) the investment firm complies with its obligations under Article 23.

5.    The investment firm shall establish a record that includes the document or documents agreed between the investment firm and the client that set out the rights and obligations of the parties, and the other terms on which the investment firm will provide services to the client. The rights and duties of the parties to the contract may be incorporated by reference to other documents or legal texts.

6.    The investment firm shall provide the client with adequate reports on the service provided in a durable medium. Those reports shall include periodic communications to clients, taking into account the type and the complexity of financial instruments involved and the nature of the service provided to the client and shall include, where applicable, the costs associated with the transactions and services undertaken on behalf of the client.

When providing investment advice, the investment firm shall, before the transaction is made, provide the client with a statement on suitability in a durable medium specifying the advice given and how that advice meets the preferences, objectives and other characteristics of the retail client.

Where the agreement to buy or sell a financial instrument is concluded using a means of distance communication which prevents the prior delivery of the suitability statement, the investment firm may provide the written statement on suitability in a durable medium immediately after the client is bound by any agreement, provided both the following conditions are met:

(a) the client has consented to receiving the suitability statement without undue delay after the conclusion of the transaction; and

(b) the investment firm has given the client the option of delaying the transaction in order to receive the statement on suitability in advance.

Where an investment firm provides portfolio management or has informed the client that it will carry out a periodic assessment of suitability, the periodic report shall contain an updated statement of how the investment meets the client's preferences, objectives and other characteristics of the retail client.

12.6.2014    EN    Official Journal of the European Union    L 173/411

7. If a credit agreement relating to residential immovable property, which is subject to the provisions concerning creditworthiness assessment of consumers laid down in Directive 2014/17/EU of the European Parliament and the Council ([1]), has as a prerequisite the provision to that same consumer of an investment service in relation to mortgage bonds specifically issued to secure the financing of and having identical terms as the credit agreement relating to residential immovable property, in order for the loan to be payable, refinanced or redeemed, that service shall not be subject to the obligations set out in this Article.

8. The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to ensure that investment firms comply with the principles set out in paragraphs 2 to 6 of this Article when providing investment or ancillary services to their clients, including information to obtain when assessing the suitability or appropriateness of the services and financial instruments for their clients, criteria to assess non-complex financial instruments for the purposes of point (a)(vi) of paragraph 4 of this Article, the content and the format of records and agreements for the provision of services to clients and of periodic reports to clients on the services provided. Those delegated acts shall take into account:

(a) the nature of the service(s) offered or provided to the client or potential client, having regard to the type, object, size and frequency of the transactions;

(b) the nature of the products being offered or considered, including different types of financial instruments;

(c) the retail or professional nature of the client or potential clients or, in the case of paragraph 6, their classification as eligible counterparties.

9. ESMA shall adopt by 3 January 2016 guidelines specifying criteria for the assessment of knowledge and competence required under paragraph 1.

10. ESMA shall develop by 3 January 2016, and update periodically, guidelines for the assessment of:

(a) financial instruments incorporating a structure which makes it difficult for the client to understand the risk involved in accordance with points (a)(ii) and (a)(iii) of paragraph 4;

(b) structured deposits incorporating a structure which makes it difficult for the client to understand the risk of return or the cost of exiting the product before term, in accordance with point (a)(v) of paragraph 4.

11. ESMA may develop guidelines, and update them periodically, for the assessment of financial instruments being classified as non-complex for the purpose of point (a)(vi) of paragraph 4, taking into account the delegated acts adopted under paragraph 8.

*Article 26*

**Provision of services through the medium of another investment firm**

Member States shall allow an investment firm receiving an instruction to provide investment or ancillary services on behalf of a client through the medium of another investment firm to rely on client information transmitted by the latter investment firm. The investment firm which mediates the instructions will remain responsible for the completeness and accuracy of the information transmitted.

---

([1]) Directive 2014/17/EU of the European Parliament and of the Council of 4 February 2014 on credit agreements for consumers relating to residential immovable property and amending Directives 2008/48/EC and 2013/36/EU and Regulation (EU) No 1093/2010 (OJ L 60, 28.2.2014, p. 34).

The investment firm which receives an instruction to undertake services on behalf of a client in that way shall also be able to rely on any recommendations in respect of the service or transaction that have been provided to the client by another investment firm. The investment firm which mediates the instructions will remain responsible for the suitability for the client of the recommendations or advice provided.

The investment firm which receives client instructions or orders through the medium of another investment firm shall remain responsible for concluding the service or transaction, based on any such information or recommendations, in accordance with the relevant provisions of this Title.

*Article 27*

**Obligation to execute orders on terms most favourable to the client**

1.    Member States shall require that investment firms take all sufficient steps to obtain, when executing orders, the best possible result for their clients taking into account price, costs, speed, likelihood of execution and settlement, size, nature or any other consideration relevant to the execution of the order. Nevertheless, where there is a specific instruction from the client the investment firm shall execute the order following the specific instruction.

Where an investment firm executes an order on behalf of a retail client, the best possible result shall be determined in terms of the total consideration, representing the price of the financial instrument and the costs relating to execution, which shall include all expenses incurred by the client which are directly relating to the execution of the order, including execution venue fees, clearing and settlement fees and any other fees paid to third parties involved in the execution of the order.

For the purposes of delivering best possible result in accordance with the first subparagraph where there is more than one competing venue to execute an order for a financial instrument, in order to assess and compare the results for the client that would be achieved by executing the order on each of the execution venues listed in the investment firm's order execution policy that is capable of executing that order, the investment firm's own commissions and the costs for executing the order on each of the eligible execution venues shall be taken into account in that assessment.

2.    An investment firm shall not receive any remuneration, discount or non-monetary benefit for routing client orders to a particular trading venue or execution venue which would infringe the requirements on conflicts of interest or inducements set out in paragraph 1 of this Article and Article 16(3) and Articles 23 and 24.

3.    Member States shall require that for financial instruments subject to the trading obligation in Articles 23 and 28 Regulation (EU) No 600/2014 each trading venue and systematic internaliser and for other financial instruments each execution venue makes available to the public, without any charges, data relating to the quality of execution of trans-actions on that venue on at least an annual basis and that following execution of a transaction on behalf of a client the investment firm shall inform the client where the order was executed. Periodic reports shall include details about price, costs, speed and likelihood of execution for individual financial instruments.

4.    Member States shall require investment firms to establish and implement effective arrangements for complying with paragraph 1. In particular, Member States shall require investment firms to establish and implement an order execution policy to allow them to obtain, for their client orders, the best possible result in accordance with paragraph 1.

5.    The order execution policy shall include, in respect of each class of financial instruments, information on the different venues where the investment firm executes its client orders and the factors affecting the choice of execution venue. It shall at least include those venues that enable the investment firm to obtain on a consistent basis the best possible result for the execution of client orders.

Member States shall require that investment firms provide appropriate information to their clients on their order execution policy. That information shall explain clearly, in sufficient detail and in a way that can be easily understood by clients, how orders will be executed by the investment firm for the client. Member States shall require that investment firms obtain the prior consent of their clients to the order execution policy.

12.6.2014        EN        Official Journal of the European Union        L 173/413

Member States shall require that, where the order execution policy provides for the possibility that client orders may be executed outside a trading venue, the investment firm shall, in particular, inform its clients about that possibility. Member States shall require that investment firms obtain the prior express consent of their clients before proceeding to execute their orders outside a trading venue. Investment firms may obtain such consent either in the form of a general agreement or in respect of individual transactions.

6.    Member States shall require investment firms who execute client orders to summarise and make public on an annual basis, for each class of financial instruments, the top five execution venues in terms of trading volumes where they executed client orders in the preceding year and information on the quality of execution obtained.

7.    Member States shall require investment firms who execute client orders to monitor the effectiveness of their order execution arrangements and execution policy in order to identify and, where appropriate, correct any deficiencies. In particular, they shall assess, on a regular basis, whether the execution venues included in the order execution policy provide for the best possible result for the client or whether they need to make changes to their execution arrangements, taking account of, inter alia, the information published under paragraphs 3 and 6. Member States shall require investment firms to notify clients with whom they have an ongoing client relationship of any material changes to their order execution arrangements or execution policy.

8.    Member States shall require investment firms to be able to demonstrate to their clients, at their request, that they have executed their orders in accordance with the investment firm's execution policy and to demonstrate to the competent authority, at its request, their compliance with this Article.

9.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 concerning:

(a) the criteria for determining the relative importance of the different factors that, pursuant to paragraph 1, may be taken into account for determining the best possible result taking into account the size and type of order and the retail or professional nature of the client;

(b) factors that may be taken into account by an investment firm when reviewing its execution arrangements and the circumstances under which changes to such arrangements may be appropriate. In particular, the factors for determining which venues enable investment firms to obtain on a consistent basis the best possible result for executing the client orders;

(c) the nature and extent of the information to be provided to clients on their execution policies, pursuant to paragraph 5.

10.    ESMA shall develop draft regulatory technical standards to determine:

(a) the specific content, the format and the periodicity of data relating to the quality of execution to be published in accordance with paragraph 3, taking into account the type of execution venue and the type of financial instrument concerned;

(b) the content and the format of information to be published by investment firms in accordance with paragraph 6.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

*Article 28*

**Client order handling rules**

1.    Member States shall require that investment firms authorised to execute orders on behalf of clients implement procedures and arrangements which provide for the prompt, fair and expeditious execution of client orders, relative to other client orders or the trading interests of the investment firm.

Those procedures or arrangements shall allow for the execution of otherwise comparable client orders in accordance with the time of their reception by the investment firm.

2.    Member States shall require that, in the case of a client limit order in respect of shares admitted to trading on a regulated market or traded on a trading venue which are not immediately executed under prevailing market conditions, investment firms are, unless the client expressly instructs otherwise, to take measures to facilitate the earliest possible execution of that order by making public immediately that client limit order in a manner which is easily accessible to other market participants. Member States may decide that investment firms comply with that obligation by transmitting the client limit order to a trading venue. Member States shall provide that the competent authorities may waive the obligation to make public a limit order that is large in scale compared with normal market size as determined under Article 4 of Regulation (EU) No 600/2014.

3.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to define:

(a) the conditions and nature of the procedures and arrangements which result in the prompt, fair and expeditious execution of client orders and the situations in which or types of transaction for which investment firms may reasonably deviate from prompt execution so as to obtain more favourable terms for clients;

(b) the different methods through which an investment firm can be deemed to have met its obligation to disclose not immediately executable client limit orders to the market.

*Article 29*

**Obligations of investment firms when appointing tied agents**

1.    Member States shall allow an investment firm to appoint tied agents for the purposes of promoting the services of the investment firm, soliciting business or receiving orders from clients or potential clients and transmitting them, placing financial instruments and providing advice in respect of such financial instruments and services offered by that investment firm.

2.    Member States shall require that where an investment firm decides to appoint a tied agent it remains fully and unconditionally responsible for any action or omission on the part of the tied agent when acting on behalf of the investment firm. Member States shall require the investment firm to ensure that a tied agent discloses the capacity in which he is acting and the investment firm which he is representing when contacting or before dealing with any client or potential client.

Member States may allow, in accordance with Article 16(6), (8) and (9), tied agents registered in their territory to hold money and/or financial instruments of clients on behalf and under the full responsibility of the investment firm for which they are acting within their territory or, in the case of a cross border operation, in the territory of a Member State which allows a tied agent to hold client money.

Member States shall require the investment firms to monitor the activities of their tied agents so as to ensure that they continue to comply with this Directive when acting through tied agents.

3.    Tied agents shall be registered in the public register in the Member State where they are established. ESMA shall publish on its website references or hyperlinks to the public registers established under this Article by the Member States that decide to allow investment firms to appoint tied agents.

12.6.2014    EN    Official Journal of the European Union    L 173/415

Member States shall ensure that tied agents are only admitted to the public register if it has been established that they are of sufficiently good repute and that they possess the appropriate general, commercial and professional knowledge and competence so as to be able to deliver the investment service or ancillary service and to communicate accurately all relevant information regarding the proposed service to the client or potential client.

Member States may decide that, subject to appropriate control, investment firms can verify whether the tied agents which they have appointed are of sufficiently good repute and possess the knowledge and competence referred to in the second subparagraph.

The register shall be updated on a regular basis. It shall be publicly available for consultation.

4.    Member States shall require that investment firms appointing tied agents take adequate measures in order to avoid any negative impact that the activities of the tied agent not covered by the scope of this Directive could have on the activities carried out by the tied agent on behalf of the investment firm.

Member States may allow competent authorities to collaborate with investment firms and credit institutions, their associations and other entities in registering tied agents and in monitoring compliance of tied agents with the requirements of paragraph 3. In particular, tied agents may be registered by an investment firm, credit institution or their associations and other entities under the supervision of the competent authority.

5.    Member States shall require that investment firms appoint only tied agents entered in the public registers referred to in paragraph 3.

6.    Member States may adopt or retain provisions that are more stringent than those set out in this Article or add further requirements for tied agents registered within their jurisdiction.

*Article 30*

**Transactions executed with eligible counterparties**

1.    Member States shall ensure that investment firms authorised to execute orders on behalf of clients and/or to deal on own account and/or to receive and transmit orders, may bring about or enter into transactions with eligible counterparties without being obliged to comply with the obligations under Article 24, with the exception of paragraphs 4 and 5, Article 25, with the exception of paragraph 6, Article 27 and Article 28(1) in respect of those transactions or in respect of any ancillary service directly relating to those transactions.

Member States shall ensure that, in their relationship with eligible counterparties, investment firms act honestly, fairly and professionally and communicate in a way which is fair, clear and not misleading, taking into account the nature of the eligible counterparty and of its business.

2.    Member States shall recognise as eligible counterparties for the purposes of this Article investment firms, credit institutions, insurance companies, UCITS and their management companies, pension funds and their management companies, other financial institutions authorised or regulated under Union law or under the national law of a Member State, national governments and their corresponding offices including public bodies that deal with public debt at national level, central banks and supranational organisations.

Classification as an eligible counterparty under the first subparagraph shall be without prejudice to the right of such entities to request, either on a general form or on a trade-by-trade basis, treatment as clients whose business with the investment firm is subject to Articles 24, 25, 27 and 28.

3.    Member States may also recognise as eligible counterparties other undertakings meeting pre-determined proportionate requirements, including quantitative thresholds. In the event of a transaction where the prospective counterparties are located in different jurisdictions, the investment firm shall defer to the status of the other undertaking as determined by the law or measures of the Member State in which that undertaking is established.

Member States shall ensure that the investment firm, when it enters into transactions in accordance with paragraph 1 with such undertakings, obtains the express confirmation from the prospective counterparty that it agrees to be treated as an eligible counterparty. Member States shall allow the investment firm to obtain that confirmation either in the form of a general agreement or in respect of each individual transaction.

4.    Member States may recognise as eligible counterparties third country entities equivalent to those categories of entities referred to in paragraph 2.

Member States may also recognise as eligible counterparties third country undertakings such as those referred to in paragraph 3 on the same conditions and subject to the same requirements as those laid down in paragraph 3.

5.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to specify:

(a) the procedures for requesting treatment as clients under paragraph 2;

(b) the procedures for obtaining the express confirmation from prospective counterparties under paragraph 3;

(c) the pre-determined proportionate requirements, including quantitative thresholds that would allow an undertaking to be considered to be an eligible counterparty under paragraph 3.

## Section 3

### Market transparency and integrity

*Article 31*

**Monitoring of compliance with the rules of the MTF or the OTF and with other legal obligations**

1.    Member States shall require that investment firms and market operators operating an MTF or OTF establish and maintain effective arrangements and procedures, relevant to the MTF or OTF, for the regular monitoring of the compliance by its members or participants or users with its rules. Investment firms and market operators operating an MTF or an OTF shall monitor the orders sent, including cancellations and the transactions undertaken by their members or participants or users under their systems, in order to identify infringements of those rules, disorderly trading conditions, conduct that may indicate behaviour that is prohibited under Regulation (EU) No 596/2014 or system disruptions in relation to a financial instrument and shall deploy the resource necessary to ensure that such monitoring is effective.

2.    Member States shall require investment firms and market operators operating an MTF or an OTF to inform its competent authority immediately of significant infringements of its rules or disorderly trading conditions or conduct that may indicate behaviour that is prohibited under Regulation (EU) No 596/2014 or system disruptions in relation to a financial instrument.

The competent authorities of the investment firms and market operators operating an MTF or an OTF shall communicate to ESMA and to the competent authorities of the other Member States the information referred to in the first subparagraph.

In relation to conduct that may indicate behaviour that is prohibited under Regulation (EU) No 596/2014, a competent authority must be convinced that such behaviour is being or has been carried out before it notifies the competent authorities of the other Member States and ESMA.

3.    Member States shall also require investment firms and market operators operating an MTF or an OTF to also supply without undue delay the information referred to in paragraph 2 to the authority competent for the investigation and prosecution of market abuse and to provide full assistance to the latter in investigating and prosecuting market abuse occurring on or through its systems.

4.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to determine circumstances that trigger an information requirement as referred to in paragraph 2 of this Article.

*Article 32*

**Suspension and removal of financial instruments from trading on an MTF or an OTF**

1.    Without prejudice to the right of the competent authority under Article 69(2) to demand suspension or removal of a financial instrument from trading, an investment firm or a market operator operating an MTF or an OTF may suspend or remove from trading a financial instrument which no longer complies with the rules of the MTF or an OTF unless such suspension or removal would be likely to cause significant damage to the investors' interests or the orderly functioning of the market.

2.    Member States shall require that an investment firm or a market operator operating an MTF or an OTF that suspends or removes from trading a financial instrument also suspends or removes derivatives referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument where necessary to support the objectives of the suspension or removal of the underlying financial instrument. The investment firm or market operator operating an MTF or an OTF shall make public its decision on the suspension or removal of the financial instrument and of any related derivative and communicate the relevant decisions to its competent authority.

The competent authority, in whose jurisdiction the suspension or removal originated, shall require that regulated markets, other MTFs, other OTFs and systematic internalisers, which fall under its jurisdiction and trade the same financial instrument or derivatives referred to in points (4) to (10) of Section C of Annex I to this Directive that relate or are referenced to that financial instrument, also suspend or remove that financial instrument or derivatives from trading, where the suspension or removal is due to suspected market abuse, a take-over bid or the non-disclosure of inside information about the issuer or financial instrument infringing Articles 7 and 17 of Regulation (EU) No 596/2014 except where such suspension or removal could cause significant damage to the investors' interests or the orderly functioning of the market.

The competent authority shall immediately make public and communicate to ESMA and the competent authorities of the other Member States such a decision.

The notified competent authorities of the other Member States shall require that regulated markets, other MTFs, other OTFs and systematic internalisers, which fall under their jurisdiction and trade the same financial instrument or derivatives referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument, also suspend or remove that financial instrument or derivatives from trading, where the suspension or removal is due to suspected market abuse, a take-over bid or the non-disclosure of inside information about the issuer or financial instrument infringing Articles 7 and 17 of Regulation (EU) No 596/2014 except where such suspension or removal could cause significant damage to the investors' interests or the orderly functioning of the market.

Each notified competent authority shall communicate its decision to ESMA and other competent authorities, including an explanation if the decision was not to suspend or remove from trading the financial instrument or derivatives referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument.

This paragraph also applies when the suspension from trading of a financial instrument or derivatives referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument is lifted.

The notification procedure referred to in this paragraph shall also apply in the case where the decision to suspend or remove from trading a financial instrument or derivatives referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument is taken by the competent authority pursuant to points (m) and (n) of Article 69(2).

In order to ensure that the obligation to suspend or remove from trading such derivatives is applied proportionately, ESMA shall develop draft regulatory technical standards to further specify the cases in which the connection between a derivative as referred to in points (4) to (10) of Section C of Annex I relating or referenced to a financial instrument suspended or removed from trading and the original financial instrument implies that the derivative is also to be suspended or removed from trading, in order to achieve the objective of the suspension or removal of the underlying financial instrument.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

3.    ESMA shall develop draft implementing technical standards to determine the format and timing of the communications and the publication referred to in paragraph 2.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

4.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to list situations constituting significant damage to the investors' interests and the orderly functioning of the market referred to in paragraphs 1 and 2 of this Article.

Section 4

SME growth markets

*Article 33*

SME growth markets

1.    Member States shall provide that the operator of a MTF may apply to its home competent authority to have the MTF registered as an SME growth market.

2.    Member States shall provide that the home competent authority may register the MTF as an SME growth market if the competent authority receives an application referred to in paragraph 1 and is satisfied that the requirements in paragraph 3 are complied with in relation to the MTF.

3.    Member States shall ensure that MTFs are subject to effective rules, systems and procedures which ensure that the following is complied with:

(a) at least 50 % of the issuers whose financial instruments are admitted to trading on the MTF are SMEs at the time when the MTF is registered as an SME growth market and in any calendar year thereafter;

(b) appropriate criteria are set for initial and ongoing admission to trading of financial instruments of issuers on the market;

(c) on initial admission to trading of financial instruments on the market there is sufficient information published to enable investors to make an informed judgment about whether or not to invest in the financial instruments, either an appropriate admission document or a prospectus if the requirements laid down in Directive 2003/71/EC are applicable in respect of a public offer being made in conjunction with the initial admission to trading of the financial instrument on the MTF;

(d) there is appropriate ongoing periodic financial reporting by or on behalf of an issuer on the market, for example audited annual reports;

(e) issuers on the market as defined in point (21) of Article 3(1) of Regulation (EU) No 596/2014, persons discharging managerial responsibilities as defined in point (25) of Article 3(1) of Regulation (EU) No 596/2014 and persons closely associated with them as defined in point (26) of Article 3(1) of Regulation (EU) No 596/2014 comply with relevant requirements applicable to them under Regulation (EU) No 596/2014;

(f) regulatory information concerning the issuers on the market is stored and disseminated to the public;

(g) there are effective systems and controls aiming to prevent and detect market abuse on that market as required under the Regulation (EU) No 596/2014.

4. The criteria in paragraph 3 are without prejudice to compliance by the investment firm or market operator operating the MTF with other obligations under this Directive relevant to the operation of MTFs. They also do not prevent the investment firm or market operator operating the MTF from imposing additional requirements to those specified in that paragraph.

5. Member States shall provide that the home competent authority may deregister a MTF as an SME growth market in any of the following cases:

(a) the investment firm or market operator operating the market applies for its deregistration;

(b) the requirements in paragraph 3 are no longer complied with in relation to the MTF.

6. Members States shall require that if a home competent authority registers or deregisters an MTF as an SME growth market under this Article it shall as soon as possible notify ESMA of that registration or deregistration. ESMA shall publish on its website a list of SME growth markets and shall keep that list up to date.

7. Member States shall require that where a financial instrument of an issuer is admitted to trading on one SME growth market, the financial instrument may also be traded on another SME growth market only where the issuer has been informed and has not objected. In such a case however, the issuer shall not be subject to any obligation relating to corporate governance or initial, ongoing or ad hoc disclosure with regard to the latter SME growth market.

8. The Commission shall be empowered to adopt delegated acts in accordance with Article 89 further specifying the requirements laid down in paragraph 3 of this Article. The measures shall take into account the need for the requirements to maintain high levels of investor protection to promote investor confidence in those markets while minimising the administrative burdens for issuers on the market and that de-registrations do not occur nor shall registrations be refused as a result of a merely temporary failure to meet the conditions set out in point (a) of paragraph 3 of this Article.

L 173/420    EN    Official Journal of the European Union    12.6.2014

CHAPTER III

*Rights of investment firms*

*Article 34*

**Freedom to provide investment services and activities**

1.    Member States shall ensure that any investment firm authorised and supervised by the competent authorities of another Member State in accordance with this Directive, and in respect of credit institutions in accordance with Directive 2013/36/EU, may freely provide investment services and/or perform investment services as well as ancillary services within their territories, provided that such services and activities are covered by its authorisation. Ancillary services may only be provided together with an investment service and/or activity.

Member States shall not impose any additional requirements on such an investment firm or credit institution in respect of the matters covered by this Directive.

2.    Any investment firm wishing to provide services or activities within the territory of another Member State for the first time, or which wishes to change the range of services or activities so provided, shall communicate the following information to the competent authorities of its home Member State:

(a)  the Member State in which it intends to operate;

(b)  a programme of operations stating in particular the investment services and/or activities as well as ancillary services which it intends to provide in the territory of that Member State and whether it intends to do so through the use of tied agents, established in its home Member State. Where an investment firm intends to use tied agents, the investment firm shall communicate to the competent authority of its home Member State the identity of those tied agents.

Where an investment firm intends to use tied agents established in its home Member State, in the territory of the Member States in which it intends to provide services the competent authority of the home Member State of the investment firm shall, within one month from receipt of all the information, communicate to the competent authority of the host Member State designated as contact point in accordance with Article 79(1) the identity of the tied agents that the investment firm intends to use to provide investment services and activities in that Member State. The host Member State shall publish such information. ESMA may request access to that information in accordance with the procedure and under the conditions set out in Article 35 of Regulation (EU) No 1095/2010.

3.    The competent authority of the home Member State shall, within one month of receiving the information, forward it to the competent authority of the host Member State designated as contact point in accordance with Article 79(1). The investment firm may then start to provide the investment services and activities concerned in the host Member State.

4.    In the event of a change in any of the particulars communicated in accordance with paragraph 2, an investment firm shall give written notice of that change to the competent authority of the home Member State at least one month before implementing the change. The competent authority of the home Member State shall inform the competent authority of the host Member State of that change.

5.    Any credit institution wishing to provide investment services or activities as well as ancillary services in accordance with paragraph 1 through tied agents shall communicate to the competent authority of its home Member State the identity of those tied agents.

Where the credit institution intends to use tied agents established in its home Member State in the territory of the Member States in which it intends to provide services, the competent authority of the home Member State of the credit institution shall, within one month from the receipt of all the information, communicate to the competent authority of the host Member State designated as contact point in accordance with Article 79(1) the identity of the tied agents that the credit institution intends to use to provide services in that Member State. The host Member State shall publish such information.

6.    Member States shall, without further legal or administrative requirement, allow investment firms and market operators operating MTFs and OTFs from other Member States to provide appropriate arrangements on their territory so as to facilitate access to and trading on those markets by remote users, members or participants established in their territory.

7.    The investment firm or the market operator operating an MTF or an OTF shall communicate to the competent authority of its home Member State the Member State in which it intends to provide such arrangements. The competent authority of the home Member State shall communicate, within one month, that information to the competent authority of the Member State in which the MTF or the OTF intends to provide such arrangements.

The competent authority of the home Member State of the MTF shall, on the request of the competent authority of the host Member State of the MTF and without undue delay, communicate the identity of the remote members or participants of the MTF established in that Member State.

8.    ESMA shall develop draft regulatory technical standards to specify the information to be notified in accordance with paragraphs 2, 4, 5 and 7.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

9.    ESMA shall develop draft implementing technical standards to establish standard forms, templates and procedures for the transmission of information in accordance with paragraphs 3, 4, 5 and 7.

ESMA shall submit those draft implementing technical standards to the Commission by 31 December 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 35*

**Establishment of a branch**

1.    Member States shall ensure that investment services and/or activities as well as ancillary services may be provided within their territories in accordance with this Directive and with Directive 2013/36/EU through the right of establishment, whether by the establishment of a branch or by the use of a tied agent established in a Member State outside its home Member State, provided that those services and activities are covered by the authorisation granted to the investment firm or the credit institution in the home Member State. Ancillary services may only be provided together with an investment service and/or activity.

Member States shall not impose any additional requirements save those allowed under paragraph 8, on the organisation and operation of the branch in respect of the matters covered by this Directive.

2.    Member States shall require any investment firm wishing to establish a branch within the territory of another Member State or to use tied agents established in another Member State in which it has not established a branch, first to notify the competent authority of its home Member State and to provide it with the following information:

(a)    the Member States within the territory of which it plans to establish a branch or the Member States in which it has not established a branch but plans to use tied agents established there;

(b) a programme of operations setting out, inter alia, the investment services and/or activities as well as the ancillary services to be offered;

(c) where established, the organisational structure of the branch and indicating whether the branch intends to use tied agents and the identity of those tied agents;

(d) where tied agents are to be used in a Member State in which an investment firm has not established a branch, a description of the intended use of the tied agent(s) and an organisational structure, including reporting lines, indicating how the agent(s) fit into the corporate structure of the investment firm;

(e) the address in the host Member State from which documents may be obtained;

(f) the names of those responsible for the management of the branch or of the tied agent.

Where an investment firm uses a tied agent established in a Member State outside its home Member State, such tied agent shall be assimilated to the branch, where one is established, and shall in any event be subject to the provisions of this Directive relating to branches.

3.     Unless the competent authority of the home Member State has reason to doubt the adequacy of the administrative structure or the financial situation of an investment firm, taking into account the activities envisaged, it shall, within three months of receiving all the information, communicate that information to the competent authority of the host Member State designated as contact point in accordance with Article 79(1) and inform the investment firm concerned accordingly.

4.     In addition to the information referred to in paragraph 2, the competent authority of the home Member State shall communicate details of the accredited compensation scheme of which the investment firm is a member in accordance with Directive 97/9/EC to the competent authority of the host Member State. In the event of a change in the particulars, the competent authority of the home Member State shall inform the competent authority of the host Member State accordingly.

5.     Where the competent authority of the home Member State refuses to communicate the information to the competent authority of the host Member State, it shall give reasons for its refusal to the investment firm concerned within three months of receiving all the information.

6.     On receipt of a communication from the competent authority of the host Member State, or failing such communication from the latter at the latest after two months from the date of transmission of the communication by the competent authority of the home Member State, the branch may be established and commence business.

7.     Any credit institution wishing to use a tied agent established in a Member State outside its home Member State to provide investment services and/or activities as well as ancillary services in accordance with this Directive shall notify the competent authority of its home Member State and provide it with the information referred to in paragraph 2.

Unless the competent authority of the home Member State has reason to doubt the adequacy of the administrative structure or the financial situation of a credit institution, it shall, within three months of receiving all the information, communicate that information to the competent authority of the host Member State designated as contact point in accordance with Article 79(1) and inform the credit institution concerned accordingly.

Where the competent authority of the home Member State refuses to communicate the information to the competent authority of the host Member State, it shall give reasons for its refusal to the credit institution concerned within three months of receiving all the information.

On receipt of a communication from the competent authority of the host Member State, or failing such communication from the latter at the latest after two months from the date of transmission of the communication by the competent authority of the home Member State, the tied agent can commence business. Such tied agent shall be subject to the provisions of this Directive relating to branches.

8.    The competent authority of the Member State in which the branch is located shall assume responsibility for ensuring that the services provided by the branch within its territory comply with the obligations laid down in Articles 24, 25, 27, 28, of this Directive and Articles 14 to 26 of Regulation (EU) No 600/2014 and the measures adopted pursuant thereto by the host Member State where allowed in accordance with Article 24(12).

The competent authority of the Member State in which the branch is located shall have the right to examine branch arrangements and to request such changes as are strictly needed to enable the competent authority to enforce the obligations under Articles 24, 25, 27, 28 of this Directive and Articles 14 to 26 of Regulation (EU) No 600/2014 and measures adopted pursuant thereto with respect to the services and/or activities provided by the branch within its territory.

9.    Each Member State shall provide that, where an investment firm authorised in another Member State has established a branch within its territory, the competent authority of the home Member State of the investment firm, in the exercise of its responsibilities and after informing the competent authority of the host Member State, may carry out on-site inspections in that branch.

10.    In the event of a change in any of the information communicated in accordance with paragraph 2, an investment firm shall give written notice of that change to the competent authority of the home Member State at least one month before implementing the change. The competent authority of the host Member State shall also be informed of that change by the competent authority of the home Member State.

11.    ESMA shall develop draft regulatory technical standards to specify the information to be notified in accordance with paragraphs 2, 4, 7 and 10.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

12.    ESMA shall develop draft implementing technical standards to establish standard forms, templates and procedures for the transmission of information in accordance with paragraphs 3, 4, 7 and 10.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 36*

**Access to regulated markets**

1.    Member States shall require that investment firms from other Member States which are authorised to execute client orders or to deal on own account have the right of membership or have access to regulated markets established in their territory by means of any of the following arrangements:

(a)  directly, by setting up branches in the host Member States;

(b) by becoming remote members of or having remote access to the regulated market without having to be established in the home Member State of the regulated market, where the trading procedures and systems of the market in question do not require a physical presence for conclusion of transactions on the market.

2. Member States shall not impose any additional regulatory or administrative requirements, in respect of matters covered by this Directive, on investment firms exercising the right conferred by paragraph 1.

*Article 37*

**Access to CCP, clearing and settlement facilities and right to designate settlement system**

1. Without prejudice to Titles III, IV or V of Regulation (EU) No 648/2012, Member States shall require that investment firms from other Member States have the right of direct and indirect access to CCP, clearing and settlement systems in their territory for the purposes of finalising or arranging the finalisation of transactions in financial instruments.

Member States shall require that direct and indirect access of those investment firms to such facilities be subject to the same non-discriminatory, transparent and objective criteria as apply to local members or participants. Member States shall not restrict the use of those facilities to the clearing and settlement of transactions in financial instruments undertaken on a trading venue in their territory.

2. Member States shall require that regulated markets in their territory offer all their members or participants the right to designate the system for the settlement of transactions in financial instruments undertaken on that regulated market, subject to the following conditions:

(a) such links and arrangements between the designated settlement system and any other system or facility as are necessary to ensure the efficient and economic settlement of the transaction in question;

(b) agreement by the competent authority responsible for the supervision of the regulated market that technical conditions for settlement of transactions concluded on the regulated market through a settlement system other than that designated by the regulated market are such as to allow the smooth and orderly functioning of financial markets.

That assessment of the competent authority of the regulated market shall be without prejudice to the competencies of the national central banks as overseers of settlement systems or other supervisory authorities with competence in relation to such systems. The competent authority shall take into account the oversight/supervision already exercised by those institutions in order to avoid undue duplication of control.

*Article 38*

**Provisions regarding CCPs, clearing and settlement arrangements in respect of MTFs**

1. Member States shall not prevent investment firms and market operators operating an MTF from entering into appropriate arrangements with a CCP or clearing house and a settlement system of another Member State with a view to providing for the clearing and/or settlement of some or all trades concluded by the members or participants under their systems.

2. The competent authority of investment firms and market operators operating an MTF may not oppose the use of CCP, clearing houses and/or settlement systems in another Member State except where demonstrably necessary in order to maintain the orderly functioning of that MTF and taking into account the conditions for settlement systems established in Article 37(2).

In order to avoid undue duplication of control, the competent authority shall take into account the oversight and supervision of the clearing and settlement system already exercised by the central banks as overseers of clearing and settlement systems or by other supervisory authorities with competence in relation to such systems.

CHAPTER IV

*Provision of investment services and activities by third country firms*

S e c t i o n   1

**P r o v i s i o n   o f   s e r v i c e s   o r   p e r f o r m a n c e   o f   a c t i v i t i e s   t h r o u g h   t h e   e s t a b l i s h m e n t   o f   a   b r a n c h**

*Article 39*

**Establishment of a branch**

1.    A Member State may require that a third-country firm intending to provide investment services or perform investment activities with or without any ancillary services to retail clients or to professional clients within the meaning of Section II of Annex II in its territory establish a branch in that Member State.

2.    Where a Member State requires that a third-country firm intending to provide investment services or to perform investment activities with or without any ancillary services in its territory establish a branch, the branch shall acquire a prior authorisation by the competent authorities of that Member State in accordance with the following conditions:

(a) the provision of services for which the third-country firm requests authorisation is subject to authorisation and supervision in the third country where the firm is established and the requesting firm is properly authorised, whereby the competent authority pays due regard to any FATF recommendations in the context of anti-money laundering and countering the financing of terrorism;

(b) cooperation arrangements, that include provisions regulating the exchange of information for the purpose of preserving the integrity of the market and protecting investors, are in place between the competent authorities in the Member State where the branch is to be established and competent supervisory authorities of the third country where the firm is established;

(c) sufficient initial capital is at free disposal of the branch;

(d) one or more persons are appointed to be responsible for the management of the branch and they all comply with the requirement laid down in Article 9(1);

(e) the third country where the third-country firm is established has signed an agreement with the Member State where the branch is to be established, which fully comply with the standards laid down in Article 26 of the OECD Model Tax Convention on Income and on Capital and ensures an effective exchange of information in tax matters, including, if any, multilateral tax agreements;

(f) the firm belongs to an investor-compensation scheme authorised or recognised in accordance with Directive 97/9/EC.

3.    The third-country firm referred to in paragraph 1 shall submit its application to the competent authority of the Member State where it intends to establish a branch.

*Article 40*

**Obligation to provide information**

A third-country firm intending to obtain authorisation for the provision of any investment services or the performance of investment activities with or without any ancillary services in the territory of a Member State through a branch shall provide the competent authority of that Member State with the following:

(a) the name of the authority responsible for its supervision in the third country concerned. When more than one authority is responsible for supervision, the details of the respective areas of competence shall be provided;

(b) all relevant details of the firm (name, legal form, registered office and address, members of the management body, relevant shareholders) and a programme of operations setting out the investment services and/or activities as well as the ancillary services to be provided and the organisational structure of the branch, including a description of any outsourcing to third parties of essential operating functions;

(c) the name of the persons responsible for the management of the branch and the relevant documents to demonstrate compliance with requirements laid down in Article 9(1);

(d) information about the initial capital at free disposal of the branch.

*Article 41*

**Granting of the authorisation**

1.    The competent authority of the Member State where the third-country firm has established or intends to establish its branch shall only grant authorisation when the competent authority is satisfied that:

(a) the conditions under Article 39 are fulfilled; and

(b) the branch of the third-country firm will be able to comply with the provisions referred to in paragraph 2.

The competent authority shall inform the third-country firm, within six months of submission of a complete application, whether or not the authorisation has been granted.

2.    The branch of the third-country firm authorised in accordance with paragraph 1, shall comply with the obligations laid down in Articles 16 to 20, 23, 24, 25 and 27, Article 28(1), and Articles 30, 31 and 32 of this Directive and in Articles 3 to 26 of Regulation (EU) No 600/2014 and the measures adopted pursuant thereto and shall be subject to the supervision of the competent authority in the Member State where the authorisation was granted.

Member States shall not impose any additional requirements on the organisation and operation of the branch in respect of the matters covered by this Directive and shall not treat any branch of third-country firms more favourably than Union firms.

*Article 42*

**Provision of services at the exclusive initiative of the client**

Member States shall ensure that where a retail client or professional client within the meaning of Section II of Annex II established or situated in the Union initiates at its own exclusive initiative the provision of an investment service or activity by a third-country firm, the requirement for authorisation under Article 39 shall not apply to the provision of that service or activity by the third country firm to that person including a relationship specifically relating to the provision of that service or activity. An initiative by such clients shall not entitle the third-country firm to market otherwise than through the branch, where one is required in accordance with national law, new categories of investment products or investment services to that client.

S e c t i o n   2

**W i t h d r a w a l   o f   a u t h o r i s a t i o n s**

*Article 43*

**Withdrawal of authorisations**

The competent authority which granted an authorisation under Articles 41 may withdraw the authorisation issued to a third country firm where such a firm:

(a) does not make use of the authorisation within 12 months, expressly renounces the authorisation or has provided no investment services or performed no investment activity for the preceding six months, unless the Member State concerned has provided for the authorisation to lapse in such cases;

(b) has obtained the authorisation by making false statements or by any other irregular means;

(c) no longer meets the conditions under which authorisation was granted;

(d) has seriously and systematically infringed the provisions adopted pursuant to this Directive governing the operating conditions for investment firms and applicable to third-country firms;

(e) falls within any of the cases where national law, in respect of matters outside the scope of this Directive, provides for withdrawal.

TITLE III

**REGULATED MARKETS**

*Article 44*

**Authorisation and applicable law**

1.    Member States shall reserve authorisation as a regulated market to those systems which comply with this Title.

Authorisation as a regulated market shall be granted only where the competent authority is satisfied that both the market operator and the systems of the regulated market comply at least with the requirements laid down in this Title.

In the case of a regulated market that is a legal person and that is managed or operated by a market operator other than the regulated market itself, Member States shall establish how the different obligations imposed on the market operator under this Directive are to be allocated between the regulated market and the market operator.

The market operator shall provide all information, including a programme of operations setting out, inter alia, the types of business envisaged and the organisational structure, necessary to enable the competent authority to satisfy itself that the regulated market has established, at the time of initial authorisation, all the necessary arrangements to meet its obligations under this Title.

2.    Member States shall require the market operator to perform tasks relating to the organisation and operation of the regulated market under the supervision of the competent authority. Member States shall ensure that competent authorities keep under regular review the compliance of regulated markets with this Title. They shall also ensure that competent authorities monitor that regulated markets comply at all times with the conditions for initial authorisation established under this Title.

3.    Member States shall ensure that the market operator is responsible for ensuring that the regulated market that it manages complies with the requirements laid down in this Title.

Member States shall also ensure that the market operator is entitled to exercise the rights that correspond to the regulated market that it manages by virtue of this Directive.

4.    Without prejudice to any relevant provisions of Regulation (EU) No 596/2014 or of Directive 2014/57/EU, the public law governing the trading conducted under the systems of the regulated market shall be that of the home Member State of the regulated market.

5.   The competent authority may withdraw the authorisation issued to a regulated market, where it:

(a)  does not make use of the authorisation within 12 months, expressly renounces the authorisation or has not operated for the preceding six months, unless the Member State concerned has provided for authorisation to lapse in such cases;

(b)  has obtained the authorisation by making false statements or by any other irregular means;

(c)  no longer meets the conditions under which authorisation was granted;

(d)  has seriously and systematically infringed the provisions adopted pursuant to this Directive or Regulation (EU) No 600/2014;

(e)  falls within any of the cases where national law provides for withdrawal.

6.   ESMA shall be notified of any withdrawal of authorisation.

*Article 45*

**Requirements for the management body of a market operator**

1.   Member States shall require that all members of the management body of any market operator shall at all times be of sufficiently good repute, possess sufficient knowledge, skills and experience to perform their duties. The overall composition of the management body shall reflect an adequately broad range of experience.

2.   Members of the management body shall, in particular, fulfil the following requirements:

(a)  All members of the management body shall commit sufficient time to perform their functions in the market operator. The number of directorships a member of the management body can hold, in any legal entity, at the same time shall take into account individual circumstances and the nature, scale and complexity of the market operator's activities.

Unless representing the Member State, members of the management body of market operators that are significant in terms of their size, internal organisation and the nature, the scope and the complexity of their activities shall not at the same time hold positions exceeding more than one of the following combinations:

 (i)  one executive directorship with two non-executive directorships;

(ii)  four non-executive directorships.

Executive or non-executive directorships held within the same group or undertakings where the market operator owns a qualifying holding shall be considered to be one single directorship.

Competent authorities may authorise members of the management body to hold one additional non-executive directorship. Competent authorities shall regularly inform ESMA of such authorisations.

Directorships in organisations which do not pursue predominantly commercial objectives shall be exempt from the limitation on the number of directorships a member of a management body can hold.

(b) The management body shall possess adequate collective knowledge, skills and experience to be able to understand the market operator's activities, including the main risks.

(c) Each member of the management body shall act with honesty, integrity and independence of mind to effectively assess and challenge the decisions of the senior management where necessary and to effectively oversee and monitor decision-making.

3.    Market operators shall devote adequate human and financial resources to the induction and training of members of the management body.

4.    Member States shall ensure that market operators which are significant in terms of their size, internal organisation and the nature, scope and complexity of their activities establish a nomination committee composed of members of the management body who do not perform any executive function in the market operator concerned.

The nomination committee shall carry out the following:

(a) identify and recommend, for the approval of the management body or for approval of the general meeting, candidates to fill management body vacancies. In doing so, the nomination committee shall evaluate the balance of knowledge, skills, diversity and experience of the management body. Further, the committee shall prepare a description of the roles and capabilities for a particular appointment, and assess the time commitment expected. Furthermore, the nomination committee shall decide on a target for the representation of the underrepresented gender in the management body and prepare a policy on how to increase the number of the underrepresented gender in the management body in order to meet that target;

(b) periodically, and at least annually, assess the structure, size, composition and performance of the management body, and make recommendations to the management body with regard to any changes;

(c) periodically, and at least annually, assess the knowledge, skills and experience of individual members of the management body and of the management body collectively, and report to the management body accordingly;

(d) periodically review the policy of the management body for selection and appointment of senior management and make recommendations to the management body.

In performing its duties, the nomination committee shall, to the extent possible and on an ongoing basis, take account of the need to ensure that the management body's decision making is not dominated by any one individual or small group of individuals in a manner that is detrimental to the interests of the market operator as a whole.

In performing its duties, the nomination committee shall be able to use any forms of resources it deems appropriate, including external advice.

Where, under national law, the management body does not have any competence in the process of selection and appointment of any of its members, this paragraph shall not apply.

5.    Member States or competent authorities shall require market operators and their respective nomination committees to engage a broad set of qualities and competences when recruiting members to the management body and for that purpose to put in place a policy promoting diversity on the management body.

6.    Member States shall ensure that the management body of a market operator defines and oversees the implementation of the governance arrangements that ensure effective and prudent management of an organisation, including the segregation of duties in the organisation and the prevention of conflicts of interest, and in a manner that promotes the integrity of the market.

Member States shall ensure that the management body monitors and periodically assesses the effectiveness of the market operator's governance arrangements and takes appropriate steps to address any deficiencies.

Members of the management body shall have adequate access to information and documents which are needed to oversee and monitor management decision-making.

7.    The competent authority shall refuse authorisation if it is not satisfied that the members of the management body of the market operator are of sufficiently good repute, possess sufficient knowledge, skills and experience and commit sufficient time to perform their functions, or if there are objective and demonstrable grounds for believing that the management body of the market operator may pose a threat to its effective, sound and prudent management and to the adequate consideration of the integrity of the market.

Member States shall ensure that, in the process of authorisation of a regulated market, the person or persons who effectively direct the business and the operations of an already authorised regulated market in accordance with this Directive are deemed to comply with the requirements laid down in paragraph 1.

8.    Member States shall require the market operator to notify the competent authority of the identity of all members of its management body and of any changes to its membership, along with all information needed to assess whether the market operator complies with paragraphs 1 to 5.

9.    ESMA shall issue guidelines on the following:

(a) the notion of sufficient time commitment of a member of the management body to perform that member's functions, in relation to the individual circumstances and the nature, scale and complexity of activities of the market operator;

(b) the notion of adequate collective knowledge, skills and experience of the management body as referred to in point (b) of paragraph 2;

(c) the notions of honesty, integrity and independence of mind of a member of the management body as referred to in point (c) of paragraph 2;

(d) the notion of adequate human and financial resources devoted to the induction and training of members of the management body as referred to in paragraph 3;

(e) the notion of diversity to be taken into account for the selection of members of the management body as referred to in paragraph 5.

ESMA shall issue those guidelines by 3 January 2016.

*Article 46*

**Requirements relating to persons exercising significant influence over the management of the regulated market**

1.    Member States shall require the persons who are in a position to exercise, directly or indirectly, significant influence over the management of the regulated market to be suitable.

2.    Member States shall require the market operator of the regulated market:

(a) to provide the competent authority with, and to make public, information regarding the ownership of the regulated market and/or the market operator, and in particular, the identity and scale of interests of any parties in a position to exercise significant influence over the management;

(b) to inform the competent authority of and to make public any transfer of ownership which gives rise to a change in the identity of the persons exercising significant influence over the operation of the regulated market.

3.    The competent authority shall refuse to approve proposed changes to the controlling interests of the regulated market and/or the market operator where there are objective and demonstrable grounds for believing that they would pose a threat to the sound and prudent management of the regulated market.

*Article 47*

**Organisational requirements**

1.    Member States shall require the regulated market:

(a) to have arrangements to identify clearly and manage the potential adverse consequences, for the operation of the regulated market or for its members or participants, of any conflict of interest between the interest of the regulated market, its owners or its market operator and the sound functioning of the regulated market, and in particular where such conflicts of interest might prove prejudicial to the accomplishment of any functions delegated to the regulated market by the competent authority;

(b) to be adequately equipped to manage the risks to which it is exposed, to implement appropriate arrangements and systems to identify all significant risks to its operation, and to put in place effective measures to mitigate those risks;

(c) to have arrangements for the sound management of the technical operations of the system, including the establishment of effective contingency arrangements to cope with risks of systems disruptions;

(d) to have transparent and non-discretionary rules and procedures that provide for fair and orderly trading and establish objective criteria for the efficient execution of orders;

(e) to have effective arrangements to facilitate the efficient and timely finalisation of the transactions executed under its systems;

(f) to have available, at the time of authorisation and on an ongoing basis, sufficient financial resources to facilitate its orderly functioning, having regard to the nature and extent of the transactions concluded on the market and the range and degree of the risks to which it is exposed.

2.    Member States shall not allow market operators to execute client orders against proprietary capital, or to engage in matched principal trading on any of the regulated markets they operate.

*Article 48*

**Systems resilience, circuit breakers and electronic trading**

1.    Member States shall require a regulated market to have in place effective systems, procedures and arrangements to ensure its trading systems are resilient, have sufficient capacity to deal with peak order and message volumes, are able to ensure orderly trading under conditions of severe market stress, are fully tested to ensure such conditions are met and are subject to effective business continuity arrangements to ensure continuity of its services if there is any failure of its trading systems.

2.    Member States shall require a regulated market to have in place:

(a)  written agreements with all investment firms pursuing a market making strategy on the regulated market;

(b)  schemes to ensure that a sufficient number of investment firms participate in such agreements which require them to post firm quotes at competitive prices with the result of providing liquidity to the market on a regular and predictable basis, where such a requirement is appropriate to the nature and scale of the trading on that regulated market.

3.    The written agreement referred to in paragraph 2 shall at least specify:

(a)  the obligations of the investment firm in relation to the provision of liquidity and where applicable any other obligation arising from participation in the scheme referred to in paragraph 2(b);

(b)  any incentives in terms of rebates or otherwise offered by the regulated market to an investment firm so as to provide liquidity to the market on a regular and predictable basis and, where applicable, any other rights accruing to the investment firm as a result of participation in the scheme referred to in paragraph 2(b).

The regulated market shall monitor and enforce compliance by investment firms with the requirements of such binding written agreements. The regulated market shall inform the competent authority about the content of the binding written agreement and shall, upon request, provide all further information to the competent authority necessary to enable the competent authority to satisfy itself of compliance by the regulated market with this paragraph.

4.    Member States shall require a regulated market to have in place effective systems, procedures and arrangements to reject orders that exceed pre-determined volume and price thresholds or are clearly erroneous.

5.    Member States shall require a regulated market to be able to temporarily halt or constrain trading if there is a significant price movement in a financial instrument on that market or a related market during a short period and, in exceptional cases, to be able to cancel, vary or correct any transaction. Member States shall require a regulated market to ensure that the parameters for halting trading are appropriately calibrated in a way which takes into account the liquidity of different asset classes and sub-classes, the nature of the market model and types of users and is sufficient to avoid significant disruptions to the orderliness of trading.

Member States shall ensure that a regulated market reports the parameters for halting trading and any material changes to those parameters to the competent authority in a consistent and comparable manner, and that the competent authority shall in turn report them to ESMA. Member States shall require that where a regulated market which is material in terms of liquidity in that financial instrument halts trading, in any Member State, that trading venue has the necessary systems and procedures in place to ensure that it will notify competent authorities in order for them to coordinate a market-wide response and determine whether it is appropriate to halt trading on other venues on which the financial instrument is traded until trading resumes on the original market.

6.    Member States shall require a regulated market to have in place effective systems, procedures and arrangements, including requiring members or participants to carry out appropriate testing of algorithms and providing environments to facilitate such testing, to ensure that algorithmic trading systems cannot create or contribute to disorderly trading conditions on the market and to manage any disorderly trading conditions which do arise from such algorithmic trading systems, including systems to limit the ratio of unexecuted orders to transactions that may be entered into the system by a member or participant, to be able to slow down the flow of orders if there is a risk of its system capacity being reached and to limit and enforce the minimum tick size that may be executed on the market.

7.    Member States shall require a regulated market that permits direct electronic access to have in place effective systems procedures and arrangements to ensure that members or participants are only permitted to provide such services if they are investment firms authorised under this Directive or credit institutions authorised under Directive 2013/36/EU,

that appropriate criteria are set and applied regarding the suitability of persons to whom such access may be provided and that the member or participant retains responsibility for orders and trades executed using that service in relation to the requirements of this Directive.

Member States shall also require that the regulated market set appropriate standards regarding risk controls and thresholds on trading through such access and is able to distinguish and if necessary to stop orders or trading by a person using direct electronic access separately from other orders or trading by the member or participant.

The regulated market shall have arrangements in place to suspend or terminate the provision of direct electronic access by a member or participant to a client in the case of non-compliance with this paragraph.

8.    Member States shall require a regulated market to ensure that its rules on co-location services are transparent, fair and non-discriminatory.

9.    Member States shall require that a regulated market ensure that its fee structures including execution fees, ancillary fees and any rebates are transparent, fair and non-discriminatory and that they do not create incentives to place, modify or cancel orders or to execute transactions in a way which contributes to disorderly trading conditions or market abuse. In particular, Member States shall require a regulated market to impose market making obligations in individual shares or a suitable basket of shares in exchange for any rebates that are granted.

Member States shall allow a regulated market to adjust its fees for cancelled orders according to the length of time for which the order was maintained and to calibrate the fees to each financial instrument to which they apply.

Member States may allow a regulated market to impose a higher fee for placing an order that is subsequently cancelled than an order which is executed and to impose a higher fee on participants placing a high ratio of cancelled orders to executed orders and on those operating a high-frequency algorithmic trading technique in order to reflect the additional burden on system capacity.

10.    Member States shall require a regulated market to be able to identify, by means of flagging from members or participants, orders generated by algorithmic trading, the different algorithms used for the creation of orders and the relevant persons initiating those orders. That information shall be available to competent authorities upon request.

11.    Member States shall require that upon request by the competent authority of the home Member State of a regulated market, regulated markets make available to the competent authority data relating to the order book or give the competent authority access to the order book so that it is able to monitor trading.

12.    ESMA shall develop draft regulatory technical standards further specifying:

(a) the requirements to ensure trading systems of regulated markets are resilient and have adequate capacity;

(b) the ratio referred to in paragraph 6, taking into account factors such as the value of unexecuted orders in relation to the value of executed transactions;

(c) the controls concerning direct electronic access in such a way as to ensure that the controls applied to sponsored access are at least equivalent to those applied to direct market access;

(d) the requirements to ensure that co-location services and fee structures are fair and non-discriminatory and that fee structures do not create incentives for disorderly trading conditions or market abuse;

(e) the determination of where a regulated market is material in terms of liquidity in that financial instrument;

(f) the requirements to ensure that market making schemes are fair and non-discriminatory and to establish minimum market making obligations that regulated markets must provide for when designing a market making scheme and the conditions under which the requirement to have in place a market making scheme is not appropriate, taking into account the nature and scale of the trading on that regulated market, including whether the regulated market allows for or enables algorithmic trading to take place through its systems;

(g) the requirements to ensure appropriate testing of algorithms so as to ensure that algorithmic trading systems including high-frequency algorithmic trading systems cannot create or contribute to disorderly trading conditions on the market.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

13. ESMA shall, by 3 January 2016, develop guidelines on the appropriate calibration of trading halts under paragraph 5, taking into account the factors referred to in that paragraph.

*Article 49*

**Tick sizes**

1. Member States shall require regulated markets to adopt tick size regimes in shares, depositary receipts, exchange-traded funds, certificates and other similar financial instruments and in any other financial instrument for which regulatory technical standards are developed in accordance with paragraph 4.

2. The tick size regimes referred to in paragraph 1 shall:

(a) be calibrated to reflect the liquidity profile of the financial instrument in different markets and the average bid-ask spread, taking into account the desirability of enabling reasonably stable prices without unduly constraining further narrowing of spreads;

(b) adapt the tick size for each financial instrument appropriately.

3. ESMA shall develop draft regulatory technical standards to specify minimum tick sizes or tick size regimes for specific shares, depositary receipts, exchange-traded funds, certificates, and other similar financial instruments where necessary to ensure the orderly functioning of markets, in accordance with the factors in paragraph 2 and the price, spreads and depth of liquidity of the financial instruments.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

4.    ESMA may develop draft regulatory technical standards to specify minimum tick sizes or tick size regimes for specific financial instruments other than those listed in paragraph 3 where necessary to ensure the orderly functioning of markets, in accordance with the factors in paragraph 2 and the price, spreads and depth of liquidity of the financial instruments.

ESMA shall submit any such draft regulatory technical standards to the Commission by 3 January 2016.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

*Article 50*

**Synchronisation of business clocks**

1.    Member States shall require that all trading venues and their members or participants synchronise the business clocks they use to record the date and time of any reportable event.

2.    ESMA shall develop draft regulatory technical standards to specify the level of accuracy to which clocks are to be synchronised in accordance with international standards.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

*Article 51*

**Admission of financial instruments to trading**

1.    Member States shall require that regulated markets have clear and transparent rules regarding the admission of financial instruments to trading.

Those rules shall ensure that any financial instruments admitted to trading on a regulated market are capable of being traded in a fair, orderly and efficient manner and, in the case of transferable securities, are freely negotiable.

2.    In the case of derivatives, the rules referred to in paragraph 1 shall ensure in particular that the design of the derivative contract allows for its orderly pricing as well as for the existence of effective settlement conditions.

3.    In addition to the obligations set out in paragraphs 1 and 2, Member States shall require the regulated market to establish and maintain effective arrangements to verify that issuers of transferable securities that are admitted to trading on the regulated market comply with their obligations under Union law in respect of initial, ongoing or ad hoc disclosure obligations.

Member States shall ensure that the regulated market establishes arrangements which facilitate its members or participants in obtaining access to information which has been made public under Union law.

4.    Member States shall ensure that regulated markets have established the necessary arrangements to review regularly the compliance with the admission requirements of the financial instruments which they admit to trading.

5.    A transferable security that has been admitted to trading on a regulated market can subsequently be admitted to trading on other regulated markets, even without the consent of the issuer and in compliance with the relevant provisions of Directive 2003/71/EC. The issuer shall be informed by the regulated market of the fact that its securities are traded on that regulated market. The issuer shall not be subject to any obligation to provide information required under paragraph 3 directly to any regulated market which has admitted the issuer's securities to trading without its consent.

6.    ESMA shall develop draft regulatory technical standards which:

(a)  specify the characteristics of different classes of financial instruments to be taken into account by the regulated market when assessing whether a financial instrument is issued in a manner consistent with the conditions laid down in the second subparagraph of paragraph 1 for admission to trading on the different market segments which it operates;

(b)  clarify the arrangements that the regulated market is required to implement so as to be considered to have fulfilled its obligation to verify that the issuer of a transferable security complies with its obligations under Union law in respect of initial, ongoing or ad hoc disclosure obligations;

(c)  clarify the arrangements that the regulated market has to establish pursuant to paragraph 3 in order to facilitate its members or participants in obtaining access to information which has been made public under the conditions established by Union law.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

*Article 52*

**Suspension and removal of financial instruments from trading on a regulated market**

1.    Without prejudice to the right of the competent authority under Article 69(2) to demand suspension or removal of a financial instrument from trading, a market operator may suspend or remove from trading a financial instrument which no longer complies with the rules of the regulated market unless such suspension or removal would be likely to cause significant damage to the investors' interests or the orderly functioning of the market.

2.    Member States shall require that a market operator that suspends or removes from trading a financial instrument also suspends or removes the derivatives as referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument where necessary to support the objectives of the suspension or removal of the underlying financial instrument. The market operator shall make public its decision on the suspension or removal of the financial instrument and of any related derivative and communicate the relevant decisions to its competent authority.

The competent authority, in whose jurisdiction the suspension or removal originated, shall require that other regulated markets, MTFs, OTFs and systematic internalisers, which fall under its jurisdiction and trade the same financial instrument or derivatives as referred to in points (4) to (10) of Section C of Annex I to this Directive that relate or are referenced to that financial instrument, also suspend or remove that financial instrument or derivatives from trading, where the suspension or removal is due to suspected market abuse, a take-over bid or the non-disclosure of inside information about the issuer or financial instrument infringing Articles 7 and 17 of Regulation (EU) No 596/2014 except where such suspension or removal could cause significant damage to the investors' interests or the orderly functioning of the market.

Each notified competent authority shall communicate its decision to ESMA and other competent authorities, including an explanation if the decision was not to suspend or remove from trading the financial instrument or derivatives as referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument.

The competent authority shall immediately make public and communicate to ESMA and the competent authorities of the other Member States such a decision.

The notified competent authorities of the other Member States shall require that regulated markets, other MTFs, other OTFs and systematic internalisers, which fall under their jurisdiction and trade the same financial instrument or derivatives referred to in points (4) to (10) of Section C of Annex I to this Directive that relate or are referenced to that financial instrument, also suspend or remove that financial instrument or derivatives from trading, where the suspension or removal is due to suspected market abuse, a take-over bid or the non-disclosure of inside information about the issuer or financial instrument infringing Articles 7 and 17 of Regulation (EU) No 596/2014 except where such suspension or removal could cause significant damage to the investors' interests or the orderly functioning of the market.

This paragraph applies also when the suspension from trading of a financial instrument or derivatives as referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument is lifted.

The notification procedure referred to in this paragraph shall also apply in the case where the decision to suspend or remove from trading a financial instrument or derivatives as referred to in points (4) to (10) of Section C of Annex I that relate or are referenced to that financial instrument is taken by the competent authority pursuant to points (m) and (n) of Article 69(2).

In order to ensure that the obligation to suspend or remove from trading such derivatives is applied proportionately, ESMA shall develop draft regulatory technical standards to further specify the cases in which the connection between a derivative relating or referenced to a financial instrument suspended or removed from trading and the original financial instrument implies that the derivative are also to be suspended or removed from trading, in order to achieve the objective of the suspension or removal of the underlying financial instrument.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

3.    ESMA shall develop draft implementing technical standards to determine the format and timing of the communications and publications referred to in paragraph 2.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

4.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to specify the list of circumstances constituting significant damage to the investors' interests and the orderly functioning of the market referred to in paragraphs 1 and 2.

*Article 53*

**Access to a regulated market**

1.    Member States shall require a regulated market to establish, implement and maintain transparent and non-discriminatory rules, based on objective criteria, governing access to or membership of the regulated market.

2.    The rules referred to in paragraph 1 shall specify any obligations for the members or participants arising from:

(a)  the constitution and administration of the regulated market;

(b)  rules relating to transactions on the market;

(c)  professional standards imposed on the staff of the investment firms or credit institutions that are operating on the market;

(d)  the conditions established, for members or participants other than investment firms and credit institutions, under paragraph 3;

(e)  the rules and procedures for the clearing and settlement of transactions concluded on the regulated market.

3.    Regulated markets may admit as members or participants investment firms, credit institutions authorised under Directive 2013/36/EU and other persons who:

(a)  are of sufficient good repute;

(b)  have a sufficient level of trading ability, competence and experience;

(c)  have, where applicable, adequate organisational arrangements;

(d)  have sufficient resources for the role they are to perform, taking into account the different financial arrangements that the regulated market may have established in order to guarantee the adequate settlement of transactions.

4.    Member States shall ensure that, for the transactions concluded on a regulated market, members and participants are not obliged to apply to each other the obligations laid down in Articles 24, 25, 27 and 28. However, the members or participants of the regulated market shall apply the obligations provided for in Articles 24, 25, 27 and 28 with respect to their clients when they, acting on behalf of their clients, execute their orders on a regulated market.

5.    Member States shall ensure that the rules on access to or membership of or participation in the regulated market provide for the direct or remote participation of investment firms and credit institutions.

6.    Member States shall, without further legal or administrative requirements, allow regulated markets from other Member States to provide appropriate arrangements on their territory so as to facilitate access to and trading on those markets by remote members or participants established in their territory.

The regulated market shall communicate to the competent authority of its home Member State the Member State in which it intends to provide such arrangements. The competent authority of the home Member State shall communicate that information to the Member State in which the regulated market intends to provide such arrangements within 1 month. ESMA may request access to that information in accordance with the procedure and under the conditions set out in Article 35 of Regulation (EU) No 1095/2010.

12.6.2014    EN    Official Journal of the European Union    L 173/439

The competent authority of the home Member State of the regulated market shall, on the request of the competent authority of the host Member State and, without undue delay, communicate the identity of the members or participants of the regulated market established in that Member State.

7. Member States shall require the market operator to communicate, on a regular basis, the list of the members or participants of the regulated market to the competent authority of the regulated market.

*Article 54*

**Monitoring of compliance with the rules of the regulated market and with other legal obligations**

1. Member States shall require that regulated markets establish and maintain effective arrangements and procedures including the necessary resource for the regular monitoring of the compliance by their members or participants with their rules. Regulated markets shall monitor orders sent including cancellations and the transactions undertaken by their members or participants under their systems in order to identify infringements of those rules, disorderly trading conditions or conduct that may indicate behaviour that is prohibited under Regulation (EU) No 596/2014 or system disruptions in relation to a financial instrument.

2. Member States shall require the market operators of the regulated markets to immediately inform their competent authorities of significant infringements of their rules or disorderly trading conditions or conduct that may indicate behaviour that is prohibited under Regulation (EU) No 596/2014 or system disruptions in relation to a financial instrument.

The competent authorities of the regulated markets shall communicate to ESMA and to the competent authorities of the other Member States the information referred to in the first subparagraph.

In relation to conduct that may indicate behaviour that is prohibited under Regulation (EU) No 596/2014, a competent authority shall be convinced that such behaviour is being or has been carried out before it notifies the competent authorities of the other Member States and ESMA.

3. Member States shall require the market operator to supply the relevant information without undue delay to the authority competent for the investigation and prosecution of market abuse on the regulated market and to provide full assistance to the latter in investigating and prosecuting market abuse occurring on or through the systems of the regulated market.

4. The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to determine circumstances that trigger an information requirement as referred to in paragraph 2 of this Article.

*Article 55*

**Provisions regarding CCP and clearing and settlement arrangements**

1. Without prejudice to Titles III, IV or V of Regulation (EU) No 648/2012, Member States shall not prevent regulated markets from entering into appropriate arrangements with a CCP or clearing house and a settlement system of another Member State with a view to providing for the clearing and/or settlement of some or all trades concluded by market participants under their systems.

2. Without prejudice to Titles III, IV or V of Regulation (EU) No 648/2012, the competent authority of a regulated market may not oppose the use of CCP, clearing houses and/or settlement systems in another Member State except where demonstrably necessary in order to maintain the orderly functioning of that regulated market and taking into account the conditions for settlement systems established in Article 37(2) of this Directive.

In order to avoid undue duplication of control, the competent authority shall take into account the oversight/supervision of the clearing and settlement system already exercised by the central banks as overseers of clearing and settlement systems or by other supervisory authorities with competence in relation to such systems.

*Article 56*

**List of regulated markets**

Each Member State shall draw up a list of the regulated markets for which it is the home Member State and shall forward that list to the other Member States and ESMA. A similar communication shall be effected in respect of each change to that list. ESMA shall publish and keep up-to-date a list of all regulated markets on its website. That list shall contain the unique code established by ESMA in accordance with Article 65(6) identifying the regulated markets for use in reports in accordance with point (g) of Article 65(1) and point (g) of Article 65(2) of this Directive and with Articles 6, 10 and 26 of Regulation (EU) No 600/2014.

TITLE IV

POSITION LIMITS AND POSITION MANAGEMENT CONTROLS IN COMMODITY DERIVATIVES AND REPORTING

*Article 57*

**Position limits and position management controls in commodity derivatives**

1.    Member States shall ensure that competent authorities, in line with the methodology for calculation determined by ESMA, establish and apply position limits on the size of a net position which a person can hold at all times in commodity derivatives traded on trading venues and economically equivalent OTC contracts. The limits shall be set on the basis of all positions held by a person and those held on its behalf at an aggregate group level in order to:

(a)  prevent market abuse;

(b)  support orderly pricing and settlement conditions, including preventing market distorting positions, and ensuring, in particular, convergence between prices of derivatives in the delivery month and spot prices for the underlying commodity, without prejudice to price discovery on the market for the underlying commodity.

Position limits shall not apply to positions held by or on behalf of a non-financial entity and which are objectively measurable as reducing risks directly relating to the commercial activity of that non-financial entity.

2.    Position limits shall specify clear quantitative thresholds for the maximum size of a position in a commodity derivative that persons can hold.

3.    ESMA shall develop draft regulatory technical standards to determine the methodology for calculation that competent authorities are to apply in establishing the spot month position limits and other months' position limits for physically settled and cash settled commodity derivatives based on the characteristics of the relevant derivative. The methodology for calculation shall take into account at least the following factors:

(a)  the maturity of the commodity derivative contracts;

(b)  the deliverable supply in the underlying commodity;

(c)  the overall open interest in that contract and the overall open interest in other financial instruments with the same underlying commodity;

(d)  the volatility of the relevant markets, including substitute derivatives and the underlying commodity markets;

(e)  the number and size of the market participants;

(f) the characteristics of the underlying commodity market, including patterns of production, consumption and transportation to market;

(g) the development of new contracts.

ESMA shall take into account experience regarding the position limits of investment firms or market operators operating a trading venue and of other jurisdictions.

ESMA shall submit those draft regulatory technical standards referred to in the first subparagraph to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

4.    A competent authority shall set limits for each contract in commodity derivatives traded on trading venues based on the methodology for calculation determined by ESMA in accordance with paragraph 3. That position limit shall include economically equivalent OTC contracts.

A competent authority shall review position limits where there is a significant change in deliverable supply or open interest or any other significant change on the market, based on its determination of deliverable supply and open interest and reset the position limit in accordance with the methodology for calculation developed by ESMA.

5.    Competent authorities shall notify ESMA of the exact position limits they intend to set in accordance with the methodology for calculation established by ESMA under paragraph 3. Within two months following receipt of the notification, ESMA shall issue an opinion to the competent authority concerned assessing the compatibility of position limits with the objectives of paragraph 1 and with the methodology for calculation established by ESMA under paragraph 3. ESMA shall publish the opinion on its website. The competent authority concerned shall modify the position limits in accordance with ESMA's opinion, or provide ESMA with justification why the change is considered to be unnecessary. Where a competent authority imposes limits contrary to an ESMA opinion, it shall immediately publish on its website a notice fully explaining its reasons for doing so.

Where ESMA determines that a position limit is not in line with the methodology for calculation in paragraph 3, it shall take action in accordance with its powers under Article 17 of Regulation (EU) No 1095/2010.

6.    Where the same commodity derivative is traded in significant volumes on trading venues in more than one jurisdiction, the competent authority of the trading venue where the largest volume of trading takes place (the central competent authority) shall set the single position limit to be applied on all trading in that contract. The central competent authority shall consult the competent authorities of other trading venues on which that derivative is traded in significant volumes on the single position limit to be applied and any revisions to that single position limit. Where competent authorities do not agree, they shall state in writing the full and detailed reasons why they consider that the requirements laid down in paragraph 1 are not met. ESMA shall settle any dispute arising from a disagreement between competent authorities in accordance with its powers under Article 19 of Regulation (EU) No 1095/2010.

The competent authorities of the trading venues where the same commodity derivative is traded and the competent authorities of position holders in that commodity derivative shall put in place cooperation arrangements including exchange of relevant data with each other in order to enable the monitoring and enforcement of the single position limit.

7.    ESMA shall monitor at least once a year the way competent authorities have implemented the position limits set in accordance with the methodology for calculation established by ESMA under paragraph 3. In doing so, ESMA shall ensure that a single position limit effectively applies to the same contract irrespective of where it is traded in line with paragraph 6.

8.    Member States shall ensure that an investment firm or a market operator operating a trading venue which trades commodity derivatives apply position management controls. Those controls shall include at least, the powers for the trading venue to:

(a)  monitor the open interest positions of persons;

(b)  access information, including all relevant documentation, from persons about the size and purpose of a position or exposure entered into, information about beneficial or underlying owners, any concert arrangements, and any related assets or liabilities in the underlying market;

(c)  require a person to terminate or reduce a position, on a temporary or permanent basis as the specific case may require and to unilaterally take appropriate action to ensure the termination or reduction if the person does not comply; and

(d)  where appropriate, require a person to provide liquidity back into the market at an agreed price and volume on a temporary basis with the express intent of mitigating the effects of a large or dominant position.

9.    The position limits and position management controls shall be transparent and non-discriminatory, specifying how they apply to persons and taking account of the nature and composition of market participants and of the use they make of the contracts submitted to trading.

10.    The investment firm or market operator operating the trading venue shall inform the competent authority of the details of position management controls.

The competent authority shall communicate the same information as well as the details of the position limits it has established to ESMA, which shall publish and maintain on its website a database with summaries of the position limits and position management controls.

11.    The position limits of paragraph 1 shall be imposed by competent authorities pursuant to point (p) of Article 69(2).

12.    ESMA shall develop draft regulatory technical standards to determine:

(a)  the criteria and methods for determining whether a position qualifies as reducing risks directly relating to commercial activities;

(b)  the methods to determine when positions of a person are to be aggregated within a group;

(c)  the criteria for determining whether a contract is an economically equivalent OTC contract to that traded on a trading venue, referred to in paragraph 1, in a way that facilitates the reporting of positions taken in equivalent OTC contracts to the relevant competent authority as determined in Article 58(2);

(d) the definition of what constitutes the same commodity derivative and significant volumes under paragraph 6 of this Article;

(e) the methodology for aggregating and netting OTC and on-venue commodity derivatives positions to establish the net position for purposes of assessing compliance with the limits. Such methodologies shall establish criteria to determine which positions may be netted against one another and shall not facilitate the build-up of positions in a manner inconsistent with the objectives set out in paragraph 1 of this Article;

(f) the procedure setting out how persons may apply for the exemption under the second subparagraph of paragraph 1 of this Article and how the relevant competent authority will approve such applications;

(g) the method for calculation to determine the venue where the largest volume of trading in a commodity derivative takes place and significant volumes under paragraph 6 of this Article.

ESMA shall submit those draft regulatory technical standards referred to in the first subparagraph to the Commission by 3 July 2015.

Power shall be delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

13.     Competent authorities shall not impose limits which are more restrictive than those adopted pursuant to paragraph 1 except in exceptional cases where they are objectively justified and proportionate taking into account the liquidity of the specific market and the orderly functioning of that market. Competent authorities shall publish on their website the details of the more restrictive position limits they decide to impose, which shall be valid for an initial period not exceeding six months from the date of their publication on the website. The more restrictive position limits may be renewed for further periods not exceeding six months at a time if the grounds for the restriction continue to be applicable. If not renewed after that six-month period, they shall automatically expire.

Where competent authorities decide to impose more restrictive position limits, they shall notify ESMA. The notification shall include a justification for the more restrictive position limits. ESMA shall, within 24 hours, issue an opinion on whether it considers that the more restrictive position limits are necessary to address the exceptional case. The opinion shall be published on ESMA's website.

Where a competent authority imposes limits contrary to an ESMA opinion, it shall immediately publish on its website a notice fully explaining its reasons for doing so.

14.     Member States shall provide that competent authorities can apply their powers to impose sanctions under this Directive for the infringements of position limits set in accordance with this Article to:

(a) positions held by persons situated or operating in its territory or abroad which exceed the limits on commodity derivative contracts the competent authority has set in relation to contracts on trading venues situated or operating in its territory or economically equivalent OTC contracts;

(b) positions held by persons situated or operating in its territory which exceed the limits on commodity derivative contracts set by competent authorities in other Member States.

*Article 58*

**Position reporting by categories of position holders**

1.    Member States shall ensure that an investment firm or a market operator operating a trading venue which trades commodity derivatives or emission allowances or derivatives thereof:

(a) make public a weekly report with the aggregate positions held by the different categories of persons for the different commodity derivatives or emission allowances or derivatives thereof traded on their trading venue, specifying the number of long and short positions by such categories, changes thereto since the previous report, the percentage of the total open interest represented by each category and the number of persons holding a position in each category in accordance with paragraph 4 and communicate that report to the competent authority and to ESMA; ESMA shall proceed to a centralised publication of the information included in those reports;

(b) provide the competent authority with a complete breakdown of the positions held by all persons, including the members or participants and the clients thereof, on that trading venue, at least on a daily basis.

The obligation laid down in point (a) shall only apply when both the number of persons and their open positions exceed minimum thresholds.

2.    Member States shall ensure that investment firms trading in commodity derivatives or emission allowances or derivatives thereof outside a trading venue provide the competent authority of the trading venue where the commodity derivatives or emission allowances or derivatives thereof are traded or the central competent authority where the commodity derivatives or emission allowances or derivatives thereof are traded in significant volumes on trading venues in more than one jurisdiction at least on a daily basis with a complete breakdown of their positions taken in commodity derivatives or emission allowances or derivatives thereof traded on a trading venue and economically equivalent OTC contracts, as well as of those of their clients and the clients of those clients until the end client is reached, in accordance with Article 26 of Regulation (EU) No 600/2014 and, where applicable, of Article 8 of Regulation (EU) No 1227/2011.

3.    In order to enable monitoring of compliance with Article 57(1), Member States shall require members or participants of regulated markets, MTFs and clients of OTFs to report to the investment firm or market operator operating that trading venue the details of their own positions held through contracts traded on that trading venue at least on a daily basis, as well as those of their clients and the clients of those clients until the end client is reached.

4.    Persons holding positions in a commodity derivative or emission allowance or derivative thereof shall be classified by the investment firm or market operator operating that trading venue according to the nature of their main business, taking account of any applicable authorisation, as either:

(a) investment firms or credit institutions;

(b) investment funds, either an undertaking for collective investments in transferable securities (UCITS) as defined in Directive 2009/65/EC, or an alternative investment fund manager as defined in Directive 2011/61/EC;

(c) other financial institutions, including insurance undertakings and reinsurance undertakings as defined in Directive 2009/138/EC, and institutions for occupational retirement provision as defined in Directive 2003/41/EC;

(d) commercial undertakings;

(e) in the case of emission allowances or derivatives thereof, operators with compliance obligations under Directive 2003/87/EC.

The reports referred to in point (a) of paragraph 1 shall specify the number of long and short positions by category of persons, any changes thereto since the previous report, percent of total open interest represented by each category, and the number of persons in each category.

The reports referred to in point (a) of paragraph 1 and the breakdowns referred to in paragraph 2 shall differentiate between:

(a) positions identified as positions which in an objectively measurable way reduce risks directly relating to commercial activities; and

(b) other positions.

5.    ESMA shall develop draft implementing technical standards to determine the format of the reports referred to in point (a) of paragraph 1 and of the breakdowns referred to in paragraph 2.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

In the case of emission allowances or derivatives thereof, the reporting shall not prejudice the compliance obligations under Directive 2003/87/EC.

6.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to specify the thresholds referred to in the second subparagraph of paragraph 1 of this Article, having regard to the total number of open positions and their size and the total number of persons holding a position.

7.    ESMA shall develop draft implementing technical standards to specify the measures to require all reports referred to in point (a) of paragraph 1 to be sent to ESMA at a specified weekly time, for their centralised publication by the latter.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

TITLE V

**DATA REPORTING SERVICES**

Section 1

**Authorisation procedures for data reporting services providers**

*Article 59*

**Requirement for authorisation**

1.    Member States shall require that the provision of data reporting services described in Annex I, Section D as a regular occupation or business be subject to prior authorisation in accordance with this Section. Such authorisation shall be granted by the home Member State competent authority designated in accordance with Article 67.

2.   By way of derogation from paragraph 1, Member States shall allow an investment firm or a market operator operating a trading venue to operate the data reporting services of an APA, a CTP and an ARM, subject to the prior verification of their compliance with this Title. Such a service shall be included in their authorisation.

3.   Member States shall register all data reporting services providers. The register shall be publicly accessible and shall contain information on the services for which the data reporting services provider is authorised. It shall be updated on a regular basis. Every authorisation shall be notified to ESMA.

ESMA shall establish a list of all data reporting services providers in the Union. The list shall contain information on the services for which the data reporting services provider is authorised and it shall be updated on a regular basis. ESMA shall publish and keep up-to-date that list on its website.

Where a competent authority has withdrawn an authorisation in accordance with Article 62, that withdrawal shall be published on the list for a period of 5 years.

4.   Member States shall require data reporting services providers to provide their services under the supervision of the competent authority. Member States shall ensure that competent authorities keep under regular review the compliance of data reporting services providers with this Title. They shall also ensure that competent authorities monitor that data reporting services providers comply at all times with the conditions for initial authorisation established under this Title.

*Article 60*

**Scope of authorisation**

1.   The home Member State shall ensure that the authorisation specifies the data reporting service which the data reporting services provider is authorised to provide. A data reporting services provider seeking to extend its business to additional data reporting services shall submit a request for extension of its authorisation.

2.   The authorisation shall be valid for the entire Union and shall allow a data reporting services provider to provide the services, for which it has been authorised, throughout the Union.

*Article 61*

**Procedures for granting and refusing requests for authorisation**

1.   The competent authority shall not grant authorisation unless and until such time as it is fully satisfied that the applicant complies with all requirements under the provisions adopted pursuant to this Directive.

2.   The data reporting services provider shall provide all information, including a programme of operations setting out, inter alia, the types of services envisaged and the organisational structure, necessary to enable the competent authority to satisfy itself that the data reporting services provider has established, at the time of initial authorisation, all the necessary arrangements to meet its obligations under the provisions of this Title.

3.   An applicant shall be informed, within six months of the submission of a complete application, whether or not authorisation has been granted.

4.   ESMA shall develop draft regulatory technical standards to determine:

(a) the information to be provided to the competent authorities under paragraph 2, including the programme of operations;

(b) the information included in the notifications under Article 63(3).

ESMA shall submit the draft regulatory technical standards referred to in the first subparagraph to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

5.    ESMA shall develop draft implementing technical standards to determine standard forms, templates and procedures for the notification or provision of information provided for in paragraph 2 of this Article and in Article 63(4).

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 62*

**Withdrawal of authorisations**

The competent authority may withdraw the authorisation issued to a data reporting services provider where the provider:

(a) does not make use of the authorisation within 12 months, expressly renounces the authorisation or has provided no data reporting services for the preceding six months, unless the Member State concerned has provided for authorisation to lapse in such cases;

(b) has obtained the authorisation by making false statements or by any other irregular means;

(c) no longer meets the conditions under which authorisation was granted;

(d) has seriously and systematically infringed the provisions of this Directive or of Regulation (EU) No 600/2014.

*Article 63*

**Requirements for the management body of a data reporting services provider**

1.    Member States shall require that all members of the management body of a data reporting services provider shall at all times be of sufficiently good repute, possess sufficient knowledge, skills and experience and commit sufficient time to perform their duties.

The management body shall possess adequate collective knowledge, skills and experience to be able to understand the activities of the data reporting services provider. Each member of the management body shall act with honesty, integrity and independence of mind to effectively challenge the decisions of the senior management where necessary and to effectively oversee and monitor management decision-making where necessary.

Where a market operator seeks authorisation to operate an APA, a CTP or an ARM and the members of the management body of the APA, the CTP or the ARM are the same as the members of the management body of the regulated market, those persons are deemed to comply with the requirement laid down in the first subparagraph.

2.    ESMA shall, by 3 January 2016, develop guidelines for the assessment of the suitability of the members of the management body described in paragraph 1, taking into account different roles and functions carried out by them and the need to avoid conflicts of interest between members of the management body and users of the APA, CTP or ARM.

3.    Member States shall require the data reporting services provider to notify the competent authority of all members of its management body and of any changes to its membership, along with all information needed to assess whether the entity complies with paragraph 1.

4.    Member States shall ensure that the management body of a data reporting services provider defines and oversees the implementation of the governance arrangements that ensure effective and prudent management of an organisation including the segregation of duties in the organisation and the prevention of conflicts of interest, and in a manner that promotes the integrity of the market and the interest of its clients.

5.    The competent authority shall refuse authorisation if it is not satisfied that the person or the persons who shall effectively direct the business of the data reporting services provider are of sufficiently good repute, or if there are objective and demonstrable grounds for believing that proposed changes to the management of the provider pose a threat to its sound and prudent management and to the adequate consideration of the interest of its clients and the integrity of the market.

S e c t i o n   2

C o n d i t i o n s   f o r   A P A s

*Article 64*

**Organisational requirements**

1.    The home Member State shall require an APA to have adequate policies and arrangements in place to make public the information required under Articles 20 and 21 of Regulation (EU) No 600/2014 as close to real time as is technically possible, on a reasonable commercial basis. The information shall be made available free of charge 15 minutes after the APA has published it. The home Member State shall require the APA to be able to efficiently and consistently disseminate such information in a way that ensures fast access to the information, on a non-discriminatory basis and in a format that facilitates the consolidation of the information with similar data from other sources.

2.    The information made public by an APA in accordance with paragraph 1 shall include, at least, the following details:

(a)  the identifier of the financial instrument;

(b)  the price at which the transaction was concluded;

(c)  the volume of the transaction;

(d)  the time of the transaction;

(e)  the time the transaction was reported;

(f)  the price notation of the transaction;

(g) the code for the trading venue the transaction was executed on, or where the transaction was executed via a systematic internaliser the code 'SI' or otherwise the code 'OTC';

(h) if applicable, an indicator that the transaction was subject to specific conditions.

3.    The home Member State shall require the APA to operate and maintain effective administrative arrangements designed to prevent conflicts of interest with its clients. In particular, an APA who is also a market operator or investment firm shall treat all information collected in a non-discriminatory fashion and shall operate and maintain appropriate arrangements to separate different business functions.

4.    The home Member State shall require the APA to have sound security mechanisms in place designed to guarantee the security of the means of transfer of information, minimise the risk of data corruption and unauthorised access and to prevent information leakage before publication. The APA shall maintain adequate resources and have back-up facilities in place in order to offer and maintain its services at all times.

5.    The home Member State shall require the APA to have systems in place that can effectively check trade reports for completeness, identify omissions and obvious errors and request re-transmission of any such erroneous reports.

6.    ESMA shall develop draft regulatory technical standards to determine common formats, data standards and technical arrangements facilitating the consolidation of information as referred to in paragraph 1.

ESMA shall submit the draft regulatory technical standards referred to in the first subparagraph to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

7.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 clarifying what constitutes a reasonable commercial basis to make information public as referred to in paragraph 1 of this Article.

8.    ESMA shall develop draft regulatory technical standards specifying:

(a) the means by which an APA may comply with the information obligation referred to in paragraph 1;

(b) the content of the information published under paragraph 1, including at least the information referred to in paragraph 2 in such a way as to enable the publication of information required under Article 64;

(c) the concrete organisational requirements laid down in paragraphs 3, 4 and 5.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

L 173/450    EN    Official Journal of the European Union    12.6.2014

### Section 3

### Conditions for CTPs

*Article 65*

### Organisational requirements

1.    The home Member State shall require a CTP to have adequate policies and arrangements in place to collect the information made public in accordance with Articles 6 and 20 of Regulation (EU) No 600/2014, consolidate it into a continuous electronic data stream and make the information available to the public as close to real time as is technically possible, on a reasonable commercial basis.

That information shall include, at least, the following details:

(a)  the identifier of the financial instrument;

(b)  the price at which the transaction was concluded;

(c)  the volume of the transaction;

(d)  the time of the transaction;

(e)  the time the transaction was reported;

(f)  the price notation of the transaction;

(g)  the code for the trading venue the transaction was executed on, or where the transaction was executed via a systematic internaliser the code 'SI' or otherwise the code 'OTC';

(h)  where applicable, the fact that a computer algorithm within the investment firm was responsible for the investment decision and the execution of the transaction;

(i)  if applicable, an indicator that the transaction was subject to specific conditions;

(j)  if the obligation to make public the information referred to in Article 3(1) of Regulation (EU) No 600/2014 was waived in accordance with point (a) or (b) of Article 4(1) of that Regulation, a flag to indicate which of those waivers the transaction was subject to.

The information shall be made available free of charge 15 minutes after the CTP has published it. The home Member State shall require the CTP to be able to efficiently and consistently disseminate such information in a way that ensures fast access to the information, on a non-discriminatory basis and in formats that are easily accessible and utilisable for market participants.

2.    The home Member State shall require a CTP to have adequate policies and arrangements in place to collect the information made public in accordance with Articles 10 and 21 of Regulation (EU) No 600/2014, consolidate it into a continuous electronic data stream and make following information available to the public as close to real time as is technically possible, on a reasonable commercial basis including, at least, the following details:

(a)  the identifier or identifying features of the financial instrument;

(b) the price at which the transaction was concluded;

(c) the volume of the transaction;

(d) the time of the transaction;

(e) the time the transaction was reported;

(f) the price notation of the transaction;

(g) the code for the trading venue the transaction was executed on, or where the transaction was executed via a systematic internaliser the code 'SI' or otherwise the code 'OTC';

(h) if applicable, an indicator that the transaction was subject to specific conditions.

The information shall be made available free of charge 15 minutes after the CTP has published it. The home Member State shall require the CTP to be able to efficiently and consistently disseminate such information in a way that ensures fast access to the information, on a non-discriminatory basis and in generally accepted formats that are interoperable and easily accessible and utilisable for market participants.

3.    The home Member State shall require the CTP to ensure that the data provided is consolidated from all the regulated markets, MTFs, OTFs and APAs and for the financial instruments specified by regulatory technical standards under point (c) of paragraph 8.

4.    The home Member State shall require the CTP to operate and maintain effective administrative arrangements designed to prevent conflicts of interest. In particular, a market operator or an APA, who also operate a consolidated tape, shall treat all information collected in a non-discriminatory fashion and shall operate and maintain appropriate arrangements to separate different business functions.

5.    The home Member State shall require the CTP to have sound security mechanisms in place designed to guarantee the security of the means of transfer of information and to minimise the risk of data corruption and unauthorised access. The home Member State shall require the CTP to maintain adequate resources and have back-up facilities in place in order to offer and maintain its services at all times.

6.    ESMA shall develop draft regulatory technical standards to determine data standards and formats for the information to be published in accordance with Articles 6, 10, 20 and 21 of Regulation (EU) No 600/2014, including financial instrument identifier, price, quantity, time, price notation, venue identifier and indicators for specific conditions the transactions was subject to as well as technical arrangements promoting an efficient and consistent dissemination of information in a way ensuring for it to be easily accessible and utilisable for market participants as referred to in paragraphs 1 and 2, including identifying additional services the CTP could perform which increase the efficiency of the market.

ESMA shall submit the draft regulatory technical standards referred to in the first subparagraph to the Commission by 3 July 2015 in respect of information published in accordance with Articles 6 and 20 of Regulation (EU) No 600/2014 and by 3 July 2015 in respect of information published in accordance with Articles 10 and 21 of Regulation (EU) No 600/2014.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

7.    The Commission shall adopt delegated acts in accordance with Article 89 clarifying what constitutes a reasonable commercial basis to provide access to data streams as referred to in paragraphs 1 and 2 of this Article.

8.    ESMA shall develop draft regulatory technical standards specifying:

(a)  the means by which the CTP may comply with the information obligation referred to in paragraphs 1 and 2;

(b)  the content of the information published under paragraphs 1 and 2;

(c)  the financial instruments data of which must be provided in the data stream and for non-equity instruments the trading venues and APAs which need to be included;

(d)  other means to ensure that the data published by different CTPs is consistent and allows for comprehensive mapping and cross-referencing against similar data from other sources, and is capable of being aggregated at Union level;

(e)  the concrete organisational requirements laid down in paragraphs 4 and 5.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

## Section 4

## Conditions for ARMs

*Article 66*

**Organisational requirements**

1.    The home Member State shall require an ARM to have adequate policies and arrangements in place to report the information required under Article 26 of Regulation (EU) No 600/2014 as quickly as possible, and no later than the close of the working day following the day upon which the transaction took place. Such information shall be reported in accordance with the requirements laid down in Article 26 of Regulation (EU) No 600/2014.

2.    The home Member State shall require the ARM to operate and maintain effective administrative arrangements designed to prevent conflicts of interest with its clients. In particular, an ARM that is also a market operator or investment firm shall treat all information collected in a non-discriminatory fashion and shall operate and maintain appropriate arrangements to separate different business functions.

3.    The home Member State shall require the ARM to have sound security mechanisms in place designed to guarantee the security and authentication of the means of transfer of information, minimise the risk of data corruption and unauthorised access and to prevent information leakage, maintaining the confidentiality of the data at all times. The home Member State shall require the ARM to maintain adequate resources and have back-up facilities in place in order to offer and maintain its services at all times.

4.    The home Member State shall require the ARM to have systems in place that can effectively check transaction reports for completeness, identify omissions and obvious errors caused by the investment firm and where such error or omission occurs, to communicate details of the error or omission to the investment firm and request re-transmission of any such erroneous reports.

The home Member State shall also require the ARM to have systems in place to enable the ARM to detect errors or omissions caused by the ARM itself and to enable the ARM to correct and transmit, or re-transmit as the case may be, correct and complete transaction reports to the competent authority.

5.    ESMA shall develop draft regulatory technical standards specifying:

(a) the means by which the ARM may comply with the information obligation referred to in paragraph 1; and

(b) the concrete organisational requirements laid down in paragraphs 2, 3 and 4.

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation (EU) No 1095/2010.

TITLE VI

**COMPETENT AUTHORITIES**

CHAPTER I

***Designation, powers and redress procedures***

Article 67

**Designation of competent authorities**

1.    Each Member State shall designate the competent authorities which are to carry out each of the duties provided for under the different provisions of Regulation (EU) No 600/2014 and of this Directive. Member States shall inform the Commission, ESMA and the competent authorities of other Member States of the identity of the competent authorities responsible for enforcement of each of those duties, and of any division of those duties.

2.    The competent authorities referred to in paragraph 1 shall be public authorities, without prejudice to the possibility of delegating tasks to other entities where that is expressly provided for in Article 29(4).

Any delegation of tasks to entities other than the authorities referred to in paragraph 1 may not involve either the exercise of public authority or the use of discretionary powers of judgement. Member States shall require that, prior to delegation, competent authorities take all reasonable steps to ensure that the entity to which tasks are to be delegated has the capacity and resources to effectively execute all tasks and that the delegation takes place only if a clearly defined and documented framework for the exercise of any delegated tasks has been established stating the tasks to be undertaken and the conditions under which they are to be carried out. Those conditions shall include a clause obliging the entity in question to act and be organised in such a manner as to avoid conflict of interest and so that information obtained from carrying out the delegated tasks is not used unfairly or to prevent competition. The final responsibility for supervising compliance with this Directive and with its implementing measures shall lie with the competent authority or authorities designated in accordance with paragraph 1.

Member States shall inform the Commission, ESMA and the competent authorities of other Member States of any arrangements entered into with regard to delegation of tasks, including the precise conditions regulating such delegation.

3.    ESMA shall publish and keep up-to-date a list of the competent authorities referred to in paragraphs 1 and 2 on its website.

L 173/454          EN          Official Journal of the European Union          12.6.2014

*Article 68*

**Cooperation between authorities in the same Member State**

If a Member State designates more than one competent authority to enforce a provision of this Directive or of Regulation (EU) No 600/2014, their respective roles shall be clearly defined and they shall cooperate closely.

Each Member State shall require that such cooperation also take place between the competent authorities for the purposes of this Directive or of Regulation (EU) No 600/2014 and the competent authorities responsible in that Member State for the supervision of credit and other financial institutions, pension funds, UCITS, insurance and reinsurance intermediaries and insurance undertakings.

Member States shall require that competent authorities exchange any information which is essential or relevant to the exercise of their functions and duties.

*Article 69*

**Supervisory powers**

1.    Competent authorities shall be given all supervisory powers, including investigatory powers and powers to impose remedies, necessary to fulfil their duties under this Directive and under Regulation (EU) No 600/2014.

2.    The powers referred to in paragraph 1 shall include, at least, the following powers to:

(a)   have access to any document or other data in any form which the competent authority considers could be relevant for the performance of its duties and receive or take a copy of it;

(b)   require or demand the provision of information from any person and if necessary to summon and question a person with a view to obtaining information;

(c)   carry out on-site inspections or investigations;

(d)   require existing recordings of telephone conversations or electronic communications or other data traffic records held by an investment firm, a credit institution, or any other entity regulated by this Directive or by Regulation (EU) No 600/2014;

(e)   require the freezing or the sequestration of assets, or both;

(f)   require the temporary prohibition of professional activity;

(g)   require the auditors of authorised investment firms, regulated markets and data reporting services providers to provide information;

(h)   refer matters for criminal prosecution;

(i)   allow auditors or experts to carry out verifications or investigations;

(j)   require or demand the provision of information including all relevant documentation from any person regarding the size and purpose of a position or exposure entered into via a commodity derivative, and any assets or liabilities in the underlying market;

(k) require the temporary or permanent cessation of any practice or conduct that the competent authority considers to be contrary to the provisions of Regulation (EU) No 600/2014 and the provisions adopted in the implementation of this Directive and prevent repetition of that practice or conduct;

(l) adopt any type of measure to ensure that investment firms, regulated markets and other persons to whom this Directive or Regulation (EU) No 600/2014 applies, continue to comply with legal requirements;

(m) require the suspension of trading in a financial instrument;

(n) require the removal of a financial instrument from trading, whether on a regulated market or under other trading arrangements;

(o) request any person to take steps to reduce the size of the position or exposure;

(p) limit the ability of any person from entering into a commodity derivative, including by introducing limits on the size of a position any person can hold at all times in accordance with Article 57 of this Directive;

(q) issue public notices;

(r) require, in so far as permitted by national law, existing data traffic records held by a telecommunication operator, where there is a reasonable suspicion of an infringement and where such records may be relevant to an investigation into infringements of this Directive or of Regulation (EU) No 600/2014;

(s) suspend the marketing or sale of financial instruments or structured deposits where the conditions of Articles 40, 41 or 42 of Regulation (EU) No 600/2014 are met;

(t) suspend the marketing or sale of financial instruments or structured deposits where the investment firm has not developed or applied an effective product approval process or otherwise failed to comply with Article 16(3) of this Directive;

(u) require the removal of a natural person from the management board of an investment firm or market operator.

By 3 July 2016, the Member States shall notify the laws, regulations and administrative provisions transposing paragraphs 1 and 2 to the Commission and ESMA. They shall notify the Commission and ESMA without undue delay of any subsequent amendment thereto.

Member States shall ensure that mechanisms are in place to ensure that compensation may be paid or other remedial action be taken in accordance with national law for any financial loss or damage suffered as a result of an infringement of this Directive or of Regulation (EU) No 600/2014.

*Article 70*

**Sanctions for infringements**

1.    Without prejudice to the supervisory powers including investigatory powers and powers to impose remedies of competent authorities in accordance with Article 69 and the right for Member States to provide for and impose criminal sanctions, Member States shall lay down rules on and ensure that their competent authorities may impose administrative sanctions and measures applicable to all infringements of this Directive or of Regulation (EU) No 600/2014 and the national provisions adopted in the implementation of this Directive and of Regulation (EU) No 600/2014, and shall take all measures necessary to ensure that they are implemented. Such sanctions and measures shall be effective, proportionate and dissuasive and shall apply to infringements even where they are not specifically referred to in paragraphs 3, 4 and 5.

Member States may decide not to lay down rules for administrative sanctions for infringements which are subject to criminal sanctions under their national law. In that case, Member States shall communicate to the Commission the relevant criminal law provisions.

By 3 July 2016 Member States shall notify the laws, regulations and administrative provisions transposing this Article, including any relevant criminal law provisions, to the Commission and ESMA. Member States shall notify the Commission and ESMA without undue delay of any subsequent amendments thereto.

2.    Member States shall ensure that where obligations apply to investment firms, market operators, data reporting services providers, credit institutions in relation to investment services or investment activities and ancillary services, and branches of third-country firms in the case of an infringement, sanctions and measures can be applied, subject to the conditions laid down in national law in areas not harmonised by this Directive, to the members of the investment firms' and market operators' management body, and any other natural or legal persons who, under national law, are responsible for an infringement.

3.    Member States shall ensure that at least an infringement of the following provisions of this Directive or of Regulation (EU) No. 600/2014 shall be regarded as an infringement of this Directive or of Regulation (EU) No. 600/2014:

(a)  with regard to this Directive:

       (i)  point (b) of Article 8;

       (ii)  Article 9(1) to (6);

       (iii)  Article 11(1) and (3);

       (iv)  Article 16(1) to (11);

       (v)  Article 17(1) to (6);

       (vi)  Article 18(1) to (9) and the first sentence of Article 18(10);

       (vii)  Articles 19 and 20;

       (viii)  Article 21(1);

       (ix)  Article 23(1), (2) and (3);

       (x)  Article 24(1) to (5) and (7) to (10) and the first and second subparagraphs of Article 24(11);

       (xi)  Article 25(1) to (6);

       (xii)  the second sentence of Article 26(1) and Article 26(2) and (3);

       (xiii)  Article 27(1) to (8);

(xiv)   Article 28(1) and (2);

(xv)   the first subparagraph of Article 29(2), the third subparagraph of Article 29(2), the first sentence of Article 29(3), the first subparagraph of Article 29(4), and Article 29(5);

(xvi)   the second subparagraph of Article 30(1), the first sentence of the second subparagraph of Article 30(3);

(xvii)   Article 31(1), the first subparagraph of Article 31(2) and Article 31(3);

(xviii)   Article 32(1), the first, second and fourth subparagraphs of Article 32(2);

(xix)   Article 33(3);

(xx)   Article 34(2), the first sentence of Article 34(4), the first sentence of Article 34(5), the first sentence of Article 34(7);

(xxi)   Article 35(2), the first subparagraph of Article 35(7), the first sentence of Article 35(10);

(xxii)   Article 36(1);

(xxiii)   the first subparagraph and the first sentence of the second subparagraph of Article 37(1), and the first subparagraph of Article 37(2);

(xxiv)   the fourth subparagraph of Article 44(1), the first sentence of Article 44(2), the first subparagraph of Article 44(3) and point (b) of Article 44(5);

(xxv)   Article 45(1) to (6) and (8);

(xxvi)   Article 46(1), points (a) and (b) of Article 46(2);

(xxvii)   Article 47;

(xxviii)   Article 48(1) to (11);

(xxix)   Article 49(1);

(xxx)   Article 50(1);

(xxxi)   Article 51(1) to (4) and the second sentence of Article 51(5);

(xxxii)   Article 52(1), the first, second and fifth subparagraphs of Article 52(2);

(xxxiii)   Article 53(1), (2) and (3) and the first sentence of the second subparagraph of Article 53(6), Article 53(7);

(xxxiv)  Article 54(1), the first subparagraph of Article 54(2) and Article 54(3);

(xxxv)  Article 57(1) and (2), Article 57(8) and the first subparagraph of Article 57(10);

(xxxvi)  Article 58(1) to (4);

(xxxvii)  Article 63(1), (3) and (4);

(xxxviii)  Article 64(1) to (5);

(xxxix)  Article 65(1) to (5);

(xxxx)  Article 66(1) to (4); and

(b)  with regard to Regulation (EU) No 600/2014:

(i)  Articles 3(1) and (3);

(ii)  the first subparagraph of Article 4(3);

(iii)  Article 6;

(iv)  the first sentence of third subparagraph of Article 7(1);

(v)  Article 8(1), (3) and, (4);

(vi)  Article 10;

(vii)  the first sentence of third subparagraph of Article 11(1) and the third subparagraph of Article 11(3);

(viii)  Article 12(1);

(ix)  Article 13(1);

(x)  Article 14(1), the first sentence of Article 14(2) and the second, third and fourth sentence of Article 14(3);

(xi)  the first subparagraph and the first and third sentences of second subparagraph of Article 15(1), Article 15(2) and the second sentence of Article 15(4);

(xii)  the second sentence of Article 17(1);

(xiii)  Article 18(1) and (2), first sentence of Article 18(4), first sentence of Article 18(5), the first subparagraph of Article 18(6), Article 18(8) and (9);

(xiv) Article 20(1) and the first sentence of Article 20(2);

(xv) Article 21(1), (2) and (3);

(xvi) Article 22(2);

(xvii) Article 23(1) and (2);

(xviii) Article 25(1) and (2);

(xix) the first subparagraph of Article 26(1), Article 26(2) to (5), the first subparagraph of Article 26(6), the first to fifth and eighth subparagraph of Article 26(7);

(xx) Article 27(1);

(xxi) Article 28(1) and the first subparagraph of Article 28(2);

(xxii) Article 29(1) and (2);

(xxiii) Article 30(1);

(xxiv) Article 31(2) and (3);

(xxv) Article 35(1), (2) and (3);

(xxvi) Article 36(1), (2) and (3);

(xxvii) Article 37(1) and (3);

(xxviii) Articles 40, 41 and 42.

4.    Providing investment services or performing investment activities without the required authorisation or approval in accordance with the following provisions of this Directive or of Regulation (EU) No 600/2014 shall also be considered to be an infringement of this Directive or of Regulation (EU) No 600/2014:

(a) Article 5 or Article 6(2) or Articles 34, 35, 39, 44 or 59 of this Directive; or

(b) the third sentence of Article 7(1) or Article 11(1) of Regulation (EU) No 600/2014.

5.    Failure to cooperate or comply in an investigation or with an inspection or request covered by Article 69 shall also be regarded as an infringement of this Directive.

6.    In the cases of infringements referred to in paragraphs 3, 4 and 5, Member States shall, in conformity with national law, provide that competent authorities have the power to take and impose at least the following administrative sanctions and measures:

(a)  a public statement, which indicates the natural or legal person and the nature of the infringement in accordance with Article 71;

(b)  an order requiring the natural or legal person to cease the conduct and to desist from a repetition of that conduct;

(c)  in the case of an investment firm, a market operator authorised to operate an MTF or OTF, a regulated market, an APA, a CTP and an ARM, withdrawal or suspension of the authorisation of the institution in accordance with Articles 8, 43 and 65;

(d)  a temporary or, for repeated serious infringements a permanent ban against any member of the investment firm's management body or any other natural person, who is held responsible, to exercise management functions in investment firms;

(e)  a temporary ban on any investment firm being a member of or participant in regulated markets or MTFs or any client of OTFs;

(f)  in the case of a legal person, maximum administrative fines of at least EUR 5 000 000, or in the Member States whose currency is not the euro, the corresponding value in the national currency on 2 July 2014, or of up to 10 % of the total annual turnover of the legal person according to the last available accounts approved by the management body; where the legal person is a parent undertaking or a subsidiary of the parent undertaking which has to prepare consolidated financial accounts in accordance with Directive 2013/34/EU, the relevant total annual turnover shall be the total annual turnover or the corresponding type of income in accordance with the relevant accounting legislative acts according to the last available consolidated accounts approved by the management body of the ultimate parent undertaking;

(g)  in the case of a natural person, maximum administrative fines of at least EUR 5 000 000, or in the Member States whose currency is not the euro, the corresponding value in the national currency on 2 July 2014;

(h)  maximum administrative fines of at least twice the amount of the benefit derived from the infringement where that benefit can be determined, even if that exceeds the maximum amounts in points (f) and (g).

7.    Member States may empower competent authorities to impose types of sanction in addition to those referred to in paragraph 6 or to impose fines exceeding the amounts referred to in points (f), (g) and (h) of paragraph 6.

*Article 71*

**Publication of decisions**

1.    Member States shall provide that competent authorities publish any decision imposing an administrative sanction or measure for infringements of Regulation (EU) No 600/2014 or of the national provisions adopted in the implementation of this Directive on their official websites without undue delay after the person on whom the sanction was imposed has been informed of that decision. The publication shall include at least information on the type and nature of the infringement and the identity of the persons responsible. That obligation does not apply to decisions imposing measures that are of an investigatory nature.

However, where the publication of the identity of the legal persons or of the personal data of the natural persons is considered by the competent authority to be disproportionate following a case-by-case assessment conducted on the proportionality of the publication of such data, or where publication jeopardises the stability of financial markets or an on-going investigation, Member States shall ensure that competent authorities shall either:

(a) defer the publication of the decision to impose the sanction or measure until the moment where the reasons for non-publication cease to exist;

(b) publish the decision to impose the sanction or measure on an anonymous basis in a manner which complies with national law, if such anonymous publication ensures an effective protection of the personal data concerned;

(c) not publish the decision to impose a sanction or measure at all in the event that the options set out in points (a) and (b) are considered to be insufficient to ensure:

   (i) that the stability of financial markets would not be put in jeopardy;

   (ii) the proportionality of the publication of such decisions with regard to measures which are deemed to be of a minor nature.

In the case of a decision to publish a sanction or measure on an anonymous basis, the publication of the relevant data may be postponed for a reasonable period of time if it is envisaged that within that period the reasons for anonymous publication shall cease to exist.

2.    Where the decision to impose a sanction or measure is subject to appeal before the relevant judicial or other authorities, competent authorities shall also publish, immediately, on their official website such information and any subsequent information on the outcome of such appeal. Moreover, any decision annulling a previous decision to impose a sanction or a measure shall also be published.

3.    Competent authorities shall ensure that any publication in accordance with this Article shall remain on their official website for a period of at least five years after its publication. Personal data contained in the publication shall only be kept on the official website of the competent authority for the period which is necessary in accordance with the applicable data protection rules.

Competent authorities shall inform ESMA of all administrative sanctions imposed but not published in accordance with point (c) of paragraph 1 including any appeal in relation thereto and the outcome thereof. Member States shall ensure that competent authorities receive information and the final judgement in relation to any criminal sanction imposed and submit it to ESMA. ESMA shall maintain a central database of sanctions communicated to it solely for the purposes of exchanging information between competent authorities. That database shall be accessible to competent authorities only and it shall be updated on the basis of the information provided by the competent authorities.

4.    Member States shall provide ESMA annually with aggregated information regarding all sanctions and measures imposed in accordance with paragraphs 1 and 2. That obligation does not apply to measures of an investigatory nature. ESMA shall publish that information in an annual report.

Where Member States have chosen, in accordance with Article 70, to lay down criminal sanctions for infringements of the provisions referred to in that Article, their competent authorities shall provide ESMA annually with anonymised and aggregated data regarding all criminal investigations undertaken and criminal sanctions imposed. ESMA shall publish data on criminal sanctions imposed in an annual report.

5.    Where the competent authority has disclosed an administrative measure, sanction or criminal sanction to the public, it shall, at the same time, report that fact to ESMA.

6.    Where a published criminal or administrative sanction relates to an investment firm, market operator, data reporting services provider, credit institution in relation to investment services and activities or ancillary services, or a branch of third-country firms authorised in accordance with this Directive, ESMA shall add a reference to the published sanction in the relevant register.

7.    ESMA shall develop draft implementing technical standards concerning the procedures and forms for submitting information as referred to in this Article.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 72*

**Exercise of supervisory powers and powers to impose sanctions**

1.    Competent authorities shall exercise the supervisory powers including, investigatory powers and powers to impose remedies, referred to in Article 69 and the powers to impose sanctions referred to in Article 70 in accordance with their national legal frameworks:

(a)  directly;

(b)  in collaboration with other authorities;

(c)  under their responsibility by delegation to entities to which tasks have been delegated pursuant to Article 67(2); or

(d)  by application to the competent judicial authorities.

2.    Member States shall ensure that competent authorities, when determining the type and level of an administrative sanction or measure imposed under the exercise of powers to impose sanctions in Article 70, take into account all relevant circumstances, including, where appropriate:

(a)  the gravity and the duration of the infringement;

(b)  the degree of responsibility of the natural or legal person responsible for the infringement;

(c)  the financial strength of the responsible natural or legal person, as indicated in particular by the total turnover of the responsible legal person or the annual income and net assets of the responsible natural person;

(d)  the importance of profits gained or losses avoided by the responsible natural or legal person, insofar as they can be determined;

(e)  the losses for third parties caused by the infringement, insofar as they can be determined;

(f)  the level of cooperation of the responsible natural or legal person with the competent authority, without prejudice to the need to ensure disgorgement of profits gained or losses avoided by that person;

(g) previous infringements by the responsible natural or legal person.

Competent authorities may take into account additional factors to those referred to in the first subparagraph when determining the type and level of administrative sanctions and measures.

## Article 73

### Reporting of infringements

1.    Member States shall ensure that competent authorities establish effective mechanisms to enable reporting of potential or actual infringements of the provisions of Regulation (EU) No 600/2014 and of the national provisions adopted in the implementation of this Directive to competent authorities.

The mechanisms referred to in the first subparagraph shall include at least:

(a) specific procedures for the receipt of reports on potential or actual infringements and their follow-up, including the establishment of secure communication channels for such reports;

(b) appropriate protection for employees of financial institutions who report infringements committed within the financial institution at least against retaliation, discrimination or other types of unfair treatment;

(c) protection of the identity of both the person who reports the infringements and the natural person who is allegedly responsible for an infringement, at all stages of the procedures unless such disclosure is required by national law in the context of further investigation or subsequent administrative or judicial proceedings.

2.    Member States shall require investment firms, market operators, data reporting services providers, credit institutions in relation to investment services or activities and ancillary services, and branches of third-country firms to have in place appropriate procedures for their employees to report potential or actual infringements internally through a specific, independent and autonomous channel.

## Article 74

### Right of appeal

1.    Member States shall ensure that any decision taken under the provisions of Regulation (EU) No 600/2014 or under laws, regulations or administrative provisions adopted in accordance with this Directive is properly reasoned and is subject to the right of appeal before a tribunal. The right of appeal before a tribunal shall also apply where, in respect of an application for authorisation which provides all the information required, no decision is taken within six months of its submission.

2.    Member States shall provide that one or more of the following bodies, as determined by national law, also may, in the interests of consumers and in accordance with national law, take action before the courts or competent administrative bodies to ensure that Regulation (EU) No 600/2014 and the national provisions adopted in the implementation of this Directive are applied:

(a) public bodies or their representatives;

(b) consumer organisations having a legitimate interest in protecting consumers;

(c) professional organisations having a legitimate interest in acting to protect their members.

*Article 75*

**Extra-judicial mechanism for consumers complaints**

1.    Member States shall ensure the setting-up of efficient and effective complaints and redress procedures for the out-of-court settlement of consumer disputes concerning the provision of investment and ancillary services provided by investment firms, using existing bodies where appropriate. Member States shall further ensure that all investment firms adhere to one or more such bodies implementing such complaint and redress procedures.

2.    Member States shall ensure that those bodies actively cooperate with their counterparts in other Member States in the resolution of cross-border disputes.

3.    The competent authorities shall notify ESMA of the complaint and redress procedures referred to in paragraph 1 which are available under its jurisdictions.

ESMA shall publish and keep up-to-date a list of all extra-judicial mechanisms on its website.

*Article 76*

**Professional secrecy**

1.    Member States shall ensure that competent authorities, all persons who work or who have worked for the competent authorities or entities to whom tasks are delegated pursuant to Article 67(2), as well as auditors and experts instructed by the competent authorities, are bound by the obligation of professional secrecy. They shall not divulge any confidential information which they may receive in the course of their duties, save in summary or aggregate form such that individual investment firms, market operators, regulated markets or any other person cannot be identified, without prejudice to requirements of national criminal or taxation law or the other provisions of this Directive or of Regulation (EU) No 600/2014.

2.    Where an investment firm, market operator or regulated market has been declared bankrupt or is being compulsorily wound up, confidential information which does not concern third parties may be divulged in civil or commercial proceedings if necessary for carrying out the proceeding.

3.    Without prejudice to requirements of national criminal or taxation law, the competent authorities, bodies or natural or legal persons other than competent authorities which receive confidential information pursuant to this Directive or to Regulation (EU) No 600/2014 may use it only in the performance of their duties and for the exercise of their functions, in the case of the competent authorities, within the scope of this Directive or of Regulation (EU) No 600/2014 or, in the case of other authorities, bodies or natural or legal persons, for the purpose for which such information was provided to them and/or in the context of administrative or judicial proceedings specifically relating to the exercise of those functions. However, where the competent authority or other authority, body or person communicating information consents thereto, the authority receiving the information may use it for other purposes.

4.    Any confidential information received, exchanged or transmitted pursuant to this Directive or to Regulation (EU) No 600/2014 shall be subject to the conditions of professional secrecy laid down in this Article. Nevertheless, this Article shall not prevent the competent authorities from exchanging or transmitting confidential information in accordance with this Directive or with Regulation (EU) No 600/2014 and with other Directives or Regulations applicable to investment firms, credit institutions, pension funds, UCITS, AIFs, insurance and reinsurance intermediaries, insurance undertakings, regulated markets or market operators, CCPs, CSDs, or otherwise with the consent of the competent authority or other authority or body or natural or legal person that communicated the information.

5.    This Article shall not prevent the competent authorities from exchanging or transmitting in accordance with national law, confidential information that has not been received from a competent authority of another Member State.

*Article 77*

**Relations with auditors**

1.    Member States shall provide, at least, that any person authorised within the meaning of Directive 2006/43/EC of the European Parliament and of the Council (¹), performing in an investment firm, a regulated market or a data reporting services provider the task described in Article 34 of Directive 2013/34/EU or Article 73 of Directive 2009/65/EC or any other task prescribed by law, shall have a duty to report promptly to the competent authorities any fact or decision concerning that undertaking of which that person has become aware while carrying out that task and which is liable to:

(a)  constitute a material infringement of the laws, regulations or administrative provisions which lay down the conditions governing authorisation or which specifically govern pursuit of the activities of investment firms;

(b)  affect the continuous functioning of the investment firm;

(c)  lead to refusal to certify the accounts or to the expression of reservations.

That person shall also have a duty to report any facts and decisions of which the person becomes aware in the course of carrying out one of the tasks referred to in the first subparagraph in an undertaking having close links with the investment firm within which he is carrying out that task.

2.    The disclosure in good faith to the competent authorities, by persons authorised within the meaning of Directive 2006/43/EC, of any fact or decision referred to in paragraph 1 shall not constitute a breach of any contractual or legal restriction on disclosure of information and shall not involve such persons in liability of any kind.

*Article 78*

**Data protection**

The processing of personal data collected in or for the exercise of the supervisory powers including investigatory powers in accordance with this Directive shall be carried out in accordance with national law implementing Directive 95/46/EC and with Regulation (EC) No 45/2001 where applicable.

CHAPTER II

**Cooperation between the competent authorities of the Member States and with ESMA**

*Article 79*

**Obligation to cooperate**

1.    Competent authorities of different Member States shall cooperate with each other where necessary for the purpose of carrying out their duties under this Directive or under Regulation (EU) No 600/2014, making use of their powers whether set out in this Directive or in Regulation (EU) No 600/2014 or in national law.

Where Member States have chosen, in accordance with Article 70, to lay down criminal sanctions for infringements of the provisions referred to in that Article, they shall ensure that appropriate measures are in place so that competent authorities have all the necessary powers to liaise with judicial authorities within their jurisdiction to receive specific information relating to criminal investigations or proceedings commenced for possible infringements of this Directive and of Regulation (EU) No 600/2014 and provide the same to other competent authorities and ESMA to fulfil their obligation to cooperate with each other and ESMA for the purposes of this Directive and of Regulation (EU) No 600/2014.

_____

(¹) Directive 2006/43/EC of the European Parliament and of the Council of 17 May 2006 on statutory audits of annual accounts and consolidated accounts, amending Council Directives 78/660/EEC and 83/349/EEC and repealing Council Directive 84/253/EEC (OJ L 157, 9.6.2006, p. 87).

Competent authorities shall render assistance to competent authorities of the other Member States. In particular, they shall exchange information and cooperate in any investigation or supervisory activities.

Competent authorities may also cooperate with competent authorities of other Member States with respect to facilitating the recovery of fines.

In order to facilitate and accelerate cooperation, and more particularly exchange of information, Member States shall designate a single competent authority as a contact point for the purposes of this Directive and of Regulation (EU) No 600/2014. Member States shall communicate to the Commission, ESMA and to the other Member States the names of the authorities which are designated to receive requests for exchange of information or cooperation pursuant to this paragraph. ESMA shall publish and keep up-to-date a list of those authorities on its website.

2.    When, taking into account the situation of the securities markets in the host Member State, the operations of a trading venue that has established arrangements in a host Member State have become of substantial importance for the functioning of the securities markets and the protection of the investors in that host Member State, the home and host competent authorities of the trading venue shall establish proportionate cooperation arrangements.

3.    Member States shall take the necessary administrative and organisational measures to facilitate the assistance provided for in paragraph 1

Competent authorities may use their powers for the purpose of cooperation, even where the conduct under investigation does not constitute an infringement of any regulation in force in that Member State.

4.    Where a competent authority has good reasons to suspect that acts contrary to the provisions of this Directive or of Regulation (EU) No 600/2014, carried out by entities not subject to its supervision, are being or have been carried out on the territory of another Member State, it shall notify the competent authority of the other Member State and ESMA in as specific a manner as possible. The notified competent authority shall take appropriate action. It shall inform the notifying competent authority and ESMA of the outcome of the action and, to the extent possible, of significant interim developments. This paragraph shall be without prejudice to the competence of the notifying competent authority.

5.    Without prejudice to paragraphs 1 and 4, competent authorities shall notify ESMA and other competent authorities of the details of:

(a) any requests to reduce the size of a position or exposure pursuant to point (o) of Article 69(2);

(b) any limits on the ability of persons to enter into a commodity derivative pursuant to point (p) of Article 69(2).

The notification shall include, where relevant, the details of the request or the demand pursuant to point (j) of Article 69(2) including the identity of the person or persons to whom it was addressed and the reasons therefor, as well as the scope of the limits introduced pursuant to point (p) of Article 69(2) including the person concerned, the applicable financial instruments, any limits on the size of positions the person can hold at all times, any exemptions thereto granted in accordance with Article 57, and the reasons therefor.

The notifications shall be made not less than 24 hours before the actions or measures are intended to take effect. In exceptional circumstances, a competent authority may make the notification less than 24 hours before the measure is intended to take effect where it is not possible to give 24 hours' notice.

A competent authority of a Member State that receives notification under this paragraph may take measures in accordance with point (o) or (p) of Article 69(2) where it is satisfied that the measure is necessary to achieve the objective of the other competent authority. The competent authority shall also give notice in accordance with this paragraph where it proposes to take measures.

When an action under points (a) or (b) of the first subparagraph of this paragraph relates to wholesale energy products, the competent authority shall also notify the Agency for the Cooperation of Energy Regulators (ACER) established under Regulation (EC) No 713/2009.

6.    In relation to emission allowances, competent authorities shall cooperate with public bodies competent for the oversight of spot and auction markets and competent authorities, registry administrators and other public bodies charged with the supervision of compliance under Directive 2003/87/EC in order to ensure that they can acquire a consolidated overview of emission allowances markets.

7.    In relation to agricultural commodity derivatives, competent authorities shall report to and cooperate with public bodies competent for the oversight, administration and regulation of physical agricultural markets under Regulation (EU) No 1308/2013.

8.    The Commission shall be empowered to adopt delegated acts in accordance with Article 89 to establish the criteria under which the operations of a trading venue in a host Member State could be considered to be of substantial importance for the functioning of the securities markets and the protection of the investors in that host Member State.

9.    ESMA shall develop draft implementing technical standards to establish standard forms, templates and procedures for the cooperation arrangements referred to in paragraph 2.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 80*

**Cooperation between competent authorities in supervisory activities, for on-site verifications or investigations**

1.    A competent authority of one Member State may request the cooperation of the competent authority of another Member State in a supervisory activity or for an on-the-spot verification or in an investigation. In the case of investment firms that are remote members or participants of a regulated market the competent authority of the regulated market may choose to address them directly, in which case it shall inform the competent authority of the home Member State of the remote member or participant accordingly.

Where a competent authority receives a request with respect to an on-the-spot verification or an investigation, it shall, within the framework of its powers:

(a) carry out the verifications or investigations itself;

(b) allow the requesting authority to carry out the verification or investigation;

(c) allow auditors or experts to carry out the verification or investigation.

2.    With the objective of converging supervisory practices, ESMA may participate in the activities of the colleges of supervisors, including on-site verifications or investigations, carried out jointly by two or more competent authorities in accordance with Article 21 of Regulation (EU) No 1095/2010.

3.    ESMA shall develop draft regulatory technical standards to specify the information to be exchanged between competent authorities when cooperating in supervisory activities, on-the-spot-verifications, and investigations.

L 173/468    EN    Official Journal of the European Union    12.6.2014

ESMA shall submit those draft regulatory technical standards to the Commission by 3 July 2015.

Power is delegated to the Commission to adopt the regulatory technical standards referred to in the first subparagraph in accordance with Articles 10 to 14 of Regulation. (EU) No 1095/2010.

4.    ESMA shall develop draft implementing technical standards to establish standard forms, templates and procedures for competent authorities to cooperate in supervisory activities, on-site verifications, and investigations.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 81*

**Exchange of information**

1.    Competent authorities of Member States having been designated as contact points for the purposes of this Directive and of Regulation (EU) No 600/2014 in accordance with Article 79(1) of this Directive shall immediately supply one another with the information required for the purposes of carrying out the duties of the competent authorities, designated in accordance to Article 67(1) of this Directive, set out in the provisions adopted pursuant to this Directive or Regulation (EU) No 600/2014.

Competent authorities exchanging information with other competent authorities under this Directive or Regulation (EU) No 600/2014 may indicate at the time of communication that such information must not be disclosed without their express agreement, in which case such information may be exchanged solely for the purposes for which those authorities gave their agreement.

2.    The competent authority having been designated as the contact point in accordance with Article 79(1) may transmit the information received under paragraph 1 of this Article and under Articles 77 and 88 to the authorities referred to in Article 67(1). They shall not transmit it to other bodies or natural or legal persons without the express agreement of the competent authorities which disclosed it and solely for the purposes for which those authorities gave their agreement, except in duly justified circumstances. In this last case, the contact point shall immediately inform the contact point that sent the information.

3.    Authorities as referred to in Article 71 as well as other bodies or natural and legal persons receiving confidential information under paragraph 1 of this Article or under Articles 77 and 88 may use it only in the course of their duties, in particular:

(a)    to check that the conditions governing the taking-up of the business of investment firms are met and to facilitate the monitoring, on a non-consolidated or consolidated basis, of the conduct of that business, especially with regard to the capital adequacy requirements imposed by Directive 2013/36/EU, administrative and accounting procedures and internal-control mechanisms;

(b)    to monitor the proper functioning of trading venues;

(c)    to impose sanctions;

(d)    in administrative appeals against decisions by the competent authorities;

(e)    in court proceedings initiated under Article 74;

(f)  in the extra-judicial mechanism for investors' complaints provided for in Article 75.

4.    ESMA shall develop draft implementing technical standards to establish standard forms, templates and procedures for the exchange of information.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

5.    Neither this Article nor Article 76 or 88 shall prevent a competent authority from transmitting to ESMA, the European Systemic Risk Board, central banks, the ESCB and the ECB, in their capacity as monetary authorities, and, where appropriate, to other public authorities responsible for overseeing payment and settlement systems, confidential information intended for the performance of their tasks. Likewise such authorities or bodies shall not be prevented from communicating to the competent authorities such information as they may need for the purpose of performing their functions provided for in this Directive or in Regulation (EU) No 600/2014.

*Article 82*

**Binding mediation**

1.    The competent authorities may refer to ESMA situations where a request relating to one of the following has been rejected or has not been acted upon within a reasonable time:

(a)  to carry out a supervisory activity, an on-the-spot verification, or an investigation, as provided for in Article 80; or

(b)  to exchange information as provided for in Article 81.

2.    In the situations referred to in paragraph 1, ESMA may act in accordance with Article 19 of Regulation (EU) No 1095/2010, without prejudice to the possibilities for refusing to act on a request for information provided for in Article 83 of this Directive and to the possibility of ESMA acting in accordance with Article 17 of Regulation (EU) No 1095/2010.

*Article 83*

**Refusal to cooperate**

A competent authority may refuse to act on a request for cooperation in carrying out an investigation, on-the-spot verification or supervisory activity as provided for in Article 84 or to exchange information as provided for in Article 81 only where:

(a)  judicial proceedings have already been initiated in respect of the same actions and the same persons before the authorities of the Member State addressed;

(b)  final judgment has already been delivered in the Member State addressed in respect of the same persons and the same actions.

In the case of such a refusal, the competent authority shall notify the requesting competent authority and ESMA accordingly, providing as detailed information as possible.

*Article 84*

**Consultation prior to authorisation**

1.    The competent authorities of the other Member State involved shall be consulted prior to granting authorisation to an investment firm which is any of the following:

(a) a subsidiary of an investment firm or market operator or credit institution authorised in another Member State;

(b) a subsidiary of the parent undertaking of an investment firm or credit institution authorised in another Member State;

(c) controlled by the same natural or legal persons who control an investment firm or credit institution authorised in another Member State.

2.    The competent authority of the Member State responsible for the supervision of credit institutions or insurance undertakings shall be consulted prior to granting an authorisation to an investment firm or market operator which is any of the following:

(a) a subsidiary of a credit institution or insurance undertaking authorised in the Union;

(b) a subsidiary of the parent undertaking of a credit institution or insurance undertaking authorised in the Union;

(c) controlled by the same person, whether natural or legal, who controls a credit institution or insurance undertaking authorised in the Union.

3.    The relevant competent authorities referred to in paragraphs 1 and 2 shall in particular consult each other when assessing the suitability of the shareholders or members and the reputation and experience of persons who effectively direct the business involved in the management of another entity of the same group. They shall exchange all information regarding the suitability of shareholders or members and the reputation and experience of persons who effectively direct the business that is of relevance to the other competent authorities involved, for the granting of an authorisation as well as for the ongoing assessment of compliance with operating conditions.

4.    ESMA shall develop draft implementing technical standards to establish standard forms, templates and procedures for the consultation of other competent authorities prior to granting an authorisation.

ESMA shall submit those draft implementing technical standards to the Commission by 3 January 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

*Article 85*

**Powers for host Member States**

1.    Host Member States shall provide that the competent authority may, for statistical purposes, require all investment firms with branches within their territories to report to them periodically on the activities of those branches.

2.    In discharging their responsibilities under this Directive, host Member States shall provide that the competent authority may require branches of investment firms to provide the information necessary for the monitoring of their compliance with the standards set by the host Member State that apply to them for the cases provided for in Article 35(8). Those requirements may not be more stringent than those which the same Member State imposes on established firms for the monitoring of their compliance with the same standards.

*Article 86*

**Precautionary measures to be taken by host Member States**

1.    Where the competent authority of the host Member State has clear and demonstrable grounds for believing that an investment firm acting within its territory under the freedom to provide services infringes the obligations arising from the provisions adopted pursuant to this Directive or that an investment firm that has a branch within its territory infringes the obligations arising from the provisions adopted pursuant to this Directive which do not confer powers on the competent authority of the host Member State, it shall refer those findings to the competent authority of the home Member State.

If, despite the measures taken by the competent authority of the home Member State or because such measures prove inadequate, the investment firm persists in acting in a manner that is clearly prejudicial to the interests of host Member State investors or the orderly functioning of markets, the following shall apply:

(a) after informing the competent authority of the home Member State, the competent authority of the host Member State shall take all the appropriate measures needed in order to protect investors and the proper functioning of the markets, which shall include the possibility of preventing offending investment firms from initiating any further transactions within their territories. The Commission and ESMA shall be informed of such measures without undue delay; and

(b) the competent authority of the host Member State may refer the matter to ESMA, which may act in accordance with the powers conferred on it under Article 19 of Regulation (EU) No 1095/2010.

2.    Where the competent authorities of a host Member State ascertain that an investment firm that has a branch within its territory infringes the legal or regulatory provisions adopted in that Member State pursuant to those provisions of this Directive which confer powers on the host Member State's competent authorities, those authorities shall require the investment firm concerned to put an end to its irregular situation.

If the investment firm concerned fails to take the necessary steps, the competent authorities of the host Member State shall take all appropriate measures to ensure that the investment firm concerned puts an end to its irregular situation. The nature of those measures shall be communicated to the competent authorities of the home Member State.

Where, despite the measures taken by the host Member State, the investment firm persists in infringing the legal or regulatory provisions referred to in the first subparagraph in force in the host Member State, the competent authority of the host Member State shall, after informing the competent authority of the home Member State, take all the appropriate measures needed in order to protect investors and the proper functioning of the markets. The Commission and ESMA shall be informed of such measures without undue delay.

In addition, the competent authority of the host Member State may refer the matter to ESMA, which may act in accordance with the powers conferred on it under Article 19 of Regulation (EU) No 1095/2010.

3.    Where the competent authority of the host Member State of a regulated market, an MTF or OTF has clear and demonstrable grounds for believing that such regulated market, MTF or OTF infringes the obligations arising from the provisions adopted pursuant to this Directive, it shall refer those findings to the competent authority of the home Member State of the regulated market or the MTF or OTF.

L 173/472    EN    Official Journal of the European Union    12.6.2014

Where, despite the measures taken by the competent authority of the home Member State or because such measures prove inadequate, that regulated market or the MTF or OTF persists in acting in a manner that is clearly prejudicial to the interests of host Member State investors or the orderly functioning of markets, the competent authority of the host Member State shall, after informing the competent authority of the home Member State, take all the appropriate measures needed in order to protect investors and the proper functioning of the markets, which shall include the possibility of preventing that regulated market or the MTF or OTF from making their arrangements available to remote members or participants established in the host Member State. The Commission and ESMA shall be informed of such measures without undue delay.

In addition, the competent authority of the host Member State may refer the matter to ESMA, which may act in accordance with the powers conferred on it under Article 19 of Regulation (EU) No 1095/2010.

4.    Any measure adopted pursuant to paragraphs 1, 2 or 3 involving sanctions or restrictions on the activities of an investment firm or of a regulated market shall be properly justified and communicated to the investment firm or to the regulated market concerned.

*Article 87*

**Cooperation and exchange of information with ESMA**

1.    The competent authorities shall cooperate with ESMA for the purposes of this Directive, in accordance with Regulation (EU) No 1095/2010.

2.    The competent authorities shall, without undue delay, provide ESMA with all information necessary to carry out its duties under this Directive and under Regulation (EU) No 600/2014 and in accordance with Articles 35 and 36 of Regulation (EU) No 1095/2010.

CHAPTER III

*Cooperation with third countries*

*Article 88*

**Exchange of information with third countries**

1.    Member States and in accordance with Article 33 of Regulation (EU) No 1095/2010, ESMA, may conclude cooperation agreements providing for the exchange of information with the competent authorities of third countries only if the information disclosed is subject to guarantees of professional secrecy at least equivalent to those required under Article 76. Such exchange of information must be intended for the performance of the tasks of those competent authorities.

Transfer of personal data to a third country by a Member State shall be in accordance with Chapter IV of Directive 95/46/EC.

Transfers of personal data to a third country by ESMA shall be in accordance with Article 9 of Regulation (EU) No 45/2001.

Member States and ESMA may also conclude cooperation agreements providing for the exchange of information with third country authorities, bodies and natural or legal persons responsible for one or more of the following:

(a) the supervision of credit institutions, other financial institutions, insurance undertakings and the supervision of financial markets;

(b) the liquidation and bankruptcy of investment firms and other similar procedures;

(c) the carrying out of statutory audits of the accounts of investment firms and other financial institutions, credit institutions and insurance undertakings, in the performance of their supervisory functions, or which administer compensation schemes, in the performance of their functions;

(d) oversight of the bodies involved in the liquidation and bankruptcy of investment firms and other similar procedures;

(e) oversight of persons charged with carrying out statutory audits of the accounts of insurance undertakings, credit institutions, investment firms and other financial institutions;

(f) oversight of persons active on emission allowance markets for the purpose of ensuring a consolidated overview of financial and spot markets;

(g) oversight of persons active on agricultural commodity derivatives markets for the purpose of ensuring a consolidated overview of financial and spot markets.

The cooperation agreements referred to in the third subparagraph may be concluded only where the information disclosed is subject to guarantees of professional secrecy at least equivalent to those required under Article 76. Such exchange of information shall be intended for the performance of the tasks of those authorities or bodies or natural or legal persons. Where a cooperation agreement involves the transfer of personal data by a Member State, it shall comply with Chapter IV of Directive 95/46/EC and with Regulation (EC) No 45/2001 in the case ESMA is involved in the transfer.

2.    Where the information originates in another Member State, it may not be disclosed without the express agreement of the competent authorities which have transmitted it and, where appropriate, solely for the purposes for which those authorities gave their agreement. The same provision applies to information provided by third country competent authorities.

TITLE VII

**DELEGATED ACTS**

*Article 89*

**Exercise of the delegation**

1.    The power to adopt delegated acts is conferred on the Commission subject to the conditions laid down in this Article.

2.    The delegation of power referred to in Article 2(3), second subparagraph of Article 4(1)(2), Article 4(2), Article 13(1), Article 16(12), Article 23(4), Article 24(13), Article 25(8), Article 27(9), Article 28(3), Article 30(5), Article 31(4), Article 32(4), Article 33(8), Article 52(4), Article 54(4), Article 58(6), Article 64(7), Article 65(7) and Article 79(8) shall be conferred on the Commission for an indeterminate period of time from 2 July 2014.

3.    The delegation of powers referred to in Article 2(3), second subparagraph of Article 4(1)(2), Article 4(2), Article 13(1), Article 16(12), Article 23(4), Article 24(13), Article 25(8), Article 27(9), Article 28(3), Article 30(5), Article 31(4), Article 32(4), Article 33(8), Article 52(4) Article 54(4), Article 58(6), Article 64(7), Article 65(7) and Article 79(8) may be revoked at any time by the European Parliament or by the Council. A decision to revoke shall put an end to the delegation of the power specified in that decision. It shall take effect the day following the publication of the decision in the *Official Journal of the European Union* or at a later date specified therein. It shall not affect the validity of any delegated acts already in force.

4.    As soon as it adopts a delegated act, the Commission shall notify it simultaneously to the European Parliament and to the Council.

5.    A delegated act adopted pursuant to Article 2(3), second subparagraph of Article 4(1)(2), Article 4(2), Article 13(1), Article 16(12), Article 23(4), Article 24(13), Article 25(8), Article 27(9), Article 28(3), Article 30(5), Article 31(4), Article 32(4), Article 33(8), Article 52(4), Article 54(4), Article 58(6), Article 64(7), Article 65(7) and Article 79(8) shall enter into force only if no objection has been expressed either by the European Parliament or the Council within a period of three months of notification of that act to the European Parliament and the Council or if, before the expiry of that period, the European Parliament and the Council have both informed the Commission that they will not object. That period shall be extended by three months at the initiative of the European Parliament or the Council.

## FINAL PROVISIONS

*Article 90*

### Reports and review

1.    Before 3 March 2019 the Commission shall, after consulting ESMA, present a report to the European Parliament and the Council on:

(a) the functioning of OTFs, including their specific use of matched principal trading, taking into account supervisory experience acquired by competent authorities, the number of OTFs authorised in the Union and their market share and in particular examining whether any adjustments are needed to the definition of an OTF and whether the range of financial instruments covered by the OTF category remains appropriate;

(b) the functioning of the regime for SME growth markets, taking into account the number of MTFs registered as SME growth markets, numbers of issuers present thereon, and relevant trading volumes;

In particular, the report shall assess whether the threshold in point (a) of Article 33(3) remains an appropriate minimum to pursue the objectives for SME growth markets as stated in this Directive;

(c) the impact of requirements regarding algorithmic trading including high-frequency algorithmic trading;

(d) the experience with the mechanism for banning certain products or practices, taking into account the number of times the mechanisms have been triggered and their effects;

(e) the application of the administrative and criminal sanctions and in particular the need to further harmonise the administrative sanctions set out for the infringement of the requirements set out in this Directive and in Regulation (EU) No 600/2014;

(f) the impact of the application of position limits and position management on liquidity, market abuse and orderly pricing and settlement conditions in commodity derivatives markets;

(g) the development in prices for pre and post trade transparency data from regulated markets, MTFs, OTFs and APAs;

(h) the impact of the requirement to disclose any fees, commissions and non-monetary benefits in connection with the provision of an investment service or an ancillary service to the client in accordance with Article 24(9), including its impact on the proper functioning of the internal market on cross-border investment advice.

2.    The Commission shall, after consulting ESMA, present reports to the European Parliament and the Council on the functioning of the consolidated tape established in accordance with Title V. The report relating to Article 65(1) shall be presented by 3 September 2018. The report relating to Article 65(2) shall be presented by 3 September 2020.

The reports referred to in the first subparagraph shall assess the functioning of the consolidated tape against the following criteria:

(a) the availability and timeliness of post trade information in a consolidated format capturing all transactions irrespective of whether they are carried out on trading venues or not;

(b) the availability and timeliness of full and partial post trade information that is of a high quality, in formats that are easily accessible and usable for market participants and available on a reasonable commercial basis.

Where the Commission concludes that the CTPs have failed to provide information in a way that meets the criteria set out in the second subparagraph, the Commission shall accompany its report by a request to ESMA to launch a negotiated procedure for the appointment though a public procurement process run by ESMA of a commercial entity operating a consolidated tape. ESMA shall launch the procedure after receiving the request from the Commission on the conditions specified in the Commission's request and in accordance with Regulation (EU, Euratom) No 966/2012 of the European Parliament and of the Council (¹).

3.    The Commission shall, where the procedure outlined in paragraph 2 is initiated, be empowered to adopt delegated acts in accordance with Article 89 amending Articles 59 to 65 and Section D of Annex I of this Directive and point (19) of Article 2(1) of Regulation (EU) No 600/2014, by specifying measures in order to:

(a) provide for the contract duration of the commercial entity operating a consolidated tape and the process and conditions for renewing the contract and the launching of new public procurement;

(b) provide that the commercial entity operating a consolidated tape shall do so on an exclusive basis and that no other entity shall be authorised as a CTP in accordance with Article 59;

(c) empower ESMA to ensure adherence with tender conditions by the commercial entity operating a consolidated tape appointed through a public procurement;

(d) ensure that the post-trade information provided by the commercial entity operating a consolidated tape is of a high quality, in formats that are easily accessible and usable for market participants and in a consolidated format capturing the entire market;

(e) ensure that the post trade information is provided on a reasonable commercial basis, on both a consolidated and unconsolidated basis, and meets the needs of the users of that information across the Union;

(f) ensure that trading venues and APAs shall make their trade data available to the commercial entity operating a consolidated tape appointed through a public procurement process run by ESMA at a reasonable cost;

(g) specify arrangements applicable where the commercial entity operating a consolidated tape appointed through a public procurement fails to fulfil the tender conditions;

(h) specify arrangements under which CTPs authorised under Article 59 may continue to operate a consolidated tape where the empowerment provided for in point (b) of this paragraph is not used or, where no entity is appointed through the public procurement, until such time as a new public procurement is completed and a commercial entity is appointed to operate a consolidated tape.

---

(¹) Regulation (EU, Euratom) No 966/2012 of the European Parliament and of the Council of 25 October 2012 on the financial rules applicable to the general budget of the Union and repealing Council Regulation (EC, Euratom) No 1605/2002 (OJ L 298, 26.10.2012, p. 1).

L 173/476    EN    Official Journal of the European Union    12.6.2014

4.    By 1 January 2018 the Commission shall prepare a report, after consulting ESMA and ACER, assessing the potential impact on energy prices and on the functioning of the energy market as well as the feasibility and the benefits in terms of reducing counterparty and systemic risks and the direct costs of C6 energy derivative contracts being made subject to the clearing obligation set out in Article 4 of Regulation (EU) No 648/2012, the risk mitigation techniques set out in Article 11(3) thereof and their inclusion in calculating the clearing threshold pursuant to Article 10 thereof.

If the Commission considers that it would not be feasible and beneficial to include those contracts, it shall submit, if appropriate, a legislative proposal to the European Parliament and the Council. The Commission shall be empowered to adopt delegated acts in accordance with Article 89 of this Directive to extend the 42-month period referred to in Article 95(1) of this Directive once by two years and a further time by one year.

*Article 91*

**Amendments to Directive 2002/92/EC**

Directive 2002/92/EC is hereby amended as follows:

(1)  Article 2 is amended as follows:

   (a)  in point 3, the second paragraph is replaced by the following:

   'With the exception of Chapter III A of this Directive, those activities, when undertaken by an insurance under-taking or an employee of an insurance undertaking who is acting under the responsibility of the insurance undertaking shall not be considered to be insurance mediation or insurance distribution';

   (b)  the following point is added:

   '(13)  For the purposes of Chapter IIIA, 'insurance-based investment product' means an insurance product which offers a maturity or surrender value and where that maturity or surrender value is wholly or partially exposed, directly or indirectly, to market fluctuations and shall not include:

      (a)  non-life insurance products as listed in Annex I of Directive 2009/138/EC (Classes of Non-life Insur-ance);

      (b)  life insurance contracts where the benefits under the contract are payable only on death or in respect of incapacity due to injury, sickness or infirmity;

      (c)  pension products which, under national law, are recognised as having the primary purpose of providing the investor with an income in retirement, and which entitles the investor to certain benefits;

      (d)  officially recognised occupational pension schemes falling under the scope of Directive 2003/41/EC or Directive 2009/138/EC;

      (e)  individual pension products for which a financial contribution from the employer is required by national law and where the employer or the employee has no choice as to the pension product or provider.';

12.6.2014    EN    Official Journal of the European Union    L 173/477

(2) the following chapter is inserted:

'CHAPTER IIIA

**_Additional customer protection requirements in relation to insurance-Based investment products_**

*Article 13a*

**Scope**

Subject to the exception in the second subparagraph of Article 2(3), this Chapter lays down additional requirements on insurance mediation activities and to direct sales carried out by insurance undertakings when they are carried out in relation to the sale of insurance-based investment products. Those activities shall be referred to as insurance distribution activities.

*Article 13b*

**Prevention of conflicts of interest**

An insurance intermediary or insurance undertaking shall maintain and operate effective organisational and administrative arrangements with a view to taking all reasonable steps designed to prevent conflicts of interest, as determined in Article 13c, from adversely affecting the interests of its customers.

*Article 13c*

**Conflicts of interests**

1.    Member States shall require insurance intermediaries and insurance undertakings to take all appropriate steps to identify conflicts of interest between themselves, including their managers, employees and tied insurance intermediaries, or any person directly or indirectly linked to them by control and their customers or between one customer and another that arise in the course of carrying out any insurance distribution activities.

2.    Where organisational or administrative arrangements made by the insurance intermediary or insurance undertaking in accordance with Article 13b to manage conflicts of interest are not sufficient to ensure, with reasonable confidence, that risks of damage to customer interests will be prevented, the insurance intermediary or insurance undertaking shall clearly disclose to the customer the general nature and/or sources of conflicts of interest before undertaking business on its behalf.

3.    The Commission shall be empowered to adopt delegated acts in accordance with Article 13e to:

(a) define the steps that insurance intermediaries or insurance undertakings might reasonably be expected to take to identify, prevent, manage and disclose conflicts of interest when carrying out insurance distribution activities;

(b) establish appropriate criteria for determining the types of conflict of interest whose existence may damage the interests of the customers or potential customers of the insurance intermediary or insurance undertaking.

*Article 13d*

**General principles and information to customers**

1.    Member States shall ensure that, when carrying out insurance distribution activities, an insurance intermediary or insurance undertaking acts honestly, fairly and professionally in accordance with the best interests of its customers.

2.    All information, including marketing communications, addressed by the insurance intermediary or insurance undertaking to customers or potential customers shall be fair, clear and not misleading. Marketing communications shall be clearly identifiable as such.

L 173/478    [EN]    Official Journal of the European Union    12.6.2014

3.    Member States may prohibit the acceptance or receipt of fees, commissions or any monetary benefits paid or provided to insurance intermediaries or insurance undertakings, by any third party or a person acting on behalf of a third party in relation to the distribution of insurance-based investment products to customers.

*Article 13e*

**Exercise of the delegation**

1.    The power to adopt a delegated act is conferred on the Commission subject to the conditions laid down in this Article.

2.    The power to adopt a delegated act referred to in Article 13c shall be conferred on the Commission for an indeterminate period of time from 2 July 2014.

3.    The delegation of powers referred to in Article 13c may be revoked at any time by the European Parliament or by the Council. A decision of revocation shall put an end to the delegation of the power specified in that decision. It shall take effect the day following the publication of the decision in the *Official Journal of the European Union* or at a later date specified therein. It shall not affect the validity of any delegated acts already in force.

4.    As soon as it adopts a delegated act, the Commission shall notify it simultaneously to the European Parliament and to the Council.

5.    A delegated act adopted pursuant to Article 13c shall enter into force only if no objection has been expressed either by the European Parliament or the Council within a period of three months of notification of that act to the European Parliament and the Council or if, before the expiry of that period, the European Parliament and the Council have both informed the Commission that they will not object. That period shall be extended by three months at the initiative of the European Parliament or the Council.'.

*Article 92*

**Amendments to Directive 2011/61/EU**

Directive 2011/61/EU is amended as follows:

(1) in point (r) of Article 4(1), the following point is added:

'(vii) a Member State, other than the home Member State, in which an EU AIFM provides the services referred to in Article 6(4);';

(2) Article 33 is amended as follows:

(a) the title is replaced by the following:

'Conditions for managing EU AIFs established in other Member States and for providing services in other Member States';

(b) paragraphs 1 and 2 are replaced by the following:

'1.    Member States shall ensure that an authorised EU AIFM may, directly or by establishing a branch:

(a) manage EU AIFs established in another Member State, provided that the AIFM is authorised to manage that type of AIF;

(b) provide in another Member State the services referred to in Article 6(4) for which it has been authorised.

2.    An AIFM intending to provide the activities and services referred to in paragraph 1 for the first time shall communicate the following information to the competent authorities of its home Member State:

(a) the Member State in which it intends to manage AIFs directly or to establish a branch, and/or to provide the services referred to in Article 6(4);

(b) a programme of operations stating in particular the services which it intends to perform and/or identifying the AIFs that it intends to manage.'.

*Article 93*

**Transposition**

1.    Member States shall adopt and publish, by 3 July 2016, the laws, regulations and administrative provisions necessary to comply with this Directive. They shall forthwith communicate to the Commission the text of those measures.

Members States shall apply those measures from 3 January 2017 except for the provisions transposing Article 65(2) which shall apply from 3 September 2018.

When Member States adopt those measures, they shall contain a reference to this Directive or be accompanied by such a reference on the occasion of their official publication. Member States shall determine how such reference is to be made. They shall also include a statement that references in existing laws, regulations and administrative provisions to the directives repealed by this Directive shall be construed as references to this Directive. Member States shall determine how such reference is to be made and how that statement is to be formulated.

2.    Member States shall apply the measures referred to in Article 92 from 3 July 2015.

3.    Member States shall communicate to the Commission and to ESMA the text of the main provisions of national law which they adopt in the field covered by this Directive.

*Article 94*

**Repeal**

Directive 2004/39/EC, as amended by the acts listed in Annex III, Part A of this Directive, is repealed with effect from 3 January 2017, without prejudice to the obligations of the Member States relating to the time-limits for transposition into national law of the Directives set out in Annex III, Part B of this Directive.

References to Directive 2004/39/EC or to Directive 93/22/EEC shall be construed as references to this Directive or to Regulation (EU) No 600/2014 and shall be read in accordance with the correlation table set out in Annex IV of this Directive.

References to terms defined in, or Articles of, Directive 2004/39/EC or Directive 93/22/EEC shall be construed as references to the equivalent term defined in, or Article of, this Directive.

*Article 95*

**Transitional provisions**

1.    Until 3 July 2020:

(a) the clearing obligation set out in Article 4 of Regulation (EU) No 648/2012 and the risk mitigation techniques set out in Article 11(3) thereof shall not apply to C6 energy derivative contracts entered into by non-financial counterparties that meet the conditions in Article 10(1) of Regulation (EU) No 648/2012 or by non-financial counterparties that shall be authorised for the first time as investment firms as from 3 January 2017; and

(b) such C6 energy derivative contracts shall not be considered to be OTC derivative contracts for the purposes of the clearing threshold set out in Article 10 of Regulation (EU) No 648/2012.

C6 energy derivative contracts benefiting from the transitional regime set out in the first subparagraph shall be subject to all other requirements laid down in Regulation (EU) No 648/2012.

2.    The exemption referred to in paragraph 1 shall be granted by the relevant competent authority. The competent authority shall notify ESMA of the C6 energy derivative contracts which have been granted an exemption in accordance with paragraph 1 and ESMA shall publish on its website a list of those C6 energy derivative contracts.

*Article 96*

**Entry into force**

This Directive shall enter into force on the twentieth day following that of its publication in the *Official Journal of the European Union*.

*Article 97*

**Addressees**

This Directive is addressed to the Member States.

Done at Brussels, 15 May 2014.

|  |  |
|---|---|
| *For the European Parliament* | *For the Council* |
| *The President* | *The President* |
| M. SCHULZ | D. KOURKOULAS |

*ANNEX I*

**LISTS OF SERVICES AND ACTIVITIES AND FINANCIAL INSTRUMENTS**

SECTION A

**Investment services and activities**

(1) Reception and transmission of orders in relation to one or more financial instruments;

(2) Execution of orders on behalf of clients;

(3) Dealing on own account;

(4) Portfolio management;

(5) Investment advice;

(6) Underwriting of financial instruments and/or placing of financial instruments on a firm commitment basis;

(7) Placing of financial instruments without a firm commitment basis;

(8) Operation of an MTF;

(9) Operation of an OTF.

SECTION B

**Ancillary services**

(1) Safekeeping and administration of financial instruments for the account of clients, including custodianship and related services such as cash/collateral management and excluding maintaining securities accounts at the top tier level;

(2) Granting credits or loans to an investor to allow him to carry out a transaction in one or more financial instruments, where the firm granting the credit or loan is involved in the transaction;

(3) Advice to undertakings on capital structure, industrial strategy and related matters and advice and services relating to mergers and the purchase of undertakings;

(4) Foreign exchange services where these are connected to the provision of investment services;

(5) Investment research and financial analysis or other forms of general recommendation relating to transactions in financial instruments;

(6) Services related to underwriting.

(7) Investment services and activities as well as ancillary services of the type included under Section A or B of Annex 1 related to the underlying of the derivatives included under points (5), (6), (7) and (10) of Section C where these are connected to the provision of investment or ancillary services.

SECTION C

**Financial instruments**

(1) Transferable securities;

(2) Money-market instruments;

L 173/482    EN    Official Journal of the European Union    12.6.2014

(3) Units in collective investment undertakings;

(4) Options, futures, swaps, forward rate agreements and any other derivative contracts relating to securities, currencies, interest rates or yields, emission allowances or other derivatives instruments, financial indices or financial measures which may be settled physically or in cash;

(5) Options, futures, swaps, forwards and any other derivative contracts relating to commodities that must be settled in cash or may be settled in cash at the option of one of the parties other than by reason of default or other termination event;

(6) Options, futures, swaps, and any other derivative contract relating to commodities that can be physically settled provided that they are traded on a regulated market, a MTF, or an OTF, except for wholesale energy products traded on an OTF that must be physically settled;

(7) Options, futures, swaps, forwards and any other derivative contracts relating to commodities, that can be physically settled not otherwise mentioned in point 6 of this Section and not being for commercial purposes, which have the characteristics of other derivative financial instruments;

(8) Derivative instruments for the transfer of credit risk;

(9) Financial contracts for differences;

(10) Options, futures, swaps, forward rate agreements and any other derivative contracts relating to climatic variables, freight rates or inflation rates or other official economic statistics that must be settled in cash or may be settled in cash at the option of one of the parties other than by reason of default or other termination event, as well as any other derivative contracts relating to assets, rights, obligations, indices and measures not otherwise mentioned in this Section, which have the characteristics of other derivative financial instruments, having regard to whether, inter alia, they are traded on a regulated market, OTF, or an MTF;

(11) Emission allowances consisting of any units recognised for compliance with the requirements of Directive 2003/87/EC (Emissions Trading Scheme).

SECTION D

**Data reporting services**

(1) Operating an APA;

(2) Operating a CTP;

(3) Operating an ARM.

————

*ANNEX II*

**PROFESSIONAL CLIENTS FOR THE PURPOSE OF THIS DIRECTIVE**

Professional client is a client who possesses the experience, knowledge and expertise to make its own investment decisions and properly assess the risks that it incurs. In order to be considered to be professional client, the client must comply with the following criteria:

I.   CATEGORIES OF CLIENT WHO ARE CONSIDERED TO BE PROFESSIONALS

The following shall all be regarded as professionals in all investment services and activities and financial instruments for the purposes of the Directive.

(1)  Entities which are required to be authorised or regulated to operate in the financial markets. The list below shall be understood as including all authorised entities carrying out the characteristic activities of the entities mentioned: entities authorised by a Member State under a Directive, entities authorised or regulated by a Member State without reference to a Directive, and entities authorised or regulated by a third country:

   (a)  Credit institutions;

   (b)  Investment firms;

   (c)  Other authorised or regulated financial institutions;

   (d)  Insurance companies;

   (e)  Collective investment schemes and management companies of such schemes;

   (f)  Pension funds and management companies of such funds;

   (g)  Commodity and commodity derivatives dealers;

   (h)  Locals;

   (i)  Other institutional investors;

(2)  Large undertakings meeting two of the following size requirements on a company basis:

   — balance sheet total: EUR 20 000 000

   — net turnover: EUR 40 000 000

   — own funds: EUR 2 000 000

(3)  National and regional governments, including public bodies that manage public debt at national or regional level, Central Banks, international and supranational institutions such as the World Bank, the IMF, the ECB, the EIB and other similar international organisations.

(4)  Other institutional investors whose main activity is to invest in financial instruments, including entities dedicated to the securitisation of assets or other financing transactions.

L 173/484    EN    Official Journal of the European Union    12.6.2014

The entities referred to above are considered to be professionals. They must however be allowed to request non-professional treatment and investment firms may agree to provide a higher level of protection. Where the client of an investment firm is an undertaking referred to above, the investment firm must inform it prior to any provision of services that, on the basis of the information available to the investment firm, the client is deemed to be a professional client, and will be treated as such unless the investment firm and the client agree otherwise. The investment firm must also inform the customer that he can request a variation of the terms of the agreement in order to secure a higher degree of protection.

It is the responsibility of the client, considered to be a professional client, to ask for a higher level of protection when it deems it is unable to properly assess or manage the risks involved.

This higher level of protection will be provided when a client who is considered to be a professional enters into a written agreement with the investment firm to the effect that it shall not be treated as a professional for the purposes of the applicable conduct of business regime. Such agreement shall specify whether this applies to one or more particular services or transactions, or to one or more types of product or transaction.

II.   CLIENTS WHO MAY BE TREATED AS PROFESSIONALS ON REQUEST

II.1.  Identification criteria

Clients other than those mentioned in section I, including public sector bodies, local public authorities, municipalities and private individual investors, may also be allowed to waive some of the protections afforded by the conduct of business rules.

Investment firms shall therefore be allowed to treat any of those clients as professionals provided the relevant criteria and procedure mentioned below are fulfilled. Those clients shall not, however, be presumed to possess market knowledge and experience comparable to that of the categories listed in Section I.

Any such waiver of the protection afforded by the standard conduct of business regime shall be considered to be valid only if an adequate assessment of the expertise, experience and knowledge of the client, undertaken by the investment firm, gives reasonable assurance, in light of the nature of the transactions or services envisaged, that the client is capable of making investment decisions and understanding the risks involved.

The fitness test applied to managers and directors of entities licensed under Directives in the financial field could be regarded as an example of the assessment of expertise and knowledge. In the case of small entities, the person subject to that assessment shall be the person authorised to carry out transactions on behalf of the entity.

In the course of that assessment, as a minimum, two of the following criteria shall be satisfied:

— the client has carried out transactions, in significant size, on the relevant market at an average frequency of 10 per quarter over the previous four quarters,

— the size of the client's financial instrument portfolio, defined as including cash deposits and financial instruments exceeds EUR 500 000,

— the client works or has worked in the financial sector for at least one year in a professional position, which requires knowledge of the transactions or services envisaged.

Member States may adopt specific criteria for the assessment of the expertise and knowledge of municipalities and local public authorities requesting to be treated as professional clients. Those criteria can be alternative or additional to those listed in the fifth paragraph.

EN   Official Journal of the European Union

II.2. Procedure

Those clients may waive the benefit of the detailed rules of conduct only where the following procedure is followed:

— they must state in writing to the investment firm that they wish to be treated as a professional client, either generally or in respect of a particular investment service or transaction, or type of transaction or product,

— the investment firm must give them a clear written warning of the protections and investor compensation rights they may lose,

— they must state in writing, in a separate document from the contract, that they are aware of the consequences of losing such protections.

Before deciding to accept any request for waiver, investment firms must be required to take all reasonable steps to ensure that the client requesting to be treated as a professional client meets the relevant requirements stated in Section II.1.

However, if clients have already been categorised as professionals under parameters and procedures similar to those referred to above, it is not intended that their relationships with investment firms shall be affected by any new rules adopted pursuant to this Annex.

Firms must implement appropriate written internal policies and procedures to categorise clients. Professional clients are responsible for keeping the investment firm informed about any change, which could affect their current categorisation. Should the investment firm become aware however that the client no longer fulfils the initial conditions, which made him eligible for a professional treatment, the investment firm shall take appropriate action.

―――

L 173/486    EN    Official Journal of the European Union    12.6.2014

*ANNEX III*

PART A

**Repealed Directive with list of its successive amendments**

(referred to in Article 94)

Directive 2004/39/EC of the European Parliament and of the Council (OJ L 145, 30.4.2004, p. 1).

Directive 2006/31/EC of the European Parliament and of the Council (OJ L 114, 27.4.2006, p. 60).

Directive 2007/44/EC of the European Parliament and of the Council (OJ L 247, 21.9.2007, p. 1).

Directive 2008/10/EC of the European Parliament and of the Council (OJ L 76, 19.3.2008, p. 33).

Directive 2010/78/EC of the European Parliament and of the Council (OJ L 331, 15.12.2010, p. 120).

PART B

**List of time-limits for transposition into national law**

(referred to in Article 94)

Directive 2004/39/EC

| | |
|---|---|
| Transposition period | 31 January 2007 |
| Implementation period | 1 November 2007 |

Directive 2006/31/EC

| | |
|---|---|
| Transposition period | 31 January 2007 |
| Implementation period | 1 November 2007 |

Directive 2007/44/EC

| | |
|---|---|
| Transposition period | 21 March 2009 |

Directive 2010/78/EC

| | |
|---|---|
| Transposition period | 31 December 2011 |

*ANNEX IV*

**Correlation table referred in Article 94**

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 1(1) | Article 1(1) | |
| Article 1(2) | Article 1(3) | |
| Article 2(1)(a) | Article 2(1)(a) | |
| Article 2(1)(b) | Article 2(1)(b) | |
| Article 2(1)(c) | Article 2(1)(c) | |
| Article 2(1)(d) | Article 2(1)(d) | |
| Article 2(1)(e) | Article 2(1)(f) | |
| Article 2(1)(f) | Article 2(1)(g) | |
| Article 2(1)(g) | Article 2(1)(h) | |
| Article 2(1)(h) | Article 2(1)(i) | |
| Article 2(1)(i) | Article 2(1)(j) | |
| Article 2(1)(j) | Article 2(1)(k) | |
| Article 2(1)(k) | Article 2(1)(i) | |
| Article 2(1)(l) | — | |
| Article 2(1)(m) | Article 2(1)(l) | |
| Article 2(1)(n) | Article 2(1)(m) | |
| Article 2(2) | Article 2(2) | |
| Article 2(3) | Article 2(4) | |
| Article 3(1) | Article 3(1) | |
| Article 3(2) | Article 3(3) | |
| Article 4(1)(1) | Article 4(1)(1) | |
| Article 4(1)(2) | Article 4(1)(2) | |
| Article 4(1)(3) | Article 4(1)(3) | |
| Article 4(1)(4) | Article 4(1)(4) | |
| Article 4(1)(5) | Article 4(1)(5) | |
| Article 4(1)(6) | Article 4(1)(6) | |
| Article 4(1)(7) | Article 4(1)(20) | |
| Article 4(1)(8) | Article 4(1)(7) | |
| Article 4(1)(9) | Article 4(1)(8) | |

L 173/488          EN          Official Journal of the European Union          12.6.2014

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 4(1)(10) | Article 4(1)(9) | |
| Article 4(1)(11) | Article 4(1)(10) | |
| Article 4(1)(12) | Article 4(1)(11) | |
| Article 4(1)(13) | Article 4(1)(18) | |
| Article 4(1)(14) | Article 4(1)(21) | |
| Article 4(1)(15) | Article 4(1)(22) | |
| Article 4(1)(16) | Article 4(1)(14) | |
| Article 4(1)(17) | Article 4(1)(15) | |
| Article 4(1)(18) | Article 4(1)(44) | |
| Article 4(1)(19) | Article 4(1)(17) | |
| Article 4(1)(20) | Article 4(1)(55) | |
| Article 4(1)(21) | Article 4(1)(56) | |
| Article 4(1)(22) | Article 4(1)(26) | |
| Article 4(1)(23) | Article 4(1)(27) | |
| Article 4(1)(24) | Article 4(1)(28) | |
| Article 4(1)(25) | Article 4(1)(29) | |
| Article 4(1)(26) | Article 4(1)(30) | |
| Article 4(1)(27) | Article 4(1)(31) | |
| Article 4(1)(28) | Article 4(1)(32) | |
| Article 4(1)(29) | Article 4(1)(33) | |
| Article 4(1)(30) | Article 4(1)(35)(b) | |
| Article 4(1)(31) | Article 4(1)(35) | |
| Article 4(2) | Article 4(2) | |
| Article 5(1) | Article 5(1) | |
| Article 5(2) | Article 5(2) | |
| Article 5(3) | Article 5(3) | |
| Article 5(4) | Article 5(4) | |
| Article 5(5) | — | |
| Article 6(1) | Article 6(1) | |
| Article 6(2) | Article 6(2) | |
| Article 6(3) | Article 6(3) | |
| Article 7(1) | Article 7(1) | |

12.6.2014    EN    Official Journal of the European Union    L 173/489

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 7(2) | Article 7(2) | |
| Article 7(3) | Article 7(3) | |
| Article 7(4) | Article 7(4) and (5) | |
| Article 8(a) | Article 8(a) | |
| Article 8(b) | Article 8(b) | |
| Article 8(c) | Article 8(c) | |
| Article 8(d) | Article 8(d) | |
| Article 8(e) | Article 8(e) | |
| Article 9(1) | Article 9(1) and (3) | |
| Article 9(2) | Article 9(5) | |
| Article 9(3) | Article 9(4) | |
| Article 9(4) | Article 9(6) | |
| Article 10(1) | Article 10(1) | |
| Article 10(2) | Article 10(2) | |
| Article 10(3) | Article 11(1) | |
| Article 10(4) | Article 11(2) | |
| Article 10(5) | Article 11(3) | |
| Article 10(6) | Article 10(3), 11(4) | |
| Article 10a(1) | Article 12(1) | |
| Article 10a(2) | Article 12(2) | |
| Article 10a(3) | Article 12(3) | |
| Article 10a(4) | Article 12(4) | |
| Article 10a(5) | Article 12(5) | |
| Article 10a(6) | Article 12(6) | |
| Article 10a(7) | Article 12(7) | |
| Article 10a(8) | Article 12(8) and (9) | |
| Article 10b(1) | Article 13(1) | |
| Article 10b(2) | Article 13(2) | |
| Article 10b(3) | Article 13(3) | |
| Article 10b(4) | Article 13(4) | |
| Article 10b(5) | Article 13(5) | |
| Article 11 | Article 14 | |

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 12 | Article 15 | |
| Article 13(1) | Article 16(1) | |
| Article 13(2) | Article 16(2) | |
| Article 13(3) | Article 16(3) | |
| Article 13(4) | Article 16(4) | |
| Article 13(5) | Article 16(5) | |
| Article 13(6) | Article 16(6) | |
| Article 13(7) | Article 16(8) | |
| Article 13(8) | Article 16(9) | |
| Article 13(9) | Article 16(11) | |
| Article 13(10) | Article 16(12) | |
| Article 14(1) | Article 18(1), Article 19(1) | |
| Article 14(2) | Article 18(2) | |
| Article 14(3) | Article 19(4) | |
| Article 14(4) | Article 18(3), Article 19(2) | |
| Article 14(5) | Article 18(6), Article 19(3) | |
| Article 14(6) | Article 18(8) | |
| Article 14(7) | Article 18(9) | |
| Article 15 | — | |
| Article 16(1) | Article 21(1) | |
| Article 16(2) | Article 21(2) | |
| Article 16(3) | — | |
| Article 17(1) | Article 22 | |
| Article 17(2) | — | |
| Article 18(1) | Article 23(1) | |
| Article 18(2) | Article 23(2) | |
| Article 18(3) | Article 23(4) | |
| Article 19(1) | Article 24(1) | |
| Article 19(2) | Article 24(3) | |
| Article 19(3) | Article 24(4) | |
| Article 19(4) | Article 25(2) | |
| Article 19(5) | Article 25(3) | |

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 19(6) | Article 25(4) | |
| Article 19(7) | Article 25(5) | |
| Article 19(8) | Article 25(6) | |
| Article 19(9) | Article 24(6), Article 25(7) | |
| Article 19(10) | Article 24(13), Article 24(14), Article 25(8) | |
| Article 20 | Article 26 | |
| Article 21(1) | Article 27(1) | |
| Article 21(2) | Article 27(4) | |
| Article 21(3) | Article 27(5) | |
| Article 21(4) | Article 27(7) | |
| Article 21(5) | Article 27(8) | |
| Article 21(6) | Article 27(9) | |
| Article 22(1) | Article 28(1) | |
| Article 22(2) | Article 28(2) | |
| Article 22(3) | Article 28(3) | |
| Article 23(1) | Article 29(1) | |
| Article 23(2) | Article 29(2) | |
| Article 23(3) | Article 29(3) | |
| Article 23(4) | Article 29(4) | |
| Article 23(5) | Article 29(5) | |
| Article 23(6) | Article 29(6) | |
| Article 24(1) | Article 30(1) | |
| Article 24(2) | Article 30(2) | |
| Article 24(3) | Article 30(3) | |
| Article 24(4) | Article 30(4) | |
| Article 24(5) | Article 30(5) | |
| Article 25(1) | | Article 24 |
| Article 25(2) | | Article 25(1) |
| Article 25(3) | | Article 26(1) and (2) |
| Article 25(4) | | Article 26(3) |
| Article 25(5) | | Article 26(7) |
| Article 25(6) | | Article 26(8) |

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 25(7) | | Article 26(9) |
| Article 26(1) | Article 31(1) | |
| Article 26(2) | Article 31(2) and (3) | |
| Article 27(1) | | Article 14(1) to (5) |
| Article 27(2) | | Article 14(6) |
| Article 27(3) | | Article 15(1) to (4) |
| Article 27(4) | | Article 16 |
| Article 27(5) | | Article 17(1) |
| Article 27(6) | | Article 17(2) |
| Article 27(7) | | Article 17(3) |
| Article 28(1) | | Article 20(1) |
| Article 28(2) | | Article 20(2) |
| Article 28(3) | | Article 20(3) |
| Article 29(1) | | Article 3(1), (2) and (3) |
| Article 29(2) | | Article 4(1), (2) and (3) |
| Article 29(3) | | Article 4(6) |
| Article 30(1) | | Article 6(1) and (2) |
| Article 30(2) | | Article 7(1) |
| Article 30(3) | | Article 7(2) |
| Article 31(1) | Article 34(1) | |
| Article 31(2) | Article 34(2) | |
| Article 31(3) | Article 34(3) | |
| Article 31(4) | Article 34(4) | |
| Article 31(5) | Article 34(6) | |
| Article 31(6) | Article 34(7) | |
| Article 31(7) | Article 34(8) and (9) | |
| Article 32(1) | Article 35(1) | |
| Article 32(2) | Article 35(2) | |
| Article 32(3) | Article 35(3) | |
| Article 32(4) | Article 35(4) | |
| Article 32(5) | Article 35(5) | |
| Article 32(6) | Article 35(6) | |

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 32(7) | Article 35(8) | |
| Article 32(8) | Article 35(9) | |
| Article 32(9) | Article 35(10) | |
| Article 32(10) | Article 35(11) and (12) | |
| Article 33(1) | Article 36(1) | |
| Article 33(2) | Article 36(2) | |
| Article 34(1) | Article 37(1) | |
| Article 34(2) | Article 37(2) | |
| Article 34(3) | — | |
| Article 35(1) | Article 38(1) | |
| Article 35(2) | Article 38(2) | |
| Article 36(1) | Article 44(1) | |
| Article 36(2) | Article 44(2) | |
| Article 36(3) | Article 44(3) | |
| Article 36(4) | Article 44(4) | |
| Article 36(5) | Article 44(5) | |
| Article 36(6) | Article 44(6) | |
| Article 37(1) | Article 45(1) and (8) | |
| Article 37(2) | Article 45(7) second subparagraph | |
| Article 38(1) | Article 46(1) | |
| Article 38(2) | Article 46(2) | |
| Article 38(3) | Article 46(3) | |
| Article 39 | Article 47(1) | |
| Article 40(1) | Article 51(1) | |
| Article 40(2) | Article 51(2) | |
| Article 40(3) | Article 51(3) | |
| Article 40(4) | Article 51(4) | |
| Article 40(5) | Article 51(5) | |
| Article 40(6) | Article 51(6) | |
| Article 41(1) | Article 52(1) | |
| Article 41(2) | Article 52(2) | |
| Article 42(1) | Article 53(1) | |

L 173/494    EN    Official Journal of the European Union    12.6.2014

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 42(2) | Article 53(2) | |
| Article 42(3) | Article 53(3) | |
| Article 42(4) | Article 53(4) | |
| Article 42(5) | Article 53(5) | |
| Article 42(6) | Article 53(6) | |
| Article 42(7) | Article 53(7) | |
| Article 43(1) | Article 54(1) | |
| Article 43(2) | Article 54(2) and (3) | |
| Article 44(1) | | Article 3(1), (2) and (3) |
| Article 44(2) | | Article 4(1), (2) and (3) |
| Article 44(3) | | Article 4(6) |
| Article 45(1) | | Article 6(1) and (2) |
| Article 45(2) | | Article 7(1) |
| Article 45(3) | | Article 7(2) |
| Article 46(1) | Article 55(1) | |
| Article 46(2) | Article 55(2) | |
| Article 47 | Article 56 | |
| Article 48(1) | Article 67(1) | |
| Article 48(2) | Article 67(2) | |
| Article 48(3) | Article 67(3) | |
| Article 49 | Article 68 | |
| Article 50(1) | Article 69(1), 72(1) | |
| Article 50(2) | Article 69(2) | |
| Article 51(1) | Article 70(1) and (2) | |
| Article 51(2) | Article 70(5) | |
| Article 51(3) | Article 71(1) | |
| Article 51(4) | Article 71(4) | |
| Article 51(5) | Article 71(5) | |
| Article 51(6) | Article 71(6) | |
| Article 52(1) | Article 74(1) | |
| Article 52(2) | Article 74(2) | |
| Article 53(1) | Article 75(1) | |

12.6.2014    EN    Official Journal of the European Union    L 173/495

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 53(2) | Article 75(2) | |
| Article 53(3) | Article 75(3) | |
| Article 54(1) | Article 76(1) | |
| Article 54(2) | Article 76(2) | |
| Article 54(3) | Article 76(3) | |
| Article 54(4) | Article 76(4) | |
| Article 54(5) | Article 76(5) | |
| Article 55(1) | Article 77(1) | |
| Article 55(2) | Article 77(2) | |
| Article 56(1) | Article 79(1) | |
| Article 56(2) | Article 79(2) | |
| Article 56(3) | Article 79(3) | |
| Article 56(4) | Article 79(4) | |
| Article 56(5) | Article 79(8) | |
| Article 56(6) | Article 79(9) | |
| Article 57(1) | Article 80(1) | |
| Article 57(2) | Article 80(2) | |
| Article 57(3) | Article 80(3) and (4) | |
| Article 58(1) | Article 81(1) | |
| Article 58(2) | Article 81(2) | |
| Article 58(3) | Article 81(3) | |
| Article 58(4) | Article 81(4) | |
| Article 58(5) | Article 81(5) | |
| Article 58a | Article 82 | |
| Article 59 | Article 83 | |
| Article 60(1) | Article 84(1) | |
| Article 60(2) | Article 84(2) | |
| Article 60(3) | Article 84(3) | |
| Article 60(4) | Article 84(4) | |
| Article 61(1) | Article 85(1) | |
| Article 61(2) | Article 85(2) | |
| Article 62(1) | Article 86(1) | |

| Directive 2004/39/EC | Directive 2014/65/EU | Regulation (EU) No 600/2014 |
|---|---|---|
| Article 62(2) | Article 86(2) | |
| Article 62(3) | Article 86(3) | |
| Article 62(4) | Article 86(4) | |
| Article 62a(1) | Article 87(1) | |
| Article 62a(2) | Article 87(2) | |
| Article 63(1) | Article 88(1) | |
| Article 63(2) | Article 88(2) | |
| Article 64 | — | — |
| Article 64a | — | — |
| Article 65 | — | — |
| Article 66 | — | — |
| Article 67 | — | — |
| Article 68 | — | — |
| Article 69 | — | — |
| Article 70 | — | — |
| Article 71 | — | — |
| Article 72 | — | — |
| Article 73 | — | — |
| Annex I | Annex I | |
| Annex II | Annex II | |