# Exhibit 45, Part 12 of 15

På aktieleveringsdagen udligner short selleren således det overstigende antal af aktier i forhold til an-tallet af udstedte aktier (free float bringes tilbage til normalen), idet han foretager et dækningskøb, så ingen "opdager", at short seller har solgt aktier, han ikke ejede. Lykkedes det ikke short seller at lave et sådant dækningskøb, ville det være åbenlyst, at der havde været flere ejere af aktier end svarende til det udstedte antal. Han må derfor trække på GMSLA, hvilket bringer aktielångivers ejerskab til ophør. Dette ændrer dog ikke på, at *juridisk har været to ejere i en periode*. Hvem, der fortsætter med at være ejeren, afgøres efter de tingsretlige regler, herunder reglerne om iagttagelse af sikringsakter og vindikation/ekstinktion. Det er netop i *denne* forbindelse, at leveringen af aktien spiller en rolle under dansk lovgivning. Den, der har aktien registreret i sit depot, har en sikret retsposition som ejer. Indtil leveringen er ejerskabet, som køberen erhverver, ikke beskyttet mod ekstinktion. Køberen har ikke de-sto mindre erhvervet ejerskab til aktien.

Sagt med andre ord betyder dette, at short selleren i perioden mellem salget af aktierne, han ikke ejede, og dækningskøbet (eller lånet af aktierne under en konkret låneaftale) overdrog ejerskab af ak-tier ved en simpel købekontrakt til en køber, der ikke kan vide, at sælgeren er en short seller. Herved skaber short selleren de facto flere ejere af danske aktier, end selskabet har udstedt. Dette kan kun forhindres, hvis selve overdragelsen af ejerskab af aktier kræver levering af aktierne.

Et sådan krav eksisterer dog ikke i dansk lovgivning. I dansk lovgivning er levering af aktierne, der sker under settlement-processen, og som fører til registrering af ejerskabet hos købers custodian, blot de-klaratorisk.

Herved adskiller dansk lovgivning sig ganske væsentlig fra fx tysk lovgivning. I henhold til tysk lovgiv-ning er leveringen af aktien fra sælgers depot til købers depot nødvendig, for at køber bliver ejer. Da dette ikke er nødvendigt i dansk lovgivning, har Danmark – også i henhold til den tyske prof. dr. Chri-stoph Spengel fra Universitetet i Mannheim – gjort det utroligt let for short sellere at skabe flere aktio-nærer end svarende til antallet af danske aktier udstedt af selskaberne.

Professoren mener, at Danmark i udbyttesagen lider under et juridisk problem, som lovgivning og rets-praksis selv har skabt.

Det er helt åbenlyst, at Skattestyrelsen forsøger at støtte sig til tyske regler og retspraksis omkring er-hvervelse af ejerskab af aktier for at løse problemerne, der opstår ved short selling. Skattestyrelsen for-søger at gøre dette helt uden retsgrundlag. Der er ingen regler i Danmark, der fordrer levering af akti-erne for at erhverve ejerskab, tværtimod.

**3.2.2.1 Skattestyrelsens synspunkter vedrørende "short buyer"**

I sit sammenfattende indlæg af den 9. august 2019 præsenterer Skattestyrelsen i afsnit 8.3, side 69, en kæde, der skulle gengive short selling:

*Ejer/aktielångiver à Aktielåntager/short seller à "Short buyer"*

Denne kæde gengiver ganske rigtigt, hvordan en aktie leveres. Den gengiver dog ikke, hvordan ejerska-bet overdrages.

Skattestyrelsen lader ved præsentationen af denne kæde til at ville introducere den (nye og fiktive) fi-gur "short buyer". En "short buyer" findes i realiteten ikke. Introduktionen af dematerialiserede aktier og den anonyme måde, disse handles på, har gjort det umuligt at følge en bestemt aktie fra en bestemt sælger til en bestemt køber. Aktier eksisterer kun som tal i computere, og når disse tal under afviklings-processen kan modregnes hinanden (kaldet "netting"), så hver finansiel virksomhed kun overdrager nettosummen af alle køb og salg foretaget af hans kunder til den næste finansielle virksomhed, er det

udelukket at forfølge en bestemt aktie fra sælger til køber. Der findes ikke en "short buyer" svarende til en short seller.

En short seller er kun en short seller, hvis han <u>ikke</u> er den civilretlige ejer af aktien. Den civilretlige ejer af aktien er long seller. I det øjeblik short selleren indgår et <u>konkret aktielån</u> med ejeren af aktien, bliver aktielåntageren den civilretlige ejer af aktien. Det betyder med andre ord, at short selleren kun er "short", så længe han enten (1) er udækket (hvilket er tilladt for en såkaldt "market maker"), eller (2) "kun" er dækket ved en GMSLA, men endnu ikke har trukket (= lånt) et konkret antal aktier under en GMSLA. Når aktierne trækkes ved et konkret aktielån under GMSLA'en, bliver short selleren til long owner. Short selling er derfor kun muligt, så længe der "kun" eksisterer en GMSLA, der endnu ikke er trukket aktier under. Når en short seller trækker aktier under en GMSLA, trækker han aktier, som selskabet har udstedt. Eksistensen af GMSLA'en dækker short selleren og gør hans salg legalt (idet han dermed ikke er "udækket"), men samtidig medfører denne short selling, at der handles med flere aktier, end der er udstedt af selskabet. Der er flere aktier på markedet til handel end udstedt af selskabet.

Havde Skattestyrelsen ret i sin argumentation, ville short selling udelukkende eksistere i form af udækket short selling (foretaget af market makers).

Grunden til at short selleren kan overdrage ejerskab to noget, han ikke selv har (civilretligt og retmæssigt ejerskab), er, at shortselleren kan **legitimere** overdragelsen af ejerskabet til aktierne ved at kunne udelukke risikoen for en "fail" af handlen, dvs. at handlen ikke afvikles. En fail kan short selleren udelukke ved at (1) være i besiddelse af en GMSLA, der tillader ham at låne aktier til leveringen, og (2) have en clearing agent og custodian, der – i nødstilfælde – er forpligtet til at indestå for, at aktierne leveres under afviklingen af handlen. Short sellerens van- hjemmel til aktierne, der stadig ejes af aktielånegiver på salgstidspunktet, medfører ikke, at køberen, der handler i god tro på sælgers ejerskab, ikke erhverver ejerskab. Aktielångivers ejerskab til aktierne ekstingveres derimod af køberen, der handler i god tro. Denne ekstinktion retfærdiggøres af, at aktielånegiver selv har udsat sig for den risiko, at aktielåntager disponerer over aktierne ved at indgå en GMSLA.

Hvordan køberen handler i god tro på short sellerens ret til at overdrage legitime- ret ejerskab til aktier, han først låner senere, kan illustreres, som følger:



Den korrekte kæde til illustration af overdragelsen af ejerskab skulle følgelig se ud, som følger:

*Ejer/aktielångiver à Køber, der erhverver i god tro*

Kunne en sælger, der ikke selv er ejer, ikke overdrage ejerskab, ville reglerne omkring erhvervelse af ejerskab i god tro (vindikation/ekstinktion) slet ikke eksistere. Idet det dobbelte ejerskab af aktierne ophører – eller sagt med andre ord: idet antallet af aktier, der ejes, bringes tilbage til antallet af aktier, der er udstedt af selskabet – når aktierne leveres og registreres på køberens depotkonto, fører short selling ikke til problemer vedrørende ekstinktion. Når short selleren indgår en aftale om lån af et **bestemt antal aktier** under en GMSLA, bliver han ejer af disse aktier og leverer dem til sin køber af aktierne.

At antallet af aktier i handel øges ved short selling, er netop en af de af Finanstilsynet ønskede virkninger af short selling. Der kan således henvises til både Finanstilsynets publikation omkring short selling (jf. bilag 82) samt ESMAs rapport om udbyttearbitrage, jf. bilag 83. ESMA gør det helt tydeligt, at et retskrav på refusion bør afhænge af modtagelsen af et nettoudbytte og ikke af ejerskabet af en aktie, idet short selling netop har den konsekvens, at der handles med flere aktier, end der er udstedt af selskaberne. Når handlen i sig selv er nok til at erhverve ejerskab, har short selling fatale konsekvenser for skattesystemet. ESMA lægger ingen skjul på, at en DCA (dividend credit advice) er det korrekte dokument, som en retskrav på refusion skal dokumenteres med, men at denne DCA ikke skal afhænge af ejerskabet af aktien, men af modtagelsen af udbyttet.

Skattestyrelsen lader til at basere hele sin teori om, at der ikke skulle være "realitet" i de gennemførte aktiehandler, på det faktum at aktiehandlerne skulle være foretaget som short selling. Herved overser Skattestyrelsen, at også short selling er reelle aktiehandler, og at leveringskæden ikke er identisk med kæden til overdragelse af ejerskab, idet leveringskæden først finder sted, flere dage efter ejerskabet er overdraget. Skattestyrelsen overser konsekvent, at der kan handles ubegrænset mange aktier, og at kun antallet af aktier, der kan leveres, er begrænset af antallet af aktier udstedt af selskaberne

**3.2.2.2 Konsekvensen af flere aktier som følge af short selling (indtil settlement)**

At short sellere i perioden mellem købsaftalen og leveringen af aktier kan skabe flere ejere af aktier end svarende til antallet af udstedte aktier, fører udelukkende til problemer, hvis og når short selling sker omkring udbyttedatoen. Købekontrakten gør da en person udbytteberettiget, selv om han ikke er registreret som ejer endnu, jf. købelovens § 19, stk. 1: Køb af aktier omfatter det udbytte, som ikke var forfaldent, på det tidspunkt hvor købet sluttedes.

Dette har den konsekvens, at køberen skal krediteres nettoudbyttet på udbyttets betalingsdato, uanset hvornår registreringen af aktierne sker på hans depot. Ligger betalingsdatoen på en tidligere dato end registreringsdatoen af aktien hos custodian, skal sælgeren af aktien betale nettoudbyttet til køberen (short selleren betaler en kompensationsbetaling under "market claim-processen" til køber). På denne kompensationsbetaling er der i dansk skatteret ingen kildeskat, selvom det i virkeligheden drejer sig om betalingen af et udbytte til aktiens civilretlige ejer. Da køberen af aktien er ejer på udbyttedatoen og modtager nettoudbyttet på betalingsdagen, er han også berettiget til refusion.

Ligger betalingsdatoen for udbyttet efter registreringsdatoen af aktiesalget udført af en short seller, er det aktielångiver, der i henhold til GMSLA'en er berettiget til kompensationsbetalingen. Aktiekøberen modtager i dette tilfælde udbyttet direkte fra selskabet (hvor der også indbetales udbytteskat), men aktieudlåneren modtager kompensationsbetalingen fra short selleren, som Danmark ikke opkræver kildeskat af, på trods af at den økonomisk og skatteretligt betragtes som et udbytte.

Det midlertidige dobbelte ejerskab af aktien mellem salg og levering af aktien har dog kun konsekvenser for udbetalingen af udbytte og beskatningen heraf.

Idet det kumulative juridiske ejerskab ender, når aktierne skal leveres, vil altid kun én aktionær pr. aktie være stemmeberettiget ved generalforsamlingen, idet stemmeberettigelsen fordrer, at registreringen af aktien eftervises ved en udskrift fra den respektive custodian.

Skattestyrelsens påstand i styrelsens sammenfattende indlæg i førersagerne af den 9. august 2019 om, at

> *"Hvis der kunne være flere ejere af samme aktie, ville det også betyde, at mere end 100 % aktionærer kunne møde og stemme på selskabets generalforsamling."*

er naturligvis ikke korrekt.

**3.2.2.2.1 Manglende kildebeskatning af kompensationsbetaling**

Skatteministeriet og Skattestyrelsen har, som fremgår af den i 2015 udstedte Early Warning, helt klart identificeret, at et af hovedproblemerne i udbytteskattesagerne er short selling.

Så længe der ikke opkræves udbytteskat af kompensationsbetalingen, som en short seller skal betale, til den der køber aktien på generalforsamlingsdatoen (retserhvervelsestidspunktet for udbyttet og dermed med retskrav på refusion), men som først bliver registreret som ejer efter record day, vil der

mangle en indbetaling af udbytteskat. Da køberen af aktien (eller nogen som helst anden person) ikke kan se forskel på en aktie købt af en short seller og en aktie købt af en long owner, er short selleren, der sælger på generalforsamlingsdatoen, nødt til at betale en kompensationsbetaling ind i kæden af custodians og endelig ned til køberen svarende til nettoudbyttet på aktierne. Alle købere af aktier, også dem der køber det overskydende antal aktier, der er i omløb, modtager et nettoudbytte og en DCA og er refusionsberettigede som ejere af aktierne og modtagere af et nettoudbytte.

Da ingen andre end short selleren selv og dennes umiddelbare custodian ved, kan se eller kan konstatere, at en betaling i virkeligheden ikke kommer fra selskabet selv, men fra en short seller, er det nødvendigt at beskatte kompensationsbetalingen. Allerede ved den første subcustodian i kæden af custodians blandes alle nettoudbytter fra selskabet selv uigenkaldeligt med kompensationsbetalingerne fra short sellere. Ingen i kæden af custodians er i stand til at bekræfte over for køberen af aktien, om det beløb, han får krediteret på sin konto (nettoudbyttets sum), i virkeligheden stammer fra en short seller eller fra selskabet.

Dette afspejles også i det faktum, at hverken køberen af en aktie – eller noget andet menneske – kan sige, om den aktie, han har købt og får leveret, stammer fra en short seller eller fra en long owner. Det er meget muligt, at netop den "aktie", som køberen får registreret på sin depotkonto pga. netting i afviklingsprocessen, før var registreret hos en helt anden kunde som samme custodian. Køberen modtager jo ikke netop den specifikke aktie, som "hans" sælger har solgt ham, men en hvilken som helst aktie fra samme selskab, da aktier er genusvarer.

Ved kontormødet blev fremlagt følgende skitse, der viser dette problem i grafisk form:



Det fremgår af skitsen, at såvel aktier som også betalingen af udbyttet fra selskabet selv (vist med sorte pile) blandes med aktier/kompensationsbetalinger, der stammer fra en short seller (vist med røde pile). Mens short selleren udelukkende kan opfylde sin forpligtelse til levering af aktier, med aktier der er udstedt af selskabet, kan "udbyttet", som køberen modtager, lige så godt være en kompensationsbetaling fra en short seller. Idet kravet på betaling af udbyttet allerede opstår med købet af aktierne, er short selleren nødt til at skabe et "udbytte" – udover, hvad selskabet har betalt. Dette udbytte fra short selleren kaldes kompensations- betaling.

I Tyskland erkendte man problemerne omkring kompensationsbetalingerne allerede i 1999 (ved en kendelse fra BFH) og indførte i 2007 en kildebeskatning på kompensationsbetalingerne. I 2012 blev kildebeskatningsreglerne igen ændret, da det stod klart, at man ligeledes var nødt til at ændre skyldneren, der er pligtig til at foretage indeholdelse og indberetning af kildeskat på udbytte. Danmark har derimod til dato intet gjort for at rette op på denne mangel. I Danmark holder man stadig fast ved kildeskattelovens § 65, ifølge hvilken det er det uddelende selskab, der har pligt til at indeholde og indberette udbytteskatten, og en beskatning af kompensationsbetalingen fra short selleren sker slet ikke.

### 3.2.2.3 Skattemæssigt retmæssigt ejerskab ved aktieudlån – dobbelt ejer- skab ud over settlement

Ud over problemerne der skabes ved at en køber, der handler i god tro, kan erhverve ejerskab til aktier, der stadig ejes af en aktielångiver, medfører den praktiske håndtering af aktieudlån samt retspraksis omkring aktieudlån og retmæssigt ejerskab yderlige problemer vedrørende identifikationen af den skattemæssigt retmæssige ejer og dermed en risiko for dobbelt refusion, idet der evt. udbetales refusion til en aktielångiver, der ikke længere er at betragte som den skattemæssigt retmæssige ejer af aktierne.

### 3.2.2.3.1 Retspraksis vedrørende skattemæssigt retmæssig ejerskab ved aktieudlån

Ved aktieudlån registreres aktielåntageren ved VP Securities som den nye ejer af aktien. Denne civilretlige kategorisering af aktielånet, som kommer til udtryk hos VP Securities, stemmer dog ikke overens med de *skatteretlige* kategoriseringer af aktielån.

Ud fra skatteretlige betragtninger af aktielån bliver ejendomsretten *ikke* overdraget fra långiver til låntager (jf. SKM2010.266.SR). Der sker således *ikke* en afståelse, ved aktielån som er indgået i henhold til den danske standardiserede aktielånsordning, Morgan Stanley & Co International Limited – Overseas Securities Lender's Agreement eller Overseas Securities Lenders Association, Global Master Securities Lending Agreement (GMSLA).

Långiver beholder som udgangspunkt alle sine rettigheder mv. hidrørende fra aktierne. Låntager har dog visse dispositionsbeføjelser over aktierne, idet låneaftalen som udgangspunkt blot kræver tilbagelevering på et bestemt tidspunkt i fremtiden. Indtil dette tidspunkt oprinder, kan låntager disponere fuldt ud over aktierne, herunder afstå dem til tredjemand. Låntager skal dog betale et beløb til långiver, der svarer til udbyttet udbetalt af selskabet under aktielånets varighed (kompensationsbetaling). Låntager skal ved låneperiodens afslutning tilbagelevere aktier af samme mængde og art. Derved stilles långiver således, som om aktierne havde været i hans besiddelse under hele låneperioden. Han betragtes derfor ud fra en helhedsopfattelse af aktielånearrangementet fortsat som den *skatteretlige ejer* af aktierne. Dette resultat når både SKAT, skatteeksperter og Landsskatteretten.

Idet aktieudlåneren ikke mister det skatteretlige ejerskab af aktierne ved udlån, og han i overensstemmelse hermed i henhold til GMSLA'en også er berettiget til at modtage udbyttet, er aktieudlåner også berettiget til udbytterefusion.

Idet salg af dematerialiserede aktier foregår anonymt (via mæglere), og der ved alle tjenesteyderne, der deltager i en overdragelsestransaktion, sker en sammenblanding af alle aktier, der overdrages mellem alle deres kunder, kan en køber af en aktie ikke vide, om han *køber og modtager* en aktie, der stammer fra en long owner (der har aktien i sit depot), eller om han køber aktien af en short seller, der kun har kunnet låne aktien.

Dette er i og for sig i 364 dage om året heller ikke relevant. Det er kun, i det øjeblik hvor selskabet ud-lodder et udbytte, at det bliver et problem, når skattemyndighederne, retspraksis og litteraturen er-klærer aktielångiveren for den skattemæssige ejer af aktien.

Når køber ikke kan vide, om sælger er en short seller, der kun låner aktien, må køber nødvendigvis ved køb af aktien ikke kun blive civilretlig ejer af aktien, men også skattemæssig ejer. Idet køberen af aktien vil blive registreret hos VP Securities eller enhver anden subcustodian, vil køberen også modtage et nettoudbytte og være refusionsberettiget.

Ved siden af aktieudlåneren, der har modtaget en kompensationsbetaling fra aktielåntageren og er skattepligtig heraf, som om han havde modtaget udbyttet direkte, er der den nye ejer af aktien, der ligeledes modtager et udbytte, er skattepligtig heraf og er refusionsberettiget.

Retspraksis omkring aktielån har således skabt to skattemæssige ejere af samme aktie på udlodnings-tidspunktet.



Idet short selling skal være dækket i form af et aktielån, fører alle de af retspraksis, skatteeksperter (Katja Dyppel Joo, jf. bilag 2c) og SKAT Jura og Store Selskaber (jf. Early Warning 2015 fremlagt som bi-lag 4a) anerkendte problemer omkring aktielån til de omtalte problemer i forbindelse med short sel-ling.

### 3.2.2.3.2 SKAT om skattemæssigt retmæssigt ejerskab ved aktieudlån

Som SKAT Store Selskaber den 27. marts 2015 skrev til SKAT Jura i Early Warning, registrerer VP Securi-ties som udgangspunkt den juridiske ejer. Ved aktielån registreres låntager som ejer, hvorved udlåner ikke længere er registreret som ejer. Herefter anføres det, at der ved aktielån skattemæssigt skal hen-ses til, hvem der er retmæssig ejer/beneficial owner, jf. SKM2010.266.SR. Af afgørelsen fremgår, at en *aftale om lån af aktier ikke skatteretligt kan kvalificeres som afståelse*. En långiver anses skattemæssigt for retmæssig ejer af aktierne. Udbytte, der udloddes i låneperioden, anses for at tilfalde långiver, og långiver skal derfor beskattes heraf.

I forbindelse med short selling har dette den konsekvens, at aktielångiveren fortsat anses for at mod-tage et udbytte, han beskattes heraf, og følgelig må han være refusionsberettiget, hvis han i øvrigt op-fylder betingelserne herfor.

Samtidig erhverver en køber, der handler i god tro, og ikke ved, at han køber af en short seller, ejerskab til aktierne, ligesom han modtager udbyttet og er skattepligtig heraf, med den konsekvens at han tillige er berettiget til refusion af indeholdt udbytteskat i henhold til gældende regler herom.

SKAT Juras Early Warning af den 7. juli 2015 til Skatteministeriet tager som udgangspunkt afsæt i Early Warning fra SKAT Store Selskaber. Også SKAT Juras Early Warning fremfører indledningsvis, at låntager registreres civilretligt som ejer af de lånte aktier, men at aktierne i overensstemmelse med TfS 1999, 408 ikke anses for afstået. Skattemæssigt anses långiver således fortsat som ejer af de udlånte aktier. I SKM2010.266.SR tilsluttede Skatterådet sig SKATs indstilling om, at det er långiver, der efter de indgåede dobbeltbeskatningsaftaler er beneficial owner af udbytte på de lånte aktier, *når disse ikke er videresolgt* af låntager.

Problemet, der herved opstår, er, at aktielångiveren principielt ikke kan vide, hvorfor låntager indgår et aktielån, og han kan langt mindre vide, om låntager sælger aktierne videre. Aktielångiver må dermed med afsæt i SKM2010.266.SR gå ud fra, at han trods udlån af aktierne fortsat er den retmæssige modtager af udbyttet, skattepligtig heraf og refusionsberettiget. Samtidig bliver køberen af aktierne retmæssig ejer af aktierne, udbyttet heraf og således ligeledes refusionsberettiget.

Skattemæssigt set, medfører SKM2010.266.SR således et dobbelt skattemæssigt ejerskab af de samme aktier. Dette naturligvis kun, så længe aktielånet består.

SKAT Jura angiver med rette i Early Warning, at den skattemæssige behandling af aktielån i Danmark afviger fra den skattemæssige behandling af aktielån i resten af verden. Denne forskel giver anledning til problemer, når danske långivere eller låntagere indgår aktielån med udenlandske långivere eller låntagere.

### 3.2.2.3.3 Skatteministeriet om skattemæssigt retmæssigt ejerskab ved aktie- udlån

Skatteministeriet skelner i sit svar på Early Warning i forbindelse med aktielån af den 23. september 2015 mellem to forskellige situationer, når det drejer sig om aktielån: (1) aktielån <u>uden</u> videresalg til tredjemand og (2) aktielån <u>med</u> videresalg til tredjemand.

### 3.2.2.3.3.1 Aktieudlån uden videresalg til tredjemand

Dette beskriver Skatteministeriet, som følger:

> *"I en aktielåneaftale mellem långiver og låntager vil långiver, desuagtet udlånet af aktierne til låntager, stadig skattemæssigt være den retmæssige ejer ("beneficial owner") af aktiern og dermed også af udbyttet"*

Skatteministeriet støtter sig herved på SKM2010.266.SR, ifølge hvilken udbytte på udlånte aktier skal beskattes hos långiver. Er der tale om en udenlandsk långiver, vil denne også være berettiget til at søge refusion af den overskydende indeholdte udbytteskat (jf. bilag 4a, notat af den 23. september 2015, side 6)

Når Skatteministeriet i samme notat skriver, "*at der i dansk skatteret ikke er hjemmel til, at andre end den part, der efter dansk ret skattemæssigt anses som modtager af pengene fra et selskab, kan få godskrevet eller tilbagebetalt kildeskatter på udbytte*", skal dette ses, i sammenhæng med at der her kun er tale om tilfælde af aktielån uden videresalg til tredjemand.

Skatteministeriet lader ingen tvivl om gældende ret, når de udlånte aktier ikke sælges til tredjemand:

*"Det er lånetager, der modtager udbyttet på aktierne. Lånetager vil som regel kompensere långiver for udbyttet vis en såkaldt udbyttekompensation. Overføres bruttoudbyttet fra lånetager til långiver som udbyttekompensation, vil udbyttekompensationen generelt have en så direkte tilknytning til de udloddede udbytte, at udbyttekompensationen beskattes som ud- bytte hos långiver (jf SKM2009.65.SR). Tilsvarende er lånetager ikke skattepligtig af udbyttet, idet lånetager de facto blot modtager udbyttet på långivers vegne. Udlodningen af udbyttet har således som udgangspunkt ingen skattemæssige konsekvenser for lånetager."*

Hvad Skatteministeriet her overser, er det faktum, at låntager slet ikke modtager et bruttoudbytte, som denne kan give videre til långiver. Da låntager kun modtager et nettoudbytte, kan det også kun være dette beløb, som låntager skal give videre til långiver. Refusionen af udbytteskatten må långiver anmode om hos skattemyndig- hederne på baggrund af sit skattemæssige ejerskab af aktierne. Et sådant ejer- skab er relativt problematisk at dokumentere, da der ikke findes noget register for aktieudlån. Det er kun låntager, der kan dokumentere sit civilretlige ejerskab med en udskrift fra sin custodian.

**3.2.2.3.3.3**    Aktieudlån med videresalg til tredjemand

*"Ved lånetagers videresalg til tredjemand anses aktierne ikke for afstået af låne- giver, for så vidt angår avanceopgørelsen. Dette skal ses i sammenhæng med, at det i låneaftalen mellem långiver og lånetager er aftalt, at lånetager skal tilba- gelevere aktierne, idet der fortsat er tale om et lån. Da aktierne imidlertid er en genusvare, er salget så at sige irrelevant for långiver i avancehenseende. Der sker således ikke afståelsesbeskatning af långiver.*

*Med tredjemands erhvervelse af aktierne fra lånetager bliver tredjemand imidler- tid retmæssig ejer af aktierne og dermed også af udbyttet. (jf. SKM2010.266.SR). Udbyttet beskattes så- ledes hos tredjemand. Det er dermed tredjemand der er berettiget til at modtage en eventuel refusion af indeholdt udbytteskat.*

*I de tilfælde hvor lånetager fortsat skal kompensere långiver for udbytte, som lånetager pga. salget til tredjemand ikke har modtaget, kvalificeres udgiften til udbyttekompensation som et tab omfattet af statsskatteloven."*

Som følge af at aktierne er solgt af låntager til tredjemand, er Skatteministeriet af den opfattelse, at långiver ikke længere anses som aktuel aktionær, at kompensationsbetalingen ikke længere er at anse som et udbytte, og at aktielåntager ikke længere er refusionsberettiget. Refusionsberettiget er den tredjemand, der har erhvervet aktierne fra aktielåntager.

**3.2.2.3.3.3**    Bemærkninger til Skatteministeriets opfattelse

Skatteministeriet overser to grundlæggende aspekter:

1    Aktielångiver kan ikke vide, om og hvornår en aktielåntager sælger aktierne, da de ikke nødvendigvis har nogen umiddelbar kontakt med hinanden. Aktielån formidles af mellemmænd, såkaldte "stock loan intermediaries".

2    Aktielångiver modtager kun nettoudbyttet fra aktielåntageren (dette helt i henhold til de internatio- nale standardaftaler om aktielån GMSLA).

At lade aktielångivers retsstilling afhænge af omstændigheder, han ikke kan kende til og ingen indfly- delse har på, vil resultere i retsusikkerhed, der vil ødelægge det danske marked for aktieudlån. Når en

aktielångiver i praksis hverken kan vide, om en aktielåntager sælger aktierne (og i givet fald hvornår), eller om det beløb, han modtager, berettiger ham til refusion eller ej, selvom han kun modtager et beløb svarende til nettoudbyttet, kan hans retsstilling umuligt ændres ved aktielåntagers ensidige dispositioner. Det ville stride imod ethvert retsstatsligt princip.

Skatteministeriets position er i tilfælde af videresalg af aktierne til tredjemand juridisk ikke holdbar. Når retspraksis i henhold til SKM2010.266.SR fastholder, at aktielångiver fortsat er den skattemæssige ejer af aktien, må dette nødvendigvis gælde, uanset om aktielåntager sælger aktierne videre til tredjemand eller ej.

Den tværministerielle arbejdsgruppe oprettet i 2015 under Skatteministeriet lader også til at erkende problemet, idet det såvel i publikationen "SKAT ud af krisen",jf. bilag 4b, som også i statusnotatet af den 26. juni 2016,side 6, jf. bilag 5a, tilkendegives, at der *i Danmark* ikke findes et sæt regler, der sikrer, at det er muligt at identificere de skattemæssigt retmæssige aktieejere.

**3.2.2.3.4 Faglitteraturen om skattemæssig retmæssigt ejerskab ved aktieudlån**

I faglitteraturen har specielt Katja Joo Dyppel beskæftiget sig med konsekvenserne af aktieudlån, jf. bilag 2a, i sin artikel *"Beskatning af aktielån og repo'er"* fra 2013.

Hun fastholder, at aktier, som overføres ved indgåelse af aktielån, generelt ikke anses for afstået i <u>skatteretlig</u> henseende, hvorfor udlånet at aktier ikke medfører afståelsesbeskatning.

Hun konstaterer ligeledes korrekt, at selskaberne udbetaler udbyttet til låntageren af aktierne, såfremt aktierne er overdraget til låntagers værdipapirdepot, eller til tredjemand, hvis aktierne er overdraget til dennes værdipapirdepot. I henhold til standardlåneaftalerne er aktielångiver dog berettiget til eventuelt udloddet udbytte i låneperioden, hvorfor låntager skal kompensere långiver for udbyttet.

For at en betaling kan anses som et udbytte i skatteretlig henseende, er det en betingelse, at betalingen kan anses som en udlodning, og at modtageren heraf er aktionær i det udloddende selskab. Dette følger af ligningslovens § 16 A, hvorefter der ved udbytte forstås *"alt, hvad der af selskabet udloddes til aktuelle aktionærer"*. Afgørende er således, om långiver eller låntager er aktionær på tidspunktet for udlodningen.

Katja Joo Dyppel foretager herefter en grundig analyse af retspraksis, der ser ud, som følger:

I TfS 2001, 146 tog Ligningsrådet stilling til den skatteretlige kvalifikation af udbyt- ter betalt under et aktielån. Herefter skulle det kompenserede udbytte beskattes som almindelig indkomst hos långiver, uanset om låntager fortsat besad aktierne eller havde afstået disse. I det omfang låntager modtog udbytte fra selskabet, skulle dette udbytte udbyttebeskattes. Såfremt det i skatteretlig henseende forudsættes, at de udlånte aktier ikke er afstået til låntager, og långivers aktionærposition således ikke er ophørt, er denne **afgørelse svær at forklare**. Efter ligningslovens § 16 A forudsætter udbyttebeskatningen tilstedeværelsen af en aktionærposition, og tilsvarende gælder i forhold til statsskattelovens § 4 E. Det følger således heraf, at der ikke foreligger et udbytte, medmindre udbetalingerne sker til en aktionær. Det synes rimeligt at forudsætte, at en aktionær i aktieavancebeskatningslovens forstand tillige er aktionær i ligningslovens § 16 A's forstand, og eftersom der ikke foreligger en afståelse/erhvervelse efter aktieavancebeskatningsloven, synes praksis vanskelig at begrunde.

Konsekvensen af Ligningsrådets afgørelse offentliggjort i TfS 2001, 146 fremgår af TfS 2001, 760, hvor der tages stilling til, om kompenseret udbytte fra et aktielån indgår i investeringsforeningers minimumsudlodning. For investeringsforeninger, som udlåner aktier, indgår de udlånte aktier stadig i investeringsforeningens aktiebeholdning, men ifølge Ligningsrådet skulle modtagne refusioner af udbytte

og andet vederlag ikke indgå i minimumsudlodningen. Argumentet var, at der i minimumsudlodningen alene indgår renter, indtjente udbytter efter ligningslovens § 16 A og gevinster på finansielle kontrakter efter kursgevinstlovens §§ 29-33, jf. ligningslovens § 16 A. Eftersom det overdragne udbytte fra låntager til långiver var skattepligtigt som almindelig indkomst, anså Ligningsrådet ikke dette beløb for at kunne omfattes af minimumsudlodningen i ligningslovens § 16 C.

Senere i TfS 2002, 755 tog Ligningsrådet bl.a. stilling til den skatteretlige behandling af låntagers fra-dragsret for betaling af vederlag for udlånet samt kompenserende udbytter til långiver. Med henvis-ning til TfS 2001,146, hvorefter vederlag og kompensation for udbytte kvalificeres hos långiver, uaf-hængig af om aktierne er solgt videre af låntager eller ej, anføres det, at tilsvarende betragtninger gør sig gældende for låntager. I denne forbindelse bemærker Ligningsrådet, at aktiernes **eventuelle videre-salg derfor er irrelevant** for låntagers mulighed for at kunne fradrage vederlag og kompensation for udbytte i den skattepligtige indkomst.

I relation til den skatteretlige behandling af udbytter og kompenserende udbytter på de udlånte aktier ændrede Landsskatteretten af Ligningsrådet afgivne svar i TfS 2002, 755 i en kendelse offentliggjort i TfS 2004, 152. Ifølge Landsskatteretten afhænger den skatteretlige behandling af, hvordan låntager disponerer over de lånte aktier i låneperioden, og der tages stilling hertil i tre scenarier:

1    Låntager har videresolgt aktierne og modtager ikke udbytte, men skal kompensere långiver for udbytte. Det løbende vederlag og det beløb, der betales til långiver som kompensation for udbyttet, har en så-dan direkte forbindelse til aftalen om aktielån, at udgiften skal indgå ved opgørelsen af låntagers ge-vinst eller tab ved salg og køb efter reglerne i statsskattelovens § 4, litra f.

2    Låntager videresælger aktierne og modtager ikke udbytte og har derfor ingen gevinst konstateret, men skal stadig betale et vederlag for at låne aktierne. Udgifterne til vederlaget udgør derfor hans tab ved aftalen, og dette tab er efter statsskattelovens § 4 F ikke fradragsberettiget ved opgørelsen af den skattepligtige indkomst, men alene i eventuelle andre gevinster ved tilsvarende aftaler i samme år.

3    Låntager har ikke videresolgt aktierne, men har modtaget udbytte, som han skal kompensere långiver for. Da låntager ikke er blevet ejer af aktierne i kraft af låneaftale eller på anden måde, er han ikke skat-tepligtig af udbyttet, der tilfalder långiver i henhold til GMSLA'en.

Af Landsskatterettens kendelse kan det udledes, at den skatteretlige behandling af **låntagers** udgift til vederlag og kompenserende udbytte afhænger af, hvordan **låntager** disponerer over aktierne i perio-den. Heraf følger, at, i det omfang låntager alene kompenserer långiver for det udbytte, som låntager selv har modtaget, skal låntager ikke beskattes af det modtagne udbytte, således at udlodningen in-gen skattemæssige konsekvenser har for låntager. Argumentet er, at låntager ikke er blevet ejer af akti-erne og alene oppebærer udbytte på långivers vegne.

I de tilfælde hvor låntager skal kompensere for udbytte, som han ikke har modtaget, hvad enten akti-erne er videresolgt eller ej, kvalificeres udgiften som et tab omfattet af væddemålsbestemmelsen i statsskattelovens § 4 F. Dette betyder, at årets tab alene kan modregnes i årets gevinster på tilsva-rende aftaler.

I TfS 2009, 283 tages bl.a. stilling til, hvordan **långiver** beskattes af kompenserende udbytte. Med hen-visning til Landsskatterettens kendelse anfører Skatterådet, at **betalinger, som modtages for mang-lende udbytte** på udlånte aktier, er skattepligtige som **udbytte** hos långiver, såfremt udbyttet tilfalder långiver.

For at det kompenserende udbytte beskattes som udbytte hos långiver, må det dog være en betin-gelse, at der rent faktisk kompenseres for et udloddet udbytte. Er der således ikke udloddet udbytte, men skal låntager alligevel betale et vederlag, kan dette næppe kvalificeres som et udbytte, da

betingelsen om, at der er foretaget en udlodning i overensstemmelse med ligningslovens § 16 A, ikke er opfyldt. I et sådant tilfælde er indkomsten formentlig skattepligtig efter statsskattelovens § 4.

I Skatterådets afgørelse i TfS 2009, 283 henvises til situation 3 i Landsskatterettens kendelse, som vedrører det tilfælde, hvor låntager ikke har videresolgt aktierne, men har modtaget udbytte, som långiver skal kompenseres for. Der er således ikke taget stilling til beskatning af **långiver**, i den situation hvor låntager har solgt de lånte aktier og fortsat er forpligtet til at kompensere långiver for manglende udbytte.

Katja Joo Dyppel illustrerer situationen, som følger:



Figur 4. Betalingsstrøm ved kompenserende udbytte ved videresalg

Forskelligt fra det tilfælde, hvor låntager ikke sælger de lånte aktier, er, at tredjemand (også) bliver ejer af aktierne, **hvorfor der foreligger dobbelt ejerskab**, såfremt låntagers salg af aktierne ikke bevirker, at långiver anses for at have opgivet sin aktionærposition.

Konsekvensen af at långiver fortsat anses for at være aktionær, kan være, at långiver fortsat udbyttebeskattes efter ligningslovens § 16 A af kompenserende udbytte modtaget af låntager, uanset at låntager kompenserer långiveren for udloddet udbytte, uden at låntager selv har modtaget dette. Samtidig vil tredjemand ligeledes blive udbyttebeskattet af det udloddede udbytte, som denne modtager fra det udloddende selskab, jf. ligningslovens § 16 A. Dette **dobbelte ejerskab** kan således resultere i den uhensigtsmæssige konsekvens, at der opstår en situation, hvor der **udbyttebeskattes et større beløb, end der faktisk udloddes**.

Katja Joo Dyppel anfører i sin artikel fra 2013, at man alternativt kan argumentere for, at selvom långiver ikke anses for at have afstået sine aktier ved indgåelse af aktielånet, resulterer låntagers salg i, at långiver ikke længere er aktuel aktionær af specifikke aktier, men alene har retten til i fremtiden at modtage samme mængde aktier udstedt af samme selskab og med samme rettigheder som de udlånte. Dette resulterer i, at långiver ikke længere anses for aktuel aktionær og således ikke længere kan modtage udbytte efter ligningslovens § 16 A, hvorfor udbyttet i stedet beskattes efter statsskattelovens § 4. Katja Joo Dyppel bekræfter, at det er **uhensigtsmæssigt, at låntagers handling er afgørende for egen og lån- givers beskatning af kompenserende udbytte**. Hun mener dog, at det kan være korrekt, eftersom det synes vanskeligt at se, hvordan långiver fortsat kan anses for at være aktuel aktionær efter ligningslovens § 16 A, når aktierne er solgt til tredjemand.

Katja Joo Dyppels alternative argumentation har følgende konsekvens: Såfremt låntager (af aktierne) skal kompensere långiver for udbytte udloddet i udlånsperioden, afhænger den skatteretlige behandling af, om låntager har (videre)solgt aktierne til tredjemand eller ej. Er aktierne ikke solgt til tredjemand, anses långiver for at være aktuel aktionær og udbyttebeskattes således efter ligningslovens § 16 A, uden at udlodningen har skattemæssige konsekvenser for låntager. Er aktierne derimod solgt til tredjemand, kan långiver efter Katja Joo Dyppels mening formentlig ikke anses som aktuel aktionær,

hvorfor det kompenserende udbytte beskattes efter statsskattelovens § 4, mens låntager alene har fra-drag for det kompenserende udbytte efter væddemålsbestemmelsen i statsskattelovens § 4, litra f.

Ved denne alternative argumentation overser Katja Joo Dyppel, at långiver i **praksis** slet ikke kan vide, hvad låntager gør med aktierne. De fleste aktielån formidles af mellemmænd (stock loan intermedia-ries), der forhindrer enhver direkte kontakt med den oprindelige aktieudlåner og den endelige låntag-er. Stock loan intermediary er den kontraktuelle modpart til aktieudlåneren, og stock loan intermidi-ary kan enten låne aktien direkte ud til en anden klient eller låne aktien ud til en anden stock loan in-termediary. Om og hvornår en aktie sælges videre til en tredjemand, er i praksis fuldkommen uklart for den oprindelige aktieudlåner. I praksis fungerer den alternative model præsenteret af Katja Joo Dyppel derfor ikke.

De praktiske konsekvenser for en aktieudlåner ville være, at han aldrig kan vide, om han stadig er skat-temæssig ejer af aktierne eller ej, hvordan han skal beskattes af kompensationsbetalingen, og om han er refusionsberettiget. Det betyder for aktieudlåneren en så betydelig risiko, at han i praksis aldrig vil være parat til at låne sine aktier ud, da han konstant vil risikere at overtræde skattelovgivningen på grund af handlinger foretaget af en aktielåntager, som han ikke kender.

På et lille nationalt marked hvor aktielångiver og låntager kender hinanden, kan Katja Joo Dyppels al-ternative betragtningsmodel måske fungere. På de internationale aktiemarkeder er denne model dømt til at fejle.

### 3.2.2.4 Konklusion: Short selling har ingen indflydelse på pensionsplanens skattemæssig retmæssige ejerskab

Det er uden betydning for pensionsplanens ret til refusion, om en person, der lånte aktierne af den stock loan intermediary, som pensionsplanen lånte deres aktier til, solgte aktierne igen, idet pensions-planen først lånte aktierne ud efter retserhvervelsestidspunktet for udbyttet. Pensionsplanens skatte-mæssigt retmæssige ejerskab kan derfor ikke berøres af et videresalg til en tredjepart.

Retserhvervelsestidspunktet for udbyttet og dermed for retskravet på refusion er tidspunktet for de-klarering af udbyttet, jf. den juridiske vejledning, afsnit C.B.3.1 (Det skattemæssige udbyttebegreb). Deklarering af udbytte vil sædvanligvis ske på selskabets ordinære eller ekstraordinære generalforsam-ling. Skattemæssigt forstås ved udbytte således alt, hvad der af et selskab udloddes til aktuelle aktio-nærer (jf. ligningslovens § 16 A, stk. 2, nr. 1).

Pensionsplanen købte senest på generalforsamlingsdagen de danske aktier. Den blev den civilretlige og dermed også den skattemæssige ejer af aktierne samme dag, idet aftalen om køb af aktier er tilstræk-kelig til overdragelse af ejendomsretten.

Udbyttet blev af selskabet (VP Securities) udbetalt til den tidligere ejer af aktierne, idet denne stadig var registreret som ejer af aktierne på den såkaldte record day. Selskabet kan med frigørende virkning over for den aktuelle civilretlige og skatteretlige ejer af en aktie udbetale udbyttet, til den der er regi-streret som ejer på record day (jf. værdipapirhandelsloven § 71, stk. 2), selvom denne person ikke (længere) er den retmæssige modtager af udbyttet.

Udbyttet, der er udbetalt til sælgeren, skal debiteres dennes konto og krediteres pensionsplanens konto. Dette sker gennem de involverede custodians, der skal afvikle denne "market claim", som købe-rens krav på overførsel af udbyttet kaldes. Sælger har ingen indflydelse på denne videresendelse af ud-byttet til den berettigede (køberen).

Købte pensionsplanen aktien af en long owner seller, debiteres denne sælger det udbytte, som han modtog på grund af sin registrering på record day fra selskabet. Beløbet krediteres pensionsplanens konto, så snart denne registreres som ny ejer af aktien ved sin custodian. Det er først på det tidspunkt, at it kæden af custodians bliver synligt, hvem den egentlige berettigede til udbyttet var: pensionsplanen, der var ejer af aktien på udbyttedatoen, på trods af at han stadig ikke var registreret som sådan.

Købte pensionsplanen derimod aktien af en short seller – hvilket pensionsplanen ikke kan vide – er det short selleren, der skal kompensere pensionsplanen for det udbytte, der tilfalder pensionsplanen som retmæssig ejer af aktien på udbyttedatoen. Det egentlige udbytte udbetales af selskabet via VP Securities til den aktionær, som short selleren efter udbyttedatoen inddækker sit salg hos på leveringsdatoen (settlement day). Kompensationsbetalingen fra short selleren kan i praksis ikke skelnes fra selve udbyttet, der oprindeligt kom fra selskabet, da begge dele blandes sammen i pengestrømmen, der fører ned gennem de forskellige custodians. Det forholder sig i praksis ikke således, at køberen af en aktie ved, hvem sælgeren er – heller ikke ved OTC-handler. Køberen kan derfor umuligt vide, om den "market claim", der krediteres på hans konto, når aktiekøbet afvikles, og aktierne registreres i hans depot hos hans custodian, i virkeligheden stammer fra en long owner seller eller en short seller.

Hvis pensionsplanen købte af en short seller, var den aktionær, der <u>senere</u> lånte aktien til short selleren for at afvikle handlen, stadig retmæssige ejer af aktien på udbyttetidspunktet. Samtidig blev pensionsplanen ejer af aktien ved købekontrakten med short selleren.

Det på udbyttedatoen erhvervede retmæssige ejerskab af aktien og dermed kravet på udbetaling af udbyttet og refusion mister pensionsplanen civilretligt først, når aktien lånes ud til en tredjemand. Dette udlån foretages mellem generalforsamlingsdatoen og afviklingsdatoen for aktiekøbet. Om pensionsplanen også skatteretligt mistede ejerskabet til aktien og dermed kravet på udbyttet, da aktierne blev lånt ud, er uden betydning for pensionsplanens ret til udbyttet og refusionen, der opstod, inden aktien blev lånt ud.

Pensionsplanen var på det afgørende tidspunkt, generalforsamlingsdagen, der er retserhvervelsestidspunktet, ejer af de danske aktier. Dette, på trods af at pensionsplanen endnu ikke var registreret som ejer hos sin custodian og derfor ikke kunne deltage i selve generalforsamlingen.

Da det kun er registrerede ejere af aktier, der kan deltage i generalforsamlingen, fører det civilretlige dobbelte ejerskab til en aktie, der består mellem købet af en aktie fra en short seller og afviklingen af aktiekøbet, heller ikke til, at der kan afgives flere stemmer ved en generalforsamling, end der er udstedt aktier.

## 4 JURIDISKE FORHOLD VEDRØRENDE UDBYTTESKAT

I det følgende vil vi redegøre for hjemmelen til udbetaling af den i sagen omtvistede refusion af udbytteskatter.

I nærværende sag findes hjemmelen til refusion i kildeskatteloven og den dertilhørende kildeskattebekendtgørelse, samt den relevante dobbeltbeskatningsoverenskomst mellem Danmark og USA.

### 4.1 Udbytteskat indeholdes i henhold til kildeskattelovens regler.

I henhold til kildeskattelovens § 65, stk. 1, skal der som udgangspunkt ved enhver beslutning om udlodning af udbytter fra selskaber hjemmehørende i Danmark indeholdes udbytteskat med en sats på 27 pct.

Ifølge kildeskattelovens § 65, stk. 6, har udbytteskatten med virkning fra indkomståret 2014 været ned-
sat til 22 pct. ved udbytteudlodninger til selskaber og fonde, der er skattepligtige til Danmark efter sel-
skabsskattelovens § 1 eller fondsbeskatningsloven. Forinden var udbytteskattesatsen for disse selska-
ber og fonde nedsat til 25 pct. svarende til den dagældende selskabsskattesats efter selskabsskattelo-
vens § 17, stk. 1.

Det fremgår af kildeskattelovens § 66, stk. 1, at de selskaber, der er underlagt pligt til indeholdelse af
udbytteskatter, i måneden efter vedtagelsen af udbytteudlodningen skal indbetale det indeholdte be-
løb til SKAT senest samtidig med udløbet af betalingsfristen for selskabets indbetaling af indeholdt A-
skat og arbejdsmarkedsbidrag.

Kildeskattelovens § 65, stk. 4 (indtil den 1. januar 2013 § 65, stk. 5), bestemmer, at der ikke skal inde-
holdes kildeskat af udbytter, hvis udbyttemodtageren er hjemmehørende i udlandet og ikke er omfat-
tet af begrænset skattepligt efter bestemmelsen i selskabsskattelovens § 2, stk. 1, litra c.

Udgangspunktet i selskabsskattelovens § 2, stk. 1, litra c, er, at udenlandske modtagere af udbytte fra
Danmark omfattes af begrænset skattepligt. Dette gælder dog navnlig ikke for modtagere af udbytter
på datterselskabsaktier (dvs. ejerskab af mindst 10 pct. af det udloddende selskab) eller koncernsel-
skabsaktier (dvs. hvor den udenlandske ejer er sambeskattet med det danske udbyttebetalende sel-
skab eller kan sambeskattes med dette efter selskabsskattelovens § 31 A), forudsat at den udenlandske
modtager kan påberåbe sig en dobbeltbeskatningsoverenskomst eller EU's moder/datterselskabsdirek-
tiv (Direktiv 2011/96/EU).

### 4.2 Kildeskattebekendtgørelsens regler om fritagelse for indeholdespligt

Skatteministeren har i medfør af kildeskattelovens § 65, stk. 3 (indtil den 1. januar 2013 § 65, stk. 4),
adgang til at fastsætte regler om fritagelse for pligten til indeholdelse af udbytteskatter ved udlodnin-
ger, der ikke er skattepligtige for modtageren. Denne adgang er udnyttet i kildeskattebekendtgørelsens
kapitel 9, der handler om udbytteskatter og royaltyskatter.

Kildeskattebekendtgørelsens § 31 bestemmer, at der bl.a. ikke skal indeholdes udbytteskatter, når
modtageren kan modtage udbyttet skattefrit efter reglerne om skattefrihed for datterselskabs/kon-
cernselskabsaktier i aktieavancebeskatningslovens § 4 A eller § 4 B, selskabsskattelovens § 2, stk. 1,
litra c, selskabsskattelovens § 13, stk. 1, nr. 2, eller fondsbeskatningslovens § 10, stk. 1, medmindre det
udloddende selskab er et investeringsselskab fritaget for dansk skattepligt efter selskabsskattelovens §
13, stk. 1, nr. 19.

### 4.3 Begrænset skattepligt af udbytte

I henhold til selskabsskattelovens § 2, stk. 1, litra c, er udenlandske modtagere af udbytte fra Danmark
som udgangspunkt begrænset skattepligtige til Danmark af udbyttet. Skattesatsen for den begrænsede
skattepligt udgør 27 pct. svarende til den udbytteskat, der ifølge kildeskattelovens § 65, stk. 1, er inde-
holdt ved udbetaling af udbyttet til den udenlandske aktionær.

### 4.4   Bestemmelse af den rigtige procentsats

Der skal således ikke indeholdes den samme skatteprocent i udbytteskat for samtlige aktionærer. Er
aktionærens skattestatus ikke kendt, indeholdes den højeste skatteprocent (27 pct.). Dette betyder
dog ikke absolut, at Skattestyrelsen er på den sikre side mht. at indtage lige så meget udbytteskat, som
der senere hen er retskrav på refusion for. Handler foretaget på udbyttedatoen, der stadig ikke er af-
viklet på record day, vil medføre en risiko for refusionskrav fra aktiekøbere, der ikke kan vide, hvor

meget udbytteskat der blev indbetalt. Deres refusionskrav vil derfor altid rette sig mod de 27 pct. udbytteskat, selv hvis den ultimative sælger ikke var trukket for udbytteskat.

### 4.5    Kompensationsbetalinger

Det må lægges til grund, at der er indeholdt udbytteskat, på det udbytte der blev udloddet af de danske selskaber.

En bestemmelse om indeholdelse af udbytteskat på kompensationsbetalingerne, der betales ind i custody-kæden af short sellere og ikke på nogen måde i kæden kan skelnes, fra udbyttet der stammer fra de danske selskaber, findes ikke. Den i Tyskland i 2006 indførte regel til beskatning af udbyttekompensationsbetalingen fra short selleren mangler til dato i Danmark.

### 4.6    Refusion af udbytteskat

Det fremgår bl.a. af kildeskattelovens § 69 B, stk. 1, at *har nogen*, der er skattepligtige efter kildeskattelovens § 2, eller selskabsskattelovens § 2, *modtaget udbytte*, royalty eller renter, hvori der efter §§ 65-65 D *er indeholdt kildeskat*, som overstiger den endelige skat efter en dobbeltbeskatningsoverenskomst, *tilbagebetales beløbet* inden seks måneder fra told- og skatteforvaltningens modtagelse af anmodning om tilbagebetaling.

Af dobbeltbeskatningsoverenskomsten mellem USA og Danmark fremgår af artikel 10, stk. 3, litra c, at udbytte fra et selskab hjemmehørende i Danmark ikke beskattes i Danmark, såfremt den *retmæssige ejer er en pensionskasse*, som om- talt i artikel 22, stk. 2, litra e, der er hjemmehørende i USA. Det er en forudsætning, at sådant udbytte ikke hidrører fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.

Af dobbeltbeskatningsoverenskomstens artikel 22, stk. 2, litra e, fremgår, at en person, der er hjemmehørende i en kontraherende stat, alene skal være berettiget til alle fordele efter denne overenskomst, hvis denne person er en juridisk person, hvad enten fritaget for beskatning eller ikke, der er organiseret efter lovgivningen i en kontraherende stat med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændigt erhvervsdrivende. Det er en forudsætning, at mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i en af de kontraherende stater.

Hverken Skattestyrelsen eller Skatteankestyrelsen dementerer, at ansøgeren om refusion var en amerikansk 401K-pensionsplan organiseret efter lovgivningen i USA med det formål at yde pension efter en fastsat ordning til arbejdstagere, herunder selvstændigt erhvervsdrivende.

Idet det om anført ovenfor må lægges til grund, at den omhandlede pensionsplan har været såvel civilretlige som skatteretlige ejer af de omhandlede aktier og udbytter, må det derfor lægge til grund, at pensionsplanen opfylder betingelserne for refusion efter kildeskatteloven og den dertilhørende bekendtgørelse. Og der er som anført ikke grundlag for at nægte refusionen med henvisning til utilstrækkelig indeholdelse af udbytteskatten.

**5 DOKUMENTATION FOR SKATTEMÆSSIGT RETSMÆSSIGT EJERSKAB**

Der findes ingen entydig dokumentation for skattemæssig retmæssig ejerskab. Dette er også bekræftet af den tværministerielle arbejdsgruppe (jf. notatet af den 27. juni 2016, side 2, bilag 5a):

> "Ved kortlægning af gældende civilretlige regler er det bl.a. konstateret, at der ikke findes regler, der sikrer, at det er muligt at identificere de konkrete ejere af værdipapirer."

Dette hænger sammen med, at skattemæssig ejerskab ikke registreres nogen steder. Det eneste, der registreres, er civilretlig ejerskab – og det sker ved hver enkelt investor-custodian i henhold til EU's CSD-direktiv og Finality-direktivet.

I det følgende vil den for civilretligt ejerskab foreliggende dokumentation derfor blive gennemgået.

**5.1 Den i praksis foreliggende dokumentation for et skattemæssigt retsmæssigt ejerskab**

**5.1.1 Broker confirmations (handelsnotaer)**

Den endelige og bindende aftale mellem køberen og sælgeren af en aktie, der medfører, at køberen umiddelbart bliver ejer af aktien, bliver for dematerialiserede aktier indgået elektronisk gennem en fondsmægler (broker).

Børsnoterede aktier kan i henhold til kapitalmarkedsloven og den underliggende EU-lovgivning ikke handles uden deltagelse af (autoriserede og kontrollerede) fondsmæglerfirmaer. Af brokere føres købs- og slagsordre sammen ved en elektronisk transaktion kaldet "matching". Ved ejermatching-handler agerer brokeren som sælger af aktien til sin egen kunde. Brokeren køber aktien fra en anden kunde eller en anden broker.

Da selve indgåelsen af aftalen, der overdrager ejerskabet til aktien til køberen, er en rent elektronisk proces, kan dokumentationen heraf kun ske ved (1) undersøgelse af computeren, hvor købs- og slagsordre blev ført sammen, eller ved (2) in- direkte beviser som handelsnotaen (= broker confirmations), der efterfølgende udstedes som fysisk dokumentation for, at en elektronisk kontrakt er indgået.

Det skal hertil bemærkes, at handelsnotaen i sig selv *ikke* er selve kontrakten, der overdrager ejerskabet til aktierne. Eventuelle menneskelige fejl (såsom brug af den forkerte skabelon, der henviser til køb ("BUY") i stedet for salg ("SALE"), eller forkerte datoer, beløb eller lignende trykfejl i en broker confirmation er uden nogen relevans for gyldigheden af selve købekontrakten, der blev indgået ved den elektroniske matching. Officielle statistikker fra USA viser da også, at ca. 10 pct. af alle broker confirmations er fejlbehæftede, jf. præsentation fra konference i USA, jf. præsentation fra ACA's Spring 2015 Compliance Conference, der fremlægges som bilag 84.

Selve kontrakten vedrørende køb af de dematerialiserede aktier er en ren elektronisk sammenføring af købs- og salgsordre. En sådan elektronisk kontrakt har i henhold til EU-lovgivningen (forordning 910/2015) samme retsvirkning og bevisværdi som en fysisk kontrakt udarbejdet i papirform.

MIFID II, der i Danmark er gennemført ved kapitalmarkedsloven, har indført regler for en markedsstruktur, der sikrer, at handel finder sted på regulerede markedspladser. For at opnå en bedre beskyttelse af investorer har MIFID II pålagt alle aktier og andre finansielle instrumenter en handelsforpligtelse på "regulerede handelsfaciliteter" ("trade obligation", artikel 23 i MIFID). Det betyder, at enhver ordre til køb af aktier, der afgives af en kunde til en fondsmægler – der skal have adgang til en reguleret handelsfacilitet – obligatorisk skal føre til en matching, dvs. indgåelsen af en endelig og bindende

aftale om køb af aktier. Fondsmæglere er undergivet en ikke-diskretionær pligt til at gennemføre handelsordrer via en tilfældig, <u>elektronisk computerstyret "matching-procedure"</u>.

Idet såvel aktierne selv som også kontrakten, ved hvilken ejerskabet til aktierne overdrages, udelukkende eksisterer i elektronisk form, forefindes dokumentationen for begge dele kun i elektronisk form. Fysiske beviser for at aktierne findes, og at ejerskabet hertil er overdraget, er ikke mere end dokumenter, der efterfølgende udstedes til bevisbrug.

Handelsnotaen er således et stykke papir, der repræsenterer det faktum, at der er indgået en elektronisk købsaftale.

Handelsnotaen må ikke – som Skattestyrelsen gør det i styrelsens sammenfattende indlæg af den 9. august 2019 – forveksles med den elektroniske instruktion fra handelsplatformen – hvor matching er sket – til clearing-agenten og custodian om at afvikle handlen.

Handelsnotaen udstedes først, når der fra brokeren er givet instruktioner til clearing-agenten om afvikling af den endelige og bindende købekontrakt. Disse instruktioner sætter en afvikling i gang, som ikke kan stoppes igen. Af netop denne grund hæfter clearing-agenten for betalingen og leveringen af aktierne.

De enkelte trin, der gennemføres ved købet af en aktie, kan skitseres, som følger:



**5.1.2 Custody statements og DCA**

På trods af at clearing og afvikling (settlement) af en aktiehandel, der fører til at aktien registreres i kø-berens depot hos dennes custodian, ikke er nødvendig for at blive ejer af en dansk aktie, blev pensions-planens aktiehandler cleared og afviklet, og aktierne registreret i dens depot hos custodian.

Dette dokumenteres ved de fremlagte custody statements. Udskriften fra værdipapirdepotet (custody statement) dokumenterer, at en aktiehandel er blevet cleared, og aktieoverdragelsen afviklet (settle-ment er sket), og at den dematerialiserede aktie befinder sig på køberens depotkonto.

Der findes ingen pligt til at opbevare danske værdipapirer i et depot ved VP Securities eller i en dansk bank. Manglen på en depotudskrift fra et sådant institut er derfor intet indicium for, at investoren ikke ejer en dansk aktie.

Ingen aktionær har krav på at få oplyst af sin custodian, hvor denne har sine underdepotkonti. Sanjay Shah oplyser ikke engang til High Court i London (jf. hans processkrift, der fremlægges som bilag 85, punkt 56.1.4 og 56.1.5) i hvilke banker Solo-gruppen havde sine depotkonti. Manglen på præsentation af en kæde af subcustodians fra aktionærens egen depotkonto til et depot hos VP Securities kan derfor ligeledes ikke være et indicium for, at aktionæren ikke er ejer af en dansk aktie.

Ud over et custody statement modtager ejeren af en aktie også den af SKAT oprindeligt forlangte Divi-dend Credit Advice (DCA). Denne udstedes af custodian, når aktiehandlen er afviklet, og udbyttet er modtaget.

De fremlagte custody statements og DCA dokumenterer således at pensionsplanen ikke blot indgik en endelig og bindende aftale om køb af aktier, men at disse aftaler også blev "gennemført" – som Skatte-styrelsen gerne lægmandsagtigt ønsker at formulere sig. Korrekt ville Skattestyrelsen tale om, at hand-lerne var blevet afviklet eller afregnet.

Om handlerne med aktierne blev afviklet (clearing og settlement) ved en "fysisk" levering af aktierne ved en "de-registrering" hos sælger og en "registrering" hos køber og en dertilhørende transfer af ak-tier mellem sælgers og købers custodian, eller om handlen blev afviklet ved brug af netting (med den konsekvens, at der eventuelt slet ikke sendtes en nettorapport til VP Securities – hvis nettoresultatet er 0), er i denne forbindelse irrelevant.

**5.2 Dokumentation for pensionsplanens skattemæssigt retmæssige ejerskab**

Dokumentation for hvert eneste skridt i gennemførelsen af en komplet udbyttearbitrage transaktion er blevet fremlagt, i det omfang den stadig er til stede. De 12 enkelte skridt kan opsummeres, som følger:

1    Ordre til køb af aktier afgives pr. e-mail til brokeren, som her fremlægges som bilag 86. Samtidig infor-meres clearing-agenten om, at denne ordre er afgivet, og pensionsplanen beder om tilsagn om at af-vikle købet, hvis det matches.
2    Clearing-agenten giver tilsagn til aktiekøbet (hvilket indirekte betyder en garanti for afviklingen og be-talingen af aktierne i clearing-agentens egen- skab af prime broker) – dette tilsagn gives i sig selv elek-tronisk og kan derfor ikke fremlægges i form af et papirdokument, men det bekræftes også via e-mail, jf. bilag 80.
3    Den elektroniske matching af købsordren og derved indgåelsen af en bindende aftale om køb af akti-erne bliver bekræftet af mægleren (broker) pr. e-mail. Selve matchingen er en elektronisk proces, som man ikke kan dokumentere i sig selv, dog bekræfter mægleren handlen pr. e-mail, som er fremlagt som bilag 86. Senere sender brokeren handelsnotaen, som er fremlagt som bilag 11.
4    Faktura fra fondsmægleren (broker) bliver modtaget pr. e-mail. Er frem- lagt som bilag 11.

5     En broker confirmation (handelsnota) bliver modtaget pr. e-mail, jf. bilag 11.
6     Ordre til at sælge aktier gennem en forwardkontrakt bliver afgivet pr. e- mail, jf. bilag 86.
7     Bekræftelse vedrørende forwardkontrakten bliver modtaget pr. e-mail, jf. bilag 80.
8     Ordre vedrørende aktieudlån bliver afgivet pr. e-mail, jf. bilag 86.
9     Bekræftelse af aktieudlån bliver modtaget pr. e-mail, eksempel fremlægges som jf. <u>bilag 80</u>.
10    De enkelte skridt til at sælge aktierne igen svarer til de, der er beskrevet under punkt 1-5 i forbindelse med købet af aktierne.
11    Den åbne forwardkontrakt bliver lukket ved at placere en ordre til at købe en forwardkontrakt (jf. punkt 6 og 7).
12    Aktieudlånet bliver kaldt tilbage pr. e-mail, hvilket også blev bekræftet pr. e-mail (jf. punkt 8 og 9).

Idet selve aftalen om overdragelsen af ejerskab til en aktie indgås rent elektronisk (ved matching af købs- og salgsordre i computersystemerne), er handelsnotaen (broker confirmation), der udstedes, ef- ter handlen er indgået, blot en bekræftelse af, hvad der elektronisk er sket. Skrivefejl i en broker-con- firmation har derfor <u>ingen </u>indflydelse på, om der foreligger en endelig og bindende aftale.

Clearing- og afvikling af aktiehandlen sker ligeledes elektronisk på computersystemer, som kunderne (pensionsplanen) ikke har adgang til. Pensionsplanen har kun adgang til de e-mails, de selv har sendt og modtaget, samt den dokumentation, der efter handlen udstedes som dokumentation: en broker con- firmation (handels- nota), et DCA (Dividend Credit Advice) og et custody statement (kontoudtog over depotkonto). Andre dokumenter kan pensionsplanen ikke have i sin besiddelse som dokumentation for ejerskabet.

Pensionsplanen har fremlagt følgende dokumentation for at eftervise købet og ejerskabet af aktierne, finansieringen af aktiekøbene og modtagelse af udbyttet:

1     Ordre til køb og salg af aktier (e-mails). Når sådanne e-mails matches, sluttes kontrakten til køb eller salg af aktier
2     Broker confirmations = handelsnotaer, der viser, at der er indgået en elektronisk kontrakt om køb eller salg af aktier
3     Dividend Credit Advice: Viser ikke kun ejerskab af aktier, men også modtagelse af et nettoudbytte
4     Custody statements, der viser aktieposterne, aktieudlån og forward hedgen.
5     E-mails vedrørende clearing og afvikling af transaktionerne
6     GMSLA-rammeaftaler samt e-mails, der i hvert enkelt tilfælde konkretiserer betingelserne for det en- kelte aktieudlån. Pensionsplanen har hermed fremlagt "al korrespondance om aktielån". Skattestyrel- sens påstand på side 17 er forkert. Skattestyrelsens opfordring i styrelsens 3. indlæg om at fremlægge al korrespondance er blevet besvaret.

Herudover har pensionsplanen fremlagt dokumentationen i forbindelse med kontoåbningsproceduren hos de forskellige finansielle virksomheder, der var involveret i aktietransaktionerne.

Det er således ikke korrekt, når Skattestyrelsen påstår, at ingen af pensionsplanerne har fremlagt

> *"nogen form for fysisk eller elektronisk dokumentation for de- res tidligere aktie-*
> *besiddelser (som udgjorde grundlaget for deres refusionsanmodninger)"* (indlæg
> af den 9. maj 2019, pkt. 1)

Skattestyrelsen forlanger på den ene side, at Landsskatteretten skal se bort fra de selvsamme doku- menter, som styrelsen på den anden side samtidig påstår, ikke eksisterer. Dokumenterne, som pensi- onsplanen havde i sin besiddelse, og yderligere dokumentation, som den har fremskaffet, eftersom Skattestyrelsen tilsyneladende ikke var tilfreds med den allerede fremlagte dokumentation, er indleve- ret til Skatteankestyrelsen.

I et forsøg på at bringe den fremlagte dokumentation i miskredit påberåber Skattestyrelsen sig, at de virksomheder, der udstedte dokumentationen, var uærlige og udstedte falsk dokumentation. Herved ignorerer Skattestyrelsen komplet, at hverken nogen af de involverede uafhængige virksomheder, revisorer, finanstilsyn eller andre offentlige myndigheder til dato har påstået eller dokumenteret at, nogen af de påberåbte dokumenter i sagen skulle være falske.

Taget i betragtning at elektroniske dokumenter har almindelig bevisværdi, og købekontrakterne, der umiddelbart førte til, at pensionsplanerne blev ejere af de danske aktier, blev indgået *elektronisk* gennem fondsmæglerne, er det denne elektroniske matching, der skal dokumenteres i denne sag. Denne elektroniske matching er pensionsplanen ikke i besiddelse af, da den sker hos fondsmæglerne, dvs. på den handelsplatform hvor mæglerne agerer.

Efter den elektroniske matching, der udgør selve købekontrakten, udstedes diverse dokumenter i fysisk form. Disse kan have skrive- og trykfejl, som dog er uden betydning for gyldigheden af kontrakten, der allerede var sluttet elektronisk.

Umiddelbart efter den elektroniske matching af købs- og salgsordre gives instruktioner videre til clearing og afvikling. Clearing og afvikling af handlen er et yderligere bevis for, at der tidligere var indgået en købskontrakt. Dette yderligere bevis kan pensionsplanen dog ikke levere, da Solo-gruppens computere er blevet beslaglagt.

**KONKLUSION PÅ FØRSTE DEL**

Pensionsplanen blev den skattemæssig retmæssige ejer af aktierne og modtog udbytte fra de danske selskaber, idet disse kompensationsbetalingen fra en short seller må betragtes som udbytte i henhold til den dansk-amerikanske dobbeltbeskatningsoverenskomsts artikel 10, eftersom ingen ejer af en aktie kan skelne mellem aktier købt af short sellere og aktier købt af long ownere.

Ligestilles kompensationsbetalingen ikke med et ægte udbytte fra selskabet selv, vil dette – ud over de rent faktuelle problemer, der opstår, når ingen kan skelne mellem kompensationsbetalingen og udnyttet i kæden af custodians – også medføre, at modtageren af kompensationsbetalingen ikke vil være skattepligtig heraf, idet den så heller ikke vil være omfattet af statsskattelovens § 4. Enhver dansk skattepligtig modtager af et udbytte ville i det tilfælde påberåbe sig at have modtaget en kompensationsbetaling og ikke et ægte udbytte.

Pensionsplanens ejerskab af aktierne er også dokumenteret ved alle de af EU-lovgivningen forlangte dokumenter for ejerskab. Yderligere dokumentation kan ingen fremlægge som bevis for skattemæssigt retmæssigt ejerskab.

**DEL 2: SKATTESTYRELSENS SYNSPUNKTER BEROR PÅ ET UDO- KUMENTERET OG FORKERT GRUNDLAG – IKKE GRUNDLAG FOR TILBAGEKALDELSE**

**6 SKATTTESTYRELSENS MANGLENDE SAGSOPLYSNING**

Det skal i særlig grad fremhæves, at Skattestyrelsen – på linje med alle andre myndigheder – har haft ansvaret for at oplyse sagen tilstrækkeligt, inden Skattestyrelsen traf afgørelse i sagen.

Dette er et helt grundlæggende princip i dansk forvaltningsret. Princippet – benævnt officialprincippet eller officialmaksimen – er ikke lovfæstet, men udtryk for noget så grundlæggende, at det i teorien antages, at det er udtryk for en almindelig retsgrundsætning.

Formålet med officialprincippet er at understøtte, at der træffes materielt lovlige og rigtige afgørelser.

Officialprincippet hører til de såkaldte garantiforskrifter, og hvis en sag er utilstrækkeligt oplyst, kan det betyde, at afgørelsen må tilsidesættes som ugyldig. Det kan også betyde, at sagen må genoptages, så de manglende undersøgelser kan blive foretaget.

I nærværende sag har Skattestyrelsen i vidt omfang forsømt at overholde officialprincippet. Dette er særligt kritisabelt, når henses til den ekstraordinært store sagsgenstand og de meget alvorlige beskyldninger, og den heraf afledte store betydning for pensionsplanerne og disses ejere.

I den forbindelse skal særligt fremhæves den manglende rapport fra den 19. juni 2018 fra Deloitte, der var udarbejdet på anmodning fra Kammeradvokaten v/Boris Frederiksen. I Deloitte-rapporten er fulgt den komplette pengestrøm til Solo Capital-gruppens kapitalkonto hos Barclays Bank, men Skattestyrelsen har imidlertid ikke fremlagt denne rapport i sagen.

Dertil kommer, at Skattestyrelsen ikke har fået kopi fra SØIK af de oplysninger, der er relevante for sagerne, herunder særligt de oplysninger, som er relevante for dokumentation af de omtvistede aktietransaktioner og modtagelsen af udbytte mv.

Skattestyrelsen har endvidere forsømt at indhente relevante oplysninger hos de mange professionelle udenlandske aktører og udenlandske kontrol- og tilsynsmyndigheder.

Skattestyrelsen har tilsyneladende end ikke orienteret sig hos VP Securities om, hvordan værdipapirafviklingen foregår i praksis, herunder hvad der sker med udbyttet, når et aktiekøb ikke er afviklet endnu på record day. Dette er særligt kritisabelt når henses til den helt centrale betydning, som afviklingen af market claim processen har i nærværende sag.

Forsømmelsen af at indhente relevante oplysninger skal ses i lyset af, at SKAT via sine kontrolbeføjelser har reel mulighed for at indhente de af SKAT efterspurgte oplysninger.

I nærværende sag har SKAT imidlertid baseret sin opfattelse på udokumenterede antagelser om pensionsplanernes manglende ejerskab og udlån af de omhandlede aktier. SKAT har således ikke ført noget egentligt bevis for påstanden om manglende ejerskab mv., og påstanden er således aldeles udokumenteret.

Ved afgørelsen af nærværende sag er det meget væsentligt at holde sig for øje, at manglende tilstrækkelig sagsoplysning ikke kan komme pensionsplanerne til skade. Dette gælder særligt, når Skattestyrelsen, der som anført har en række særlige værktøjer til oplysning af sagen, er den nærmeste til at oplyse en række af sagens forhold.

Den manglende sagsoplysning må således i enhver henseende komme Skattestyrelsen til skade.

**7 FREMLAGT OG MANGLENDE DOKUMENTATION**

**7.1 Skattestyrelsens udokumenterede påstand om falsk dokumentation**

Idet Skattestyrelsen meget vel erkender, at de fremlagte dokumenter (aftaler, e- mails, custody statements, DCN'er) tilsammen beviser, at pensionsplanen var ejer af aktierne, modtog nettoudbyttet og havde retskrav på refusion, forsøger Skatte- styrelsen at overbevise Landsskatteretten om at se bort fra denne dokumentation, under påstand om at denne angiveligt skulle være "falsk".

Skattestyrelsen tøver stadig med udtrykkeligt at påberåbe sig dokumentfalsk. Dette, sandsynligvis på baggrund af at ingen af de involverede uafhængige virksomheder, der har udstedt disse dokumenter, er blevet sigtet for dokumentfalsk af hverken de ansvarlige revisorer, finanstilsyn eller anklagemyndigheder. End ikke den omfangsrige dokumentation, der er blevet fremlagt af de hundredevis af stævnede personer for domstolene over hele verden, hvor Skattestyrelsen har startet en stormflod af civile søgsmål, har frembragt nogen form for bevis at der skulle være tale om dokumentfalsk.

Skattestyrelsen forsøger at afkræfte bevisværdien af den fremlagte dokumentation og benægte realiteten i transaktionerne ved at fremhæve trykfejl og andre mangler i de fremlagte papirer. Skattestyrelsen mener, at disse fejl skulle være mistillidsskabende.

Hertil skal indledningsvis bemærkes, at denne sag ikke er en sag om trykfejl i diverse dokumenter. Det er en sag om, hvordan man bliver ejer af en dansk aktie, og om hvorvidt pensionsplanerne har modtaget et nettoudbytte fra deres aktier.

Ved en gennemgang af de omtalte fejl og mangler ses, at der gennemgående er tale om menneskelige trykfejl. Disse fejl er netop udtryk for realiteten i transaktionen og dokumentationen heraf. Havde brokernes og Solo-gruppens eneste opgaver og formål været at fremstille falske dokumenter – og ikke, som det i virkeligheden var tilfældet, at matche købs- og salgsordrer (brokernes virkelige opgave) og cleare og afvikle reelle aktiehandler (Solo-gruppens virkelige opgave) – må det formodes, at så mange selskaber med så mange medarbejdere i det mindste ville have været i stand til at fremstille korrekte "falske" dokumenter uden trykfejl eller andre mangler. Da Solo-gruppen imidlertid koncentrerede sig om clearing, afvikling og opbevaring af aktier, traderne koncentrerede sig om at placere købs- og salgsordrer samt fremskaffe finansieringen ved at finde låntagere til deres aktieposter, og fondsmæglerne koncentrerede sig om at matche købs- og salgsordrer på den alternative markedsplads, var der ingen, der bemærkede de for sølve transaktionerne ubetydelige menneskelige trykfejl i dokumentationen, der blot beviser, hvad aktørerne i virkelighedens verden har gennemført af transaktioner. Rigtige mennesker, der foretager rigtige transaktioner og skal dokumentere dette, laver rigtige fejl. Det er de fejl, som Skattestyrelsen under et stort detektivarbejde har identificeret. En perfekt dokumentation uden de i almindelig aktiehandel normale fejl ville derimod indikere, at materialet var fremstillet til formålet og ikke kunne dokumentere reelle aktietransaktioner.

### 7.1.1 Fejl i dokumentation fra brokere

Skattestyrelsen lader til at forveksle menneskelige fejl – der sker helt uden eller nærmere sagt mod de handlende personers vilje – og svindel, der kræver forsæt. Hvis Skattestyrelsen for alvor er af den opfattelse, at en skrivefejl i dokumentationen over en aktiehandel gør selve handlen ugyldig eller endog svigagtig, er 10 pct. af alle handler i hele verden ugyldige eller svigagtige. En position, som Skattestyrelsen ikke med alvor kan indtage.

Dokumentationen er jo ikke selve handlen, men det lader Skattestyrelsen også i det sammenfattende indlæg i førersagerne af den 9. august 2019, afsnit 8.6, side 70, stadig ikke til at kunne eller ville forstå. Skrivefejl kan ske og sker de facto hver dag, også inden for aktiehandel. Aktiehandlerne i sig selv berøres dog ikke af disse skrivefejl. Aktiehandlerne finder korrekt sted, og da de er bundet ind i et så strengt reguleret system, kan der ikke svindles med aktiehandel. Det har EU aller- senest med MIFID og MIFIR sikret.

Hvis Skattestyrelsen for alvor er af den opfattelse, at menneskelige skrivefejl medfører, at dokumentet, der indeholder en skrivefejl, er fiktivt, svigagtigt eller ikke-eksisterende, så må pensionsplanerne konstatere, at Skattestyrelsen selv må se sig konfronteret med det faktum, at styrelsen i det tilfælde slet ikke har sagsøgt nogen i de civile retssager, da Skattestyrelsen i disse sager konstant fejlagtigt har

betegnet sagsøger som "SKAT". En fejl, som Skattestyrelsens engelske advokat, Pinsent Masons, har indrømmet over for High Court i London.

**7.1.1.1 Forskellige handelsdatoer på broker confirmations og custody statements**

Skattestyrelsen fremhæver i styrelsens sammenfattende indlæg, afsnit 5.4.3, side 36, at der skulle være

> *"flere tilfælde, hvor handelsnotaerne (bilag 11) ikke stemmer overens med oplys-*
> *ningerne i custody statements (bilag 10) og Credit Advices (bilag Q)".*

Heraf følger ganske rigtigt, at custody statements – der i realiteten dokumenterer settlement – ikke passer med handelsnotaerne i bilag 11. Custody statements stemmer dog overens med de clearing-tilsagn, der blev fremlagt som bilag 80.

Bilag 11 var en fejlagtig handelsnota vedlagt regningen fra brokeren Sunrise, som blev modtaget længe efter transaktionerne.

Skattestyrelsen fremhæver yderligere, at pensionsplanerne ikke har fremlagt nogen dokumentation for, hvordan settlement skulle være sket korrekt, til trods for at handelsnotaerne (angiveligt) var fejlbehæftede.

Hertil skal bemærkes, at settlement netop ikke foregår på grundlag af handelsnotaerne. Settlement sker på grundlag af de elektroniske **clearing- og settlementinstruktioner**, som går fra handelsplatformen, hvor købs- og slagsordre matches, til clearing-agenten og custodian. Sådanne elektroniske afviklingsinstruktioner, der går fra en computer til en anden, kan pensionsplanerne uden adgang til disse computere ikke fremlægge.

Kun SØIK kan fremlægge denne dokumentation, da de er i besiddelse af computersystemerne.

Handelsnotaen udstedes først af brokeren (flere uger), efter settlementinstruktionerne er afgivet.

Efter at have konstateret uoverensstemmelser mellem handelsnotaerne – derud- viser menneskelige skrivefejl– og custody statements, analyserer Skattestyrelsen da også i afsnit 5.4.3.1, side 37, datoerne, der er angivet som handelsdato og som settlement-dato i de forskellige bilag, og kommer selv til den helt rigtige konklusion, at

> *"Der er flere forhold, som kunne tyde på, at uoverensstemmelsen mellem custody*
> *statement og handelsnotaen skyldes en fejl begået af brokeren"*

Disse skrivefejl i en broker confirmation gør dog ikke selve aktiehandlen, der sker ved elektronisk matching af købs- og salgsordre, ugyldig.

Betydningen, som pensionsplanerne henviser til, at handelsnotaerne har som dokumentation i sagen, er ikke en betydning, som pensionsplanerne har opfundet, sådan som Skattestyrelsen antyder. Lovgiver har i modsætning til Skattestyrelsen forstået, at når settlement af en handel – hvilket i dansk sprogbrug betegnes som "afvikling" eller "afregning" – ikke er nødvendigt for at blive ejer af en aktie, så må dokumentationen, man kan finde for handlen, findes et andet sted. Dokumentationen må findes for den købekontrakt, der indgås elektronisk ved matching af købs- og salgsordre.

En sådan dokumentation er handelsnotaen. Hvis en sådan handelsnota indeholder fejl, betyder dette dog ikke, at handlen ikke har fundet sted. Handelsnotaen er blot udtryk for det, der er sket elektronisk.

Når uafhængige, autoriserede og kontrollerede fondsmæglere har udstedt disse handelsnotaer, er det udtryk for, at de under deres professionelle ansvar har gennemført en handel.

Det bemærkes hertil, at en handel er gennemført, allerede når købs- og salgsordre er matchet. Skatte-styrelsen tager fejl i styrelsens påstand om, at pensionsplanerne ikke har dokumenteret, at en aftale om køb af aktier er blevet gennemført. Da ejerskabet skifter til køberen, når kontrakten indgås, er kon-traktens indgåelse i sig selv også gennemførelsen.

En broker confirmation er blot dokumentation for, at en elektronisk aftale er indgået. Det er ikke selve aftalen. Der, hvor selve indholdet af aftalen manifesterer sig, er registreringen af det købte antal aktier på depotkontoen hos custodian. Dette vises i custody statements.

Custody statements indeholder de korrekte datoer, og disse bekræftes og understøttes af de handels-e-mails, der er fremlagt i sagerne. Handlen blev indgået ved at matche de ordrer, der fremgår af e-mails.

Handelsdatoen i de fremlagte e-mails passer til handelsdatoen i custody statements og i DCA. Det er udelukkende mægleren, der har begået en fejl i udarbejdelsen af dokumentationen, der var vedlagt hans regninger.

### 7.1.1.2 Handelsnotaer forveksler køb og salg

Den af Skattestyrelsen konstaterede henvisning til et køb af aktier, mens custody statements viser et salg, er ligeledes udtryk for en menneskelig fejltagelse. Pensionsplanen, der tydeligvis koncentrerede sig om at gennemføre aktiehandlerne og verificere, at de bestilte henholdsvis solgte aktier blev ordent-ligt registret på pensionsplanens depotkonto, har ikke bemærket denne skrivefejl i handelsnotaerne modtaget fra pensionsplanens mægler. Pensionsplanens ordre var overensstemmende med registre-ringen på pensionsplanens depotkonto. Ofte modtog pensionsplanen også først handelsnotaerne, flere uger efter en aktietransaktion var gennemført.

Pensionsplanen har som følge af Skattestyrelsens skrivelse været i kontakt med brokeren og kan heref-ter oplyse, at det helt åbenbart var en menneskelig fejl foretaget at den ansatte medarbejder, der skulle udstede handelsnotaen. Medarbejderen brugte den forkerte skabelon, hvor der standardmæs-sigt var anført "BUY", og ikke skabelonen med "SALE".

### 7.1.1.3 Handelsnota angiver pris som "#####"

Også eksemplet på en handelsnota fra brokeren Bastion Capital London Ltd., hvor prisen på salget af 7.884 Mærsk-aktier er angivet som *"#########"* (bilag AA, side 57) er tydeligvis en computerfejl.

Pensionsplanen har som ovenfor anført heller ikke tidligere bemærket denne trykfejl, idet en broker confirmation først modtages, længe efter selve aktietransaktionen er gennemført.

Fejlen er som dokumenteret ved e-mails af den 7 januar og 16. maj 2019 fra Bastion Capital London Ltd., der fremlægges som <u>bilag 88 og 89</u>, også blevet bekræftet af brokeren Bastion Capital London Ltd, idet det anføres, at feltet ikke indeholdt et antal, men kun *"####"*, da feltets størrelse var indstillet med for få tegn til at kunne gengive det korrekte beløb. Bastion Capital London Ltd. har herefter udstedt en korrigeret broker confirmation. Dette er der intet "mystisk" i, selvom Skattestyrelsen gerne vil se en mystik, i alt hvad der foregår i denne sag. Sagens faktum er blot redegjort for og dokumenteret, såle-des som Skattestyrelsen har opfordret til.

Naturligvis har pensionsplanernes repræsentanter anmodet brokeren om at ud- stede en korrekt bro-ker confirmation, nu efter fejlen er opdaget ved Skattestyrelsens detektivarbejde.

At Adrian Mildne udstedte den nye broker confirmation, selvom han i dag ikke længere arbejder for sin brors virksomhed, Bastion Capital London Ltd., har den enkle forklaring, at han stadig har formularen på sin computer, og at det var hans fejl, at formularen var indstillet med for få tegn. Adrian Mildne kunne derfor også så længe efter transaktionerne bekræfte, at feltet simpelthen var forkert indstillet, for han havde jo stadig originalen på sin computer. De reelle, originale transaktioner var registreret i hans computer. Om det nu er Adrian Mildne eller hans bror, Patrick Mildne, der underskriver en formu-lar, der oprindeligt – i original – stammer fra en computer, som Adrian Mildne i det mindste har en kopi af, er for så vidt underordnet. Det svækker på ingen måde troværdigheden af den fremlagte dokumen-tation.

### 7.1.1.4 Handelsnotaer tager ikke højde for helligdage

Skattestyrelsen mener, at handelsnotaerne fejlagtigt ikke skulle have taget højde for helligdage og an-fører hertil, at hverdage skal fastlægges, ud fra markedet i det land hvor aktien handles. Om dette nu er rigtigt eller ej – hvorfor skulle en OTC- handel, der gennemføres af udlændinge ved udenlandske brokere, og som afvikles af udenlandske clearing-agenter og custodians, holde sig til danske hverdage? – er herved ikke af afgørende betydning.

Faktum er, som Skattestyrelsen selv angiver det, at handlen i realiteten blev afviklet T+3 i henhold til den danske helligdagskalender. Handelsnotaen fra Sunrise Brokers var endnu en gang som så ofte fejl-agtig, da den viste T+6. Denne trykfejl betyder dog ikke, at det aftalte ikke blev overholdt. Det aftalte var indholdet i computeren, som SØIK har beslaglagt.

### 7.1.1.5 Fejl i andre handelsnotaer

De af Skattestyrelsen fremhævede fejl i handelsnotaer fra andre sager, der ikke er førersager, bekræf-ter kun pensionsplanernes udsagn om, hvor mange trykfejl der var i de for selve forretningen "udbytte-arbitrage" uvæsentlige bekræftelser af, hvad der var sket i realitetens verden. Den endelige og bin-dende aftale er en elektronisk transaktion, og den var der ingen fejl ved. Dette dokumenteres af de fremlagte custody statements.

Pensionsplanerne var klar over, at de var engagerede sig i udbyttearbitrage, og at de pga. den margi-nale profit, de kan realisere, på hver en aktie de ejer, er nødt til at erhverve enorme aktiemængder. Dette kan naturligvis kun lade sig gøre ved at anvende service providere, der tilbyder de nødvendige tjenesteydelser som en "fabriksvare". Som i enhver anden fabrik betyder stigende produktion også en stigende mængde fejl.

Taget i betragtning, hvor mange transaktioner der er gennemført af pensionsplanerne, og hvor mange enkelte skridt der er nødvendige, for at dette alt sammen falder på plads, er det virkelig bemærkelses-værdige ikke, at der er fejl i den efterfølgende dokumentation, men hvor få der i virkeligheden er.

### 7.1.2 Fejl i dokumentation fra custodian – custody statement og kontoudtog

Skattestyrelsen lader til at misforstå, hvad det er for dokumentation, der er fremlagt ved kontormø-derne med Skatteankestyrelsen.

Skattestyrelsen skriver således i styrelsens 3. indlæg af den 9. maj 2019, pkt. 3.4, at,

> "De fremlagte oversigter over bogføringer (bilag 45-49 samt PowerPoint-præsen-
> tation, s. 134) er ikke kontoudtog, men alene udklip fra udaterede Excel-ark, som
> ikke har noget auto- ritativt præg, og hvis oprindelse ikke er dokumenteret."

Hertil bemærkes, at oversigten er udarbejdet af Schaffelhuber Müller & Kollegen S.à r.l. til brug for kontormøderne til at forklare transaktionerne. Dette blev også oplyst til Skatteankestyrelsen ved kontormøderne.

De fremlagte oversigterne er blot et resumé af begivenhederne, som er udarbejdet at Schaffelhuber Müller & Kollegen S.à r.l. på basis af de optegnelser over handlerne, som pensionsplanerne havde til rådighed. Som Skattestyrelsen burde have bemærket, er der intet sted er angivet, at dette er et konto-udskrift fra custodians computersystemer. I det tilfælde ville oversigterne jo havde angivet den enkelte custodians navn og være udarbejdet på custodians brevpapir.

Oversigterne er udarbejdet som et hjælpeinstrument for Skattestyrelsen og Landsskatteretten/Skatte-ankestyrelsen til at forstå de enkelte trin af en komplet aktietransaktion, der består i så mange enkelte delaspekter. Således giver de mening.

Skattestyrelsen bemærker videre til disse oversigter:

> " Oversigterne over bogføringer (bilag 45-49 og PowerPoint- præsentation, s.
> 134, fra kontormøderne) rummer ikke alle transaktioner for den givne pensions-
> plan for en given periode, men kun uddrag."

Det er ganske rigtigt. Som Skattestyrelsen rigtig bemærker, er der netop tale om et uddrag af bogførin-ger af transaktioner. Uddrag betyder, at ikke alt er taget med. For at lette forståelsen har vi kun medta-get transaktioner vedrørende en enkelt aktie. Ellers ville oversigten blive uoverskuelig og kompliceret. Oversigten var kun udarbejdet som en forklaring af et enkelt eksempel. Oversigten er og skulle ikke være et formelt kontoudtog fra et kontoførende institut.

Skattestyrelsen forstår ikke, hvorfor modtagelsen af refusionen fremgår af oversigterne udarbejdet til Skatteankestyrelsen, men ikke af de fremlagte custody statements. Grunden hertil er relativt enkel: Som forklaret ved kontormøderne viser nogle sider af custody statements aktiekøb og -salg. Andre vi-ser lånetransaktionerne, og andre igen viser forwardtransaktionerne. Custody statements viser såle-des alle transaktioner vedrørende aktiepositionerne. Udbytterefusionen blev naturligvis ikke bogført på aktiekontiene, men derimod på en "cash account". Denne cash account kunne pensionsplanerne løbende se online. Eftersom Skattestyrelsen lægger så stor vægt på ligeledes at se bevægelserne på kontantkontoen, har pensionsplanerne under stor anstrengelse kunnet fremskaffe de her som <u>bilag 90</u> fremlagte kontoudtog over bevægelserne på deres kontantkonto som ført ved deres respektive custo-dian.

Pensionsplanerne har til dato ikke betragtet dokumentation for modtagelse af udbytterefusionen for væsentlig for sagen, idet Skattestyrelsen jo godt ved, hvor meget udbytterefusion SKAT har udbetalt til pensionsplanernes agent på vegne af pensionsplanerne. Det fremgår jo også tydeligt af Skattestyrel-sens egne bilag. Der er heller ingen af pensionsplanerne, der bestrider modtagelsen af udbytterefusio-nen.

Hvis Skattestyrelsen mener, at udbytterefusionen ikke skulle være tilgået pensionsplanerne, så rejses det alvorlige spørgsmål om, hvorfor Skattestyrelsen har stævnet alle pensionsplanerne i USA for tilba-gebetaling og derved forårsaget så enorme omkostninger for de danske skatteborgere.

Den af Skattestyrelsen efterlyste dokumentation for betaling af brokeren, tax agent og custody fee fremgår af de her fremlagte cash account statements.

Den af Skattestyrelsen efterspurgte stock lending fee, der fremgår af oversigten, dækker de samlede omkostninger og renter i forbindelse med aktieudlånet. Der er altså tale om totalsummen af begge posteringer, der af custody agreement frem- står som "stock lending fee" og "interest". At oversigten benytter andre betegnelser end custody statement, er simpelthen fordi disse to ikke er udarbejdet af de samme personer. Oversigten er som sagt et resumé og trækker derfor forskellige poster sammen.

Der er følgelig ikke tale om fejl i de fremlagte custody statements. De uoverensstemmelser, der er konstateret, er opstået ved de forenklinger, som er foretaget i oversigterne, der er udarbejdet af Schaffelhuber Müller & Kollegen S.à r.l., for at forklare transaktionerne på en simpel måde for Skatteankestyrelsen.

Desuden forholder det sig således, at fejlkvotienten i custody statements i henhold til officielle amerikanske statistikker er 9:1, hvilket betyder at 10 pct. af alle dokumenter vedrørende aktietransaktioner er fejlbehæftede. Fejl er således intet udtryk for, at der ikke blev handlet danske aktier, tværtimod.

**7.1.3 Overholdelse af GMSLA**

Skattestyrelsen anfører i det sammenfattende indlæg af den 9. august 2019 i afsnit 3.2.4, side 18, at GMSLA'er ikke skulle være overholdt.

Det anføres i denne forbindelse, at GMSLA'erne skulle forudse en såkaldt "Marking to market" ("MTM") re-evaluering af værdien af aktierne, og denne svarede til den kontante sikkerhedsstillelse, for at sikre at der hverken forelå en over- eller undersikring.

Spørgsmålet om en over- eller undersikring har absolut intet at gøre med spørgs- målet om, hvorvidt pensionsplanerne var ejere af de danske aktier og modtog ud- bytte. GMSLA'erne forudser derfor både i afsnit 5.4.b og i afsnit 5.5.b, at aktielån- tager og aktielångiver kun efter anmodning vil modtage en yderligere betaling af sikkerhed eller en tilbagebetaling af den allerede stillede sikkerhed. Det er derfor ikke relevant, om 5.4 eller 5.5finder anvendelse.

Skattestyrelsen kan dog ud fra de fremlagte custody statements, der er udarbejdet for at vise samtlige årets transaktioner, ikke se hver enkelt bogføring af den daglige MTM. Det årlige kontoudtog viser et sammenfattende beløb i slutningen af året.

Da vi ikke har adgang til computersystemet "TAS", der befinder sig på Solo-gruppens computere, og som foretog disse daglige MTM-beregninger – jf. punkt 56.8.3, side 23, i Sanjay Shahs processkrift – og ikke har daglige udskrifter fra dette system, har vi ved udarbejdelsen af vores støttedokument til forklaring af transaktionerne heller ikke kunnet optage disse enkelte daglige bogføringer. De ville i øvrigt have gjort oversigten totalt uoverskuelig og dermed tilintetgøre hele formålet med et forklarende støttedokument.

Idet disse daglige MTM-reguleringer er uden betydning for ejerskabet, er der ikke foretager nærmere undersøgelser af forholdet omkring MTM.

**7.1.4 Stock lending rate**

Skattestyrelsen anfører i det sammenfattende indlæg af den 9. august 2019 i afsnit 3.2.5, at stock lending rate fastsættes arbitrært, og at den aftale rate ikke anvendes.

Skattestyrelsen tvivler på, at betingelserne for aktielånene forhandles mellem partnerne, blot fordi (1) man i de fremlagte e-mails kan se de samme betingelser, og (2) den aftale rente ikke skulle være over-holdt.

Havde Skattestyrelsen set bedre efter, ville man havde set, at der ikke var fastsat nogen låneperiode (Term: open). Dette medfører, at pensionsplanen og den professionelle mellemmand i aktielån på et-hvert tidspunkt kunne opsige lånet, hvis modparten ikke gik med til ændrede, nye markedsbetingelser. At rentesatsen konstant blev ændret mellem parterne, ses, derved at man ikke kan regne baglæns, så-dan om Skattestyrelsen forsøger i afsnit 4.5, side 28. Det er forkert kun at anvende en enkelt rentesats for hele låneperioden. Da dette er en regelmæssig øvelse, sker det ofte telefonisk. Vi har som bilag 79 fremlagt enkelte eksempler på e-mails sendt i forbindelse med aftalen om en "re-rating".

Den til ethvert tidspunkt aftalte rentesats blev overholdt. Der gjaldt bare ikke konstant den samme rentesats.

Hvad angår det faktum, at der på en given tidspunkt er aftalt samme rentesats i alle aktieudlånene, er dette en naturlig konsekvens af, at (1) alle pensionsplanerne arbejdede med de samme fem mellem-mænd i aktielån (stock loan intermediaries), og disse derfor naturligvis ved indgåelsen af aftalerne an-vendte den på det tids- punkt gældende markedsrente, og (2) at der efterfølgende formfrit blev aftalt andre rentesatser ved en såkaldt "re-rating".

Hvorvidt pensionsplanerne i deres løbende forhandlinger med mellemmændene i aktielån var i stand til at forhandle sig til andre rentesatser, afhang som sagt af det aktuelle marked og pensionsplanernes forhandlingsevne.

### 7.2 Manglende dokumentation

Vi vil i det følgende redegøre for den dokumentation, som Skattestyrelsen hævder mangler i nærvæ-rende sag.

#### 7.2.1   Købekontrakten over aktierne

Pensionsplanerne kan ikke umiddelbart dokumentere selve kontrakten, med hvilken aktierne blev købt, da denne kontrakt er elektronisk. Den sluttes, når købs- og slagsordre matches.

#### 7.2.2   Pengestrøm og kontoudtog

##### 7.2.2.1 Pengestrøm

Skattestyrelsen forlanger af få dokumenteret en pengestrøm til pensionsplanerne. En sådan pengestrøm er ikke nødvendig for at blive ejer af en aktie. Ejerskabet erhverves allerede inden betalingen af aktien.

Da afviklingen af køb (og salg) af aktier foregår efter princippet "delivery versus payment", må betalings-strømmen for aktierne dog nødvendigvis ske fra en kontantkonto hos custodian. Ellers kan custodian jo ikke sikre, at betalingen sker, samtidig med at aktierne leveres til køberens konto.

Da betalingen skal ske fra en kontant konto hos custodian, indbetales den kontante sikkerhedsstillelse under aktieudlånet ligeledes til denne konto hos custodian. Dette sikrer også, at aktielåntager modtager aktierne, på samme tidspunkt som han betaler den kontante sikkerhedsstillelse.